**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

Paul G. Mouttet                                    Case No. 12-14490-LMI
aka Gerry Mouttet,                                 Chapter 7

      Debtor.

_____/

**TALISMAN CAPITAL ALTERNATIVE**
**INVESTMENTS FUND, LTD.**, a British
Virgin Islands international business
company and workout lender; and **EGE**
**LTD.**, a British Virgin Islands international
business company and special purpose
vehicle to own shares of stock,

      Plaintiffs,
vs.                                                ADV. CASE NO. _____

**PAUL GERARD ("GERRY") MOUTTET**,
a U.S. citizen and a citizen of Trinidad, and
a Debtor Pursuant to Chapter 7 of the U.S.
Bankruptcy Code; **SUPREME VENTURES**
**LIMITED, a/k/a SUPREME VENTURES**
**LTD.**, a Jamaican limited liability company;
**PAUL HOO**, a U.S. citizen and a Jamaican
citizen; **IAN LEVY**, a citizen of Jamaica;
**JANETTE STEWART,** a citizen of Jamaica;
**PAUL GEVAIN MOUTTET**, a citizen of Trinidad;
**COLIN A. MOUTTET**, a Florida resident and
a citizen of both Trinidad and Canada; **NICHOLAS**
**MOUTTET**, a Florida resident and a citizen
of Trinidad; **JOHN G. GRAHAM**, a citizen of
Jamaica; **BRIAN GEORGE**, a Trinidad citizen;
**ATLANTIC MARKETING SERVICES**
**LIMITED**, a St. Lucia international business
company; **HAVEN HOLDINGS LTD.**, a St.
Lucia international business company;
**ATLANTIC MARKETING CONSULTANTS**
**LIMITED**, a St. Lucia International business
company; **AMERISERVICES COMPANY INC.,**

1

a St. Lucia international business company; **ST. GEORGES HOLDINGS LIMITED**, a St. Lucia International business company; **PENINSULA GLOBAL INC.**, a St. Lucia International business company; **PINNACLE INTERNATIONAL INVESTMENTS, INC.**, a Florida corporation; **FLYING FISH GLOBAL, LTD.**, a British Virgin Islands international business company; **SGC WORLDWIDE LTD.**, a Bahamas international business company in compulsory liquidation; **SUPREME GAMING LLC**, a Florida limited liability company; **SUPREME GAMING LTD.**, a British Virgin Islands international business company; **SUPREME HOLDINGS MANAGEMENT DELAWARE, LLC**, a Delaware limited liability company; **ROBERT VAZQUEZ**, a Florida resident; **JOSE R. SEVILLA**, a Florida resident; **DAISY MONTESANO**, a Florida resident; **RAFAEL DE LA CRUZ**, a Rhode Island resident; **JANE AND JOHN DOES, NUMBERS 1-25**; and **MOE AND JOE ENTITIES, NUMBERS 1-25**;

       Defendants,

and

**INTRALOT ST. LUCIA LIMITED**, a St. Lucia business entity; **INTRALOT CARIBBEAN VENTURES LIMITED.**, a St. Lucian business entity; **INTRALOT S.A.**, a Greek business entity; **SGLBVI LTD.** a British Virgin Island international business company; **VLT (BVI), LTD.**, a British Virgin Island international business company; and **ADDITIONAL RELIEF DEFENDANTS, NUMBERS 1-25**,

       Relief Defendants.

_____/

## COMPLAINT SEEKING COMPENSATORY, TREBLE, AND PUNITIVE DAMAGES, AND OTHER EQUITABLE RELIEF PURSUANT TO APPLICABLE STATUTES

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

## INDEX TO COMPLAINT

INTRODUCTION TO ENTIRE COMPLAINT .................................................. 3

ALLEGATIONS COMMON TO ALL FEDERAL RICO COUNTS ..................................... 6

    A.    Introduction .......................................................... 6

    B.    Summary of Talisman's Federal RICO Claims............................. 7

        (1)    Summary of the Relief Requested by Talisman ............... 7

        (2)    Summary of the Basis for Talisman's Federal
                RICO Claims.......................................... 10

    C.    Jurisdiction and Venue............................................. 15

    D.    The Parties........................................................ 21

        (1)    Plaintiff Talisman ....................................... 21

        (2)    The Federal RICO Defendants.............................. 22

        (3)    John and Jane Does, and Moe and Joe
                Entities Defendants ...................................... 29

        (4)    Relief Defendants ........................................ 30

    E.    Factual Background of the Federal RICO Defendants'
        Fraudulent Schemes............................................... 31

        (1)    Initial Background ....................................... 31

                (a)    Defendants Obtain a Lottery License
                        in Jamaica ...................................... 31

                (b)    The Lender Makes $30 Million in Loans in 2002 ............... 32

                (c)    The Lender Makes Additional Loans to
                        the Lottery and Gaming Business to Expand
                        in 2003, 2004, and 2005.................................... 37

                      (i)    The 2003 Loan to Allow SVL to
                                Acquire the Jamaican Lottery
                                Company Holdings Limited ...................... 38

i

(ii)    The 2004 Loan to Expand SVL's
Lottery Business into Central
America ................................................................ 39

(iii)    The 2005 Loan to Acquire Prime
Sports .................................................................... 40

(2)    The Federal RICO Defendants Devise and
Implement Their Illegal Scheme to Defraud and
Otherwise Dupe the Lender ........................................... 41

(3)    Lulling Activities of the Federal RICO
Defendants ........................................................................ 52

(a)    Payment of the Proceeds From SVL's
2005 Private Placement ...................................... 52

(b)    Payment of the Proceeds from SVL's
2006 IPO ............................................................. 53

(c)    The Federal RICO Defendants' Plans
to Obtain Lottery and Gaming Licenses
and Expand into Central America and Elsewhere ............. 58

(d)    Meetings in Miami and Elsewhere in 2008 ........................ 64

(e)    Other Actions Taken in Furtherance of the
Illegal Conspiracy and Association(s)-in-Fact.................... 66

(4)    The Sales and Assignments to Talisman  ................................... 69

(5)    Notices of Default(s) ................................................................. 69

(a)    The Loan to Atlantic............................................. 70

(b)    The Loan to SGCW .............................................. 70

COUNT I FEDERAL RICO 18 U.S.C. §1962(c) ......................................... 71

A.    The Enterprise(s) ................................................................71

B.    The Role of Each Federal RICO Defendant in the Illegal
RICO Enterprise(s) ............................................................. 73

C.    The Predicate Acts................................................................ 86

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

(1)   The Wire Fraud:  The $29.5 Million Loan to Atlantic ..................... 87

(2)   The Wire Fraud:  Federal RICO Defendants' Efforts
      to Obtain Lottery and Gaming Licenses and Expand
      into Central America ....................................................................... 91

(3)   The Wire Fraud:  The SGCW Loan in 2007 ................................. 92

(4)   The Wire Fraud: Lulling ................................................................ 97

(5)   The Mail Fraud ............................................................................. 99

(6)   The Money Laundering .............................................................. 100

D.   The Pattern of Racketeering Activity ...................................................... 101

E.   Allegations to Support Request(s) for Injunctive
     and Other Equitable Relief ...................................................................... 105

COUNT II FEDERAL RICO CONSPIRACY 18 U.S.C. §1962(d) ................................ 106

A.   The Conspiracy .......................................................................................... 107

B.   The Purpose of the Conspiracy ................................................................ 109

C.   Allegations to Support Request(s) for Injunctive
     and Other Equitable Relief ...................................................................... 111

ALLEGATIONS COMMON TO THE FLORIDA STATE LAW CLAIMS, ONLY ............ 112

A.   Introduction to the Florida State Law Claims ........................................... 112

B.   Summary of the Separate and Distinct Florida
     State Law Claims Brought by Talisman and EGE ................................... 114

     (1)   Summary of Relief Requested Pursuant to
           the Florida State Law Claims ....................................................... 114

           (a)   Relief Sought by Talisman Pursuant to
                 Florida Law ......................................................................... 114

           (b)   Relief Sought by EGE Pursuant to
                 Florida Law ......................................................................... 117

iii

(2)    Summary of the Basis for the Florida State
Law Claims .................................................................. 119

(a)    Talisman's Florida Law Claims .......................... 119

(b)    EGE's Florida Law Claims ................................ 124

C.    Jurisdiction and Venue for the Florida State Law Claims ...................... 126

D.    The Parties.................................................................................... 127

(1)    The Plaintiffs......................................................................... 127

(2)    The Florida Law Defendants ................................................ 127

(3)    John and Jane Does, and Moe and Joe Entities
Defendants ........................................................................... 128

(4)    Relief Defendants ................................................................. 128

E.    Factual Background of the Florida Law Defendants'
Fraudulent Schemes .............................................................. 130

(1)    Initial Background ................................................................ 130

(a)    Defendants Obtain a Lottery License
in Jamaica ...................................................... 130

(b)    The Lender Makes $30 Million in Loans in 2002 ............. 130

(c)    The Lender Makes Additional Loans to
the Lottery and Gaming Business to Expand
in 2003, 2004, and 2005 .................................. 137

(i)    The 2003 Loan to Allow SVL to Acquire
the Jamaican  Lottery Company Holdings
Limited................................................ 137

(ii)    The 2004 Loan to Expand SVL's Lottery
Business into Central America ............. 137

(iii)    The 2005 Loan to Acquire Prime Sports ............. 137

(2)    The Florida RICO Defendants Devise and
Implement Their Illegal Scheme to Defraud and
Otherwise Dupe the Lender...................................... 137

iv

(3)    Lulling Activities of the Florida RICO Defendants ....................... 137

    (a)    Payment of the Proceeds From SVL's 2005
        Private Placement.............................................................. 137

    (b)    Payment of the Proceeds from SVL's 2006
        IPO ...................................................................................... 137

    (c)    The Florida Law Defendants' Plans to Obtain
        Lottery and Gaming Licenses and Expand
        into Central America and Elsewhere................................ 138

    (d)    Meetings in Miami and Elsewhere in 2008 ...................... 140

    (e)    Other Actions Taken in Furtherance of the
        Illegal Conspiracy and Association(s)-in-Fact.................. 142

(4)    The Sales and Assignments to Talisman ................................... 143

(5)    Talisman's Notices of Default(s)................................................. 143

    (a)    The Loan to Atlantic.......................................................... 143

    (b)    The Loan to SGCW .......................................................... 143

(6)    Florida Law Defendants' Theft of Shares of Stock
    Owned by EGE............................................................................ 144

    (a)    EGE's Stock Acquisitions in 2002.................................... 144

    (b)    EGE's Additional Stock Acquisition and
        Inducements in 2004 ....................................................... 149

    (c)    The June 28, 2005 Supplemental
        Agreement, the 2005 Private Placement
        and the 2006 IPO.............................................................. 152

    (d)    The July 7, 2005 St. Georges Option Agreement ............ 158

    (e)    Other Lulling Activities of the Florida Law
        Defendants ........................................................................ 165

    (f)    The Florida Law Defendants Commit
        Perjury and Intentionally Withhold Documents
        And Information to Further Their Unlawful
        Conspiracy to Steal from and Defraud EGE .................... 166

v

(g)    Allegations Concerning Relief Defendant
Intralot..................................................... 168

(h)    EGE's Formal Demand Letters ......................................... 169

(i)    Demands for Registration of Ownership
In the Books and Records of SVL of the
SVL Shares Owned by EGE ................................ 169

(ii)    Demands for Dividends ......................................... 172

COUNT III FLORIDA RICO CLAIMS ASSERTED BY PLAINTIFF
TALISMAN Fla. Stat. §§772.103(3) and 895.03(3) ...................................... 176

A.    The Enterprise(s) .................................................. 176

B.    The Role of Each Florida Law RICO Defendant in the Illegal
SVL Florida Enterprise and The Mouttet Family Florida
Criminal Enterprise .................................................... 177

C.    The Predicate Acts of Criminal Activity ................................ 179

(1)    The Wire Fraud:  The $29.5 Million Loan to Atlantic................... 179

(2)    The Wire Fraud:  Florida RICO Defendants' Efforts
to Obtain Lottery and Gaming Licenses and Expand
into Central America .................................................. 179

(3)    The Wire Fraud:  The SGCW Loan in 2007................................ 180

(4)    The Wire Fraud: Lulling ........................................... 180

(5)    The Mail Fraud ................................................... 181

(6)    The Money Laundering.............................................. 181

(7)    The Making of False Statements to Obtain Credit...................... 182

(8)    The Florida Communications Fraud ........................................... 185

(9)    The Theft ............................................................. 185

D.    The Pattern of Unlawful Criminal and Racketeering Activity ................. 186

E.    Allegations to Support Request(s) for Injunctive
and Other Equitable Relief ............................................ 188

vi

COUNT IV FLORIDA RICO CONSPIRACY CLAIM ASSERTED BY
PLAINTIFF TALISMAN Fla. Stat. §§772.103(4) and 895.03(4)................................... 190

    Allegations to Support Request(s) for Injunctive
    and Other Equitable Relief ........................................................................ 192

COUNT V FLORIDA RICO CLAIMS ASSERTED BY PLAINTIFF
EGE Fla. Stat. §§772.103(3) and 895.03(3) ................................................. 193

    A.      The Enterprise(s) .......................................................... 193

    B.      The Role of Each Florida Law Defendant in the Unlawful
             SVL Florida Enterprise and The Mouttet Family
             Florida Criminal Enterprise....................................................... 195

    C.      The Predicate Acts of Criminal Activity ................................. 204

             (1)      The Obtaining of EGE's Property by False Statements.............. 204

             (2)      The Florida Communications Fraud ............................................. 207

             (3)      The Theft ................................................................. 211

    D.      The Pattern of Unlawful Criminal and Racketeering Activity ................. 211

    E.      Allegations to Support Request(s) for Injunctive
             and Other Equitable Relief ....................................................... 213

COUNT VI FLORIDA RICO CONSPIRACY CLAIM ASSERTED BY
PLAINTIFF EGE Fla. Stat. §§772.103(4) and 895.03(4)............................................. 214

    Allegations to Support Request(s) for Injunctive
    and Other Equitable Relief ........................................................................ 216

COUNT VII CONVERSION CLAIM ASSERTED BY PLAINTIFF
TALISMAN Fla. Stat. §812.014(1)............................................................... 217

COUNT VIII FLORIDA CIVIL THEFT CLAIM ASSERTED BY
PLAINTIFF TALISMAN Fla. Stat. §772.11 ................................................... 219

COUNT IX CONVERSION CLAIM ASSERTED BY PLAINTIFF EGE
Florida Stat. §812.014(1)........................................................................... 220

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

COUNT X FLORIDA CIVIL THEFT CLAIM ASSERTED BY
PLAINTIFF EGE Fla. Stat. §772.11 .............................................................................. 222

COUNT XI COMMON LAW FRAUD CLAIM ASSERTED BY
PLAINTIFF TALISMAN ................................................................................................ 223

COUNT XII COMMON LAW FRAUD CLAIM ASSERTED BY
PLAINTIFF EGE .......................................................................................................... 225

COUNT XIII CONSPIRACY UNDER FLORIDA COMMON LAW
ASSERTED BY PLAINTIFF TALISMAN ...................................................................... 227

COUNT XIV CONSPIRACY UNDER FLORIDA COMMON LAW
ASSERTED BY PLAINTIFF EGE ................................................................................. 229

COUNT XV FRAUD IN THE INDUCEMENT CLAIM ASSERTED
BY PLAINTIFF TALISMAN .......................................................................................... 231

COUNT XVI FRAUD IN THE INDUCEMENT CLAIM ASSERTED
BY PLAINTIFF EGE ..................................................................................................... 233

COUNT XVII CLAIM FOR CONSTRUCTIVE TRUST ASSERTED
BY PLAINTIFF TALISMAN .......................................................................................... 236

COUNT XVIII CLAIM FOR CONSTRUCTIVE TRUST ASSERTED
BY PLAINTIFF EGE ..................................................................................................... 237

ALLEGATIONS COMMON TO ALL OF THE SECTION 523(a) CLAIMS
OF NON-DISCHARGEABILTY AGAINST DEFENDANT MOUTTET, ONLY .............. 238

    A.    Introduction to the Section 523 Non-Dischargeability
        Claims .................................................................................................. 238

    B.    The Parties to the Section 523 Non-Dischargeability
        Claims .................................................................................................. 238

    C.    Jurisdiction and Venue for the Section 523
        Non-Dischargeability Claims ................................................................ 239

    D.    Factual Background of the Sections 523(a)
        Non-Dischargeability Claims ................................................................ 239

viii

      (1)      Additional Factual Allegations to Support
Talisman's Section 523(a) Claims ............................................... 239

      (2)      Additional Factual Allegations to Support
EGE's Section 523(a) Claims ..................................................... 252

COUNT XIX CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(2) BY PLAINTIFF TALISMAN ......................................... 257

COUNT XX CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(4) BY PLAINTIFF TALISMAN ......................................... 258

COUNT XXI CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(6) BY PLAINTIFF TALISMAN ......................................... 260

COUNT XXII CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(2) BY PLAINTIFF EGE .................................................... 261

COUNT XXIII CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(4) BY PLAINTIFF EGE .................................................... 262

COUNT XXIV CLAIM FOR NON-DISCHARGEABILTY PURSUANT TO
SECTION 523(a)(6) BY PLAINTIFF EGE .................................................... 263

RELIEF REQUESTED BY PLAINTIFFS TALISMAN AND EGE ................................. 263

    A.      Plaintiff Talisman ........................................................................ 263

    B.      Plaintiff EGE ............................................................................... 272

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

Plaintiffs Talisman Capital Alternative Investments Fund, Ltd. ("Talisman"), and EGE Ltd. ("EGE"), by and through their undersigned counsel, hereby file this Complaint against each of the above-named Defendants, and allege, as follows:

## INTRODUCTION TO ENTIRE COMPLAINT

1.     This Complaint alleges a vast intentional scheme and conspiracy to defraud and otherwise steal tens of millions of dollars, collateral, and/or other valuable personal property separately from each of the Plaintiffs, which illegal scheme was devised and masterminded by Defendant Paul Gerard ("Gerry") Mouttet ("Mouttet"), and members of his immediate and extended family (hereinafter, collectively, "The Mouttet Family Criminal Enterprise" and/or "The Mouttet Family Florida Criminal Enterprise"). This Florida-based conspiracy involved numerous and continuous acts perpetrated in this District by, and/or at the behest of Mouttet, who elicited his father, brother, uncle, and other relatives, friends, and business associates in this District to assist him in perpetrating this massive fraud.   In addition, this illicit scheme also involved other persons and entities in other countries, which all acted at the express direction and bidding of Mouttet, who controlled their, and the other members of The Mouttet Family Criminal Enterprise's and The Mouttet Family Florida Criminal Enterprise's actions (as well as the SVL Enterprise and/or the SVL Florida Enterprise, as defined and alleged, below), from Florida, in this District.

2.     To accomplish his separate thefts of tens of millions of dollars of personal property from each Plaintiff, Mouttet used his ownership and control of a gaming and lottery company in Jamaica, Defendant Supreme Ventures Limited, a/k/a Supreme Ventures Ltd. ("SVL"), and other related entities, to separately lure each of the Plaintiffs

3

to enter into a series of separate commercial transactions.  Ultimately, as Plaintiffs now know, beginning in or about 2004 or 2005, Mouttet plotted and conspired with his fellow Directors at SVL, Defendants Paul Hoo ("Hoo"), Ian Levy ("Levy"), Janette Stewart ("Stewart," the widow of SVL's former Chairman, Peter Stewart), and John G. Graham ("Graham"), and other key executives, including Defendant Brian George ("George"), SVL's President and CEO, among others, to, first, withhold, and otherwise misrepresent, crucial information and documents, and, then, ultimately to lie under oath, and withhold other key documents to falsely defend a lawsuit tried in Jamaica on claims other than those alleged in this Complaint, all with the stated purpose to either frustrate, hinder, and/or delay each of the Plaintiffs from exercising their respective, separate and distinct legal rights, or to steal each of the Plaintiff's separate property rights.  These lies and intentional withholding of information and documents only came to be discovered recently, when Mouttet filed Affidavits executed by him and George in other litigation previously pending before this District Court in early October, 2011, and, again, in early January, 2012, and produced certain documents - - disclosed for the first time to any of the Plaintiffs - - in mid-September, 2011.  These revelations showed Mouttet and his co-conspirators for what they really were, namely, a dishonest group of individuals, who had for many years tried to hide the truth from each of the Plaintiffs, but, who, now, were caught in their web of intentional deceit.

3.       At the same time, beginning at least sometime in 2005, and continuing to date, Mouttet orchestrated a scheme to either double-pledge tens of millions of dollars of collateral, securing loans due and owing to Plaintiff Talisman, and/or to illegally transfer and/or pledge other personal property previously sold to Plaintiff EGE, with the

4

express goal of preventing each of the Plaintiffs from recovering their collateral and/or personal property, while at the same time perpetrating a "shell game" to hide the assets, through a myriad of local and international entities, transfers, and the use of straw men, including, without limitation, Hoo and Stewart, when each was a Director of SVL, individually, and/or through various nominee entities; his father Defendant Paul Gevain Mouttet ("P. G. Mouttet"); his uncle Defendant Nicholas Mouttet ("N. Mouttet"), who later became a Director of SVL; and other entities, including Relief Defendants, the Intralot entities (as that term is defined hereinafter, below), and two BVI entities SGLBVI Ltd. and VLT (BVI), Ltd., which BVI entities Mouttet formed for the express purpose of defrauding each of the Plaintiffs.

4.     Acting together, and based on their mutual agreement, Mouttet, and/or his father P. G. Mouttet was/were the mastermind(s) of the criminal enterprises and his uncle N. Mouttet, Hoo, Levy, Stewart, George, and Graham were the main co-conspirators of the theft, fraudulent schemes, and illegal activities that evolved over a period of years.   The Federal RICO Defendants (as that term is defined in Count I hereinafter, below) came together into a cohesive group of individuals and entities which, while apparently conducting some legitimate business endeavors, conspired and implemented an illegal scheme to separately misappropriate tens of millions of dollars, which are now owed to Talisman by the Federal RICO Defendants, as well as tens of millions of personal property owned by, and to be returned separately to EGE.

5.     Mouttet, to this very day, is still hiding behind his nominees and co-conspirators to claim no ownership interests, or even involvement, in the entities that he purposefully used and orchestrated to do his bidding, and to perpetrate his massive

frauds and thefts, while maintaining all along, despite his recent Chapter 7 bankruptcy filing, a "lifestyle of luxury and opulence."  By the following allegations, **each of the Plaintiffs will separately allege** the pertinent underlying facts applicable to each Plaintiff, to allow the ultimate trier of fact to unwind this massive, multiple-year illicit scheme and conspiracy; to find those culpable for hundreds of millions of dollars of damages; and to provide appropriate relief to separately compensate each of the Plaintiffs for their separate and distinct, monumental losses and claims.

<u>ALLEGATIONS COMMON TO ALL FEDERAL RICO COUNTS</u>

A.    <u>Introduction</u>

6.    Talisman, <u>alone</u>, is alleging Federal RICO claims pursuant to 18 U.S.C. §§1962(c) and (d), and this Bankruptcy Court's, as well as the United States District Court for the Southern District of Florida's (the "District Court") Federal subject matter jurisdiction.  EGE is <u>not</u> alleging any such claims.

7.    Both Talisman and EGE are separately alleging certain Florida state law claims, pursuant to this Bankruptcy Court's, as well as the District Court's, diversity jurisdiction under 28 U.S.C. §1332.

8.    In addition to all of the foregoing, pursuant to various subsections of Section 523(a) of the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. §523(a), both Talisman and EGE are separately alleging certain non-dischargeability claims against Mouttet, only, who is currently a Debtor in bankruptcy, pursuant to a voluntary petition, filed on or about February 24, 2012, pursuant to Title 7 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and currently pending under Case No. 12-14490-LMI, in the Bankruptcy Court located in this District.

6

9.      The *first part of this Complaint* sets forth the allegations that give rise to *the Federal RICO claims*, pertaining to the fraudulent conspiracy perpetrated upon Talisman's assignors, and, thus, Talisman, which resulted in an illegal scheme to avoid the full repayment, and to otherwise steal some of the collateral for certain loan(s), with accrued interest, totaling over $48 million in unpaid principal and interest, and to also steal another $13.6 million in loan proceeds, plus accrued interest and associated collateral (totaling another $22 million), previously made by Talisman's assignors, and, thus, currently due and owing to Talisman.   Thereafter, *the second part of this Complaint* sets forth the additional, separate allegations, respecting *Talisman's and EGE's various Florida state law claims*.  Finally, *the third part* of this Complaint sets forth the additional allegations, respecting *Talisman's and EGE's respective objections and/or challenges to the dischargeability* of the debts Mouttet separately owes to each of the Plaintiffs.

**B.      Summary of Talisman's Federal RICO Claims**

**(1)      Summary of the Relief Requested by Talisman**

10.      Pursuant to 18 U.S.C. §§1964(a) and (c), Talisman seeks the following relief:

(a)      Treble damages (approximately $65.1 million, as of April 30, 2012) for the fraudulent conspiracy perpetrated upon Talisman's assignors, and, thus, Talisman, which resulted in an illegal scheme to avoid the repayment of the remaining principal balance due on a $29.5 million loan (of which $21,722,811 in principal remains unpaid), made by Epsilon Global Master Fund L.P. ("Epsilon Global") and Epsilon Global Master Fund II, L.P.

7

("Epsilon Global II"), two of the assignors of Talisman, to Defendant Atlantic Marketing Services Limited ("Atlantic"), pursuant to the Federal RICO Defendants' illegal RICO activities and their unlawful RICO conspiracy;

(b)     Treble damages (approximately $80.1 million, as of April 30, 2012) for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $26,718,044, as of April 30, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 21%);

(c)     Treble damages (approximately $41 million, as of March 27, 2012) for the theft of loan proceeds, totaling $13.6 million, for a short-term loan made by Westford Special Situations Master Fund L.P. ("Westford"), another assignor of Talisman (collectively, Westford, Epsilon Global, and Epsilon Global II shall be referred to as the "Lender"), to Defendant SGC Worldwide Ltd. ("SGCW"), pursuant to the Federal RICO Defendants' illegal RICO activities and their unlawful RICO conspiracy;

(d)     Treble damages (approximately $25,670,001, as of March 27, 2012) for the theft of the gaming and lottery revenues, which Mouttet has admitted were supposed to have been used to repay the $13.6 million short-term loan made to SGCW, as well as other collateral that was to secure said loan, which thefts resulted in unpaid interest accruing and being owed on the SGCW loan in the amount of $8,556,667, as of March 27, 2012 (with

8

interest continuing to accrue and being owed after that date at the annual rate of 15%);

(e) <u>Divestiture to Talisman</u> by Mouttet, his father, P. G. Mouttet, his brother, Defendant Colin Mouttet ("C. Mouttet"), and his uncle, N. Mouttet, of their equity interests and/or beneficial interests in Defendants SVL, Atlantic, Atlantic Marketing Consultants Limited ("Atlantic Consultants"), AmeriServices Company Inc. ("AmeriServices"), Haven Holdings Ltd. ("Haven"), Peninsula Global Inc. ("Peninsula"), Flying Fish Global, Ltd. ("Flying Fish"), Supreme Holdings Management Delaware, LLC ("Supreme Holdings-Delaware), Supreme Gaming LLC ("Supreme Gaming-Florida"), Supreme Gaming Ltd. ("SGL"), and SGCW, and Relief Defendants SGLBVI Ltd. ("SGLBVI"), and VLT (BVI), Ltd. ("VLT(BVI)") to Talisman;

(f) <u>An injunction imposing reasonable restrictions</u> on the Federal RICO Defendants, respecting their future activities, including, without limitation, prohibiting them from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged, below;

(g) <u>The dissolution of Defendants Pinnacle International Investments, Inc. ("Pinnacle") and Supreme Gaming-Florida</u>, each of which is organized and existing under the laws of the State of Florida, and <u>the divestiture</u> of the assets of each entity <u>to Talisman</u>;

(h) <u>Prejudgment and post judgment interest</u>;

(i) <u>Reasonable attorneys' fees</u>;

9

(j)     Costs of this action; and

(k)     Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

**(2)     Summary of the Basis for Talisman's Federal RICO Claims**

11.     The Federal RICO claims involve (a) a vast international scheme, commencing in or about at least mid-2005, and continuing to the present time, perpetrated by the Federal RICO Defendants, and the Jane and John Does and Moe and Joe Entities (as of yet unnamed) to fraudulently conspire against, first, Talisman's assignors, and, then, Talisman, which resulted in an illegal scheme to avoid the full repayment of the substantial principal balance still due and owing on a $29.5 million loan, including the theft of certain collateral securing said loan, made by the Lender to Atlantic, followed by the theft of the entirety of another $13.6 million in loan proceeds, plus accrued interest and the underlying collateral security, separately made by the Lender to SGCW; and (b) the ongoing and continuous scheme to defraud and otherwise cover-up these illegal acts and thefts, in an effort to hinder, delay, and otherwise frustrate the rights and legal claims of Talisman, as assignee of the Lender, as well as the rights of the Lender, under both of these loans.

12.     As more fully alleged below, beginning at least in or about mid-2005, it was the intentional scheme of the Federal RICO Defendants to free themselves of the obligation to repay the then-due and owing principal balance on the $29.5 million loan, by fraudulently inducing the Lender into releasing its guaranteed rights to certain cash and other valuable collateral, ensuring the payment of the unpaid balance due on that $29.5 million loan, **_based upon the Federal RICO Defendants' then-unknown - - to_**

10

*the Lender, and, thus, Talisman - - false representations* concerning supposed external circumstances then requiring the Lender to release its rights to that cash and collateral, as well as the *Federal RICO Defendants' then unknown - - again to the Lender, and thus, Talisman - - false promises* that the Federal RICO Defendants would put in place viable alternative means and concrete sources of repayment, and replacement collateral.  Thereafter, this intentional scheme involved a complex ruse, whereby the Federal RICO Defendants tricked the Lender into lending them an additional $13.6 million by fabricating a web of deceit designed to make the Lender believe it would be repaid, in full, on all loans, by the Federal RICO Defendants, rather than - - as the Lender, and, thus, Talisman, only recently discovered in 2011 and 2012 - -  the dupes in a fraudulent scheme intended to leave the Federal RICO Defendants unjustly enriched by their scheme, and to leave the Lender, and, thus, Talisman, unpaid.

13.    The Federal RICO Defendants employed various methods, including engaging in wire fraud, mail fraud, and money laundering, to cover-up their true intent and illegal activities, and to otherwise lull, first, the Lender, and, then, Talisman, into inaction *until the truth was first discovered in 2011 and 2012*, as well as the extent and magnitude of the Federal RICO Defendants' illegal and fraudulent activities.  Such illegal activities to cover-up their prior fraud and unlawful activities continue to this very day, and are themselves unlawful activities.

14.    *Unbeknownst to Talisman, or the Lender previously*, *and not discovered until 2011/2012*, what began as tens of millions of dollars of funding provided by the Lender for certain business purposes, actually resulted in an illegal

11

enterprise(s) that, first, planned and then ***secretly*** stole and diverted some of the cash and other valuable collateral securing the loan to Atlantic; second, went on to next defraud the Lender to make an additional $13.6 million loan to SGCW; and, third, culminated in the theft of the entirety of the new loan proceeds, and all of the underlying collateral therefor, resulting in over $70 million in unpaid principal and accrued interest being owed to the Lender, and, thus, Talisman.  This illegal conspiracy to defraud and steal from the Lender, and, thus, Talisman, was perpetrated by certain of the individual Defendants, namely, Mouttet, Hoo, Levy, Peter Stewart (now deceased, and survived by his spouse, Defendant Janette Stewart)(collectively, "Stewart"), other Directors/Officers of SVL, including George, and Graham, and Mouttet's father, P. G. Mouttet, his brother, C. Mouttet, his uncle, N. Mouttet, and other members of their family (and perhaps others), for their own individual and collective personal use, through a criminal enterprise(s), involving an "association-in-fact," (the "SVL Enterprise" and/or "The Mouttet Family Criminal Enterprise") which engaged in a pattern of racketeering involving acts of mail fraud, wire fraud, money laundering, and obstruction of justice in other legal proceedings, among other illegal acts.

15.     ***It was not until October 5, 2011 that Talisman, and the Lender learned for the first time***, from sworn affidavits and declarations filed by Mouttet in another proceeding previously pending before the District Court (Case No. 10-24577-CIV-GRAHAM/GOODMAN), that the Lender may have been deceived and defrauded, and that the Federal RICO Defendants had entered into one or more ***secret*** agreement(s) with the intended purpose to defraud the Lender, and, thus, Talisman.

12

16.     Thereafter, Talisman, with the Lender's assistance, conducted an investigation into the business and personal affairs of the various Federal RICO Defendants, and others, which investigation included analyzing information that was either obtained, admitted, or denied - - through the obstructionist and delaying tactics of certain of the Federal RICO Defendants - - in other lawsuits, asserting claims based solely on breaches of various contracts, in the United States and abroad, seeking relief on claims and causes of action other than those alleged hereinafter in this Complaint. The result of this investigation, to date, forms the present factual background and bases for the Federal RICO claims alleged hereinafter in this Complaint.

17.     In order to accomplish their illegal scheme and conspiracy to defraud the Lender, and, thus, Talisman, the Federal RICO Defendants utilized a number of bank accounts in Florida, elsewhere in the United States, and overseas, (a) to improperly divert monies that should have been paid to the Lender, to repay the $29.5 million loan to Atlantic, and, subsequently, the entirety of the additional $13.6 million in loan proceeds to SGCW, and, then (b) to re-route the monies to escape further detection by the Lender.  These monies ultimately were funneled into the personal accounts and pockets of Mouttet, and other members of his family, among other persons, by virtue of the collective efforts of the members of The Mouttet Family Criminal Enterprise.

18.     ***Prior to October, 2011, Talisman, and the Lender, believed*** SVL, a Jamaican limited liability company - - which became the sole provider of lottery games and a leading gaming lounge operator in Jamaica - - and its affiliated companies/ businesses (such as Atlantic and the Supreme Gaming entities, described more fully below), formed to conduct online lottery services and other services in Florida and

13

Central America, as well as SGCW, were all engaged in proper business activities conducted to generate revenues and other sources of monies to repay the loans made by the Lender.   Through its investigation, Talisman, as well as the Lender, have now learned that, in many instances, the Defendants, individually and/or through the use of the SVL Enterprise, The Mouttet Family Criminal Enterprise, other entities named as Federal RICO Defendants herein, as well as the Jane and John Does Nos. 1-25 and the Moe and Joe Entities Nos. 1-25, **secretly diverted the funds** earmarked for use by SVL and/or its affiliated Defendants for purposes other than the on-going operations of SVL and its affiliates, and that they improperly and, again, **secretly**, diverted and transferred collateral security for the repayment of the indebtedness due the Lender, and otherwise **double-pledged said collateral** to other lenders in derogation of the Lender's, and, thus, Talisman's rights.

19.     Acting together, and based upon mutual agreement, Mouttet, and/or his father P. G. Mouttet was/were the mastermind(s), and Hoo, Levy, Stewart, George, and Graham - - all Directors or key executives at SVL - - along with his uncle N. Mouttet and his brother C. Mouttet were the main co-conspirators of this theft scheme, which theft scheme evolved over a period of years into a cohesive group of individuals and entities which, while apparently conducting legitimate business endeavors, embarked upon a massive scheme to misappropriate tens of millions of dollars from the Lender, which are now owed to Talisman by the Federal RICO Defendants.

20.     Thereafter, Mouttet, N. Mouttet, C. Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, concealed their thefts and on-going fraud, by causing occasional, partial, substantial payments to be made to the Lender, to lull the Lender,

14

and to cover up the fact that the monies previously loaned, and the collateral security previously pledged, had, in fact, been stolen by Defendants, and to otherwise dissuade Talisman, and, previously, the Lender, from exercising their respective rights to declare a default under the various loans.

## C.   <u>Jurisdiction and Venue</u>

21.   This Bankruptcy Court has subject matter jurisdiction over the Federal RICO claims against Mouttet, a Chapter 7 Debtor before this Bankruptcy Court, and possibly over affiliated entities of said Defendant/Debtor, as alleged in this Complaint[1/], pursuant to Section 1964 of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964, and 28 U.S.C. §§157(a), (b)(1), (c)(1), and (d), 1331, and 1334(a) and (b).   The District Court has subject matter jurisdiction over all of the foregoing pursuant to Section 1964 of the RICO Act, 18 U.S.C. §1964, and 28 U.S.C. §§157(a), (b)(1), (c)(1), and (d), 1331, and 1334(a) and (b).

22.   Venue is proper in this District pursuant to 18 U.S.C. §1965, and 28 U.S.C. §1391, because many of the acts and conduct alleged herein occurred in this District, to-wit:

---

[1/]      As explained more fully in the **accompanying Motion to Withdraw the Reference of this entire action and to transfer same to the District Court**, while this Bankruptcy Court arguably may have subject matter jurisdiction over the Federal RICO claims asserted against various entities which are alter egos of Mouttet, the Bankruptcy Court does <u>not</u> have subject matter jurisdiction over the other non-debtor defendants. This Complaint was required to be filed in the Bankruptcy Court, initially, so as to not violate the automatic stay provisions of Section 362 of the Bankruptcy Code, to seek damages and other appropriate in one pleading, alleging common cores of operative facts separately harming and damaging each Plaintiff, against all named Defendants who were part of the overall illegal conspiracy, and otherwise furthered the illicit schemes to separately deceive and steal from each Plaintiff.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

a.      At all relevant times alleged in this Complaint, the Lender maintained a business office then-located in Boca Raton, Florida ("Boca Raton"), in this District, and/or the Decision Maker for the Lender (as that term is defined, below) was based in Florida in this District;[2/]

b.      Both before the start of their illegal conspiracy and fraud scheme, and during their illicit scheme, the Federal RICO Defendants continuously and systematically contacted the Lender by means of emails, wires, and telephone at said business office, then-located in Boca Raton, and/or directed to the decision maker of the Lender who was based in this District;

c.      The final acts required to complete the loan transactions at issue were either performed and/or occurred at a business office of the Lender, then-located in Boca Raton, and/or the signed loan documentation was either sent by the Federal RICO Defendants to the Lender in Florida, in this District, or were executed by the Decision Maker for the Lender while he was based in this District;

d.      Some of the Defendants either reside in this District or own residential property in this District, including Hoo (who is also a U.S. citizen); Mouttet (who also is a U.S. citizen), and various involved members of his family, including C. Mouttet, his brother; and N. Mouttet, his uncle; as well as

---

[2/]    All further references in this Complaint to the business office of the Lender then-located in Boca Raton, the Lender in Florida, as well as the location of the Decision Maker for the Lender will involve events, acts, and transactions that occurred in this District, unless specifically stated otherwise.

16

Defendants Robert Vazquez ("Vazquez"); Jose R. Sevilla ("Sevilla"); and Daisy Montesano ("Montesano");

e.   During most, if not all, of the relevant times alleged in this Complaint, Mouttet was present in this District when he negotiated, discussed, and/or executed the documentation for each of the loan transactions;[3/]

f.   Atlantic maintained a bank account in its corporate name at Terrabank, N.A. ("Terrabank") in Miami-Dade County, in this District,[4/] from which monies were used to repay the Lender amounts against the loan obligations which Atlantic owed to the Lender;

g.   SVL and Mouttet wired millions of dollars to Atlantic's bank account maintained at Terrabank;

h.   AmeriServices also maintained a bank account in its corporate name at Terrabank, from which monies were repaid to the Lender toward loan obligations by AmeriServices and Atlantic.   The account address for AmeriServices provided by said Defendant to Terrabank was then Mouttet's home address in Miami-Dade County, in this District;[5/]

i.   SVL, Haven, and Graham all wired monies to AmeriServices' bank account maintained at Terrabank;

---

[3/]   Unless specifically alleged to the contrary, all acts, events, transactions, including telephone calls, meetings, and the sending of emails and facsimile transmissions, by Mouttet are events occurring while Mouttet was in Florida, in this District, unless a different location is specifically alleged.

[4/]   All further references in this Complaint to Terrabank will be to an office of Terrabank located in Miami-Dade County, in this District, unless a different location for the bank is specifically alleged.

[5/]   All further references to Mouttet's home or residence, as well as his moored (docked) yacht, will be references to property owned by Mouttet located in this District.

17

j.    Haven also maintained a bank account at Terrabank.   The account address for Haven provided by said Defendant to Terrabank was then Mouttet's home address;

k.    The Board of Directors of SVL held a meeting, in or about 2002, in Fort Lauderdale, Florida, in this District, to discuss certain of the loan transactions alleged below;

l.    On numerous occasions starting in 2002, Hoo, as Chairman of SVL, and Mouttet (as a Director of SVL until 2007), met with the Decision Maker for the Lender, Steve Stevanovich (hereinafter, the "Decision Maker for the Lender"), at Mouttet's residence, and on Mouttet's moored yacht, concerning many of the transactions and events alleged in this Complaint;

m.    Since approximately the latter half of 2006, Mouttet and his brother C. Mouttet met with the Decision Maker for the Lender, on numerous occasions, at Mouttet's residence, and on Mouttet's moored yacht, concerning many of the transactions and events alleged in this Complaint involving Central America and SGCW;

n.    Sometime believed to be in 2008, Mouttet, his father P. G. Mouttet, his uncle N. Mouttet, and his brother C. Mouttet met with the Decision Maker for the Lender, on at least two occasions at Mouttet's residence, to request extensions of the various maturities of the outstanding loans alleged below, and to request new financing from the Lender;

o.    Mouttet, P. G. Mouttet, C. Mouttet, and N. Mouttet met, in or about late September, 2008, with Amir Emami, a representative of the Lender

18

(hereinafter, the "Representative of the Lender"), at the Miami International Airport ("Miami Airport"), in this District, to discuss a proposed restructuring of the outstanding loans;

p.    Mouttet, individually, and oftentimes together with his brother, C. Mouttet, met numerous times with representatives of the Lender, including, without limitation, the Decision Maker for the Lender, and the Representative of the Lender, in this District, to discuss the various transactions at issue herein, including, without limitation, meetings held in the Lender's business office then-located in Boca Raton, at Mouttet's residence, at Pinnacle's business offices located in Miami, and/or on Mouttet's docked yacht;

q.    Certain of the corporate Defendants - - Pinnacle and Supreme Gaming-Florida - - were formed under the laws of the State of Florida, and maintained their principal place of business in Miami, in this District; and

r.    Mouttet, P. G. Mouttet, C. Mouttet, and N. Mouttet are or were each officers, directors, managers, managing members, and/or registered agents of various entities organized and existing under the laws of the State of Florida, which entities maintained a business address and conducted business in Miami-Dade County, in this District.

In addition, justice requires that any Federal RICO Defendant not residing in this District be brought before the Bankruptcy Court and/or District Court within the meaning of 18 U.S.C. §1965(b).   Moreover, venue is proper in this District pursuant to 28 U.S.C. §1409(a).

19

23.     This Bankruptcy Court has personal jurisdiction over Mouttet, a Chapter 7 Debtor before this Bankruptcy Court, and possibly over affiliated entities of said Defendant/Debtor,[6/] in that each:

a.     Committed the tortious misconduct in the State of Florida;

b.     Caused the injuries within this State, in conjunction with and while contemporaneously engaging in business activities within this State, including the use of bank accounts located within this District, and conducting meetings within this District;

c.     Was part of an overall unlawful conspiracy to steal monies from the Lender, and, thus, Talisman, which illegal conspiracy committed tortious acts in this State and/or caused substantial injuries in this State;

d.     Was engaged in substantial, systematic, and not isolated activity within this State;

e.     Resides and/or owns residential property in this State; and/or

f.     Is required to be brought before this Court in the interest of justice as set forth in 18 U.S.C. §1965(b).

In addition, the District Court has personal jurisdiction over all of the Federal RICO Defendants, based upon the foregoing allegations of this paragraph, above.

24.     In connection with the illegal acts and course of conduct alleged in the Federal RICO claims, the Federal RICO Defendants directly and indirectly used means and instrumentalities of interstate and foreign commerce, including the U.S. mails and wires, as well as domestic and international telephone, each directed to a business

---

[6/]     *See* footnote 1, *supra*.

20

office of the Lender, then-located in this District, and/or directed to the Decision Maker of the Lender based in Florida, in this District, and they have also used the U.S. Federal Reserve and international banking systems to perpetrate their illegal acts and conduct.

25.    Thus, based upon the foregoing allegations, ***this Bankruptcy Court also has Florida long-arm jurisdiction over Mouttet,*** a Chapter 7 Debtor before this Bankruptcy Court, and possibly over affiliated entities of said Defendant/Debtor; and the ***District Court has Florida long-arm jurisdiction over all of said Federal RICO Defendants,*** pursuant to Fla. Stat. §§48.193(1)(a) and (b), among other provisions of Federal and/or Florida law.

**D.    The Parties**

**(1)    Plaintiff Talisman**

26.    **Plaintiff Talisman** is an international business company organized and existing under the laws of the British Virgin Islands; maintains its principal place of business in Vevey, Switzerland; and engages in the business of debt restructuring. Pursuant to certain written agreements with the Lender, to-wit:  Epsilon Global, Epsilon Global II, and Westford - - each an entity organized and existing under the laws of the Cayman Islands, and each located in Montreux, Switzerland, where each entity maintains its principal place of business today - - Talisman has succeeded to, and has been assigned, all of the rights, benefits, and positions as Lender under the various loans made to the Defendants as more fully alleged, below, of which at least $35.3 million in principal was stolen (and/or otherwise remains unpaid and outstanding due to the illegal acts and conspiracy of the Federal RICO Defendants), along with the cash and the underlying valuable collateral security, by the Federal RICO Defendants.

21

**(2)**     **The Federal RICO Defendants**

27.     Defendant **Mouttet** is *sui juris*, and holds dual citizenship in the United States and Trinidad. During the relevant time periods alleged in this Complaint to the present, Mouttet has maintained a residence in Miami-Dade County, in this District. Mouttet, and other members of his family, including P. G. Mouttet, his father, C. Mouttet, his brother, and N. Mouttet, his uncle, currently control SVL, and other entities named as Defendants in this Complaint. By exercising that control, they conducted the illegal conspiracy and controlled the unlawful enterprise(s). Until June 7, 2007, Mouttet was a Director of SVL, and had, in the past, been its Treasurer.

28.     Defendant **SVL** is a limited liability company, organized and existing under the laws of Jamaica, and headquartered in Kingston, Jamaica. SVL is currently the sole provider of lottery games and a leading gaming lounge operator in Jamaica. The publicly disclosed founding shareholders of SVL are Hoo, and Levy, and Peter Stewart (now deceased and survived by his wife, Defendant Janette Stewart), all of whom acted on behalf of P. G. Mouttet (Mouttet's father, and a citizen of Trinidad), and provided P. G. Mouttet with a mechanism and "front" to allow P. G. Mouttet and Mouttet to obtain a gambling license in Jamaica, in large part, for the Mouttet family, and others, as more fully alleged, below. In a meeting in Las Vegas, Nevada, held on or about November 11, 2006, Mouttet expressly represented to the Decision Maker for the Lender that, although the fact of their shareholder interests was not publicly disclosed, he and members of his family then-owned 43.3% of SVL. Other affiliates of SVL, not named as

22

Defendants herein, include Relief Defendant SGLBVI; as well as Supreme Gaming, S.A. (Guatemala), among other entities.

29.   Defendant **Hoo** is *sui juris*, and holds dual citizenship in the United States and Jamaica.  During the relevant time periods alleged in this Complaint to the present, Hoo has maintained a residence in Miami, in this District.[7/]  Hoo has been a member of the Board of Directors of SVL since its inception, has served as its President, its Managing Director, its Secretary, and is currently its Chairman.  Together with Levy and Peter Stewart, Hoo is one of the "Founding Shareholders" of SVL.

30.   Defendant **Levy** is *sui juris*, a citizen of Jamaica, Deputy Chairman of SVL, and one of its Founding Shareholders.

31.   Defendant **Janette Stewart** is *sui juris*, a Jamaican citizen, and is the surviving spouse of Peter Stewart (collectively, **"Stewart"**), one of the Founding Shareholders and Founding Directors of SVL, and its Chairman until his death in 2004. Janette Stewart has also served as a Director of SVL.

32.   Defendant **P. G. Mouttet** is *sui juris*, and has maintained a residence address at various times in Miami-Dade County, in this District.  P. G. Mouttet is also a citizen of Trinidad, the father of Mouttet and C. Mouttet, and has maintained a residence address in Port of Spain, Trinidad.

33.   Defendant **C. Mouttet** is *sui juris*, and resides in Miami-Dade County, Florida, in this District.  C. Mouttet is a citizen of both Trinidad and Canada, and the brother of Mouttet.

---

[7/]    All further references herein to Hoo's residence will be to property located in Miami, in this District, unless a different location is specifically alleged.

23

34.     Defendant **N. Mouttet** is *sui juris*, a citizen of Trinidad, resides in Miami-Dade County, in this District, and is a member of the Board of Directors of SVL.   N. Mouttet is the brother of P. G. Mouttet, and the uncle of Mouttet and C. Mouttet.  Due to the substantial shareholder interest Mouttet and his family had in SVL, in or about mid-2011, N. Mouttet became a Director of SVL to ensure that Mouttet and his family had a family member serving as a Director of SVL.

35.     Defendant **Graham** is *sui juris*, a citizen of Jamaica, a practicing attorney, a member of the Board of Directors of SVL, and its Secretary.

36.     Defendant **George** is *sui juris*, is a citizen of Trinidad, is an authorized agent/representative of SVL, and the President, CEO, and member of the Board of Directors of the Supreme Ventures Group of Companies, an affiliate of SVL.   George has also acted as the President and a Director of SVL.

37.     Defendant **Atlantic** is an international business company, created as a special purpose vehicle ("SPV"), which is organized and existing under the laws of St. Lucia, which maintains its registered office (principal place of business) in Castries, St. Lucia.   As more fully alleged below, Atlantic maintained at least two separate bank accounts in its name at Terrabank, from which Atlantic made periodic payments to the Lender.  Mouttet and C. Mouttet are Directors of Atlantic.  Mouttet has admitted in other litigation, previously pending before the District Court, that he was responsible for the incorporation of Atlantic, has been a Director of Atlantic since its inception (and only resigned as a Director in March, 2012, after he filed his Chapter 7 bankruptcy case), and has held a majority ownership interest in the company.   Mouttet also is the Secretary of Atlantic.  Atlantic was contractually obligated to provide marketing and

24

consulting services to SVL, the proceeds and revenue stream of which were to have repaid the loan made by the Lender to Atlantic.  However, these Defendants, along with Mouttet, Hoo, Levy, Stewart, George, Graham, and others, devised and implemented a scheme to defraud the Lender, and, thus, Talisman, into believing it was necessary, and in the best interests of the Lender, to terminate the then-existing contractual relationship between Atlantic and SVL, when, in reality, all of these Defendants had previously entered into a new *secret* contract with another entity formed by Mouttet, to funnel revenue out of SVL to the detriment of, first, the Lender, and, thus, Talisman, as more fully alleged, below.  Atlantic is a company related to SVL.

38.    Defendant **Haven** is an international business company organized and existing under the laws of St. Lucia, which maintains its registered office (principal place of business) in St. Lucia.  Mouttet has admitted in other litigation previously pending before the District Court that he holds an 83% (and, thus, a majority) ownership interest in Haven, and that Haven holds a majority ownership interest in Atlantic.  Mouttet has also admitted that he was responsible for the incorporation of Haven, and has been a Director of Haven since its inception (and only resigned as a Director in March, 2012, after he filed his Chapter 7 bankruptcy case).  Haven, as well as Atlantic, are each the alter ego of Mouttet, in that Mouttet controls all of the business decisions of Haven, which in turn controls all of the business decisions of Atlantic.  C. Mouttet has also served as a Director of Haven.  Due to its relationships with Atlantic and Mouttet, Haven is/was a related party to SVL.

39.    Defendant **Atlantic Consultants** is an international business company organized and existing under the laws of St. Lucia, which maintains its registered office

25

(principal place of business) in St. Lucia.  Mouttet and C. Mouttet are Directors of Atlantic Consultants.  Atlantic Consultants is the alter ego of Mouttet.  Atlantic Consultants formally changed its name to Atlantic on or about July 19, 2002.  Based on information that *Talisman first learned in or about March, 2012*, and first confirmed under oath by Mouttet on July 27, 2012, it now appears that Atlantic Consultants and Atlantic are one and the same entity, which Mouttet confirmed was true on July 27, 2012.  Due to its relationship with Mouttet, Atlantic Consultants is a related party to SVL.  As part of the overall illegal conspiracy and scheme to defraud the Lender, and, thus, Talisman, *Talisman, and the Lender, first learned on or about October 5, 2011*, that Atlantic Consultants had been *secretly* used, since at least November, 2004, by the Federal RICO Defendants to funnel and divert monies from SVL, for the ultimate personal benefit of Mouttet, members of his family, the SVL Enterprise, and The Mouttet Family Criminal Enterprise,  among others, which monies should have been used to repay the Lender the indebtedness owed by Atlantic.

40.    Defendant **AmeriServices** is an international business company organized and existing under the laws of St. Lucia, which maintains its registered office (principal place of business) in St. Lucia.  Haven owns at least 83% of the outstanding shares of AmeriServices.    AmeriServices is also the alter ego of Mouttet.  AmeriServices maintained a bank account in its name at Terrabank, from which it made payments to the Lender, as more fully alleged below.   AmeriServices and SVL are related parties.

41.    Defendant **Peninsula** is an international business company organized and existing under the laws of St. Lucia, which maintains its registered office (principal place

26

of business) in St. Lucia.  Haven owns 83% of the shares of Peninsula, and each company maintains the same registered office (principal place of business) in St. Lucia. Peninsula is also the alter ego of Mouttet.  Due to its relationships with Mouttet, Peninsula is a related party to SVL.

42.     Defendant **Pinnacle** is a corporation organized and existing under the laws of the State of Florida, which maintains its principal place of business in Miami, in this District.  According to the official records of the Florida Secretary of State, the officer/director and registered agent of Pinnacle is a Paul G. Mouttet.  Mouttet founded Pinnacle and is its President.  Pinnacle is a privately held investment firm with interests in gaming, among other things.  Due to its relationships with Mouttet, Pinnacle is a related party to SVL.  In addition, based on documents first produced by Mouttet in his bankruptcy case, on or about July 2, 2012, Mouttet, his father P. G. Mouttet, and Hoo, each individually owned twenty percent (20%) of Pinnacle as of 2008.

43.     Defendant **Flying Fish** is an international business company organized and existing under the laws of the British Virgin Islands, which maintains its registered office (principal place of business) therein.  Mouttet has admitted in other litigation previously pending before the District Court that members of the Mouttet family are the ultimate shareholders and beneficial owners of Flying Fish.  Mouttet and C. Mouttet control Flying Fish.  Flying Fish is the alter ego of Mouttet.

44.     Defendant **SGCW**, which stands for Supreme Gaming Corporation Worldwide, is an international business company incorporated under the laws of The Bahamas on February 6, 2007, which maintains its registered office (principal place of business) in Nassau, Bahamas.  Flying Fish owns two-thirds (2/3) of the shares of

27

SGCW.  Mouttet was one of the original Directors of SGCW.  C. Mouttet has been a Director of SGCW, and one of its authorized agents/representatives.  SGCW is presently in compulsory liquidation in The Bahamas.

45.    Defendant **Supreme Gaming-Florida** is a limited liability company organized and existing under the laws of the State of Florida, which maintains its principal place of business in Miami, in this District.  Pinnacle is the Manager of Supreme Gaming-Florida, and C. Mouttet is its Vice-President.  Pinnacle and Supreme Gaming-Florida each maintained the same business address in this District.  From time to time, representatives of the Lender met with representatives of the Defendants at the offices of Supreme Gaming-Florida and Pinnacle, in Miami, in this District.  In a meeting in Las Vegas, Nevada, held on or about November 11, 2006, Mouttet expressly represented to the Decision Maker for the Lender, that he and members of his family then-owned 52 to 57%, and SVL owned 8%, of the shares of Supreme Gaming-Florida and/or another entity with the name Supreme Gaming.

46.    Defendant **SGL** is an international business company organized and existing under the laws of the British Virgin Islands, which maintains its registered office (principal place of business) located therein.  It was represented by Mouttet to both the Decision Maker for the Lender and the Representative for the Lender that SGCW would be able to use many of the lottery licenses that were previously acquired by SGL in various countries in Central America.  Other entities related to, and/or affiliates of Supreme Gaming-Florida and/or SGL, and not named as Defendants herein, are, among other entities, Supreme Gaming Limited - - an entity based in Florida, which was to develop gaming and lottery operations for Mouttet and the other Federal RICO

28

Defendants in El Salvador, Guatemala, and Nicaragua - - and Supreme Gaming International LLC, another Florida limited liability company formed by Mouttet and/or at his direction.

47.     Defendant **Supreme Holdings-Delaware** is a limited liability company organized and existing under the laws of the State of Delaware in 2006 by Mouttet, with its principal place of business located in Miami, in this District.  Supreme Holdings-Delaware is 100% owned by Mouttet, and, as more fully alleged, below, was formed as part of the Federal RICO Defendants' illicit conspiracy and in order to defraud the Lender, and, thus Talisman.

48.     Defendant **Vazquez** is *sui juris*, and resides in Miami-Dade County, in this District.  Vazquez is the President and COO of Supreme Gaming-Florida.

49.     Defendant **Sevilla** is *sui juris*, and resides in Miami-Dade County, in this District.  Sevilla was the Chief Financial Officer of Supreme Gaming-Florida.

50.     Defendant **Montesano** is *sui juris*, and resides in Miami-Dade County, in this District.  Montesano was employed by Pinnacle, and acted as Mouttet's assistant.

51.     Defendant **Rafael De La Cruz** ("De La Cruz") is *sui juris*, and resides in Rhode Island. De la Cruz also was the President and a Director of SGCW.

**(3)     John and Jane Does, and Moe and Joe Entities Defendants**

52.     Mouttet and his co-conspirators set up companies with similar sounding names in many jurisdictions.  For this reason and others, Talisman anticipates, as discovery proceeds, naming additional individual and entity defendants that participated in the Federal RICO Defendants' theft and misappropriation of loan proceeds and

29

collateral security, and in the illegal wire fraud, mail fraud, and money laundering activities.

**(4)**   **Relief Defendants**

53.     Relief Defendant **SGLBVI** is an international business company organized and existing under the laws of the British Virgin Islands, with its registered office (principal place of business) located therein.   SGLBVI is a subsidiary of Supreme Gaming-Florida, and was formed by Mouttet, members of his family, and/or The Mouttet Family Criminal Enterprise, for the express purpose of transferring valuable assets *from* one of more of the Supreme Gaming entities, Atlantic, Atlantic Consultants, AmeriServices, Supreme Holdings- Delaware, Flying Fish, and/or SCGW *to* Relief Defendant SGLBVI. Mouttet is the President of SGLBVI.  Mouttet, N. Mouttet, De La Cruz, and Sevilla were all appointed as the First Directors of SGLBVI.   Through Supreme Holdings-Delaware, Mouttet and/or members of his family owned and controlled a majority interest in SGLBVI.   Vazquez and De La Cruz each also owns/owned minority interests in SGLBVI.   SVL has provided millions of dollars of funding to SGLBVI.

54.     Relief Defendant **VLT(BVI)** is an international business company organized and existing under the laws of the British Virgin Islands, with its registered office (principal place of business) located therein.   VLT(BVI) was formed by Mouttet, members of his family, and/or The Mouttet Family Criminal Enterprise, for the express purpose of transferring valuable assets *from* one of more of the Supreme Gaming entities, Atlantic, Atlantic Consultants, AmeriServices, Supreme Holdings-Delaware, Flying Fish, and/or SCGW *to* Relief Defendant VLT(BVI).   Mouttet is the President of

30

VLT(BVI). Mouttet, N. Mouttet, De La Cruz, and Sevilla were all appointed as the First Directors of VLT(BVI). Through Supreme Holdings-Delaware, Mouttet and/or members of his family owned and controlled a majority interest in VLT(BVI). De La Cruz also owns/owned a minority interest in VLT(BVI).

55. Talisman anticipates naming additional individual and entity defendants as **ADDITIONAL RELIEF DEFENDANTS, NUMBERS 1-25** who received from any of the Federal RICO Defendants any of the loan proceeds, collateral security, and/or the fruits and/or proceeds derived therefrom, which were stolen from and/or deprived to the Lender, and, thus, Talisman.

**E.   Factual Background of the Federal RICO Defendants' Fraudulent Schemes**

**(1)   Initial Background**

**(a)   Defendants Obtain a Lottery License in Jamaica**

56. In or about 2002, the Lender was introduced to Mouttet, and it began to discuss a possible business financing transaction with Mouttet, involving gaming and lottery operations in the Caribbean.

57. During these discussions, the Lender was told by Mouttet that he and members of his family, primarily his father, P. G. Mouttet, had spent a number of years and substantial sums of money in efforts to obtain a license to operate a lottery in Jamaica. In addition, Mouttet told the Lender that he and his family members had enlisted the cooperation of three prominent Jamaican citizens, Hoo and Levy, and Peter Stewart, to each be their "public face" or "front men" to apply for and obtain the required lottery and gaming license in the name of SVL in Jamaica, which license was obtained,

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

in or about January, 2001.  Mouttet told the Lender that SVL had the prospect of "making a lot of money" through the profits derived from the lottery license.

58.    During these discussions, the Lender was further told by Mouttet that he, Mouttet, his family members, Hoo, Levy, and Peter Stewart were interested in a "venture capitalist" to provide monies to allow all of them to monetize an early return of their investment in, and future revenue stream from SVL.

**(b)    The Lender Makes $30 Million in Loans in 2002**

59.    As a result of these initial discussions with Mouttet - - many of which, if not all of them, took place while Mouttet was located in this District - - the Lender initially proposed that a $30 million loan be extended to SVL, to be repaid out of the gross proceeds from the operations of SVL.

60.    As these discussions and negotiations evolved, Mouttet requested - - for reasons the Lender first became aware of in 2010, during the trial in Jamaica on issues other those alleged in this Complaint, that due to regulatory restrictions on the issuance of the lottery and gaming license in Jamaica, which prohibited dividend payouts by SVL until its business operations generated the amount of the start-up losses and costs incurred prior to the issuance of the license - - that the Lender restructure the nature of the transaction, and loan a nominal sum to SVL, and the vast majority of the monies to Atlantic, an entity he told the Lender he controlled.  Mouttet told the Lender that Atlantic was a St. Lucia international business company that provided marketing services to SVL, the payments for which could be used to repay any loans made by the Lender.  As alleged more fully, below, the restructuring of the loan transaction specifically requested by Mouttet allowed the Federal RICO Defendants to later exploit and defraud the

32

Lender, while at the same time avoiding the need to directly burden SVL with a massive loan obligation.  The Lender was provided a copy of a signed written agreement between SVL and Atlantic, dated the 30th day of September, 2001.  The written agreement was executed by Mouttet, as a Director of Atlantic (at the same time a Director of SVL), and Hoo and Stewart, as Director and Secretary, respectively, of SVL.

61.    Thus, the Lender (Epsilon Global and Epsilon Global II) agreed to loan a combined $30 million to SVL and Atlantic.  Mouttet, while he was located in Florida, and Hoo, and Levy, as well as Peter Stewart - - each of these four individuals were then Directors of SVL - - negotiated, by use of the telephones and emails directed to a business office of the Lender, then-located in Boca Raton, the terms of this initial loan financing.

62.    At the behest and request of Mouttet (a Director of both SVL and Atlantic), the $30 million in loans consisted of two (2) tranches, one for $500,000 directly to SVL, and another for $29.5 million (divided into two (2) tranches, one in the amount of $17 million, and the second in the amount of $12.5 million) to Atlantic, a related company of SVL, and a company that Mouttet controlled.  All of the loans were originally agreed to mature on August 30, 2005.

63.    Hoo executed the $500,000 SVL loan agreement and promissory note, as SVL's Secretary and Director.  The loan agreement was also executed by Peter Stewart as a Director, and at the time, the Chairman of SVL, and witnessed by Graham.

64.    Graham provided the Lender, by a mailing sent to a business office of the Lender, then-located in Boca Raton, with an opinion letter as counsel for SVL, as borrower's counsel.  This opinion letter affirmatively stated "all acts, conditions and

33

things required by the laws of Jamaica to be carried out, fulfilled and performed" had occurred so as to ensure the obligations of SVL are "valid, legal and enforceable."

65.     Mouttet, as a Director of Atlantic (and at the same time, who was also a Director of SVL), executed the loan agreement, and a William Rapier, as President, and also then a Director, of Atlantic, and related to Mouttet's wife, executed the two (2) promissory notes for the $29.5 million loan to Atlantic.

66.     The final acts required to complete the loan transactions, totaling $30 million, were performed and/or occurred at a business office of the Lender, then-located in Boca Raton.

67.     Pursuant to the email instructions of Mouttet, sent to the Lender's business office then-located in Boca Raton, the $29.5 million in loan proceeds was wired by the Lender, pursuant to instructions emanating from this District, to Atlantic's account located at Terrabank in this District.

68.     Pursuant to the written instructions of SVL, executed by Hoo, as President, and Mouttet, as Treasurer, and sent to the Lender's business office then-located in Boca Raton, the remaining $500,000 was, first, wired by the Lender, pursuant to instructions that originated from this District, to an escrow account of its counsel in Jamaica, and, then, subsequently paid to SVL c/o Hoo and Mouttet in Jamaica.

69.     The Atlantic loan agreement provided that the loan proceeds were to be used for the general corporate needs of the borrower and its shareholders, which, at the time the loan was extended was - - as explained by Mouttet to the Lender - - Haven, an entity controlled by Mouttet and members of his family.  On or about October 24, 2011,

34

Mouttet admitted in other litigation previously pending before the District Court that he either directed, or had the ability to direct, the use of the $29.5 million in loan proceeds.

70.     The Lender knew at the time the $29.5 million loan was made to Atlantic, that Hoo, and Levy, as well as Peter Stewart, would share, receive, and/or be loaned a portion of the proceeds by Atlantic, Haven, and Mouttet, as a result of the efforts of the Founding Shareholders to obtain the lottery and gaming licenses in Jamaica for the Mouttet family.  In exchange for this arrangement, all of these Defendants agreed that the monies generated by the marketing services agreement between Atlantic and SVL would be used to repay all of the indebtedness owed by Atlantic to the Lender.

71.     In Mouttet's recent *July 27, 2012* Bankruptcy Rule 2004 examination under oath, Talisman (and, thus the Lender) *first learned* that members of the Mouttet family also received a substantial portion of the $29.5 million in loan proceeds.

72.     Thus, as part of the collateral for the $29.5 million loan, and as one of the means of repayment of such loan, *Atlantic assigned to the Lender* all of its rights and interests in certain weekly marketing service fees said Defendant was to receive for a minimum of ten (10) years, if not longer, pursuant to its written agreement with SVL, and SVL received formal notice of this assignment by a writing executed by Mouttet (while he was a Director of both SVL and Atlantic) on behalf of Atlantic.  SVL's receipt of this assignment was later expressly confirmed by George, as CEO of SVL, in an Affidavit he executed on October 4, 2011, which was filed the next day in connection with other litigation previously pending before the District Court.

73.     As one of the conditions to the making of the $29.5 million loan, Peninsula, which was owned and controlled by Mouttet, was also obligated to assign,

35

and did assign, the weekly service fees it charged to SVL - - together with the weekly marketing service fees to be paid to Atlantic, as well as those fees to be paid to AmeriServices, alleged hereinafter, these weekly service fees will hereinafter be collectively referred to as the "Service Fees" - - to the Lender.  Such written pledge was executed by Mouttet (again while he was also a Director of SVL) on behalf of Peninsula, and was to remain in place until the $29.5 million loan was fully repaid.

74.    In a letter, dated August 28, 2002, and sent to a business office of the Lender, then-located in Boca Raton, Hoo, on behalf of SVL and as one of its Directors, and Mouttet (also a Director of SVL), on behalf of Atlantic and Peninsula, both acknowledged and agreed to the $29.5 million loan, and recognized the existence of the agreements between Atlantic and SVL, and between Peninsula and SVL, as well as the assignment of all of the Service Fees to be paid under those two agreements to the Lender by both Atlantic and Peninsula.  Hoo and Mouttet also acknowledged that the Lender expected that the debt service on the $29.5 million loan would be met from such Service Fees and from the gross revenue of SVL paid to Atlantic and Peninsula in the form of weekly Service Fees.

75.    SVL agreed to establish a reserve account into which the Service Fees would be paid, and from which Service Fees debt service payments could be withdrawn from time to time by the Lender.  One or more reserve accounts in the name of Atlantic and/or Peninsula were established at Terrabank.

76.    Hoo, and Levy, and Peter Stewart (and later, his wife, Janette), among others, each knew of the existence of Atlantic and Peninsula; that the Service Fees to be paid to each entity were pledged by written agreements in favor of the Lender, and,

36

thus, Talisman; and that Service Fees were later stolen by diverting those funds from SVL out of Jamaica to personally benefit the Mouttet family, and others, as more fully alleged, below.

**(c)**    **The Lender Makes Additional Loans to the Lottery and Gaming Business to Expand in 2003, 2004, and 2005**

77.    At various times during 2003 and 2004, Mouttet, as a Director of, and on behalf of both SVL and Atlantic, among other entities, represented to the Lender - - both in emails and telephone calls directed to the Lender at a business office then-located in Boca Raton - - the prospects for the Federal RICO Defendants to expand their lottery and online gambling businesses in both Jamaica, and Central America.

78.    During this same period of time, Hoo met several times with the Lender, and made similar presentations to the Lender to request financing to expand SVL's lottery and online gaming business in Jamaica.

79.    In order to assist the Federal RICO Defendants in doing so, and thereby assist in generating additional revenues that could be utilized to repay, principally, the $29.5 million loan to Atlantic, the Lender made certain additional, short-term loans to the Defendants, with maturity dates that would occur prior to the maturity date for the $29.5 million loan.

80.    In addition, some of these additional loans were to be used by SVL to acquire ownership of its competitors in Jamaica, and, thus, as a result, the Lender would be in a better position to obtain repayment of its outstanding loans, because SVL's revenues would increase after the acquisitions.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

**(i)    The 2003 Loan to Allow SVL to Acquire the Jamaican Lottery Company Holdings Limited**

81.    Accordingly, in or about September, 2003, Mouttet (when he was a Director of SVL) requested that the Lender provide additional loan funding so that SVL could acquire the Jamaican Lottery Company Holdings Limited ("JLC"), then SVL's only competitor in Jamaica, and suggested that the loan be extended to AmeriServices. Mouttet negotiated this proposed loan transaction while he was located in this District.

82.    As part of the negotiations for the requisite financing to permit SVL's acquisition of JLC, SVL and Atlantic, through Mouttet (as a Director of each entity), represented to the Lender that, in August, 2003, SVL had entered into a written, six-year, financial services agreement with AmeriServices, a St. Lucia international business company formed by Mouttet just a month earlier in July, 2003.  The financial services agreement was executed by Hoo, as a Director, and Graham, as Secretary, of SVL, and by Mouttet (then also a Director of SVL), as a Director of AmeriServices.

83.    Upon information and belief, AmeriServices was owned and controlled by Mouttet and members of his family.

84.    On or about September 14, 2003, the Lender made a short term $8.415 million loan to AmeriServices, which then, through the efforts of Mouttet, loaned the $8.415 million to SVL.  The final acts required to complete this loan transaction occurred and/or were performed at a business office of the Lender, then-located in Boca Raton. This loan was to mature in two years on August 30, 2005.

85.    Based on written requests faxed to the Lender, at its business office then-located in Boca Raton, each executed by Mouttet, as a Director of AmeriServices (and

38

also of SVL), in or about October, 2003, the $8.415 million in loan proceeds were wired by the Lender to AmeriServices' bank account maintained at Terrabank in this District.

86.     The $8.415 million loan transaction was expressly approved by the Board of Directors of SVL.

87.     As a result of this $8.415 million loan, SVL acquired JLC, and became the sole lottery company in Jamaica.

88.     Similar to the prior $30 million in loans extended by the Lender, and at the specific request of SVL, the $8.415 million loan was to be repaid from such Service Fees to be paid by SVL to AmeriServices.  These Service Fees were to be paid, and were, in fact, paid to a reserve account to be established in the name of AmeriServices at Terrabank, from which the Lender was authorized to, and did withdraw payments owed by AmeriServices to the Lender.

89.     In addition, as long as the $8.415 million loan was outstanding, the Services Fees to be paid by SVL to AmeriServices were also to be used to repay the remaining principal owed by Atlantic pursuant to the $29.5 million loan previously made by the Lender.

**(ii)     The 2004 Loan to Expand SVL's Lottery Business into Central America**

90.     In early 2004, Mouttet requested an additional short term $2.27 million loan to Atlantic from another of Talisman's assignors, Westford, as the Lender, for the purpose, among other reasons, of expanding the SVL group's lottery business into Central America.

91.     In addition, in order to induce the Lender into providing this additional $2.27 million loan to Atlantic, Mouttet, as a Director of and on behalf of SVL,

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

represented to the Lender in a writing, dated February 27, 2004, and sent to the Lender at a business office then-located in Boca Raton, that the proceeds from a future equity offering(s) by SVL would be used to repay the outstanding indebtedness of principal and accrued interest on any loans owed to the Lender, which loans then included the $29.5 million loan to Atlantic, the new $2.27 million loan to Atlantic, the $500,000 loan to SVL, and the $8.415 million loan to AmeriServices, even though SVL was not the borrower on any of these loans other the original $500,000 loan.

92.     The $2.27 million loan was negotiated by Mouttet, while he was located in this District.  The loan documents were executed, on or about February 27, 2004, by Mouttet and C. Mouttet, and the final acts required to complete this loan transaction were performed and/or occurred at a business office of the Lender, then-located in Boca Raton.  The loan proceeds were wired by the Lender to Atlantic's account at Terrabank.

93.     Similar to the first $29.5 million loan to Atlantic, Mouttet, as a Director of SVL, represented in writing that the debt owed pursuant to the $2.27 million loan would be repaid from the Service Fees paid by SVL to the three (3) entities controlled by Mouttet, to-wit:  Atlantic, Peninsula, and AmeriServices.

94.     The $2.27 million loan was to mature on August 30, 2005.

**(iii)    The 2005 Loan to Acquire Prime Sports**

95.     Based on numerous representations and promises made by the Federal RICO Defendants, regarding the repayment of the then-outstanding loans, as more fully alleged, below, the Lender was persuaded, and induced, into making another loan in the amount of $3.25 million to SVL, to assist said Defendant in the expansion of its

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

gaming and lottery businesses, and, specifically, its acquisition of an equity interest in Prime Sports (Jamaica) Ltd. ("Prime Sports"), a video gaming lounge operator.

96.    On behalf of, and as Directors of SVL, on or about May 31, 2005, Mouttet and Hoo both executed the promissory note.  The final acts required to complete this loan transaction were performed and/or occurred at a business office of the Lender, then-located in Boca Raton.  Mouttet negotiated the terms of this loan while he was located in this District.

97.    This $3.25 million loan was to mature on September 30, 2005, and was to be repaid from the proceeds of a future private placement of SVL stock in 2005.

**(2)    The Federal RICO Defendants Devise and Implement Their Illegal Scheme to Defraud and Otherwise Dupe the Lender**

98.    Beginning on some unknown date, believed to have occurred sometime in 2004, Mouttet, SVL, Hoo, Levy, and Stewart, individually and collectively, and with the input and knowledge of Graham and George, among others, all became concerned that the revenues generated from the Service Fees would be insufficient to cover the debt service/payments due the Lender under the various outstanding loans, which then totaled some $40 million.  In addition, these Defendants determined that the indebtedness could not be repaid by the respective maturity dates, ending August 30, 2005, and that it would take many more years to repay all the loans.  Accordingly, these Defendants became concerned that the three (3) Founding Shareholders, namely Hoo, Levy, and Stewart (since her husband Peter Stewart had died), and Mouttet, among others, might become individually responsible for, and/or subjected to a demand to repay at least portions of the $29.5 million loan, because of their prior receipt, personally, in 2002, of portions of the $29.5 million in loan proceeds, as previously

41

alleged, above.  To avoid such a result, all of these Defendants, including Graham and George, determined, thinking only of their collective, selfish, and individual best interests *(rather than being honest, and attempting, their best efforts to repay the funds that had made each of them very wealthy)* to devise a plan to ensure that none of Mouttet (or his family members), Hoo, Levy, and Stewart would be individually responsible for the repayment of the substantial indebtedness owed to the Lender. Consequently, all these Defendants devised a fraudulent plan and scheme to ensure that the Lender would be the sole party that would sustain any losses due to any failure to repay of the loans.

99.    As part of this illicit conspiracy to defraud the Lender, and, thus, Talisman, at a yet undetermined date, but believed to have occurred by no later than sometime in or before June, 2005, SVL and Atlantic, with the express knowledge and complicity of Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, *secretly* agreed to, and did, in fact, *terminate the then-existing marketing services agreement between SVL and Atlantic (which was the source and collateral for the outstanding loans), effective June 30, 2005,* and, *replaced that agreement* with a new, *secret* marketing services agreement between SVL and Atlantic Consultants - - an entity to be created and controlled by Mouttet - - effective November 1, 2004.  In order to terminate the then-existing marketing services agreement between SVL and Atlantic, the Federal RICO Defendants needed the acquiescence and consent of the Lender, as the Service Fees to be generated pursuant to that agreement were all pledged and to be paid to the Lender to service the $40 million in indebtedness then due the Lender.

42

100.    In order to deceive and defraud the Lender into providing its consent and acquiescence, the Federal RICO Defendants - - through oral statements of material fact made, in or about June and July, 2005, by Mouttet, Hoo and/or Stewart (when each was a Director of SVL, and when each was acting as a representative of SVL's Board of Directors) to the Representative of the Lender, and in writings executed by the Federal RICO Defendants and provided to the Lender - - further conspired to inform the Lender that:

 a. SVL was generating insufficient cash flows, due, in part, to increased taxes levied by Jamaica on lottery games, and, accordingly, was paying substantially reduced Service Fees, to be used to amortize the outstanding loans;

 b. The Jamaican regulatory authorities were then requiring SVL to maintain certain liquidity levels and ratios in order to retain its lottery and gaming license.  Accordingly, SVL needed to pay less Services Fees;

 c. Without disclosing their true intentions, Mouttet, SVL, Hoo, Levy, Stewart, George, and Graham, each individually and collectively requested the Lender to explore alternative strategies for repayment of the outstanding loans;

 d. That in or about late 2004, these Defendants, through the Board of Directors of SVL, decided that the best means for achieving liquidity for SVL, as well as providing a means to make substantial partial payments of both principal and interest on the outstanding loans to SVL-related companies, would be for SVL to "go public," through a two-step process,

43

the first step of which was a private placement of its shares to private investors, and the second step of which would be an initial public offering ("IPO");

e.  Under this financing plan, SVL would first raise funds through a private placement to raise $30 million (US) of new equity capital, and would use a portion of those gross proceeds to make at least substantial partial payments to the Lender of principal and interest against the outstanding loans;

f.  However, in order to be able to implement these plans to generate substantial sums of cash, the Lender was falsely told that the financial advisors for SVL had advised SVL that the marketing services agreement with Atlantic needed to be terminated, because new investors in the private placement and/or any future IPO would be unwilling to invest "new money" in SVL, when a substantial percentage of gross revenues were paid to another entity, especially when that entity might eventually be perceived as having no real value to SVL; and

g.  Finally, in order to induce the Lender to agree and otherwise consent to terminate the right to *future* Service Fees to be paid to Atlantic, Mouttet, Hoo, Stewart, Levy, George, Graham, and SVL all agreed and represented to the Lender, in a meeting held in Jamaica, in or about late June/early July, 2005, attended by the Representative of the Lender, and by Hoo and Stewart, as Directors of SVL, and as representatives of the SVL Board of Directors, not only that (i) **the Lender would receive the**

44

*bulk of the private placement and/or any future IPO proceeds,* which would both be used to pay off at least a substantial of the outstanding loans, but also (ii) *the Founding Shareholders* of SVL, to-wit: Hoo, Levy and Stewart, *would obtain a more traditional bank loan,* with their respective shares of stock in SVL pledged as collateral, to repay the Lender. At the time these promises to pay the Lender were made, neither SVL nor the Founding Shareholders were obligors/borrowers on any of the outstanding loans - - with the exception of the two (2) loans made directly to SVL - - and, thus, those promises are further evidence of the control that Mouttet, his family, and The Mouttet Family Criminal Enterprise exercised over SVL and each of the Founding Shareholders.

101.    As part of their illegal conspiracy to defraud the Lender, and otherwise deceive it into providing the required consent and acquiescence to allow for the termination of the marketing services agreement between SVL and Atlantic, *the Federal RICO Defendants intentionally did <u>not</u> disclose to the Lender*:

a.    That SVL had already terminated the marketing services agreement with Atlantic;

b.    That before tricking the Lender into consenting to the cancellation of the marketing services agreement, SVL had already *secretly* replaced that agreement with a new marketing services agreement with Atlantic Consultants, effective on or about November 1, 2004, months earlier. This new, *secret* agreement was executed by George for SVL, as its

45

President and CEO, and Mouttet (while he was also a Director of SVL) for Atlantic Consultants;

c.      That pursuant to the new, **secret** agreement with Atlantic Consultants, SVL had agreed to pay, and was paying Atlantic Consultants (in essence, Mouttet and/or other members of the SVL Enterprise and/or The Mouttet Family Criminal Enterprise) $300,000 each month, effective November 1, 2004, instead of paying Atlantic the Service Fees that went directly to the Lender to be applied to the indebtedness owed to the Lender;

d.      That the foregoing events were implemented to ensure that Mouttet, who, along with other members of his family, controlled the affairs of SVL, would be guaranteed a substantial monthly income stream - - to the detriment of, first, the Lender, and, then, Talisman - - if he was later removed or resigned, for any reason, from being a Director of SVL, as a result of the planned private placement and/or IPO of additional stock of SVL;

e.      Further, by terminating the previous marketing services agreement between SVL and Atlantic, it was no longer necessary to disclose to the investing public the existence of that agreement, and the relationship between Atlantic, SVL, Mouttet - - then a SVL Director - - and the Mouttet family; thus, **neither the controlling interest of the Mouttet family in SVL nor the substantial payments from SVL to, in essence, Mouttet and his family  were publicly disclosed;**

46

f.   That because SVL was able to secretly pay $300,000 each month to Atlantic Consultants, SVL actually had the ability to pay those monies to the Lender. **Without the Lender's consent to terminate the marketing services agreement** with Atlantic, both SVL and Atlantic would have continued to be obligated to pay Service Fees indefinitely to the Lender, for many more years, until the full indebtedness was repaid; and

g.   **The termination of the revenue stream** from SVL (in the form of Service Fees paid to the Lender) ensured the availability of monies in the future to be paid to each of Mouttet and/or other members of his family, Hoo, Levy, Stewart, Graham, and George, among others, including Mouttet family members, in the form of dividends on their shareholder holdings in SVL, to the detriment of, first, the Lender, and, then, Talisman.

All of these facts were intentionally **withheld and keep secret from the Lender** by the Federal RICO Defendants. **The Lender, and, thus, Talisman**, **did not learn of any of these facts until on or about October 5, 2011** when Mouttet filed his own Affidavit, and another Affidavit of George, in another civil action previously pending before the District Court, and attached a copy of the heretofore **secret** agreement between SVL and Atlantic Consultants.

102.   In his Affidavit, George admitted publicity, for the first time, on behalf of himself, and as the CEO of SVL, the existence and authenticity of the November 1, 2004 agreement between SVL and Atlantic Consultants.

47

103.   In addition, on July 27, 2012, Mouttet admitted under oath in his Bankruptcy Rule 2004 examination that Atlantic and Atlantic Consultants were the same entity.

104.   **Without knowledge** of the existence of, and reasons for the new, **secret** agreement between SVL and Atlantic Consultants, and/or the Federal RICO Defendants' fraud/theft schemes, on or about July 7, 2005, the Lender was fraudulently persuaded, otherwise deceived, and fraudulently induced to agree and consent to the termination of the original marketing services agreement between Atlantic and SVL, and thereby agreed to forego payment of any _future_ Service Fees due to Atlantic from SVL, in exchange for other payment arrangements established by SVL and Atlantic.  Mouttet (while he was also a Director of SVL) negotiated - - while he was located in this District - - and executed this amendment to the $29.5 million loan agreement on behalf of Atlantic.  Hoo and Stewart were aware of this amendment and attended a meeting in late June/early July, 2005, in Jamaica, with the Representative of the Lender, to discuss the amendment.

105.   As part of July 7, 2005 amendment, and based on the foregoing representations actually made to the Lender, the Lender was also persuaded to agree and consent to the extension of the maturity date of the initial $29.5 million loan to Atlantic to December 5, 2005.

106.   The termination of the marketing services agreement with Atlantic, and the promises of payment, in full, from SVL's future private placement, IPO, and a traditional bank loan to the SVL Founding Shareholders, without disclosing the new, **secret** agreement with Atlantic Consultants, the payment by SVL of $300,000 each month to

48

Atlantic Consultants, and the Federal RICO Defendants' true intentions to avoid any personal responsibility to repay the Lender the tens of millions of dollars owed, among other matters not disclosed to the Lender, were part of the Federal RICO Defendants' overall nefarious scheme to defraud and steal from Talisman, and previously from the Lender, by fraudulently and secretly terminating the Lender's, and, thus, Talisman's, right to the Service Fees to be paid by SVL to Atlantic, which allowed Mouttet, among others, to siphon off large sums, since at least November, 2004, from SVL to himself and members of the Mouttet family, and, upon information and belief, to Hoo, Levy and Stewart, among others.   Thereafter, all other actions taken by the Federal RICO Defendants were devised and undertaken to cover-up the fraud perpetrated upon the Lender, to steal additional monies from the Lender, and/or to otherwise the lull the Lender into not exercising, or, at least, delaying the exercise of its rights under the various loan documents.

107.   Despite the foregoing, the Lender, and, thus, Talisman, did not agree, in June, 2005, to:

a.   Terminate the obligation of Atlantic to pay to the Lender (and/or Talisman) the then-*accrued* Service Fees due to said Defendant from SVL, which Talisman's investigation has revealed amounted to approximately $12,269,643, as of June 30, 2005, that were never paid by SVL to Atlantic's reserve accounts maintained at Terrabank, as required, and, thus, has not been paid to the Lender, and, thus, Talisman, as required. Based on the subsequent investigation of the Lender, and Talisman, there appear to be at least $12.2 million in Service Fees that were either (i) not

49

paid by SVL to Atlantic that should have been paid to the Lender to repay the indebtedness owed by Atlantic to the Lender, and, thus, Talisman, <u>or</u> (ii) were improperly paid by SVL to third parties, such as Mouttet, members of the Mouttet family, Haven, and/or others, in breach of the loan documents, specifically executed and/or otherwise made known to SVL; and

b.     Terminate or forego the payment of any Service Fees to either, first, the Lender or, Talisman, from Peninsula, which, as of May 31, 2005, amounted to $563,279 in Service Fees owed by SVL to Peninsula, which Service Fees were never paid by SVL to Peninsula to the reserve account maintained at Terrabank, and, thus, were never paid to the Lender, and, thus, Talisman.  Based on the subsequent investigation of the Lender, and Talisman, there appear to be at least $563,279 in Service Fees that were either (i) not paid by SVL to Peninsula that should have been paid to the Lender to repay the indebtedness owed by Atlantic to the Lender, and, thus, Talisman, <u>or</u> (ii) were improperly paid by SVL to third parties, such as Mouttet, members of the Mouttet family, Haven, and/or others, in breach of the loan documents, specifically executed and/or otherwise made known to SVL.

In addition,

c.     Talisman's investigation has revealed that, as of May 31, 2005, approximately $3,957,049 in Service Fees owed by SVL to AmeriServices were never paid to the reserve account maintained at Terrabank, and,

50

thus, were never paid to the Lender, and thus, Talisman, as required. Thus, there appear to be at least $3.9 million in Service Fees that were either (i) not paid by SVL to AmeriServices that should have been paid to the Lender to repay the indebtedness owed by Atlantic to the Lender, and, thus, Talisman, or (ii) were improperly paid by SVL to third parties, such as Mouttet, members of the Mouttet family, Haven, and/or others, in breach of the loan documents, specifically executed and/or otherwise made known to SVL.

108.    Nevertheless, at the time the Lender was fraudulently persuaded to agree to and execute the July 7, 2005 amendment, based on the prior false representations made to the Lender that (a) cash resources and revenues at SVL were lower than expected; (b) revenues and cash resources were to increase due to the corporate acquisitions made by SVL, which were financed by the Lender; and (c) the outstanding loans would be repaid to the Lender from the proceeds of the planned SVL private placement, SVL IPO, and the future bank loan to the SVL Founding Shareholders, as more fully alleged, above, and at the specific requests of Mouttet - - as a Director of and representative of the Board of Directors of SVL, and as a Director of Atlantic - - for the Lender to exercise patience to allow for the generation of alternative sources of repayment and financing, as well as increased revenues, the Lender agreed to forego demands for payment of the Service Fees. ***However, Talisman's subsequent investigation has revealed that the Federal RICO Defendants engaged in a fraudulent scheme and conspiracy to steal additional monies from the Lender,***

51

and/or to otherwise lull the Lender into not exercising, or, at least, delaying the exercise of its rights under the various loan documents.

**(3)**     **Lulling Activities of the Federal RICO Defendants**

**(a)**     **Payment of the Proceeds From SVL's 2005 Private Placement**

109.   As part of the process to be paid from the SVL private placement, SVL IPO, and an eventual traditional bank loan to the SVL Founding shareholders, and based on the foregoing representations made to the Lender by the Federal RICO Defendants, in or about 2005, the Lender consented to the extension of the maturity date of the $29.5 million loan to Atlantic, first, to December 5, 2005 (by amendment dated July 7, 2005), thereafter to January 31, 2006 (by amendment dated December 5, 2005), and to March 31, 2008 (by amendment executed on January 4, 2007), and finally to September 30, 2008 (by amendment executed on April 23, 2008).   Each of these amendments was executed by Mouttet on behalf of Atlantic.

110.   The promised private placement of SVL's shares occurred on or about July 18, 2005, resulting in the payment of $14,635,628 (from the net proceeds thereof) by the Federal RICO Defendants to repay the Lender - - through various wire transfers, made on or about July 27 and 29, 2005, and August 1, 2 and 3, 2005, to various accounts in the names of Atlantic and AmeriServices maintained at Terrabank, as well as at Chase Manhattan Bank, N.A. in New York, New York.   These proceeds paid the outstanding principal and interest owed on the $500,000 SVL loan, the $2.27 million Atlantic loan, the $8.415 million AmeriServices loan, and the $3.25 million Prime Sports loan - - all of which were scheduled to mature on August 30, 2005 (prior to the maturity date, as extended, for the $29.5 million loan to Atlantic).   As a result of those payments,

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

the Lender was induced to believe that the remainder of the Atlantic loan would be repaid as promised by the Defendants from monies to be obtained through SVL's IPO, and the bank loan to be obtained by the SVL Founding Shareholders.

111.    However, as previously alleged above, **the Lender was totally unaware** that SVL had been **secretly paying**, since November 1, 2004, the $300,000 stolen and diverted each month to Atlantic Consultants, which monthly payments could, and should have been used to repay a portion of the remaining indebtedness due and owing to the Lender, and, thus, Talisman, in what has now been uncovered as a conspiracy, and association-in-fact, to defraud and steal both assets and cash payments from the Lender, and, thus, Talisman.

**(b)    Payment of the Proceeds from SVL's 2006 IPO**

112.    On or about October 13 and 14, 2005, Mouttet (while a Director of SVL) had two telephone conversations with a representative of the Lender, then-located at the Lender's business office in Boca Raton, during which he represented to the Lender that Hoo was arranging a $40 million bank loan from NCB, the proceeds of which would be used to repay the Atlantic loan.

113.    As previously alleged above, in December, 2005, the Lender agreed to extend the maturity date of the $29.5 million loan to January 31, 2006.  As part of that agreement, and to induce the Lender to agree to extend the maturity date, SVL again agreed, in meetings between Hoo and the Representative of the Lender held in Jamaica, in and or about, December, 2005, and, January, 2006, that the Lender would be paid in full from the proceeds of SVL's IPO, as well as a future, traditional bank loan to be obtained by the Founding Shareholders, using their SVL shares as collateral.

53

114.    Since the Lender was previously advised by Mouttet, while he was a Director of SVL, that the IPO proceeds were not sufficient to fully repay the $29.5 million loan, on or about January 5, 2006, Mouttet, by an email sent to the Lender at a business office then-located in Boca Raton, made further representations and promises to the Lender that a traditional bank loan would now be obtained by Hoo, Levy and Stewart to pay off a portion of the outstanding Atlantic loan.  Mouttet, Hoo, Levy, and Stewart each failed to fulfill that promise.

115.    SVL's IPO occurred on or about January 27, 2006.

116.    Hoo, Levy, and Stewart received a combined windfall of approximate $7.3 million in proceeds from the IPO, which proceeds were transferred to the Lender, on or about February 21, 2006, by a wire transfer from The Bank of Bermuda Limited to Citibank, N.A., in New York, New York, to repay approximately $5.49 million in principal and $1.76 million in accrued interest, on the $29.5 million Atlantic loan.  None of these three (3) Defendants was the borrower on the Atlantic loan.

117.    Again, however, as previously alleged above, the Lender was totally **unaware that SVL had been secretly paying,** since November 1, 2004, $300,000 each month to Atlantic Consultants, which monthly payments could, and should have been used to repay the Atlantic loan, and which payments are now an apparent part of the conspiracy and association-in-fact to defraud and steal from the Lender, and, thus, Talisman.

118.    Also, as previously alleged above, the Lender was told repeatedly by Mouttet, Hoo, and Stewart, each a Director of SVL, and each a representation of SVL's Board of Directors, that the Founding Shareholders would obtain a multi-million

54

traditional bank loan, using their SVL shares as collateral, to generate sufficient additional monies to fully repay the Atlantic loan.

119.    Thereafter, on or about June 23, 2006, Levy arranged with Mouttet for a $2,410,691.85 payment to the Lender - - which Mouttet considered was Levy's portion of the outstanding balance of the $29.5 million Atlantic loan - - which was applied to the Atlantic loan.  Levy testified during a trial in another proceeding - - on claims that differ from those alleged in this Complaint, which claims herein were not alleged in that other, prior proceeding - - that Mouttet informed him that his remaining unpaid portion was approximately $4 million, and that the remaining portion of those monies, some $1.6 million, would be repaid directly by Mouttet to the Lender, since Mouttet owed Levy approximately $1.6 million pursuant to a separate transaction.  This fact was not known to the Lender, and, thus, Talisman, until Levy testified, at this other trial, on or about September 2, 2010.  Mouttet never paid the Lender the other $1.6 million on Levy's behalf, leaving that amount outstanding and unpaid by Levy.

120.    Following the SVL IPO, the Representative of the Lender met several times in Los Angeles, Miami, and New York with Mouttet and SVL's financial advisor, UBS, to explore financing alternatives for SVL.  One of the meetings occurred in or about 2007 at the offices of Pinnacle in Miami.  Present at that meeting were Mouttet, as a Director of SVL, and a representative of SVL's Board of Directors; the Representative of the Lender; and a representative of UBS from either Los Angeles or New York.  During the meeting, a possible sale of SVL was discussed, and it was agreed that if such a sale were to take place, the Lender would be repaid, in full, from the sale proceeds.  After the meeting, Mouttet and the Representative of the Lender

55

called Hoo in Jamaica from Pinnacle's Miami office to report the results of the meeting just concluded and to request that SVL assemble the information and documents that UBS needed to complete the required offering memorandum for the sale of SVL.  At no time during the meeting or conference call did Mouttet or Hoo ever dispute that the Lender would be repaid - - either by SVL, or through the sale of SVL - - the remaining indebtedness owed by Atlantic.

121.   To accommodate Atlantic and SVL, the Lender agreed to extend the maturity date of the $29.5 million loan agreement, among other provisions, several times from 2003 to 2008, and ultimately, on or about April 23, 2008, the maturity date was extended to the final maturity date of September 30, 2008.  Mouttet negotiated and executed each of these amendments on behalf of Atlantic, and did so for the most part, if not at all times, while he was located in this District.

122.   The Lender had agreed to extend the maturity date for the $29.5 million Atlantic loan due to the fact that SVL's lottery and online gaming businesses were growing, and, as alleged more fully hereinafter, SVL and affiliated entities had obtained additional lottery licenses in Central America to further expand and grow its businesses, thereby anticipating increased revenues from which the Lender would be repaid.

123.   In addition, in order to induce the Lender to agree to extend the maturity date of the $29.5 million Atlantic loan, as well as to consider providing additional financing for lottery and gaming businesses in Central America, on or about January 4, 2007, Mouttet executed and delivered to the Lender - - via facsimile transmission, sent by Mouttet's counsel located in Miami, to the Lender, and then delivered to the Decision Maker for the Lender then-located in this District - -  his duly executed Guarantee and

56

Pledge Agreement, wherein Mouttet personally guaranteed Atlantic's repayment obligations under the $29.5 million loan (the "Atlantic Guarantee").

124.    At the time Mouttet executed his Atlantic Guarantee, and as allegedly previously, above, he had represented to the Lender, and specifically to the Decision Maker for the Lender, that Mouttet and members of his family owned approximately 43.3% of the outstanding capital shares of SVL, as well as approximately 52% to 57% of Supreme Gaming-Florida and/or another entity named Supreme Gaming, and that SVL, in turn, owned 8% of that Supreme Gaming entity.  The Lender also knew that Mouttet owned a yacht worth millions of dollars, among other significant assets. Consequently, the Lender considered it had received the Atlantic Guarantee from an individual with substantial wealth and financial means.

125.    When the Lender tried to enforce the Atlantic Guarantee in litigation previously filed in the District Court, Mouttet denied any obligation.  Therefore, Mouttet's execution of the Atlantic Guarantee appears to be an additional fraudulent act committed to induce the Lender into believing that re-payment of the $29.5 million Atlantic loan was assured.

126.    Despite Mouttet's prior denial in the District Court of any obligations on the Atlantic Guarantee, on or about March 9, 2012, Mouttet personally executed a Stipulation of Final Judgment in the litigation previously pending before the District Court, expressly agreeing to the entry of a Final Judgment of $47,803,454.00 against himself, personally, on the amount owed by Atlantic, and guaranteed by him, which Final Judgment was entered on March 12, 2012.

57

127.   Talisman was shocked to learn of Mouttet's apparent and/or asserted current financial condition as disclosed in the papers he voluntarily filed under Chapter 7 of the Bankruptcy Code, where he represents that he has no assets, and does not own any interest in either SVL or Supreme Gaming-Florida.

**(c)   The Federal RICO Defendants' Plans to Obtain Lottery and Gaming Licenses and Expand into Central America and Elsewhere**

128.   Several times in or about April and May, 2006, Mouttet - - acting on behalf of SVL, and while located in this District - - sent written projections and calculations by email to the Lender in this District - - furnished to him by Vazquez - - for planned gaming and lottery operations in Nicaragua, El Salvador, Panama, Costa Rica, and Guatemala, among other countries.   This was done to cause the Lender to believe that such expansion into Central America would take place, and would be profitable; and, therefore, the Lender could expect that all outstanding loans would be repaid in full. Mouttet's projections were also intended to induce the Lender to provide additional financing to fund the expansion of the lottery and gaming businesses into Central America.

129.   As part of the plans to expand into Central America, on or about April 21, 2006, the Lender was given a PowerPoint presentation - - provided by Vazquez, initially, to Mouttet and then sent by email to the Lender by Mouttet - - indicating that the Founding Shareholders of SVL (Hoo, Levy, and Stewart) had formed SGL, with the intention that it would become a lottery service provider in Central and South America. It was further represented to the Lender in the PowerPoint presentation that SGL had gaming licenses and contracts to provide online lottery services in Guatemala, Nicaragua, and El Salvador.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

130. **Unbeknownst to the Lender at the time**, and, thus, unknown to Talisman, while Mouttet and SVL were having discussions and negotiations with the Lender, Mouttet, while still a Director of SVL, and with the assistance of Vazquez, Sevilla, and De La Cruz, had already obtained various investors, investments, and loans to finance the expansion into Central America from Thomas J. Petters[8/] and/or his companies, Petters Group Worldwide, Petters Company, Inc., Petters Capital, and/or Central American Holdings, LLC, of Minneapolis, Minnesota (collectively, "Petters"), to Supreme Gaming-Florida (through its managing member, Pinnacle, also controlled by Mouttet) and Supreme Holdings-Delaware, in the total amount of at least $16.5 million. The loans from Petters were made during the period from in or about July, 2006, through in or about April, 2007.

131. In order to obtain the $16.5 million or more of loan(s) from Petters, Mouttet pledged the shareholder interests that he, his father P. G. Mouttet, and his brother C. Mouttet held in both SVL and Supreme Gaming-Florida, which SVL shares had been promised previously to be pledged to collaterize the SVL Founding Shareholders' loan with a traditional bank lender.

132. The $16.5 million or more in loans from Petters were, in essence, the traditional bank financing that Mouttet, Hoo, and Stewart had previously promised the Lender that the Founding Shareholders would obtain to repay the remaining Atlantic loan. However, none of the $16.5 million or more of new loan proceeds from Petters

---

[8/]     In 2010, Petters, individually, was sentenced to 50 years in prison as a result of his Federal criminal conviction for fraud, conspiracy, and money laundering for running a $3.65 billion Ponzi scheme.  As part of the Federal criminal prosecution, his companies were also placed under receivership.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

were paid to the Lender, or otherwise used to reduce or payoff the remaining indebtedness owed by Atlantic to the Lender, as previously promised several times by Mouttet, Hoo, and Stewart.

133.   In addition, ***unbeknownst to the Lender at the time***, and, thus, unknown to Talisman, while Mouttet and SVL were having the discussions regarding plans to expand into Central America, including the resulting negotiations with the Lender, Mouttet, again, while a Director of SVL, was also discussing with representatives of Petters the proposed loan transaction with the Lender, and was, in fact, seeking Petters' consent to enter into the proposed loan with the Lender.

134.   ***Talisman, and, thus, the Lender, did not learn of the loan transactions with Petters, including the stock pledges as collateral for the loans, until the Summer of 2011***, when during its investigation (a) Talisman discovered the existence of certain Reports of the Receiver appointed for Petters, and thereafter (b) on or about September 19, 2011, when Mouttet produced certain additional documents in other litigation previously pending in the District Court.   ***Thus, it was not until September 19, 2011, that the Lender first learned that the loans from Petters, and the resulting collateral pledges of the SVL stock, were the real reason why the Founding Shareholders had been unable to obtain the traditional bank financing to generate sufficient funds to repay of the indebtedness owed to the Lender.***

135.   In or about December, 2006, at the specific request of Mouttet, an affiliate of the Lender made a $4 million personal loan to Mouttet and his brother, C. Mouttet. Based upon instructions emanating from Pinnacle and Montesano, dated December 7, 2006, $4 million in loan proceeds from the $13.6 million in loans were deposited into a

60

personal bank account in the name of Mouttet and C. Mouttet located at City National Bank of Miami, in this District. This loan was later repaid in full, as more fully alleged, below.

136. In or about January, 2007, a Memorandum of Understanding ("MOU") was entered into between Westford, one of Talisman's assignors, as Lender, and Mouttet, and his brother, C. Mouttet. The signed MOU was sent to the Lender by facsimile transmission, on or about January 5, 2007, by Mouttet's attorneys located in Miami. As part of this MOU, Mouttet and C. Mouttet agreed to form a new entity, SGCW, for the purpose of, among other things (a) obtaining licenses for future gaming and lottery operations, and (b) partially purchasing a revenue sharing agreement for Guatemala from GTECH Corporation Inc. ("GTECH") which would entitle SGCW to 2.05% of the gross revenue from lottery sales in Guatemala from GTECH, a Minnesota corporation that provided all of the vendor and terminal management services needed by SVL, among others.

137. The MOU expressly provided that neither Mouttet nor C. Mouttet would have any outside gaming interests, except through SGL. *Unbeknownst to the Lender*, and, thus, Talisman, at the time, *and not discovered until the Summer of 2011*, when the Reports of the Petters Receiver were first uncovered, Mouttet and C. Mouttet were each in violation of this provision of the MOU, due to their previous loan transactions with Petters, as more fully alleged hereinabove, at the time they negotiated and executed the MOU.

138. The MOU also expressly provided that the repayment of this new financing would be personally guaranteed by both Mouttet, and his brother, C. Mouttet.

61

139.   Without any knowledge of the foregoing violation of the MOU, in or about March, 2007, the Lender agreed to make a series of specifically defined short-term loans in the total aggregate amount of $13.6 million to SGCW, the purposes of which were to pursue expansion of a lottery business into Central America, and to purchase the necessary lottery equipment from GTECH to do so - - which Sevilla represented to the Lender was done in an email he sent, on or about May 11, 2007, from Miami - -  as follows, among other purposes:  (a) $3 million for the partial buyout of GTECH revenue sharing for Guatemala - - which Sevilla again represented to the Lender, in his May 11, 2007, email was done; (b) up to $2 million to repurchase as much as 17% of the shares of Supreme Gaming-Florida issued to a third party; (c) up to $4 million to Flying Fish, the largest shareholder of SGCW, and which was another company controlled by Mouttet and C. Mouttet; and (d) up to $750,000 as working capital for the business operations of SGCW.  The $4 million that the Lender funded to SGCW, which SGCW in turn paid over to Flying Fish, was used by Flying Fish to repay, in full, the $4 million personal loan previously made to Mouttet and his brother, C. Mouttet.

140.   The executed Master Financing and Security Agreement and related promissory notes were all sent, on or about March 23, 2007, to the Lender by facsimile transmission by Mouttet's attorney located in Miami; and the originals of said loan documents were sent to the Lender, on or about April 26, 2007, by FedEx, originating from Mouttet's attorney's office in Miami.

141.   These short term loans were all scheduled to mature in or about July, 2008.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

142.   As a further inducement to make the $13.6 million loan, and as he previously agreed when he executed the MOU, on April 10, 2007, Mouttet executed another Guarantee and Pledge Agreement to personally guarantee the repayment of the loan to SGCW (the "SGCW Guarantee").   When the Lender tried to enforce the SGCW Guarantee in litigation previously filed in the District Court, Mouttet denied any obligation, and, thus, Mouttet's execution of his SGCW Guarantee appears to be yet another fraudulent act, to provide the façade of legitimacy, and to induce the Lender into believing that re-payment of the $13.6 million loan was assured.

143.   Despite Mouttet's prior denial in District Court, on or about March 9, 2012, Mouttet personally executed a Stipulation of Final Judgment in the litigation before the District Court, agreeing to the entry of a Final Judgment of $22,270,000.00 against himself, personally, on the amount owed by SCGW, which Final Judgment was entered on March 12, 2012.

144.   C. Mouttet executed at least two (2) of the promissory notes for SGCW as the borrower.   In addition, C. Mouttet executed a personal guarantee for at least the $4 million portion, to be used by Flying Fish, of the $13.6 million loans to SGCW. **Unbeknownst to the Lender at the time**, and, thus, Talisman, **C. Mouttet had no intention to honor the obligations of his personal guarantee,** and only executed the document to lull the Lender into believing that re-payment of the $13.6 million in new short-term loans was assured.

145.   The executed loan documentation for the $4 million of SGCW loan proceeds that were furnished to Flying Fish were provided to the Lender by emails sent by either Mouttet, while he was in this District, or by his counsel in Miami.

63

146.   **As an inducement to the Lender** to provide the $4 million in loan proceeds to Flying Fish, on or about April 10, 2007, Flying Fish entered into a written Security Agreement, whereby all of its assets were pledged to the Lender as collateral security for the repayment of this $4 million portion of the SGCW loan.   Mouttet executed this Security Agreement in his capacity as a Director of Flying Fish.

147.   In or about April, 2010, Mouttet admitted in a sworn affidavit filed in another court proceeding previously before the District Court that it was "agreed between [the parties to the loan] that **all the profits** from our gaming business would go to repay the interest and then the principal on the loan."

148.   Pursuant to the instructions of Mouttet, all sent by Mouttet while he was in Florida, in this District, from March, 2007, to September, 2007, the proceeds for the $13.6 million loan were all wired from the Lender, on instructions ultimately emanating from Florida, in this District, to various banks in New York, including Bank of America, Deutsche Bank Trust Company of America, Chase Manhattan Bank, HSBC Bank USA, and Citibank, and then they were subsequently wired to various offshore banks, including Bank of Bermuda Commercial Bank and Capital G Bank Limited in Bermuda, on the further instructions of Mouttet.

**(d)**   **Meetings in Miami and Elsewhere in 2008**

149.   From January, 2008 through October, 2008, both prior to the maturity date of the $13.6 million loan to SGCW, and after the loan had matured, the Decision Maker for the Lender and the Representative of the Lender met several times with Mouttet, P. G. Mouttet, C. Mouttet, and/or N. Mouttet, at various locations, including Mouttet's residence, and at the Miami Airport, to discuss and obtain repayment of the outstanding

64

loans, as well as Mouttet's plans for SGCW.  Mouttet and C. Mouttet, along with their agents and employees, and other members of their family, engaged in additional schemes and tactics to delay, lull, and ultimately refuse repayment of the various outstanding loans.

150.   In addition, Mouttet, while he was in this District, stated in a telephone conversation with the Representative of the Lender, in or about the Summer of 2008, that he intended for SGCW to take over the lottery operations in Central America, and for Intralot, a Greek lottery company, to take over the Jamaican and Guatemala operations.  Mouttet used Intralot to continue to lull and otherwise placate the Lender into believing it would get paid, when, in fact, Mouttet, and the other Federal RICO Defendants, had no intention of repaying, or causing SVL or others to repay the monies still owed to the Lender. That intention was carried out by the various schemes, lies, the withholding of material information, material misrepresentations, and thefts they employed to steal and double-pledge collateral by running a loan kiting scheme.

151.   In or about late September, 2008, the Representative of the Lender met at the Miami Airport, with P. G. Mouttet, Mouttet, C. Mouttet, and N. Mouttet.  At that meeting, Mouttet pressed for more time to repay the outstanding loans, asked that the loans be restructured, and referenced the profitability from the lottery business in Central America, indicating that the newly established relationship with Intralot would "help turn things around."  The Lender refused to extend the time of repayment any further, beyond the then-current, and final maturity date of September 30, 2008.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

(e) **Other Actions Taken in Furtherance of the Illegal Conspiracy and Association(s)-in-Fact**

152. On or about December 4, 2008, Mouttet directed and caused a term sheet to be sent via facsimile transmission to the Lender, via a fax directly to the Decision Maker for the Lender, in Florida, on his own behalf, as well as on behalf of Atlantic, SGCW, and AmeriServices. This term sheet proposed the re-structuring of the outstanding debts owed by Atlantic and SGCW, following their defaults on September 30, 2008.

153. The term sheet that Mouttet sent also admitted, *for the first time*, that Atlantic and/or SGCW owned 45% of Relief Defendant SGLBVI. Based upon this term sheet, it is the information and belief of Talisman, that Mouttet *transferred assets from some of the Federal RICO Defendants* (such as, without limitation, Mouttet, other members of his family, including, but not limited to, P. G. Mouttet, C. Mouttet, and N. Mouttet, as well as Atlantic, Haven, Peninsula, SVL, AmeriServices, Hoo, Levy, Stewart, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, SGCW, and Flying Fish) *to Relief Defendant SGLBVI,* to hinder, delay, and otherwise frustrate the rights of first the Lender, and then, Talisman, and to otherwise defraud each of them, and to steal valuable cash, property, and rights of, and from the Lender, and, thus Talisman.

154. It is the further information and belief of Talisman, that *Mouttet transferred assets from some of the Federal RICO Defendants* (such as, without limitation, Mouttet, other members of his family, including, but not limited to, P. G. Mouttet, C. Mouttet, and N. Mouttet, as well as Atlantic, Haven, Peninsula, SVL, AmeriServices, Hoo, Levy, Stewart, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, SGCW, and Flying Fish) *to Relief Defendant VLT(BVI),* to hinder, delay,

66

and otherwise frustrate the rights of first the Lender, and then, Talisman, and to otherwise defraud each of them, and to steal valuable cash, property and rights of, and from the Lender, and, thus Talisman.

155.    In addition, the term sheet that Mouttet sent on or about December 4, 2008, also sought a release of the various personal guarantees previously executed by Mouttet and C. Mouttet.   This additional evidence and admission is contrary to the position previously taken by Mouttet in other litigation previously pending before the District Court, in which he asserted that his personal guarantees were a legal nullity, and that he had no obligation whatsoever thereunder, and he chose to litigate various spurious defenses, personally, before the District Court, and previously on behalf of certain of the Federal RICO Defendants in civil actions filed in the Cayman Islands and the New York state court, for nearly three (3) years, until he voluntarily chose to waive, abandon, concede, and/or voluntarily withdraw those unfounded defenses, when Mouttet, himself, consented to the entry of the $70 million Final Judgment against him on his Atlantic Guarantee and SGCW Guarantee.

156.    In order to avoid payment; to cover up the paper trail of monies previously paid by SVL to entities controlled by Mouttet, members of his family, and/or The Mouttet Family Criminal Enterprise, including the **previously unknown and secret** payment of $300,000 each month to Atlantic Consultants, beginning on or about November 1, 2004, continuing to an unknown date, including to the present time; to avoid the disclosure and production of documentation regarding such prior payments **heretofore kept secret** from the Lender, and, thus, Talisman; to avoid disclosure and production of the loan documents with, loan proceeds from, and payments to Petters; and to otherwise

67

defraud the Lender in furtherance of the illegal conspiracy and association-in-fact, Mouttet, C. Mouttet, and The Mouttet Family Criminal Enterprise, among others, including, at times, with the active assistance of Mouttet's legal counsel in Miami, all caused the corporate registrations to lapse (and/or allowed the entities to be administratively dissolved, and/or caused liquidation proceedings to be instituted) for some of the affiliated and related entities, among other entities, to-wit:

    a.       Atlantic had failed to pay its annual fees and thus had been struck from the Register of International Business Companies (as of January 1, 2008);

    b.       Pinnacle (administratively dissolved on or about September 25, 2009);

    c.       Haven (on January 1, 2008);

Talisman and/or the Lender first learned of these facts in or about June, 2011, after a search of the public documents of St. Lucia International Business Companies; and

    d.       Most recently, in or about mid-June, 2012, C. Mouttet undertook action to attempt to voluntarily liquidate Atlantic in St. Lucia.

These lapses of corporate registrations followed the efforts of, first, the Lender, and, then, Talisman, to aggressively pursue their rights and remedies against them and their guarantors.  In this manner, Mouttet blocked, or at least attempted to block, first, the Lender's and, then, Talisman's ability to exercise their respective rights as Lender, and thereby also sought to preclude, and, otherwise frustrate the ability to trace assets, and the flow of loan proceeds and other monies into, and out of these and related entities. These collective activities have been for the purpose, in part, to obstruct justice in court proceedings in numerous U.S. and Caribbean jurisdictions.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

157.    Because Atlantic, Atlantic Consultants, AmeriServices, Peninsula, Pinnacle, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, Flying Fish, and Haven, among other entities, are all related entities under the direction, ownership, and/or control, directly or indirectly, of Mouttet, and The Mouttet Family Criminal Enterprise, each of their corporate forms may be disregarded.  Each of these alleged companies were mere instrumentalities of Mouttet and The Mouttet Family Criminal Enterprise, and of each other.  Each of these related entities, through their participation in the illegal conspiracy, association-in-fact, thefts, and frauds alleged in this Complaint, injured, first, the Lender, and, thus, Talisman.

**(4)    The Sales and Assignments to Talisman**

158.    On or about March 5, 2009, the outstanding SGCW loan, and on or about March 17, 2009, the outstanding Atlantic loan were each sold to Talisman.

159.    By separate purchase and sale agreements, Talisman succeeded to all of the rights of the Lender to those loans.

160.    Following the purchase and sale of those loans and assignments, Talisman now stands in the shoes of the Lender in pursuing the claims relating to the loans asserted in this Complaint.

**(5)    Notices of Default(s)**

161.    After giving the Federal RICO Defendants the time and opportunity to cure the October 1, 2008 events of default, based on the proposals, statements, and representations of the Federal RICO Defendants (which they failed to fulfill), Talisman sent Notices of Default(s).

69

**(a)**     **The Loan to Atlantic**

162.   On or about March 25, 2009, Talisman notified Atlantic of various events of default, the amount of the outstanding indebtedness, and Talisman's demand for cure of the defaults.  When Atlantic failed to cure within 30 days, a second notice of default and demand for cure was sent by Talisman to this Defendant on or about April 30, 2009.

163.   When Atlantic failed to cure as demanded, Talisman accelerated repayment of all outstanding amounts of principal and interest due from, and otherwise owed by Atlantic.

164.   Principal and accrued interest in the amount of $48,440,855, through April 30, 2012, remains due and owing to Talisman under the 2002 loan to Atlantic, plus interest thereafter at 21% per annum.  ***Through their illegal conspiracy, association-in-fact, and scheme to defraud and steal, the Federal RICO Defendants have fraudulently deprived Talisman of at least $48,440,855, as of April 30, 2012, plus interest thereafter at 21% per annum, owed by Atlantic.***

**(b)**     **The Loan to SGCW**

165.   On or about March 27, 2009, Talisman notified SGCW of various events of default, the amount of the outstanding indebtedness, and Talisman's demand for cure of the defaults.  When SGCW failed to make payment, Talisman accelerated repayment of all outstanding amounts of principal and interest.

166.   ***Through their illegal conspiracy, association-in-fact, and scheme to defraud and steal, the Federal RICO Defendants have fraudulently deprived Talisman of at least $18,666,667 (i.e., $13.6 million in principal, and $2,566,667 in***

70

*accrued interest, as of March 27, 2012, plus interest thereafter at 15% per annum)*
*owed by SGCW.*

167.   All conditions precedent to the institution of each of the causes of action alleged in this Complaint have occurred, have been waived, and/or have been excused.

168.   Talisman has retained the services of its undersigned counsel, and has agreed to pay said counsel a reasonable fee for its services, and to reimburse said counsel for all expenses incurred in bringing the claims alleged herein.  Talisman has also retained the services of other Experts to assist in the investigation and assembly of the facts on which this case is based.

**COUNT I**
**FEDERAL RICO**
**18 U.S.C. §1962(c)**

169.   This Count I seeks relief from all named Federal RICO Defendants, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, for violations of 18 U.S.C. §1962(c).

170.   Each of the Federal RICO Defendants is a person within the meaning of 18 U.S.C. §1961(3).

**A.**     **The Enterprise(s)**

171.   At all times relevant to this Complaint, all of the Federal RICO Defendants, and numerous unknown persons, including Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, were an "association-in-fact enterprise," as defined by 18 U.S.C. §1961(4) (the "SVL Enterprise" and/or "The Mouttet Family Criminal Enterprise"), that was engaged in, and its activities affected, interstate and foreign commerce in the United States, and elsewhere.

71

172.    Through this unlawful association-in-fact of several individuals and business entities, almost all of whom/which are related or affiliated companies of SVL, as well as Mouttet, and almost all of whom/which are the alter ego of Mouttet, the Federal RICO Defendants - - Mouttet, SVL, Hoo, Levy, Stewart, P. G. Mouttet, C. Mouttet, N. Mouttet, Graham, George, Atlantic, AmeriServices, Haven, Peninsula, Pinnacle, Atlantic Consultants, Flying Fish, SGCW, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, including the SVL Enterprise and The Mouttet Family Criminal Enterprise - - have engaged in multiple acts of fraud and criminality in connection with their dealings with the Lender, and, thus, with Talisman.  Such acts of criminality include multiple acts of wire fraud, mail fraud, and money laundering, as wells as obstruction of justice.

173.    From at least some time beginning no later than 2005, and possibly beforehand, and continuously to the present, Mouttet, and The Mouttet Family Criminal Enterprise used this mosaic of companies, all of which he owned or controlled, and in which each of the Federal RICO Defendants received a direct or indirect benefit, to give the false appearance of arms-length transactions with SVL, the Founding Shareholders, and each of his other companies.   However, as alleged herein, the Federal RICO Defendants participated in these acts of deception, stole and otherwise improperly diverted monies and collateral due and/or pledged to the Lender, and, thus, Talisman, and/or otherwise concealed such unlawful actions, for their own individual and/or collective personal benefit.  A primary purpose and goal of the SVL Enterprise and The Mouttet Family Criminal Enterprise was to steal the collateral to be used to repay, and

72

to otherwise avoid the repayment of the remainder of the $29.5 million loan to Atlantic, as well as to steal the entirety of the $13.6 million in loan proceeds, and the underlying collateral, from the SGCW loan previously made by the Lender, and to cover it up, through continuing and repeated instances of mail fraud, wire fraud, and money laundering, as well as obstruction of justice.

**B.    The Role of Each Federal RICO Defendant in the Illegal RICO Enterprise(s)**

174.    As previously alleged above, **Mouttet** orchestrated and masterminded the thefts and misappropriations of monies and collateral, as well as the fraudulent acts, practices, and diversionary tactics, and negotiated the several loan financings from the Lender.  Mouttet, together with his father, **P. G. Mouttet**, and his brother, **C. Mouttet**, and his uncle, **N. Mouttet**, with the active assistance and participation of the Founding Shareholders, **Hoo, Levy, and Stewart**, as well as **George and Graham,** formed and used an association-in-fact, and an illegal RICO enterprise(s), comprised of a group of companies and individuals, all of which were affiliated with Mouttet, or otherwise were subject to his direct or indirect control, or over which he exercised influence, to make them all an integral part of his fraudulent scheme. Mouttet and The Mouttet Family Criminal Enterprise directed and caused this group of companies and individuals to act in concert for the purpose of obtaining lottery licenses and contracts, and for the purpose of obtaining various loan financings, and they all shared in those purposes. After the Jamaican gaming and lottery license was obtained by SVL in 2001, Mouttet was the common thread through which all entities and individuals named or referenced in this Federal RICO Complaint acted and carried out his/its wishes.  Thus, Mouttet and The Mouttet Family Criminal Enterprise controlled the financial affairs of the companies,

73

and misused the collateral, assets, loan proceeds, and his influence for their own individual and collective greed and personal gain, as well as the greed and personal gain of his co-Federal RICO Defendants, including the SVL Enterprise and The Mouttet Family Criminal Enterprise.

175.    Mouttet determined how and to whom loan proceeds would be disbursed, and was integrally involved in all aspects of, among other illicit and illegal actions, namely (a) the decision to prematurely and wrongfully terminate the rights of the Lender in certain collateral, including the Service Fees, and to double-pledge the collateral and income repayment stream, (b) the development and implementation of the fraudulent scheme to attempt to escape any individual's personal liability and responsibility to repay the remainder of the outstanding $29.5 million loan to Atlantic, (c) the theft of the $13.6 million in loan proceeds to SGCW, (d) the previously secret payments of $300,000 each month to Atlantic Consultants, (e) the previously secret loans from Petters, the proceeds of which were kept by Mouttet, and not used to repay the indebtedness due the Lender, and (f) the wrongful transfers, concealments, and diversions of assets and collateral that could, and should have been used to repay the Lender, and, thus, Talisman.

176.    Mouttet personally participated and benefited in the theft of tens of millions of dollars of loan proceeds and collateral, and participated in the fraudulent and lulling acts to cover-up the illegal thefts, transfers, and diversions, in order to persuade the Lender and Talisman to delay exercising its legal rights under the various loan agreements and related documents.  Whenever, Talisman came close to learning any of the truth of the fraud previously committed upon the Lender, and, therefore it, Mouttet

74

has done all he could to frustrate and deny the ability of Talisman to learn the truth, by hiding assets and transactions in a web of numerous entities, ostensibly owned by other family members and/or close business associates, when, in fact, Mouttet and The Mouttet Family Criminal Enterprise owned and/or controlled these other entities; has instituted proceedings to liquidate and/or de-register his/its companies; has asserted and maintained spurious defenses in other litigations; and by instituting this very Chapter 7 bankruptcy proceeding. Collectively, these acts have been a massive scheme to obstruct justice in multiple courts in multiple jurisdictions.

177.    As previously alleged above, **P. G. Mouttet** helped to form an association-in-fact of various individuals, and obtained the active assistance and participation of the Founding Shareholders - - Hoo, Levy, and Stewart - - of SVL to acquire a lottery license without revealing to the Jamaican authorities that he and his son, Mouttet, were the real owners, and proponents of this business venture, and that they were not citizens/residents of Jamaica.  P. G. Mouttet personally participated and benefited in the loan proceeds, and participated in acts of lulling to persuade the Lender, and, thus, Talisman, to delay exercising its legal rights under the various loan agreements and related documents, including at least three (3) meetings with the Lender, as well as his sons, Mouttet and C. Mouttet, and his brother, N. Mouttet, in or about 2008 at Mouttet's residence, and later in or about late September, 2008, at the Miami Airport, in an attempt to further frustrate, delay, and otherwise lull the Lender to forebear from or delay in pursuing its legal rights under the various loan agreements and related documents.

75

178.   As alleged above, **C. Mouttet** actively participated and assisted in the formation of SGCW, and became one of its Directors and beneficial owners.  C. Mouttet signed at least two (2) of the promissory notes for the $13.6 million loan to SGCW, a $4 million portion of which was loaned to Flying Fish, a company controlled by his brother, Mouttet.  C. Mouttet also executed a personal guarantee to repay this $4 million portion of the loan.  C. Mouttet also met numerous times with the Lender, beginning in or about late 2006, at his brother's residence in Miami-Dade County, on his brother's moored yacht, and in or about late September, 2008, at the Miami Airport, to first obtain an additional $13.6 million in loan proceeds from the Lender, and, then, in an attempt to frustrate, delay and otherwise lull the Lender into not pursuing its legal rights under the various loan agreements and related documents.

179.   As alleged above, among other things, **N. Mouttet** met at least three times with the Lender, in or about 2008 at Mouttet's residence, and, then in or about late September, 2008, at the Miami Airport, in an attempt to frustrate, delay and otherwise lull the Lender into not pursuing its legal rights under the various loan agreements and related documents.   N. Mouttet was also installed as a member of SVL's Board of Directors, to ensure that the Mouttet family had a member on SVL's Board.

180.   As previously alleged above, **Hoo** has, among other things, served as a "front man," or "buffer," and alter ego for Mouttet, his father, P. G. Mouttet, The Mouttet Family Criminal Enterprise, and the SVL Enterprise in seeking to obtain the lottery license in Jamaica, which then served as the basis for the Lender to loan tens of millions of dollars to SVL, and Atlantic, among other entities.   Hoo also personally benefited from a portion of the proceeds of the $29.5 million loan to Atlantic.  Hoo sat on

76

the Board of Directors of SVL, and fraudulently induced the Lender to agree, in or about June/July, 2005, to the termination of the payment of Service Fees by SVL to Atlantic, for his own personal gain and benefit, in an attempt to not only avoid any future, personal responsibility to repay any portion of the $29.5 million loan, but also to eliminate a drain of cash from SVL to allow future cash dividends to be paid to Hoo, among others.  In addition, Hoo was part of the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender, and, Talisman.  As alleged above, Hoo also actively participated in the fraudulent and deceitful acts of lulling, to persuade the Lender not to exercise its legal rights under the various loan agreements and related documents.

181.   As alleged previously above, **Levy** also served as a "front man," or "buffer," and alter ego for Mouttet, P. G. Mouttet, The Mouttet Family Criminal Enterprise, and the SVL Enterprise in obtaining the lottery license for SVL, which served as the basis for the Lender to loan tens of millions of dollars to SVL, and Atlantic, among other entities.  Levy also personally benefited from a portion of the proceeds of the $29.5 million loan to Atlantic.  Levy sat on the Board of Directors of SVL, and fraudulently induced the Lender to agree, in or about June/July, 2005, to the termination of the payment of Service Fees by SVL to Atlantic, for his own personal gain and benefit, in an attempt to not only avoid any future, personal responsibility to repay any portion of the $29.5 million loan, but also to eliminate a drain of cash from SVL to allow future cash dividends to be paid to Levy, among others.  In addition, Levy was part of

77

the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender, and, Talisman.

182.   **Janette Stewart**, the widow of Peter Stewart, a Founding Shareholder, benefited from her late husband's portion of the $29.5 million in loan proceeds provided to Atlantic.  Janette Stewart also sat on the Board of Directors of SVL; and fraudulently induced the Lender to agree, in or about June/July, 2005, to the termination of the payment of Service Fees by SVL to Atlantic, for her own personal gain and benefit, in an attempt to not only avoid any future, personal responsibility to repay any portion of the $29.5 million loan, but also to eliminate a drain of cash from SVL to allow future cash dividends to be paid to Stewart, among others.  In addition, Stewart was part of the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, , and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender, and, Talisman.  As alleged above, Stewart also actively participated in acts of lulling, to persuade the Lender not to exercise its legal rights under the various loan agreements and related documents.  Also, as alleged above, Stewart made material misrepresentations in or about late June/early July, 2005, in a meeting in Jamaica, with the Representative of the Lender, about repayment of the loans.

183.   **SVL** was the corporate mechanism by which Mouttet, P. G. Mouttet, The Mouttet Family Criminal Enterprise, the SVL Enterprise, and the three Founding

Shareholders, applied for, and obtained the Jamaican lottery license.  SVL was also a borrower on several occasions from the Lender, and it participated in the fraudulent and deceitful acts, which lulled the Lender into delaying the exercise of its legal rights under the various loan agreements and related documents.  SVL was part of the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender, and, Talisman.

184.   As alleged above, **Graham** served as the Secretary, a Director, and a Jamaican lawyer, in advising the Founding Shareholders and SVL and in helping to implement their fraudulent dealings with the Lender.   Graham was part of the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender, and, Talisman.  For his efforts and participation, Graham has received substantial sums in legal fees and other benefits from the SVL Enterprise, from The Mouttet Family Criminal Enterprise, from SVL, and from the other Federal RICO Defendants.

185.   As alleged above, **George** served as the President and CEO of SVL.  In November, 2004, George *secretly* executed the new consulting agreement between Atlantic Consultants and SVL, whereby Atlantic Consultants was to be paid $300,000 each month, and kept the existence of this agreement *secret* from the Lender, and, thus, Talisman, until early October, 2011.  George fraudulently induced the Lender to

79

agree, in or about June/July, 2005, to the termination of the payment of Service Fees by SVL to Atlantic, for his own personal gain and benefit, and in an attempt to eliminate a drain of cash from SVL, to allow future cash dividends to be paid to George, among others.  In addition, George was part of the conspiracy to deceive and defraud the Lender, and, thus, Talisman, to ensure that Mouttet, members of his family, and The Mouttet Family Criminal Enterprise would receive hundreds of thousands of dollars monthly, which monies could have, and should have been paid to the Lender.

186.   The Federal RICO Defendants created, constructed and used a web of special purpose vehicles and entities ("SPVs"), Florida corporations, and other off-shore companies, for the purpose of concealing, stealing and diverting tens of millions of dollars of loan proceeds provided by the Lender to their own individual and collective benefit and personal use.  All of these corporate entities were affiliated with, related to, and mere instrumentalities of each other.

187.   **Atlantic** was the borrower under two separate loan transactions, one for $29.5 million, in August, 2002, and another for $2.27 million, in February, 2004, from the Lender.  Atlantic was contractually obligated to provide marketing consultancy services to SVL, for which it received Service Fees that were to be paid over to the Lender. Atlantic was merely an alter ego of Mouttet, the SVL Enterprise, and The Mouttet Family Criminal Enterprise, by which he and the other Federal RICO Defendants stole, and otherwise diverted collateral and assets of Atlantic, that could have, and should have been used to repay the $29.5 million loan.

188.   **Atlantic Consultants** *secretly* contracted to provide corporate financial services to SVL, for which it received $300,000 in monthly Service Fees that should

80

have been used to repay the outstanding loans owed to the Lender, and, thus, Talisman.  However, Atlantic Consultants served as a mechanism for Mouttet, the SVL Enterprise, The Mouttet Family Criminal Enterprise, Hoo, Levy, Stewart, George, and Graham, beginning in November, 2004, to siphon off $300,000 in monthly revenues from SVL, and divert those monies out of Jamaica, all to the detriment of, first, the Lender, and, then, Talisman.

189.    To induce the Lender to grant the $30 million in loans to SVL and Atlantic, **Haven** agreed to be fully bound to the Lender, and, thus, Talisman, for the repayment of the loans.  Haven was merely an alter ego of Mouttet and The Mouttet Family Criminal Enterprise.  It appears that assets of Haven that could have, and should have been used to repay the indebtedness owed to the Lender, and, thus, Talisman; and that they may have been transferred to one or more of Relief Defendants SGLBVI and/or VLT(BVI), in an effort to defraud, and otherwise frustrate, hinder, and delay the repayment of the indebtedness owed to the Lender, and, now Talisman.

190.    **AmeriServices** was the borrower under a $8.415 million loan transaction, in or about September/October 2003, from the Lender.    AmeriServices was contractually obligated to provide corporate financial services to SVL, for which it received Service Fees that were to be paid over to the Lender.  AmeriServices was merely an alter ego of Mouttet and The Mouttet Family Criminal Enterprise.  It appears that assets of AmeriServices that could have, and should have been used to repay the indebtedness owed to the Lender, and, thus, Talisman; and that they may have been transferred to one or more of Relief Defendants SGLBVI and/or VLT(BVI), in an effort to

81

defraud, and otherwise frustrate, hinder, and delay the repayment of the indebtedness owed to the Lender, and, now Talisman.

191.  **Peninsula** is affiliated with Atlantic, Atlantic Consultants, and Haven. Peninsula was contractually obligated to provide corporate financial services to SVL for which it received Service Fees that were to be paid over to the Lender.  Peninsula was merely an alter ego of Mouttet and The Mouttet Family Criminal Enterprise.  It appears that assets of Peninsula that could have, and should have been used to repay the indebtedness owed to the Lender, and, thus, Talisman; and that they may have been transferred to one or more of Relief Defendants SGLBVI and/or VLT(BVI), in an effort to defraud, and otherwise frustrate, hinder, and delay the repayment of the indebtedness owed to the Lender, and, now Talisman.

192.  **Pinnacle** was the "manager" of SGL.  On or about December 7, 2006, **Montesano**, acting on behalf of Pinnacle, and on behalf of Mouttet, C. Mouttet, and The Mouttet Family Criminal Enterprise, provided wire instructions to the Lender for the personal loan made to Mouttet and his brother, and thereafter, the $4 million in loan proceeds were deposited into a personal bank account in the name of Mouttet and C. Mouttet located at City National Bank of Miami, in this District.

193.  Montesano was also an authorized signatory and account holder, along with Mouttet, in various bank accounts located in Miami-Dade County, in this District, from which Mouttet received and/or diverted the cash proceeds due the Lender.

194.  As alleged above, the lottery licenses obtained by **SGL** in various Central American countries were used to lure the Lender into making the $13.6 million

82

additional loan to SGCW, and to otherwise lull the Lender into delaying the exercise of its legal rights under the various loan agreements and related documents.

195.   As alleged above, **Supreme Gaming-Florida** was used to lure the Lender into making the $13.6 million additional loan to SGCW, and to otherwise lull the Lender into delaying the exercise of its legal rights under the various loan agreements and related documents.   Also, as alleged above, this Defendant, along with **Supreme Holdings-Delaware**, kept *secret* from the Lender, and, thus, Talisman, the fact that the Federal RICO Defendants had already obtained at least $16.5 million of loan financing for their expansion into Central America from Petters, which $16.5 million in traditional loan financing was not used to repay any portion of the indebtedness owed to the Lender.   And, as alleged above, monies were diverted by Mouttet from Supreme Gaming-Florida to *secretly* repay a portion of the loans *secretly* received from Petters. The Federal RICO Defendants and The Mouttet Family Criminal Enterprise were, thus, secretly engaged in a "loan kiting" scheme, as well, to further their personal and criminal enterprise(s).

196.   Mouttet set up various entities using the name "Supreme Gaming," including SGLBVI, Supreme Gaming Guatemala, Supreme Gaming-Florida, and SGL. These various entities were purportedly used to begin lottery services in Central and South America under existing contracts in Nicaragua, Guatemala and El Salvador. Mouttet used these entities as a means to obtain additional loans from the Lender, and to lull and persuade the Lender not to exercise its legal rights under the various loan agreements and related documents.   Mouttet also *secretly* transferred valuable assets from these other entitles into Relief Defendants SGLBVI and VLT(BVI).

83

197.   As alleged previously above, the formation of **SGCW** and the promises previously made by Mouttet as to its operations were used to lure the Lender into making the $13.6 million loan to this Defendant, and to otherwise lull the Lender in delaying the exercise of its legal rights under the various prior loan agreements and related documents.

198.   **Flying Fish** pledged assets to the Lender, which pledge was used by Mouttet to obtain the $13.6 million loan from the Lender.

199.   **Vazquez** furnished Mouttet (by emails Vazquez sent, in 2006, from Miami) with various projections for future lottery and gaming operations in Central America, which projections were used by Mouttet to lure the Lender into making the $13.6 million loan to SGCW, and to otherwise lull the Lender in delaying the exercise of its legal rights under the various prior loan agreements and related documents.   Vazquez also assisted Mouttet in obtaining the *secret* $16.5 million loan from Petters, which loan was kept secret from the Lender, and, thus, Talisman.

200.   As alleged above, **Sevilla** assisted Mouttet in obtaining the *secret* $16.5 loan from Petters, which loan was kept secret from the Lender, and, thus, Talisman.  In addition, with the knowledge and acquiesce of Mouttet, and under his express directions, Sevilla delayed making any decisions to implement or pursue various business opportunities by SGCW, in order to allow the Federal RICO Defendants to continue to perpetrate their frauds, deceits, and thefts against the Lender, and, thus, Talisman, and to otherwise delay the detection of the same.

201.   Mouttet, with the assistance of **De La Cruz**, N. Mouttet, and Sevilla, among others, transferred assets, including, some of the collateral pledged for the

84

repayment of some of the loans made by the Lender, from some of the Federal RICO Defendants (such as, without limitation, Mouttet, other members of his family, including, but not limited to, P. G. Mouttet, C. Mouttet, and N. Mouttet, as well as Atlantic, Haven, Peninsula, SVL, AmeriServices, Hoo, Levy, Stewart, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, SGCW, and Flying Fish) to Relief Defendants SGLBVI and/or VLT(BVI), to hinder, delay, and otherwise frustrate the rights of first the Lender, and then, Talisman, and to otherwise defraud each of them, and to steal valuable property and rights from the Lender, and, thus Talisman. De La Cruz also assisted Mouttet in obtaining the $16.5 million loan from Petters, which loan was kept secret from the Lender, and, thus, Talisman.

202.   As discovery proceeds, Talisman anticipates naming **Jane and John Does No. 1-25**, and **Moe and Joe Entities Nos. 1-25**, as additional individuals and entity defendants who/which participated in the Federal RICO Defendants' theft and misappropriation of loan proceeds, and collateral, and the illegal wire fraud, mail fraud, and money laundering activities.

203.   The corporate form of many of the above-captioned corporate defendants need not be honored, because all of the domestic Florida companies, the off-shore international business companies created as SPVs, and the other entities were all related, affiliated, *de facto* instrumentalities, and alter egos of Mouttet, and the Mouttet Family Criminal Enterprise, as well as the SVL Enterprise, through which the Federal RICO Defendants engaged in the fraudulent acts and practices alleged in this Complaint.   The corporate forms of the Florida companies and the off-shore SPV entities were mere shams, to clothe and disguise the true nature of the fraudulent

85

activities being perpetuated, and engaged in, by the Federal RICO Defendants, which acts of fraud injured, first, the Lender, and, then, Talisman. On information and belief, many of these entities did not hold prescribed meetings, did not maintain accurate corporate books, and did not pay annual registration and franchise fees.  When it served the needs of Mouttet, and The Mouttet Family Criminal Enterprise, they either allowed various corporate registrations to lapse, placed companies in voluntary liquidation, and/or allowed such action to be taken.  When the Lender, and/or Talisman, then tried to reactivate them, Mouttet objected and reinstalled himself as majority shareholder, chairman of the board, and the person with admitted *de facto* control over the affairs of these companies, for himself and others.

204.   The corporations and other entities which are named as Federal RICO Defendants are each liable for the illegal acts, conduct, practices, and courses of business of their respective officers, Directors, agents and representatives, named as individual Federal RICO Defendants, who each acted within the scope of their apparent authority.

C.     **The Predicate Acts**

205.   Each of the predicate acts alleged, below, are related to the purposes of The Mouttet Family Criminal Enterprise and the unlawful SVL Enterprise, which the Federal RICO Defendants formed, because they were designed and intended for the same or similar purposes and results, to-wit:  to finance their unlawful SVL Enterprise and The Mouttet Family Criminal Enterprise, by, first, fraudulently deceiving and duping the Lender into relinquishing valuable cash and other collateral, and, then, loaning millions of additional dollars, each for expressly stated business purposes to finance

86

and grow legitimate business operations, but with the *secret* purpose of, first, stealing the cash and other valuable collateral, and, then, the millions of dollars of additional loans, personally pocketing the same, and, thereafter, to expressly lull the Lender, and, thus Talisman, into delaying the exercise of its legal rights under the various loan agreements and related documents.  These efforts unfolded over several years, unbeknownst to the Lender (and thus, Talisman), and they were very successful, concealing the truth from the Lender (and thus, Talisman). Thus, the Federal RICO Defendants embarked upon a scheme or artifice to defraud, to illegally obtain tens of millions of dollars, and to attempt to unlawfully retain that money, by means of knowingly false or fraudulent pretenses, representations, or promises, as set forth below, by use of the mails and wires, all in violation of 18 U.S.C. §§1341 and 1343, among other Federal laws.

**(1)**　　**The Wire Fraud:  The $29.5 Million Loan to Atlantic**

206.   On or about July 5, 2005, Pinnacle sent a fax to SVL and George, containing Mouttet's signature on the previously *secret* agreement between SVL and Atlantic Consultants, whereby those Defendants, as well as Graham, and Founding Shareholders Hoo, Levy, and Stewart, all agreed that SVL would *secretly* begin to pay Atlantic Consultants $300,000 each month, and would cease paying Atlantic any Service Fees.  This November, 2004 agreement was *kept secret* from, first, the Lender, and then, Talisman, *until on or October 5, 2011*.

207.   On or about July 27 and 29, 2005, and August 1, 2, and 3, 2005, the Federal RICO Defendants caused various wire transfers, totaling $14,635,628, to be sent to various accounts in the name of Atlantic and AmeriServices maintained at

87

Terrabank in Miami, and Chase Manhattan Bank, N.A. in New York, to repay, in full, the outstanding principal and interest owed on the $500,000 SVL loan, the $2.27 million Atlantic loan, the $8.415 million AmeriServices loan, and the $3.25 million Prime Sports loan; thus, inducing the Lender to believe that the Federal RICO Defendants intended to repay the Lender the remainder of the outstanding loan to Atlantic.   The Lender continued to believe that it would receive payment of the remainder of the outstanding loan from the upcoming IPO planned by SVL, as well as the traditional bank loan being negotiated and arranged by Mouttet and the three Founding Shareholders.

208.   On or about October 13 and 14, 2005, Mouttet telephoned the Lender at its business office then-located in Boca Raton, to discuss a $40 million loan that the Founding Shareholders were negotiating with NCB in Jamaica, the proceeds of which would be used to repay, in full, the entire indebtedness then-owed to the Lender.

209.   On or about December 5, 2005, Mouttet and Atlantic sent the signed December 5, 2005 amendment to the $29.5 million loan agreement by facsimile transmission to the Lender, which amendment was then delivered to the Decision Maker for the Lender then-located in this District.   This facsimile transmission was made, and the foregoing amendment was executed, to lull the Lender into believing that the entire indebtedness owed by Atlantic would be repaid.

210.   Since Mouttet previously told the Lender that the IPO proceeds were not going to be sufficient to pay, in full, the $29.5 million loan, on or about January 5, 2006, Mouttet represented and promised, by an email sent to the Lender at a business office then-located in Boca Raton, that a traditional bank loan was then being obtained by Hoo, Levy and Stewart, collectively, to pay off a portion of the remainder of the loan.

88

211.   On or about February 21, 2006, Mouttet sent a facsimile transmission to the Lender at its business office then-located in Boca Raton, indicating that over $7.2 million would be wired by Atlantic to the Lender as a partial repayment of the outstanding indebtedness owed by Atlantic to the Lender.  Mouttet then caused said wire transfer of funds to be sent that same day from The Bank of Bermuda Limited to Citibank, N.A., in New York.  This wire was sent by Mouttet and Atlantic to lull the Lender into believing that the entire indebtedness owed by Atlantic would be repaid.

212.   Thereafter, sometime in or about 2007, from Pinnacle's offices located in Miami, Mouttet and the Representative of the Lender called Hoo in Jamaica to request that SVL assemble the information and documents that UBS needed to complete the required offering memorandum for the proposed sale of SVL.  At no time during this telephone conference call did Mouttet or Hoo ever dispute that the Lender was then owed, and would be paid - - and by SVL - - the remaining indebtedness owed by Atlantic from any proposed sale of SVL, or otherwise.

213.   On or about January 4, 2007, Mouttet and Atlantic caused their counsel in Miami to send the signed January 4, 2007 amendment to the $29.5 million loan agreement by facsimile transmission to the Lender, which amendment was then delivered to the Decision Maker for the Lender.  This facsimile transmission was made, and the foregoing amendment was executed, to lull the Lender into believing that the entire indebtedness owed by Atlantic would be repaid.

214.   In addition, in order to induce the Lender to agree to further extend the maturity date of the $29.5 million loan, as well as to entertain possible, additional financing of the lottery and gaming businesses into Central America, on or about

89

January 4, 2007, Mouttet executed and delivered the Atlantic Guarantee, via facsimile transmission by his counsel in Miami, to the Lender.   The Atlantic Guarantee was ultimately delivered to the Decision Maker for the Lender in Florida.   In the Atlantic Guarantee, Mouttet agreed to personally guarantee the repayment of the outstanding balance owed by Atlantic on the $29.5 million loan.

215.   On or about April 23, 2008, Mouttet and Atlantic sent the signed April 23, 2008 amendment to the $29.5 million loan agreement by facsimile transmission to the Lender, which amendment was then delivered to the Decision Maker for the Lender. This facsimile transmission was made, and the foregoing amendment was executed, to lull the Lender into believing that the entire indebtedness owed by Atlantic would be repaid, and to continue to hide the Federal RICO Defendants' criminal enterprises.

216.   Each of the foregoing wires were for the purpose of defrauding and duping the Lender, and otherwise to lull the Lender into taking no action to enforce its legal rights under the various loan documents, allowing the Federal RICO Defendants to perpetrate their illegal and fraudulent scheme to have the Lender relinquish its rights to cash and other valuable collateral that could have, and should have been used to repay the indebtedness owed to the Lender, and, thus, Talisman.   In doing so, the Federal RICO Defendants perpetrated their fraudulent acts and practices, motivated by their greed and desire for unreasonable financial gain, by whatever illegal means necessary; their desire to escape the legal consequences of their past frauds and thefts; their desire to lull the Lender to refrain from pursuing its rights under the various agreements; and, their desire to continue to seek and obtain other loans.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

217.   Having so deceived and defrauded the Lender to relinquish said collateral, and having stolen said collateral for their individual and collective personal uses, the Federal RICO Defendants have refused to repay, in full, the $29.5 million loan, with interest, made to Atlantic. Following, Talisman's initiation of litigation in the Cayman Islands, the District Court, and New York state court, Mouttet and the Federal RICO Defendants continued their fraudulent schemes by delaying, and otherwise obstructing justice in those jurisdictions for as long as possible.   In fact, the very filing of this Chapter 7 bankruptcy case by Mouttet is in furtherance, and part of those frauds, schemes, and obstructions of justice.

218.   As alleged above, each of the foregoing wires were sent, or caused to be sent, in interstate and/or foreign commerce, for the purpose of, and in furtherance of the Federal RICO Defendants' scheme or artifice to defraud, first, the Lender, and, thus, Talisman, and/or to otherwise illegally steal cash and other valuable collateral that could have, and should have been used to pay obtain money or property from the Lender, and, thus, Talisman, by means of false or fraudulent practices, representations, or promises.

219.   Accordingly, the Federal RICO Defendants have violated 18 U.S.C. §1343.

**(2)**   **The Wire Fraud:  Federal RICO Defendants' Efforts to Obtain Lottery and Gaming Licenses and Expand into Central America**

220.   Several times in or about April and May, 2006, Mouttet sent various emails, while he was located in this District, to the Lender, containing written projections - - furnished to Mouttet by Vazquez - - for future planned gaming and lottery operations

91

in Nicaragua, El Salvador, Panama, Costa Rica, and Guatemala, among other countries.

221.    As previously alleged above, the emails were sent by Mouttet to further the fraudulent acts and practices of the Federal RICO Defendants, which were motivated by their greed and desire for unreasonable financial gain, by whatever illegal means necessary; their desire to escape the legal consequences of their past frauds and thefts; their desire to lull the Lender to refrain from pursuing its rights under the various agreements; and, their desire to continue to seek and obtain other loans from the Lender.

222.    As alleged above, each of the foregoing wires were sent, or caused to be sent, in interstate and/or foreign commerce, for the purpose of, and in furtherance of the Federal RICO Defendants' scheme or artifice to defraud, first, the Lender, and, thus, Talisman, and/or to otherwise steal cash and other valuable collateral, and to otherwise obtain additional millions of dollars in new loans from the Lender, and, thus, Talisman, by means of false or fraudulent practices, representations, or promises.

223.    Accordingly, the Federal RICO Defendants have violated 18 U.S.C. §1343.

**(3)    The Wire Fraud:  The SGCW Loan in 2007**

224.    As part of the Federal RICO Defendants' scheme to induce the Lender to loan Defendants millions of dollars of new money on an ongoing basis, and purportedly in order to proceed with the global development of SVL's gaming and lottery business, and by causing the duly executed MOU to be sent by facsimile transmission, through Mouttet's lawyers in Miami, and on or about January 5, 2007, to the Lender, and then

92

delivered to the Decision Maker for the Lender, Mouttet and C. Mouttet misrepresented the purposes for which they sought the SGCW loan in 2007, and the ultimate use of those proceeds.   The Lender was told and led to believe that the SGCW loan was for legitimate, specific, business-related purposes, and it was **not advised** that the true purpose(s) was for the personal benefit of or for other improper, illegal, or fraudulent purposes of the Federal RICO Defendants.

225.   On or about January 4, 2007, Mouttet and C. Mouttet caused Mouttet's counsel in Miami to send the signed personal guarantee of C. Mouttet by facsimile transmission to the Lender, which personal guarantee was then delivered to the Decision Maker for the Lender.   This facsimile transmission was made, and the foregoing personal guarantee of C. Mouttet was executed, to lull the Lender into believing that at least $4 million of the indebtedness owed by SGCW would be repaid.

226.   On or about March 23, 2007, Mouttet and C. Mouttet sent, or caused to be sent, by facsimile transmission, through Mouttet's lawyers in Miami, the various loan documents concerning the SGCW $13.6 million loan to the Lender, and thereafter delivered to the Decision Maker for the Lender.  Each of the duly executed promissory notes for the SGCW loan was caused to be sent by Mouttet, while he was in this District, by facsimile transmission to the Lender, which signed promissory notes were then delivered to the Decision Maker for the Lender.

227.   On or about March 28, 2007, and again on or about April 12, 2007, the executed loan documentation for the $4 million of SGCW loan proceeds that were furnished to Flying Fish were provided to the Lender by emails sent by either Mouttet, while he was in this District, or by his counsel in Miami.

93

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

228.    Mouttet and C. Mouttet knowingly and purposefully misrepresented the reasons for, and the ultimate use of, the $13.6 million in loan proceeds.

229.    As alleged more fully below, Mouttet funneled the proceeds of the $13.6 million loan, first, through accounts of United States banks in New York, and then through several offshore accounts held in the names of shell corporations, to mask the true identify and beneficial owner of the accounts and the true recipient of the loan proceeds. Such activities are methodologies to commit criminal money laundering activities, also used to complement the loan kiting, wire fraud, mail fraud and other schemes of the Federal RICO Defendants.

230.    On or about December 7, 2006, the Lender received by email wire instructions sent by Montesano at Pinnacle, acting on behalf of Mouttet, on which Mouttet was copied, instructing the Lender to wire $4 million to Mouttet's personal bank account located at City National Bank of Florida, in Pinecrest, Florida, in this District.

231.    On or about March 23, 2007, pursuant to instructions sent by email by Mouttet, while he was in this District, the Lender disbursed $1.5 million as follows:  $1 Million to Bank of America New York for GTECH to purchase equipment; and $500,000 to HSBC Bank USA in New York, for further crediting to Capital G Bank in Bermuda.

232.    On or about April 13, 2007 and April 23, 2007, pursuant to instructions sent by email by Mouttet, while he was in this District, the Lender wired $5,025,000 to Chase Manhattan Bank and Deutsche Bank Trust Company of America, both located in New York, for further crediting to Bermuda Commercial Bank Ltd.  These monies were used to repay the previous $4 million personal loan made to Mouttet and his brother C. Mouttet, and the balance was supposed to be used by SGCW for operating expenses.

94

233.   On or about April 19, 2007, pursuant to instructions sent by email by Mouttet, while he was in this District, Westford, as Lender, wired $1 million to Bank of America in New York for GTECH, as a second installment payment on the equipment purchased by SGCW.

234.   On or about June 12, 2007, pursuant to instructions made by a telephone call from Mouttet, or by an email he sent, while he was in this District, the Lender wired another $1 million to Citibank in New York for Mayberry Investments Ltd. ("Mayberry"), at which SGCW had a brokerage account, on which C. Mouttet was the sole authorized signatory.

235.   On or about June 15, 2007, pursuant to email instructions from Mouttet, while he was located in this District, the Lender wired $1,550,000 to Citibank in New York, $1.25 million of which went to Citibank in New York for Mayberry, at which SGCW had an account, and for which C. Mouttet was the sole signatory; and the remaining $300,000 was wired by the Lender to SGCW's account located at Bermuda Commercial Bank Ltd.

236.   On or about June 19, 2007, pursuant to email instructions from Mouttet, while he was located in this District, the Lender wired another $2 million to Citibank in New York for Mayberry, at which SGCW had an account, and for which C. Mouttet was the sole signatory.

237.   On or about September 28, 2007, pursuant to email instructions from Mouttet, again, while he was in this District, the Lender wired $1,025,000 to Deutsche Bank Trust Company of America in New York, for further crediting to SGCW's account at Bermuda Commercial Bank Ltd.

95

238.   Mouttet has admitted, in other litigation before the District Court, that he directed, through Flying Fish, the largest shareholder of SGCW, or that he had the ability to direct the disbursement of the $13.6 million in loan proceeds made by the Lender to SGCW.   Using that authority, Mouttet, and his brother, C. Mouttet, each misappropriated those funds for unauthorized, illegal, and individual and collective personal uses, as members of The Mouttet Family Criminal Enterprise.

239.   Each of Mouttet's instructions, and each resulting wire was for the purpose of defrauding the Lender, and perpetrating the Federal RICO Defendants' scheme to appear to borrow money for what appeared to be legitimate corporate, business purposes, when the true purpose was to steal those funds for their own individual and collective personal uses, which purposes were inconsistent with and contrary to the various loan documents.

240.   Having stolen these funds for their individual and collective personal uses, the Federal RICO Defendants have refused to repay, in full, the $13.6 million loan, with interest, made to SGCW.

241.   On or about April 10, 2007, Mouttet executed and delivered to the Lender, via facsimile transmission to the Lender, which document was ultimately delivered to the Decision Maker for the Lender, the SGCW Guarantee, whereby Mouttet agreed to personally guarantee the repayment of the $13.6 million loan to SGCW.

242.   As alleged above, each of the foregoing wires were sent, or caused to be sent, in interstate and/or foreign commerce, for the purpose of, and in furtherance of the Federal RICO Defendants' scheme or artifice to defraud, first, the Lender, and, thus,

96

Talisman, and/or to otherwise obtain money or property from the Lender, and, thus, Talisman, by means of false or fraudulent practices, representations, or promises.

243.   Accordingly, the Federal RICO Defendants have violated 18 U.S.C. §1343.

**(4)**   **The Wire Fraud: Lulling**

244.   From sometime beginning no later than in or about 2005, but otherwise *unknown by the Lender or Talisman*, the Federal RICO Defendants' scheme contemplated the commission of fraudulent activities that were intended to be and actually were carried out -- *both before, and after* -- the money was loaned to them, on multiple occasions, as set forth above.  Documents and emails were sent by the Federal RICO Defendants to the Lender, at a business office, then-located in Boca Raton, and/or to the Decision Maker for the Lender, for the purpose of lulling the Lender not only into believing, and assuring it, that the Federal RICO Defendants possessed great opportunities to generate revenues in Central America, to allow the loans to be repaid, as promised.  However, now that the truth has been discovered by the Lender and Talisman, it is clear that the true purpose was to delay the Lender *from detecting their fraudulent scheme and prior theft(s)* of, first, cash and other valuable collateral, and, then, millions of dollars of additional proceeds, and corresponding additional collateral security, and *from pursuing* courses of legal action that might be available to, first, the Lender and, then Talisman.  Thus, even after the Federal RICO Defendants stole the collateral and additional loan funds, and personally received the benefits derived therefrom, they persisted in their fraudulent acts and practices, motivated by (a) their greed and desire for unreasonable financial gain, by whatever illegal means necessary;

97

(b) their desire to hide, and to escape the legal consequences of their past frauds and theft(s); (c) their desire to hide and lull the Lender from detecting their frauds and thefts, or pursuing its rights under the various agreements; and (d) their desire to continue to seek and obtain loans.

245.   SVL, Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, utilized the private placement and IPO processes in 2005, and 2006, respectively, as well as promises of a traditional bank loan, to induce the Lender to believe that it should not, and need not immediately exercise its rights, because both the private placement and the IPO, and the traditional bank loan, would generate sufficient proceeds to retire all outstanding loans owed to the Lender.

246.   On or about December 4, 2008, Mouttet directed and caused a term sheet to be sent via facsimile transmission to the Lender, via a fax sent directly to the Decision Maker for the Lender then-located in Florida, on his own behalf, as well as on behalf of Atlantic, SGCW, and AmeriServices.  This term sheet proposed the re-structuring of the outstanding debts owed by Atlantic and SGCW.

247.   As alleged above, each of the foregoing wires were sent, or caused to be sent, in interstate and/or foreign commerce, for the purpose of, and in furtherance of the **_Federal RICO Defendants' scheme or artifice to defraud,_** first, the Lender, and, thus, Talisman, and/or **_to otherwise cover-up and continue to conceal their prior thefts_** of first, cash and other valuable collateral, and, then, additional millions of dollars of loan proceeds and corresponding collateral security from the Lender, and, thus, Talisman, by means of false or fraudulent practices, representations, or promises.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

248.    Accordingly, the Federal RICO Defendants have violated 18 U.S.C. §1343.

**(5)    The Mail Fraud**

249.    In or about July, 2005, Mouttet sent, or caused to be sent by private or commercial interstate carrier, the original of the duly executed amendment, dated July 7, 2005, to the loan agreement with Atlantic to a business office of the Lender, then-located in Boca Raton.

250.    On or about March 13, 2006, Mouttet caused his attorneys in Miami, to send by private or commercial interstate carrier various licenses and contracts, regarding the planned expansion of lottery business into Central America to the Lender, which were then delivered to the Decision Maker for the Lender.

251.    On or about March 23, 2007, Mouttet and C. Mouttet sent, or caused to be sent, by private or commercial interstate carrier through Mouttet's lawyers in Miami, to the Decision Maker for the Lender, the originals of various loan documents executed by SGCW for the $13.6 million loan.   In addition, each of the seven (7) promissory notes were signed by Mouttet or C. Mouttet, on behalf of SGCW in Florida, and each of those original promissory notes were sent by private or commercial interstate carrier to the Decision Maker for the Lender.

252.    Each of the above mailings in interstate and foreign commerce was part of, or incidental to, the Federal RICO Defendants' scheme and artifice to defraud the Lender, by either concealing their prior theft of the cash and other valuable collateral that secured the $29.5 million loan to Atlantic, and/or by obtaining and stealing additional millions of dollars of loan proceeds, and the corresponding collateral security,

99

acquired by false and fraudulent pretenses, representations, and promises. These illegal acts were committed for the purpose of executing and furthering their scheme and artifice to defraud, and to steal tens of millions of dollars from the Lender, and, thus, Talisman, all in violation of 18 U.S.C. §1341.

253.    Mouttet, Hoo, Levy, Stewart, C. Mouttet, George, Graham, SGCW, Atlantic, and SVL, among others, all knowingly participated in the schemes to defraud as alleged in this Complaint.

254.    The above alleged fraudulent written communications and mailings were motivated by the Federal RICO Defendants' greed and desire for unreasonable financial gain, by whatever illegal means necessary; their desire to hide and escape the legal consequences of their past frauds; their desire to delay detection of the frauds and thefts of monies they had perpetrated; and their desire to lull and persuade, first, the Lender, and, as a result, Talisman, into delaying the exercise of its legal rights.

255.    Through the Federal RICO Defendants' multiple instances of mail fraud, the Lender, and thus, Talisman, was deprived of its rights, title and interest as lender in the loan proceeds, collateral, and interest thereon.

256.    Accordingly, the Federal RICO Defendants have violated the provisions of 18 U.S.C. §1341.

**(6)    The Money Laundering**

257.    The various wire transfers from Florida and the United States that were requested by Mouttet, on behalf of the Federal RICO Defendants, into off-shore bank accounts controlled by Mouttet and The Mouttet Family Criminal Enterprise, through his/its various entities (from which proceeds of at least $13.6 million was also stolen and

ultimately personally pocketed, by Mouttet and C. Mouttet in addition to $300,000 each month, since November 1, 2004, stolen by The Mouttet Family Criminal Enterprise) were designed by the Federal RICO Defendants to conceal or disguise the source, use, and/or control of the stolen funds.

258.    Mouttet and C. Mouttet, and Mouttet and The Mouttet Family Criminal Enterprise knew that the foregoing $13.6 million in stolen loan proceeds, and the $300,000 each month since November 1, 2004, respectively, were derived from the fraud and thefts they/it had perpetrated on the Lender, through the illegal uses of the wires and mails, as alleged above, and these Defendants knew that, by transferring the funds through multiple bank and corporate accounts, as if this were a shell game, the purpose of such transfers was to conceal the purpose, nature, source, control, and location of the funds.  Thus, they intended to conceal or disguise the true nature and source of the transferred funds between corporations and ultimately to themselves.

259.    The Federal RICO Defendants knew that the funds intentionally transported represented proceeds from their fraudulent activities and thefts.

260.    Accordingly, the Federal RICO Defendants engaged in illegal money laundering activities in violation of 18 U.S.C. §1956(a)(1)(B)(i).

**D.    The Pattern of Racketeering Activity**

261.    The foregoing predicate acts enumerated above formed a pattern of racketeering activity, because each financing transaction the Federal RICO Defendants engaged in shared common characteristics, to-wit:  to induce the Lender to either relinquish cash and/or other valuable collateral in exchange for promises of alternative means of repayment and/or to loan tens of millions of additional dollars of funds to the

101

SVL Enterprise and/or The Mouttet Family Criminal Enterprise on the pretext that the monies would be used for what appeared to be legitimate corporate and business purposes; to generate the necessary funds and revenue stream to not only repay, in full, the new loans, but also all prior outstanding loans; the stealing, theft, diversion, embezzlement, and/or otherwise misappropriation of the collateral and additional loan funds for individual and/or collective personal uses; fraudulent misrepresentations to stall repayment and lull the Lender into refraining from exercising its legal rights; fraudulent dishonoring of repayment; and the violations of the wire fraud, mail fraud, and money laundering Federal statutes, all of which proximately caused injury to, first, the Lender, and, then Talisman.

262.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

263.    The Federal RICO Defendants have directly and indirectly conducted and participated in the conduct of the SVL Enterprise's affairs, and those of The Mouttet Family Criminal Enterprise's affairs, through the pattern of racketeering activity described above, in violation of 18 U.S.C. §1962(c).

264.    The predicate acts alleged above were all related, because they were all designed and intended for the same or similar purposes, namely, to continue to obtain sizeable loans from the Lender; to either steal cash and other valuable collateral and/or additional loan proceeds; to delay and otherwise avoid repayment; to delay detection of the Federal RICO Defendants' fraudulent conduct and thefts; and to otherwise prevent, first, the Lender, and, then, Talisman from exercising its rights under the various loan agreements and related documents.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

265.   The predicate acts in which the Federal RICO Defendants engaged formed a pattern in that they both constituted, and threatened the likelihood of continued, criminal activity.

266.   By their repeated conduct, perpetrating the predicate acts alleged above, from in or about at least 2005 through at least the present time, both the individual defendants (Mouttet, C. Mouttet, P. G. Mouttet, N. Mouttet, Hoo, Levy, Stewart, Graham, George, Vazquez, Sevilla, Montesano, and De La Cruz), and the corporate defendants (SVL, Atlantic, Atlantic Consultants, SGCW, AmeriServices, Peninsula, Pinnacle, Haven, Flying Fish, Supreme Holdings-Delaware, SGL, and Supreme Gaming-Florida), as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, engaged in a pattern of racketeering in violation of 18 U.S.C. §1961(c).

267.   By their very conduct, in blocking and preventing Talisman from exercising its rights as lender, the individual and corporate Defendants have demonstrated that their predicate acts are part of an ongoing, regular course of doing business, in which they still persist in conducting an unlawful RICO enterprise(s). Thus, these Defendants have threatened to continue, and have in fact continued, their illegal RICO enterprise(s) to deprive Talisman of the money and property to which it is entitled, namely, full repayment of the $29.5 million and $13.6 million in loans, with interest.

268.   The pattern of racketeering engaged in by the individual and corporate Defendants directly and proximately caused the injuries to the same victim, namely, first, the Lender, and, then, Talisman. As alleged above, the acts, practices, and courses of business alleged herein deprived, first, the Lender, and, hence, Talisman, of the money and property to which it is entitled, namely, full repayment of the $29.5

103

million and $13.6 million in loans, with interest.   **But for** the unlawful pattern of racketeering engaged in by the Federal RICO Defendants, the loans would have been repaid in full with the existing cash and other valuable collateral, and not further extended, or, in the case of the $13.6 million additional loan to SGCW, not made in the first place, and the Lender, and, thus, Talisman, would not have suffered any harm, damages, and/or injury.

269.   The Lender reasonably relied upon the covenants of the various loan documents in governing its behavior, respecting the maturity date and repayment of the loans, as well as on the representations and promises of the various Federal RICO Defendants as heretofore alleged above.

270.   The Federal RICO Defendants acted knowingly, purposefully, and with intent to deceive and otherwise steal from, first, the Lender, and, then, Talisman.

271.   Accordingly, the Federal RICO Defendants have violated the provisions of 18 U.S.C. §1962(c).

272.   As the direct and proximate result of the Federal RICO Defendants' racketeering activities, and violations of 18 U.S.C. §1962(c), Talisman (and its assignors, the Lender) has been injured in its business and property.   Specifically, after making tens of millions of dollars of business loans (for what appeared to be legitimate business purposes), *the acts of The Mouttet Family Criminal Enterprise, the SVL Enterprise, and the Defendants' post-loan closing racketeering acts* - - including *the misappropriation and theft of, <u>first</u>, cash and other valuable collateral and, <u>then</u>, millions of dollars of additional loan proceeds*, from the Lender, and, thus, Talisman, as well as *other funds and other valuable property* of, first, the Lender,

104

and, then, Talisman - - prevented the Lender, and, thus, Talisman, from halting the theft and diversion of funds and other valuable property, and/or caused Talisman (and its assignors, the Lender) to forego the opportunity to demand repayment of monies from the borrowers and guarantors, by declaring defaults under the loans and the agreements executed in association therewith.

**E.**     **Allegations to Support Request(s) for Injunctive and Other Equitable Relief**

273.   **Talisman will likely succeed on the merits of its Federal RICO claim(s)**, Fed.R.Civ.P. 65.   Based upon the foregoing allegations, Talisman has established *prima facie* violations by the Federal RICO Defendants of the provisions of 18 U.S.C. §1962(c).

274.   **Talisman will suffer irreparable injury unless an injunction issues or other equitable relief is awarded,** Fed.R.Civ.P. 65.  The entry of an injunction and other equitable relief is needed to stop the Federal RICO Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of Talisman. Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of Talisman's property, namely, the loan proceeds, the collateral security for the loans, and the proceeds of that collateral.  To do so, Talisman seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of Talisman's property stolen by the Federal RICO Defendants, and to prevent the further dissipation and theft of Talisman's property.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

275.    **The threatened injury to Talisman outweighs whatever damage the proposed injunction or other equitable relief may cause the Federal RICO Defendants,** Fed.R.Civ.P. 65.   The Federal RICO Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to perpetrate their illicit RICO schemes and conspiracy, which has resulted in Talisman being deprived of its property and the agreed-upon collateral to repay the outstanding loans.   The equities weigh far more heavily in favor of Talisman, than in favor the Federal RICO Defendants. In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by Talisman exceeds $200 million, and, thus, the injury to Talisman far outweighs any perceived injury to the Federal RICO Defendants, which may result from the injunctive and other equitable relief awarded to Talisman.

276.    **The requested injunction and other equitable relief will not be adverse to the public interest,** Fed.R.Civ.P. 65.   In fact, the public interest is served by carrying out the Congressional and legislative mandate for the Federal courts to issue the injunctive and other equitable relief specifically requested by Talisman, and specifically authorized pursuant to 18 U.S.C. §1964(a).

### COUNT II
### FEDERAL RICO CONSPIRACY
### 18 U.S.C. §1962(d)

277.    Talisman re-alleges paragraphs 169 to 276, above, and incorporates said paragraphs by reference as if fully set forth herein.

278.    Count II of this Complaint seeks relief against all of the named Federal RICO Defendants and Jane and Does Nos. 1-25 and Moe and Joe Entities Nos. 1-25,

106

among others (collectively, the "Count II Federal RICO Defendants") for violation of 18 U.S.C. §1962(d).

A.    **The Conspiracy**

279.    From in or about at least 2005 through the present, all of the individual and corporate Count II Federal RICO Defendants willfully and knowingly combined, conspired, performed overt acts in further of said conspiracy, and agreed to violate the provisions of 18 U.S.C. §1961 *et seq*.

280.    Mouttet, Hoo, Levy, and Graham, and Peter Stewart agreed to provide certain cash collateral in the form of Service Fees to be paid by SVL, directly to the Lender, to secure the repayment of the $29.5 million loan for Atlantic from the Lender, and either signed agreements to that effect, or had knowledge of such agreements and/or participated in the procurement of them.  Subsequently, Stewart and George acquired express and actual knowledge of these agreements.

281.    Sometime believed to be between on or about November 1, 2004 and in and about June, 2005, SVL, Atlantic, Atlantic Consultants, Mouttet, Hoo, Levy, Stewart, Graham, and George **secretly** and fraudulently entered in an "amendment" to the marketing services agreement between SVL and Atlantic, to cut off the Lender's rights to payment, and to cut off the escrowing of any Service Fees to be paid by SVL to Atlantic.  At the same time, all of these Defendants entered into **a second, secret** agreement between SVL and a "newly formed" entity, Atlantic Consultants, to siphon off $300,000 each month from SVL, to the detriment of, initially, the Lender, and, then Talisman.  This **secret** agreement was executed by George, on behalf of SVL, and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

Mouttet (while he was also a Director of SVL), on behalf of Atlantic Consultants, with the knowledge and express approval of the remaining individual Defendants.

282.   Thereafter, these individual Defendants devised an illegal scheme and plan to defraud and deceive the Lender to relinquish its rights to the Services Fees, in **purported** exchange for alternative means of repayment, namely, the proceeds from the private placement, SVL IPO, and traditional bank loan(s), as well as the personal guarantee of Mouttet, himself.   By doing so, these individual Defendants caused the Lender to forego a revenue stream in the form of Service Fees that could have, and should have been used to repay the indebtedness owed to the Lender, and, thus, Talisman.   This illegal scheme to defraud and deceive the Lender, followed their acts to lull the Lender into agreeing to further extensions of the maturity date for the $29.5 million loan to Atlantic, were all motivated by the Count II Federal RICO Defendants' greed and desire for unreasonable financial gain, by whatever illegal means necessary; their desire to hide and escape the legal consequences of their past schemes and frauds; their desire to delay detection of the schemes, frauds, and thefts of monies they had perpetrated; and their desire to lull and persuade, first, the Lender, and as a result, Talisman, into delaying its exercise of its legal rights.

283.   In addition, despite the promises by Mouttet, Hoo, and Stewart to pledge shares of SVL capital stock to obtain a traditional bank loan to repay, in full, the remaining indebtedness owed by Atlantic to the Lender, these Defendants, instead, with the knowledge of Graham, George, and Levy, among others, used those shares of SVL stock, for Supreme Holdings-Delaware and Supreme Gaming-Florida, to obtain at least

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

$16.5 million in loans from Petters, but none of said proceeds were used to repay any portion of the indebtedness owed to the Lender.

284.   Further, with the knowledge and approval of his fellow SVL Board Members, namely, Hoo, Levy, Stewart, Graham, and George, Mouttet sought expansion, with the active assistance of Vazquez, Sevilla, De La Cruz and Montesano, of the lottery business into Central America, and organized SGCW as a means to borrow another $13.6 million from the Lender, funds which he, and his brother, C. Mouttet, and the Mouttet Family Criminal Enterprise thereafter used in unauthorized ways.

285.   All of the individual and corporate Count II Federal RICO Defendants knowingly and voluntarily participated in the conspiracy, by either carrying out one or more of the predicate acts, or by agreeing to the conduct of The Mouttet Family Criminal Enterprise's and/or SVL Enterprise's affairs and overall objectives of the conspiracy.

**B.** **The Purpose of the Conspiracy**

286.   The Count II Federal RICO Defendants and their co-conspirators ***illegally and fraudulently obtained tens of millions of dollars*** in the form of, <u>first</u>, the ***diversion and theft of the cash and other valuable collateral securing the existing $29.5 million*** loan to Atlantic, then through the ***solicitation and theft of $13.6 million*** for an additional business loan to SGCW, from the Lender, through false pretenses, representations, and promises, all in order to carry out the purpose of the conspiracy, to-wit:  to obtain substantial economic benefits for themselves and others through their unauthorized diversion, theft, misuse, misappropriation, and secreting of the cash and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

other valuable collateral for all of the loans, as well as the $13.6 in additional loan proceeds, made by the Lender, to their own use and illegal purposes.

287.   To accomplish these purposes, as alleged above, each of the individual and corporate Count II Federal RICO Defendants either carried out one of more of the overt predicate acts, or agreed to the conduct of The Mouttet Family Criminal Enterprise's and/or the SVL Enterprise's affairs and overall objectives of the conspiracy, *to steal over $35.3 million in outstanding principal, plus $35 million in accrued interest,* by wire fraud, mail fraud, and money laundering activities which violated the RICO statute, 18 U.S.C. §1961 *et seq.*

288.   The Count II Federal RICO Defendants agreed and conspired to violate 18 U.S.C. §1962(c).  Specifically, the Count II Federal RICO Defendants have intentionally conspired and agreed to, directly and indirectly, conduct and participate in the conduct of the affairs of The Mouttet Family Criminal Enterprise and/or the SVL Enterprise through a pattern of racketeering activity, as set forth in detail heretofore above.

289.   The Count II Federal RICO Defendants knew that their overt predicate acts were part of a pattern of racketeering activity, and agreed to participate in or condone the commission of those acts to further the scheme described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

290.   As a direct and proximate cause of the Count II Federal RICO Defendants' conspiracy, the overt acts taken in the furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Talisman has been injured in its business and property.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

C.    <u>Allegations to Support Request(s) for Injunctive and Other Equitable Relief</u>

291.   **Talisman will likely succeed on the merits of its Federal RICO claim(s)**, Fed.R.Civ.P. 65.   Based upon the foregoing allegations, Talisman has established *prima facie* violations by the Federal RICO Defendants of the provisions of 18 U.S.C. §1962(d).

292.   **Talisman will suffer irreparable injury unless an injunction issues or other equitable relief is awarded**, Fed.R.Civ.P. 65.  The entry of an injunction and other equitable relief is needed to stop the Federal RICO Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of Talisman. Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of Talisman's property, namely, the loan proceeds, the collateral security for the loans, and the proceeds of that collateral.  To do so, Talisman seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of Talisman's property stolen by the Federal RICO Defendants, and to prevent the further dissipation and theft of Talisman's property.

293.   **The threatened injury to Talisman outweighs whatever damage the proposed injunction or other equitable relief may cause the Federal RICO Defendants**, Fed.R.Civ.P. 65.  The Federal RICO Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to perpetrate their illicit RICO schemes and conspiracy, which has resulted in Talisman being deprived of its property and the agreed-upon collateral to repay the outstanding loans.  The equities

111

weigh far more heavily in favor of Talisman, than in favor the Federal RICO Defendants. In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by Talisman exceeds $200 million, and, thus, the injury to Talisman far outweighs any perceived injury to the Federal RICO Defendants, which may result from the injunctive and other equitable relief awarded to Talisman.

294.   **The requested injunction and other equitable relief will not be adverse to the public interest**, Fed.R.Civ.P. 65.  In fact, the public interest is served by carrying out the Congressional and legislative mandate for the Federal courts to issue the injunctive and other equitable relief specifically requested by Talisman, and specifically authorized pursuant to 18 U.S.C. §1964(a).

<u>ALLEGATIONS COMMON TO THE FLORIDA STATE LAW CLAIMS, ONLY</u>

A.   <u>Introduction to the Florida State Law Claims</u>

295.   In addition to, and separately from the allegations, above (pertaining to this Bankruptcy Court's and/or District Court's Jurisdiction and Venue, Talisman and the Federal RICO Defendants, and the facts that form the basis of Talisman's Federal RICO claims, and its alone), ***Talisman and EGE*** each hereby allege the following additional allegations that form the basis of their ***separate Florida state law claims*** against each of the Florida Law Defendants (as that term is defined below), as follows:

296.   Both Plaintiffs are asserting various Florida state law claims.  However, ***<u>Talisman</u>, <u>alone</u>, is asserting claims arising from the thefts by certain of the Florida Law Defendants of tens of millions of dollars of certain loan proceeds, and/or the collateral that secured these loans***; whereas, ***<u>EGE</u>, <u>alone</u>, is asserting separate and unique Florida law claims arising from the thefts of shares of stock,***

112

***dividends, and other valuable property rights*** by certain of the Florida Law Defendants.

297.    EGE informs this Bankruptcy Court, as well as the District Court, that the Florida Law Defendants may attempt to move to dismiss its unique Florida law claims asserted herein based upon an incorrect argument that those claims are somehow barred by certain, prior court proceedings in Jamaica.  Such a legal argument is without merit in that, as more fully alleged, below (a) certain of the Florida Law Defendants intentionally ***withheld*** from production during pre-trial discovery, and ***withheld*** as evidence at trial, certain written agreements - - such as, for example, a June 28, 2005 Supplemental Agreement, as more fully alleged, below[9/] - - they either executed, consented to, and/or with knowledge thereof pursued a course of conduct that caused injuries and damage to EGE; (b) the foregoing Defendants were either in possession of said agreements, or had knowledge of the same, at the time of the trial in Jamaica, but intentionally ***withheld*** those agreements from the trier of fact in Jamaica with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts; (c) thereafter, certain of said Defendants have affirmatively attempted to use the existence and express terms of those very same agreements (again, among other agreements, the June 28, 2005 Supplemental Agreement)[10/] to attempt to defeat a subsequent claim of both liability and damages arising from the Atlantic Guarantee as well as the SGCW Guarantee  previously executed by Mouttet in

---

[9/]    This is in addition to the November, 2004 consulting agreement between SVL and Atlantic Marketing that was never disclosed to the Lender, or to Talisman, until seven (7) years after it was executed.

[10/]    Again, this is in addition to the November, 2004 consulting agreement between SVL and Atlantic Marketing.

113

favor of the Lender; (d) certain of the Florida Law Defendants committed perjury, or condoned the commission of perjured testimony, at the trial in Jamaica, with the express purpose and design to unlawfully persuade that trier of fact to render a decision contrary to the true facts, and to otherwise attempt to hide from EGE, and also the Lender, and, thus, Talisman, and cover-up their prior and still ongoing illegal conspiracy to separately defraud and steal from each of the Plaintiffs; (e) this action involves additional parties named as Florida Law Defendants that were not sued in Jamaica; and (f) EGE is asserting Florida state law claims that are not available under Jamaican law, and which were not previously litigated or determined by any court.  In sum, the Florida Law Defendants' collective actions rendered the prior Jamaican proceedings unlawful, due to their collective obstruction of justice, and therefore, a nullity.

**B.      Summary of the Separate and Distinct Florida State Law Claims Brought by Talisman and EGE**

**(1)      Summary of Relief Requested Pursuant to the Florida State Law Claims**

**(a)      Relief Sought by Talisman Pursuant to Florida Law**

298.    Pursuant to Fla. Stat. §§768.73, 772.104, 772.11, 772.18, 772.185, 812.035, and 895.05, and Florida common law, Talisman seeks the following relief:

(a)      Treble damages (approximately $65.1 million, as of April 30, 2012) for the fraudulent conspiracy perpetrated upon Talisman's assignors, and, thus, Talisman, which resulted in an illegal scheme to avoid the repayment of the remaining principal balance due on the $29.5 million loan (of which $21,722,811 in principal remains unpaid) made to Atlantic, due the illegal activities and unlawful conspiracy of the Florida Law Defendants;

114

(b)    <u>Treble damages (approximately $80.1 million, as of April 30, 2012)</u> for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $26,718,044, as of April 30, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 21%), due the illegal activities and unlawful conspiracy of the Florida Law Defendants;

(c)    <u>Treble damages (approximately $41 million, as of March 27, 2012)</u> for the theft of loan proceeds, totaling $13.6 million, for a short-term loan made to SGCW, due the illegal activities and unlawful conspiracy of the Florida Law Defendants;

(d)    <u>Treble damages (approximately $25,670,001, as of March 27, 2012)</u> for the theft of the gaming and lottery revenues, which Mouttet has admitted were supposed to have been used to repay the $13.6 million short term loan made to SGCW, as well as other collateral that were to secure said loan, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $8,556,667, as of March 27, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 15%);

(e)    <u>Divestiture to Talisman</u> by Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet, and/or any other member of The Mouttet Family <u>Florida</u> Criminal Enterprise, of their equity interests and/or beneficial interests in SVL, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Flying

115

Fish, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and SGCW, and Relief Defendants Intralot St. Lucia Limited, Intralot Caribbean Ventures Limited, and Intralot, S.A. (collectively "Intralot), SGLBVI, and VLT(BVI);

(f)     An injunction imposing reasonable restrictions on the Florida Law Defendants' future activities, including, without limitation, prohibiting them from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged, below;

(g)     The dissolution of Pinnacle, and Supreme Gaming-Florida, each an entity organized and existing under the laws of the State of Florida, and the divestiture of the assets of each entity to Talisman;

(h)     An accounting of the unlawfully retained benefits conferred upon each of the Florida Law Defendants;

(i)     The imposition of a constructive trust over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate Talisman for the loss of the principal, interest thereon, and collateral that secured the outstanding loans made to Atlantic and SGCW;

(j)     Prejudgment and post judgment interest;

(k)     Punitive damages pursuant to Fla. Stat. § 768.73;[11]

(l)     Reasonable attorneys' fees;

(m)     Costs of this action; and

---

[11]     Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time, later in this litigation.

116

(n)     <u>Such other relief</u> as this Bankruptcy Court, as well as the District Court, each deems just and proper.

**(b)     <u>Relief Sought by EGE Pursuant to Florida Law</u>**

299.    Pursuant to Fla. Stat. §§768.73, 772.104, 772.11, 772.18, 772.185, 812.035, and 895.05, and Florida common law, EGE seeks the following relief:

(a)     <u>The return, delivery, and/or proper registration</u>, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE, <u>of all of the 391,584,242 shares of SVL stock</u>, and <u>treble damages of either 1,174,752,726 shares of SVL or the dollar value</u> of said shares for the theft of the over 391.5 million shares of ordinary stock (after stock split(s)) of SVL, by the unlawful conspiracy of and pattern of conduct by SVL, Mouttet, P. G. Mouttet, N. Mouttet, Hoo, Levy, Stewart, Graham, George, and/or other members of The Mouttet Family <u>Florida</u> Criminal Enterprise, among other Florida Law Defendants;

(b)     <u>Treble damages for the theft of all of the dividends paid</u> on the foregoing 391.5 million shares of <u>SVL</u>;

(c)     <u>Treble damages for the theft of its 17% equity participation in both Atlantic and Peninsula</u>;

(d)     <u>Treble damages for the theft of all of the dividends</u> declared and paid on its 17% equity participation <u>in both Atlantic and Peninsula</u>;

(e)     <u>Divestiture to EGE</u> by Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet and/or any other member of The Mouttet Family <u>Florida</u> Criminal Enterprise of their equity interests and/or beneficial interests in SVL,

117

Atlantic, Haven, Atlantic Consultants, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Peninsula, and Relief Defendants Intralot, SGLBVI, and VLT(BVI);

(f)     Divestiture to EGE by Hoo, Levy, and Stewart of their equity interests and/or beneficial interests in SVL Supreme Holdings-Delaware, Supreme Gaming-Florida, and SGL, and Relief Defendants Intralot, SGLBVI and VLT(BVI);

(g)     An injunction imposing reasonable restrictions on the Florida Law Defendants' future activities, including, without limitation, prohibiting them from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged, below;

(h)     An accounting of the unlawfully retained benefits conferred upon each of the Florida Law Defendants;

(i)     The imposition of a constructive trust over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate EGE for the thefts of its stock ownership and equity participations in SVL, Atlantic, and Peninsula and dividends paid thereon;

(j)     Prejudgment and post judgment interest;

(k)     Punitive damages pursuant to Fla. Stat. § 768.73;[12/]

(l)     Reasonable attorneys' fees;

(m)     Costs of this action; and

---

[12/]     EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

118

(n)     Such other relief as this Bankruptcy Court, as well as the District Court,
each deems just and proper.

**(2)      Summary of the Basis for the Florida State Law Claims**

**(a)      Talisman's Florida Law Claims**

300.    The Florida state law claims of Talisman involve (a) a vast international
scheme, commencing in or about, at least mid-2005, and continuing to the present time,
perpetrated by the Florida Law Defendants and the Jane and John Does and Moe and
Joe Entities (as of yet unnamed) to fraudulently conspire against, first, the Lender, and,
then, Talisman, which resulted in an illegal scheme to avoid the full repayment of the
substantial principal balance still due and owing on the $29.5 million loan, including the
theft of certain cash and other valuable collateral securing said loan, made by the
Lender to Atlantic, followed by the theft of the entirety of another $13.6 million in loan
proceeds, plus accrued interest and the underlying collateral security, separately made
by the Lender to SGCW, and (b) the ongoing and continuous scheme to defraud and
otherwise cover-up the illegal acts and thefts, in an effort to hinder, delay, and otherwise
frustrate the rights and legal claims of Talisman, as assignee of the Lender, and the
rights as lender, under both of these loans.

301.    As more fully alleged below, beginning in or about mid-2005, it was the
intentional scheme of the Florida Law Defendants to free themselves of the obligation to
repay the then-due and owing principal balance on the $29.5 million loan, by
fraudulently inducing the Lender into releasing its guaranteed rights to certain cash and
other valuable collateral, ensuring the repayment of the unpaid balance on that loan,
***based upon the Florida Law Defendants' then-unknown - -  to the Lender, and,***

119

***thus, Talisman - - false representations*** concerning supposed external circumstances then requiring the Lender to release its rights to that cash and collateral, as well as the ***Florida Law Defendants' then unknown - - again to the Lender, and thus, Talisman - - false promises*** that the Florida Law Defendants would put in place viable alternative means and concrete sources of repayment, and replacement collateral. Thereafter, this intentional scheme involved a complex ruse, whereby the Florida Law Defendants tricked the Lender into lending them an additional $13.6 million by fabricating a web of deceit, designed to make the Lender believe it would be repaid, in full, on all loans, by the Florida Law Defendants, rather than - - ***as the Lender, and, thus, Talisman, only recently discovered in 2011 and 2012*** - - the dupes in a scheme to leave the Florida Law Defendants unjustly enriched by their scheme and to leave the Lender, and, thus, Talisman, unpaid.

302. The Florida Law Defendants employed various methods, including engaging in loan kiting, wire fraud, mail fraud, money laundering, and obstruction of justice, to cover-up their true intent and illegal activities, and to otherwise lull, first, the Lender, and, then, Talisman, into inaction ***until the truth was first discovered in 2011 and 2012***, as well as the extent and magnitude of the Florida Law Defendants' illegal and fraudulent activities. Such illegal activities to cover-up their prior fraud and illicit activities continue to this very day.

303. ***Unbeknownst to Talisman, or the Lender previously, and not discovered until 2011/2012***, what began as tens of millions of dollars of funding provided by the Lender, actually resulted in an illegal enterprise(s) that, first, planned and then ***secretly*** stole and diverted some of the cash and other valuable collateral

securing the loan to Atlantic; second, went to next defraud the Lender to make an additional $13.6 million loan to SGCW; and, third, culminated in the theft of the entirety of the new loan proceeds, and all of the underlying collateral therefor, resulting in over $70 million in unpaid principal and accrued interest being owed to the Lender, and, thus, Talisman, which was stolen by the Florida Law Defendants. This illegal conspiracy to defraud and steal from the Lender, and, thus, Talisman, was perpetrated by certain of the individual Defendants, namely, Mouttet, Hoo, Levy, Stewart, other Directors/Officers of SVL, including George, and Graham, and Mouttet's brother, C. Mouttet, his father P. G. Mouttet, his uncle N. Mouttet, and other members of their family (and perhaps others), for their own individual and collective personal use, through one or more criminal enterprise(s), involving an "association-in-fact" (the "SVL Florida Enterprise" and/or The Mouttet Family Florida Criminal Enterprise"), which engaged in a pattern of racketeering involving acts of mail fraud, wire fraud, money laundering, and obstruction of justice in other, prior legal proceedings, among other illegal acts.

304.    *It was not until October 5, 2011 that Talisman, and the Lender, learned for the first time*, from sworn affidavits/declarations filed by Mouttet in another proceeding previously pending before the District Court (Case No. 10-24577-CIV-GRAHAM/GOODMAN), that the Lender may have been deceived and defrauded, and that the Florida Law Defendants had entered into at least one *secret* agreement with the intended purpose to defraud the Lender, and, thus, Talisman.

305.    Thereafter, Talisman, with the Lender's assistance, conducted an investigation into the business and personal affairs of the various Florida Law Defendants, and others, which investigation included analyzing information that was

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

either obtained, admitted, or denied - - through the obstructionist and delaying tactics of certain of the Florida Law Defendants - - in other lawsuits, asserting claims based solely on breaches of various contracts, in the United States and abroad, seeking relief on claims and causes of action other than those alleged, below, in this Complaint.   The result of this investigation, to date, forms the present factual background and bases for the Florida Law claims alleged in this Complaint.

306.   In order to accomplish this illegal scheme and conspiracy to defraud the Lender, and, thus, Talisman, the Florida Law Defendants utilized a number of bank accounts in Florida, elsewhere in the United States, and overseas, (a) to improperly divert and launder monies that should have been paid to the Lender, to repay the $29.5 million loan to Atlantic, and subsequently, the entirety of the additional $13.6 million in loans proceeds to SGCW, and then (b) to re-route the monies to escape further detection by the Lender, among others.   These monies ultimately were funneled into the personal accounts and pockets of Mouttet, and other members of his family, among other persons, by virtue of the collective activities of the members of the Mouttet Family Florida Criminal Enterprise.

307.   ***Prior to early October, 2011, Talisman, and, the Lender, believed*** that SVL, a Jamaican limited liability company - - which became the sole provider of lottery games and a leading gaming lounge operator in Jamaica - - and its affiliated companies/businesses (such as the Atlantic and Supreme Gaming entities), formed to conduct online lottery services and other services in Florida and Central America, as well as SGCW, were all engaged in proper business activities conducted to generate revenues and other sources of monies to repay the loans made by the Lender.   Through

122

its investigation, Talisman, as well as the Lender, has now recently learned that, in many instances, these Defendants, individually and/or through the use of other entities named as Florida Law Defendants herein, as well as the Jane and John Does Nos. 1-25 and the Moe and Joe Entities Nos. 1-25, **secretly laundered and diverted** the funds earmarked for use by SVL and/or its affiliated Defendants for purposes other than the on-going operations of SVL and its affiliates, as well as improperly, and, again, **secretly stole, diverted, and transferred** collateral security for the repayment of the indebtedness due the Lender, and **otherwise double-pledged said collateral** to other lenders in derogation of the Lender's, and, thus, Talisman's rights.

308.   Acting together, and based upon mutual agreement, Mouttet, and his father P. G. Mouttet was/were either the front-man/men and/or the mastermind(s), and Hoo, Levy, Stewart, George, and Graham - - all Directors or key executives at SVL - - along with his uncle N. Mouttet, and his brother C. Mouttet, were the main co-conspirators of this theft scheme, which evolved over a period of years into a cohesive group of individuals and entities which, while apparently conducting legitimate business endeavors, embarked upon a massive scheme to misappropriate tens of millions of dollars from the Lender, which are now owed to Talisman by the Florida Law Defendants.

309.   Thereafter, Mouttet, P. G. Mouttet, N. Mouttet, C. Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, concealed their thefts and on-going fraud, by causing occasional, partial, substantial payments to be made to the Lender, to lull the Lender, and to cover up the fact that the monies previously loaned, and the collateral security previously pledged, had, in fact, been stolen by Defendants, and to

123

otherwise dissuade Talisman, and, previously, the Lender, from exercising their respective rights as a lender to declare a default under the various loans.

310.   As a result, Talisman now brings its Florida state law claims f*or damages and other relief* for Florida racketeering, conspiracy under Florida law, conversion, theft, common law fraud, fraudulent inducement, and the imposition of a constructive trust.

**(b)**    **EGE's Florida Law Claims**

311.   The Florida claims of EGE involve an international scheme by the Florida Law Defendants to steal what now amounts to, after stock split(s), over 391,500,000 (exactly, 391,584,242) ordinary shares of SVL, which had been, and was sold to EGE by Hoo, Levy and Stewart.

312.   The purpose of this intentional scheme to defraud EGE was to frustrate EGE's ability to register title to its stock ownership of those over 391,500,000 shares in SVL, to divert dividends and other rights from that stock ownership - -  and to steal those 391,500,000 shares, for the Florida Law Defendants' own individual and collective personal use and benefit, including subsequent sales of portions of that stock to generate tens of million dollars of cash.  EGE, alone, is bringing the Florida law claims concerning the theft of the shares in SVL, and the theft of the incidental rights and claims attendant to such stock ownership.

313.   As a result, EGE now brings its Florida state law claims for damages and other relief for Florida racketeering, conspiracy under Florida law, conversion, theft, common law fraud, fraudulent inducement, and the imposition of a constructive trust to protect its interests and to recover its property.

124

314.   Along with Talisman, EGE conducted an investigation, as more fully alleged above, following the testimony of certain of the Founding Shareholders and other officers/representatives of SVL, during a trial, in or about early September, 2010, on Jamaican contract issues, which was held in Jamaica, in mid-2010, and learned that SVL, through its Directors, officers, and representatives, principally George, Graham, Hoo, Mouttet, Levy, and Stewart, among others, had **withheld** documents and evidence they either executed, consented to, and/or with knowledge thereof, and pursued a course of conduct to defraud and otherwise steal from EGE, and obstruct justice, resulting in injuries and damage to said Plaintiff.

315.   Acting together, and based upon mutual agreement, Mouttet, Hoo, Levy, Stewart, George, and Graham were the masterminds of this theft scheme, which evolved over a period of years into a cohesive group of individuals and entities which embarked upon a massive scheme to steal and misappropriate the shares of SVL and other property rights which are, and should be owned now by EGE, instead of by the unlawful SVL <u>Florida</u> Enterprise as well as The Mouttet Family <u>Florida</u> Criminal Enterprise, and the Florida Law Defendants.

316.   Due to the Florida Law Defendants' illegal RICO activities, conspiracy and other tortious actions, ***EGE, and it alone, seeks compensatory damages and/or the return of its stolen stock, other stolen equity participations, and stolen cash dividends,*** including treble damages, punitive damages,[13/] and pre-judgment interest, attorneys' fees and costs, and a constructive trust.   In addition, ***EGE also seeks injunctive relief***, ordering the registration of ownership, on the books and records of

---

[13/]   EGE is mindful of the need to comply with the requirements of Section 768.73, Florida Statutes, and will do so at the appropriate time later in this litigation.

SVL, of the over 391,500,000 shares of SVL's stock which EGE owns, as called for in the various agreements at issue in this action, and as promised by the Defendants.

**C.**     **Jurisdiction and Venue for the Florida State Law Claims**

317.   Talisman and EGE re-allege all of the allegations contained in paragraphs 21 through 25 above, and incorporate each of them by specific reference as if fully set forth herein.  In addition, due to the complete diversity of citizenship of the respective parties, this Bankruptcy Court, as well as the District Court, each has diversity jurisdiction, pursuant to 28 U.S.C. §1332, over each and every one of the Florida state law claims, which are separately asserted by Talisman and EGE.

318.   Venue for all of the Florida state law claims alleged in this Complaint is proper in this District for all the reasons set forth in paragraph 22, above, and Plaintiffs re-allege all of those allegations and incorporate each of them by specific reference as if fully set forth herein.  In addition, at all times relevant to the allegations pertaining to the Florida Law Defendants' violations of Florida law, EGE either maintained a business office in the State of Florida, then-located in Boca Raton, in this District, at which the transactions pertaining to EGE closed, and/or Mr. Stevanovich, the Decision Maker for EGE was based in Florida, in this District, and to which the various Florida Law Defendants sent written communications through the means and instrumentalities of interstate and foreign commerce, and otherwise caused damage to EGE.

319.   In addition, Defendant St. Georges Holdings Limited ("St. Georges") wired monies into the bank account maintained by Atlantic at Terrabank in Miami.

320.   This Bankruptcy Court, as well as the District Court, each has personal jurisdiction over each and every one of the Florida Law Defendants for all the reasons

126

set forth in paragraphs 22 through 25, above, and Plaintiffs re-allege all of those allegations and incorporate each of them by specific reference as if fully set forth herein. For similar reasons, this Bankruptcy Court, as well as the District Court, each has personal jurisdiction over each and every one of the Florida Law Defendants for all Florida state law claims asserted by EGE.

**D.    The Parties**

**(1)    The Plaintiffs**

321.    As to **Plaintiff Talisman**, Plaintiffs re-allege all of the allegations contained in paragraph 26, above, and incorporate each of said allegations by specific reference as if fully set forth herein.  In addition, at no time relevant to the allegations contained in this Complaint did the Lender or Talisman ever maintain its principal place of business in Florida.

322.    **Plaintiff EGE** is an international business company, created as a SPV organized and existing under the laws of the British Virgin Islands, which maintains its principal place of business in Montreux, Switzerland.  EGE was previously known as Epsilon Global Equities Ltd., a/k/a Epsilon Global Equities Limited.   EGE was specifically established to own and hold the shares of SVL that are the subject of this Plaintiff's Florida law claims.  In addition, at no time relevant to the allegations contained in this Complaint did EGE ever maintain its principal place of business in Florida.

**(2)    The Florida Law Defendants**

323.    As to Defendants **Mouttet, SVL, Hoo, Levy, Stewart, P. G. Mouttet, C. Mouttet, N. Mouttet, Graham, George, Atlantic, Haven, Atlantic Consultants, AmeriServices, Peninsula, Pinnacle, Flying Fish, SGCW, Supreme Gaming-**

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

**Florida, SGL**, **Supreme Holdings-Delaware, Vazquez, Sevilla, Montesano, and De La Cruz**, Plaintiffs re-allege all of the allegations contained in paragraphs 27 through 51, above, and incorporate each of said allegations by specific reference as if fully set forth herein.

324. Defendant **St. Georges** is an international business company organized and existing under the laws of St. Lucia, which maintains its registered office (principal place of business) in St. Lucia. St. Georges is also the alter ego of Mouttet.

**(3) John and Jane Does, and Moe and Joe Entities Defendants**

325. Talisman and EGE anticipate, as discovery proceeds, naming additional individuals and entity defendants that participated in the Florida Law Defendants' theft and misappropriation of loan proceeds owed to Talisman, the collateral for the loans, and the proceeds of said collateral; as well as shares and equity participations owned by EGE, dividends declared and paid and/or owed on said stock and/or equity participations, and the illegal wire fraud, mail fraud, obstruction of justice, and money laundering activities.

**(4) Relief Defendants**

326. Relief Defendant **Intralot St. Lucia Ltd.** is a business entity organized and existing under the laws of St. Lucia, with its principal place of business located in Castries, St. Lucia.

327. Relief Defendant **Intralot Caribbean Ventures Ltd.** is a business entity organized and existing under the laws of St. Lucia, with its principal place of business located in Castries, St. Lucia. N. Mouttet is a Director of Intralot Caribbean Ventures.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

328.    Relief Defendant **Intralot, S.A.** is a business entity organized and existing under the laws of the Hellenic Republic, with its principal place of business located in Greece.  Relief Defendant Intralot, S.A. owns 50.1 percent of Relief Defendant Intralot Caribbean Ventures Ltd., which operates as a subsidiary of Relief Defendant Intralot S.A.   Upon information and belief, Mouttet and members of his family own the remainder or at least a substantial portion of the remaining 49.9 percent of Relief Defendant Intralot Caribbean Ventures Ltd., and, thus, the reason for N. Mouttet, a relative of Mouttet, being appointed and serving as a Director of that entity.

329.    Relief Defendants Intralot St. Lucia, S.A., Intralot Caribbean Ventures Limited, and Intralot, S.A. shall be collectively hereinafter referred to as "Relief Defendant **Intralot**."

330.    As to Relief Defendants **SGLBVI** and **VLT(BVI)**, Plaintiffs re-allege all of the allegations contained in paragraphs 53 through 54, above, and incorporate each of said allegations by specific reference as if fully set forth herein.

331.    Talisman and EGE anticipate naming additional individuals and entity defendants as **ADDITIONAL RELIEF DEFENDANTS, NUMBERS 1-25** that received from any of the Florida Law Defendants, the SVL Florida Enterprise and/or The Mouttet Family Florida Criminal Enterprise either any of the loan proceeds and/or collateral security, and/or the stock owned by EGE and/or the dividends paid on that stock, and/or the fruits and/or proceeds derived therefrom, which were stole from and/or withheld/deprived from the Lender, and, thus, Talisman, or EGE, respectively.

129

**E.**    **Factual Background of the Florida Law Defendants' Fraudulent Schemes**

**(1)**    **Initial Background**

**(a)**    **Defendants Obtain a Lottery License in Jamaica**

332.    Talisman re-alleges all of the allegations contained in paragraphs 56 through 58, above, and incorporates all of said allegations as if fully set forth herein.

**(b)**    **The Lender Makes $30 Million in Loans in 2002**

333.    Talisman re-alleges all of the allegations contained in paragraphs 59 through 76, above, and incorporates all of said allegations as if fully set forth herein.

334.    *Unbeknownst to the Lender, and, thus, Talisman, until July 27, 2012*, when Mouttet testified under oath at his Bankruptcy Rule 2004 examination concerning certain documents he previously produced, on or about July 2, 2012, in his bankruptcy case, some of the owners of Haven, since August 6, 2002 to the present time, included Hoo's mother; Levy, personally; an entity owned by Stewart; and an entity nominally owned by Mouttet's grandmother (P. G. Mouttet's mother), which is controlled by Mouttet, his father P. G. Mouttet, and members of The Mouttet Family <u>Florida</u> Criminal Enterprise, and in which Mouttet owns a 20% interest..

335.    In addition to the foregoing, and as further additional collateral for the $29.5 million loan to Atlantic, Haven, as holder of 83% of the shares of Atlantic, agreed to place a "charge over," or pledge over, said shares in favor of the Lender, and, thus, Talisman.  This pledge was to remain in place until the $29.5 million loan was fully repaid.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

336.   As part of its agreement with the Lender, Haven was obligated to deposit with the Lender all of its shares in Atlantic, and to furnish the Lender with undated, executed instruments of transfer for all of those shares.

337.   Since the $29.5 million loan extended to Atlantic had not been repaid, in full, during the months of July through September, 2011, Talisman sought to exercise its rights in the shares of Atlantic, previously pledged/assigned by Haven, but Mouttet improperly blocked those efforts, claiming he is the majority shareholder of Atlantic.

338.   As one of the additional conditions to the making of the $29.5 million loan, Peninsula, which was owned and controlled by Mouttet, also placed a "charge over," or pledge over, in favor of the Lender, and, thus, Talisman, of 83% of the stock of Peninsula.  This pledge was to remain in place until the $29.5 million loan was fully repaid.

339.   As part of its agreement with the Lender, Haven was obligated to deposit with the Lender all of its shares in Peninsula and to furnish the Lender with undated, executed instruments of transfer for all of those shares.

340.   As part of the agreement, dated July 7, 2005, to forego *future* Service Fees from Atlantic, and in order to induce the Lender to so agree, the $29.5 million loan agreement was amended at the same time to change the definition of "collateral" to refer to an assignment, "charge over," and/or pledge over, of shares and other instruments entered into, by the Founding Shareholders of SVL regarding 1,389,173,513 ordinary shares of SVL.

341.   While he was a Director of both SVL and Atlantic, Mouttet negotiated this July 7, 2005 amendment to the loan agreement.  Hoo and Stewart, as Directors of SVL,

131

and as representatives of SVL's Board of Directors, were aware of this amendment, and attended a meeting in late June/early July, 2005, in Jamaica, with the Representative of the Lender, to discuss it.  Mouttet executed this amendment on behalf of Atlantic.

342.   Despite demands made by the Lender in or about late 2005 and early 2006, the SVL shares were never delivered to either the Lender or Talisman.  Instead, in response, Mouttet made numerous misrepresentations and excuses to the Lender, including to the Representative of the Lender, as to why the shares could not be delivered, including SVL's, and its Founding Shareholders' purported inability to get a traditional bank loan if the shares were turned over as requested.  Because the Lender believed that SVL and/or its Founding Shareholders' could and would obtain a traditional bank loan, with shares in SVL to be pledged as collateral security, and that said bank loan would repay, in full, the remaining indebtedness owed to the Lender by Atlantic, the Lender agreed to forego demands for delivery of the agreed-upon replacement collateral.  However, ***unbeknownst to the Lender, and, thus, Talisman, at the time, and not known until on or about September 19, 2011*** - - when Mouttet produced certain documents in another lawsuit previously pending before the District Court - - the reason why the agreed-upon replacement collateral was never delivered to the Lender is because that personal property was needed as collateral security in order that Mouttet, through Supreme Holdings-Delaware and Supreme Gaming-Florida, could obtain the $16.5 million loan from Petters later on in 2006, which Talisman now believes Mouttet, among others, was discussing with Petters at the time the Lender made the foregoing demands, recited earlier in this paragraph of the Complaint, and continuing thereafter during 2006.

132

343.    The $29.5 million loan agreement was again amended on December 5, 2005, to change the definition of "collateral" to now refer to an assignment, "charge over," or pledge over, of shares, and other arrangements made by Hoo, regarding 235,173,649 ordinary shares he owned in SVL.  To signify his agreement to assign and otherwise "charge over," or pledge over, the additional 235,000,000  shares, Mouttet (while he was a Director of both SVL and Atlantic) executed this amendment on behalf of Atlantic.

344.    As previously alleged above, based upon prior face-to-face meetings with Hoo and Stewart, as well as conversations with and emails from Mouttet, the Lender was told that Hoo was seeking another loan from a financial institution, such as NCB, to pay off the Lender, but wanted to keep such a loan transaction "out of the public eye." The pledge of the 235,000,000 shares by Hoo was in addition to the other shares held by Hoo, and previously sold to EGE, pursuant to certain agreements negotiated and executed in 2002 and 2004, as amended in 2005, as more fully alleged, below.  Based upon previous statements made by both Mouttet and Hoo to the Representative of the Lender, the Lender understood that, while title to the 235,000,000 shares in SVL was in Hoo's name, these shares actually belonged to Mouttet, and that Mouttet controlled any disposition of these shares.

345.    Hoo's 235,000,000 shares of SVL were never delivered to either the Lender or Talisman.  Instead, in or about 2006, Hoo and Mouttet (while he was in this District) made - - to the Representative of the Lender - - numerous misrepresentations and purported excuses as to why the shares could not be delivered, including SVL's, and its Founding Shareholders' purported inability to get a traditional bank loan if the

133

shares were turned over as requested.  Because the Lender believed that SVL and/or its Founding Shareholders' could and would obtain a traditional bank loan, with shares in SVL to be pledged as collateral security, and that said bank loan would repay, in full, the remaining indebtedness owed to the Lender by Atlantic, the Lender agreed to forego demands for  delivery of the agreed-upon replacement collateral.

346.   Thereafter, as alleged previously above, and **unbeknownst to the Lender, and, thus, Talisman, until beginning in the Summer of 2011, and/or in about mid-September, 2011**, as previously alleged, above, Mouttet began to **secretly** negotiate with Petters to seek and obtain at least $16.5 million in new financing from Petters by pledging, among other collateral, the very same shares in SVL that he had offered and promised to the Lender as additional collateral security for the repayment of the remaining indebtedness owed by Atlantic to the Lender, while, at the same time, Mouttet, through Atlantic Consultants, continued to **secretly** receive $300,000 in monthly payments from SVL to Atlantic Consultants, a fact **not known to the Lender, and, thus, Talisman, until on or about October 5, 2011**, as previously alleged, above.

347.   The $29.5 million loan agreement between Atlantic and the Lender was further amended, on or about January 4, 2007, to change the meaning of collateral to refer to 15% of SVL's outstanding capital shares - - which were some of the SVL shares held and owned by Mouttet, and which were supposed to be transferred to an entity designated by the Lender - - as well as the Atlantic Guarantee from Mouttet.  Mouttet (while he was a Director of both SVL and Atlantic) executed this 2007 amendment on behalf of Atlantic.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

348.   Again, after signing the January 4, 2007 agreement, Mouttet mislead the Lender, misrepresented his inability to provide the shares, and never delivered the required shares.

349.   The SVL shares were never delivered to either the Lender or Talisman.  In or about 2007, Mouttet made numerous misrepresentations and purported excuses, by telephone while he was in this District, to the Representative of the Lender, as to why the shares could not be delivered, including SVL's, and its Founding Shareholders' purported inability to get a traditional bank loan if the shares were turned over as required.

350.   Nevertheless, as previously alleged, above, at the time Mouttet executed his Atlantic Guarantee, he had previously represented to the Lender, and specifically the Decision Maker for the Lender, at a meeting held, on or about November 11, 2006, at the Wynn Hotel in Las Vegas, Nevada, that Mouttet and members of his family owned approximately 43.3% of the outstanding capital shares of SVL, as well as approximately 52% to 57% of Supreme Gaming-Florida, or another related entity named Supreme Gaming, and that SVL, in turn, owned 8% of that Supreme Gaming entity.  In addition, the Lender also knew that Mouttet owned a yacht worth millions of dollars, among other significant assets.  Thus, the Lender believed it had received the Atlantic Guarantee from a person of substantial wealth and financial means.

351.   However, *at that time, it was unknown to the Lender, and, thus, Talisman*, that Mouttet and his family had already pledged, in 2006, their shareholders' interests in both SVL and Supreme Gaming-Florida, as well as the dividends from these two entities, to Petters to obtain at least $16.5 million in loans for Supreme Holdings-

135

Delaware and Supreme Gaming-Florida.  *The Lender, and Talisman did not learn of those facts until on or about September 19, 2011*, when Mouttet produced certain documents in other litigation previously pending in the District Court.

352.   In addition, pursuant to the MOU, dated January 5, 2007, between the Lender and Mouttet and C. Mouttet, SGCW was to hold the fifteen percent (15%) of outstanding shares of SVL capital stock as collateral for the $29.5 million loan previously made to Atlantic.  Mouttet represented to the Lender that this 15% of the outstanding shares of SVL capital stock would be transferred from Hoo's shareholdings in SVL to SGCW; however, this was never done.

353.   Nevertheless, by this point in time, the Lender had received and was relying on, among other things, the projections of future revenue for Central America - - sent by Vazquez to Mouttet, and by Mouttet to the Lender - - and elsewhere to be generated from the loan made to SGCW; the shares of SVL to be acquired by SGCW on the open trading market (through an account in the name of SGCW maintained at Mayberry, in Jamaica, for which account C. Mouttet was the sole authorized signatory), using a portion of said loan; as well as Mouttet's SGCW Guarantee, and his Atlantic Guarantee, as the means to assure that all the indebtedness owed to the Lender would be repaid.  Again, due to Mouttet's execution and delivery of his Atlantic Guarantee and his SGCW Guarantee, and his prior representations to the Lender of his assets, the Lender believed it had received two personal guarantees from a person of substantial wealth and financial means, and did not know, at the time, that Mouttet had already pledged his shareholdings in SVL, Supreme Holdings-Delaware, and the SGL entities to Petters, all as previously alleged, above.

136

**(c)     The Lender Makes Additional Loans to The Lottery and Gaming Business to Expand in 2003, 2004, and 2005**

354.    Talisman re-alleges all of the allegations contained in paragraphs 77 through 80, above, and incorporates all of said allegations as if fully set forth herein.

**(i)     The 2003 Loan to Allow SVL to Acquire the Jamaican Lottery Company Holdings Limited**

355.    Talisman re-alleges all of the allegations contained in paragraphs 81 through 89, above, and incorporates all of said allegations as if fully set forth herein.

**(ii)    The 2004 Loan to Expand SVL's Lottery Business into Central America**

356.    Talisman re-alleges all of the allegations contained in paragraphs 90 through 94, above, and incorporates all of said allegations as if fully set forth herein.

**(iii)   The 2005 Loan to Acquire Prime Sports**

357.    Talisman re-alleges all of the allegations contained in paragraphs 95 through 97, above, and incorporates all of said allegations as if fully set forth herein.

**(2)     The Florida RICO Defendants Devise and Implement Their Illegal Scheme to Defraud and Otherwise Dupe the Lender**

358.    Talisman re-alleges all of the allegations contained in paragraphs 98 through 108, above, and incorporates all of said allegations as if fully set forth herein.

**(3)     Lulling Activities of the Florida RICO Defendants**

**(a)     Payment of the Proceeds From SVL's 2005 Private Placement**

359.    Talisman re-alleges all of the allegations contained in paragraphs 109 through 111, above, and incorporates all of said allegations as if fully set forth herein.

**(b)     Payment of the Proceeds from SVL's 2006 IPO**

360.    Talisman re-alleges all of the allegations contained in paragraphs 112 through 127, above, and incorporates all of said allegations as if fully set forth herein.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

361.   In addition, as consistently represented by Mouttet over and over again, both in face-to-face meetings held in this District, and by telephone calls while Mouttet was in this District, sometime after either the private placement or the IPO, Mouttet told both the Decision Maker for the Lender, as well as the Representative of the Lender, that the Mouttet family shareholder interests in SVL were held by two entities, to-wit: Falcon Global Capital S.A. ("Falcon") and Senoda Limited ("Senoda").   According to what Mouttet told the Lender, those shares had been transferred to Mouttet and his family members by Hoo and Stewart from those two Founding Shareholders' holdings in SVL, after SVL received its gaming and lottery license in Jamaica, to compensate Mouttet and his family members for their roles in obtaining the license.   Mouttet further stated to the Lender, that since Mouttet and his family members were not Jamaican citizens or residents, Hoo and Stewart held those shares of SVL capital stock in trust for the Mouttet family, and Falcon and Senoda were each thereafter created sometime in 2005 or 2006 to hold the stock for the Mouttet family.   Thereafter, Falcon and Senoda were listed by SVL as the two largest shareholders of SVL, until 2010, when Relief Defendant Intralot became the largest shareholder of SVL by purchasing stock from Falcon and Senoda, as more fully alleged, below.   It is the further belief of Talisman that Mouttet caused the sales of the SVL shares held nominally for him and his family by Falcon and Senoda to raise monies to repay the debt owed to Petters.

(c)   **The Florida Law Defendants' Plans to Obtain Lottery and Gaming Licenses and Expand into Central America and Elsewhere**

362.   Talisman re-alleges all of the allegations contained in paragraphs 128 through 148, above, and incorporates all of said allegations as if fully set forth herein.

138

363.   In addition to the foregoing, and as part of the agreements reached in the MOU, on or about January 5, 2007, between the Lender and Mouttet and C. Mouttet, some of the business purposes for SGCW were to also include (a) the acquisition of shares of SVL in the open trading market, and (b) the holding of 15% of the SVL shares as additional collateral for the still outstanding $29.5 million loan to Atlantic.

364.   **Unbeknownst to the Lender at the time**, and, thus, unknown to Talisman, at the time the MOU was executed and the short term loan of $13.6 million was made by the Lender to SGCW, and **not discovered until September 19, 2011**, the $16.5 million loan previously extended by Petters to Supreme Gaming-Florida and Supreme Holdings-Delaware were secured by shares of SVL stock, as well as any dividends to be paid on, and capital distributions of such stock, which, upon information and belief, **were the same shares of SVL pledged as collateral for the outstanding loans owed to the Lender**, and, thus Talisman.

365.   As part of the collateral for the SGCW loan of $13.6 million, the Lender was to have received (a) the shares of SVL transferred to SGCW as collateral for the original $29.5 million loan to Atlantic, and (b) 100% of the shares of SGCW issued to Flying Fish.  Neither of the loan covenants was ever fulfilled, and **unbeknownst to the Lender**, and, thus Talisman, at the time, Mouttet and C. Mouttet **never intended to fulfill** the covenants.  These covenants were agreed to by Mouttet and C. Mouttet, individually, and on behalf of their international business companies, in order to defraud the Lender, and, thus, Talisman, and such were merely further steps in furtherance of their overall illegal conspiracy with the other Defendants.  Again, due to Mouttet's execution and delivery of his Atlantic Guarantee and SGCW Guarantee for the

139

repayment of all the remaining indebtedness due and owing to the Lender, and his prior representations to the Lender of his assets, the Lender believed it had received two personal Guarantees from a person of substantial wealth and financial means, and, *did not know, at the time,* that Mouttet had already pledged his shareholdings in SVL, Supreme Holdings-Delaware, and the SGL entities to Petters, all as previously alleged, above.

366.    As part of the $13.6 million loan transaction, the Lender, and, thus, Talisman, became a one-third (1/3) shareholder in SGCW.  As such, the Lender, and, thus, Talisman was entitled to a distribution of the net profits of SGCW in the form of dividends.  No such dividends were paid to either the Lender or Talisman.

**(d)    Meetings in Miami and Elsewhere in 2008**

367.    Talisman re-alleges all of the allegations contained in paragraphs 149 through 151, above, and incorporates all of said allegations as if fully set forth herein.

368.    In or about late December, 2007, or early January, 2008, Mouttet met the Decision Maker for the Lender, at the Biltmore Hotel in Coral Gables, Florida, in this District.  At that meeting, a restructuring of the all of the then-outstanding loans was discussed, but no agreement could be reached at that time.

369.    In or about late September, 2008, at the meeting held at the Miami Airport, Mouttet informed the Lender that the dividends the Lender should have received on the shares of SVL stock pledged as collateral for the repayment of the indebtedness owed by Atlantic to the Lender had, instead, been used by Mouttet to repay other then-unspecified corporate debts, which the Lender and Talisman *later learned, in or about the Summer of 2011*, during its investigation (when the Lender and Talisman first

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

learned of the existence of the Receiver Reports for the Petters Ponzi scheme), that Mouttet had used the dividend payments to pay Petters a portion of the loans due Petters, instead of paying those amounts to the Lender, and thus to Talisman, as required.

370.    Based upon documents produced by Mouttet produced, in or about mid-July, 2012, to the Bankruptcy Trustee of his Chapter 7 case (the "Bankruptcy Trustee"), it is now apparent that Falcon and Senoda actually pledged the SVL shares that served as collateral for the $16.5 million loan from Petters to Supreme Holdings-Delaware and Supreme Gaming-Florida, and that Mouttet has re-acquired the shares of SVL previously pledged to Petters, but has hidden them from Talisman, and the Bankruptcy Trustee.

371.    Previously, *in or about the summer of 2011, EGE learned for the first time* that, in order to settle his affairs with the Receiver in the <u>Petters</u> matter, Mouttet paid at least a portion of the dividend income he had received from SVL to the Receiver. However, those SVL dividends were pledged as collateral to repay the loans owed to the Lender, and, thus, Talisman, as alleged above.  Mouttet simply stole them.

372.    Based upon information first learned during Mouttet's examination under oath, taken on July 27, 2012, pursuant to Bankruptcy Rule 2004, it now also appears that some of the SVL shares previously pledged as collateral to the Lender, and, thus, Talisman, were sold, liquidated, and/or transferred to either repay a portion of the $16.5 million loan from Petters, to provide funds for Mouttet and/or other members of his family, to personally use and/or to attempt to hide and/or place the shares out of the reach of, first, the Lender, and, thus, Talisman, all in derogation of the Lender's and

141

Talisman's legal rights.   Mouttet simply stole the SVL shares and/or the proceeds derived therefrom.   Talisman reserves the right to amend this Complaint once additional facts, documents, and/or information is obtained.[14/]

### (e)   Other Actions Taken in Furtherance of the Illegal Conspiracy and Association(s)-in-Fact

373.   Talisman re-alleges all of the allegations contained in paragraphs 152 through 157, above, and incorporates all of said allegations as if fully set forth herein.

374.   During its investigation, Talisman has learned that Relief Defendant Intralot acquired over a billion shares of SVL, from Falcon and Senoda, which shares, upon information and belief, are some and/or all of the shares of SVL stock which was to have been part of the collateral pledged to the Lender, and, thus, Talisman, for repayment of the outstanding loans due the Lender, and, thus, Talisman, by Atlantic.

375.   In addition, during its investigation, Talisman has also learned that, in or about October, 2008, Relief Defendant Intralot became the majority owner of a lottery operation in Guatemala with Relief Defendants SGLBVI and VLT(BVI), both entities controlled by Mouttet, P. G. Mouttet, C. Mouttet, and N. Mouttet, among other members of the Mouttet family and The Mouttet Family Florida Criminal Enterprise. This event, among other matters, constituted a violation of the MOU and Master Financing Agreement between Mouttet, C. Mouttet, and the Lender, which documents control the $13.6 million in loan financing previously made by the Lender to SGCW.

376.   Upon information and belief, based upon the term sheet Mouttet caused to be faxed to the Lender, on or about December 4, 2008, Relief Defendants SGLBVI and

---

[14/]      In this regard, Talisman will seek an extension of time until at least October 9, 2012, to assert potential claims against Mouttet pursuant to Section 727 of the Bankruptcy Code.

142

VLT(BVI) are each fraudulent transferees of the assets of Atlantic, Atlantic Consultants, AmeriServices, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and/or SGCW, among other corporate Defendants, which fraudulent transfers occurred to hinder, delay, and/or defraud the rights to collateral security for the indebtedness owed to the Lender, and, thus, Talisman, and to otherwise defraud the Lender, and, thus, Talisman, and to steal valuable property and rights from, first, the Lender, and, then, Talisman.

**(4)**     **The Sales and Assignments to Talisman**

377.   Talisman re-alleges all of the allegations contained in paragraphs 158 through 160, above, and incorporates all of said allegations as if fully set forth herein.

**(5)**     **Talisman's Notices of Default(s)**

378.   After giving the Florida Law Defendants the time and opportunity to cure the October 1, 2008 events of default, based on the proposals, statements, and representations of the Florida Law Defendants (which they failed to fulfill), Talisman sent Notices of Default(s).

**(a)**     **The Loans to Atlantic**

379.   Talisman re-alleges all of the allegations contained in paragraphs 162 through 164, above, and incorporates all of said allegations as if fully set forth herein.

**(b)**     **The Loan to SGCW**

380.   Talisman re-alleges all of the allegations contained in paragraphs 165 through 168, above, and incorporates all of said allegations as if fully set forth herein.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

**(6)**   **Florida Law Defendants' Theft of Shares of Stock Owned by EGE**

**(a)**   **EGE's Stock Acquisitions in 2002**

381.   On or about August 28, 2002, EGE was sold an equity participation in the success of SVL, whereby **EGE was conveyed ownership of 17% of SVL's share capital, as well as an equity participation and ownership in the same 17% percentage in both Atlantic and Peninsula.**   Thus, it was the intent of all of the parties to these transactions, that EGE would own 17% in each of SVL, Atlantic, and Peninsula. In his sworn testimony in another proceeding, Levy, as a Director of SVL, and a co-conspirator herein, has admitted that EGE was to receive 17% of the shares of SVL's stock.

382.   To memorialize the foregoing agreement, on or about August 28, 2002, Atlantic entered into a written agreement with EGE wherein Atlantic agreed to issue, and did issue, 1,700 new shares to EGE in consideration for  EGE's payment of $1,700 (U.S.).  In this agreement, Atlantic also confirmed to EGE that the remaining 83% of its stock was then owned by Haven.  This agreement was executed by Mouttet (when he was also a Director of SVL), on behalf of both Atlantic and Haven.  The final acts required to complete this transaction were performed and/or occurred at a business office of EGE, then-located in Boca Raton.[15/]

383.   To further memorialize the foregoing agreement, on or about August 28, 2002, Peninsula entered into a written agreement with EGE, wherein Peninsula agreed to issue, and did issue, 1,700 new shares to EGE in consideration for EGE's payment of

---

[15/]     All further references herein to the business office of EGE then-located in Boca Raton, EGE in Florida, as well as the location of the Decision Maker for EGE (as that term is defined, above) will involve events, acts, and transactions that occurred in this District, unless specifically stated otherwise.

$1,700 (U.S.).  In this agreement, Peninsula also confirmed to EGE that the remaining 83% of its stock was then owned by Haven.  This agreement was executed by Mouttet (when he was also a Director of SVL), on behalf of both Peninsula and Haven.  The final acts required to complete this transaction were performed and/or occurred at a business office of EGE, then-located in Boca Raton.

384.   To further memorialize the foregoing agreement, to provide the Lender with an equity participation and ownership in the same 17% in SVL, on behalf of SVL and themselves, Mouttet, Hoo and Levy, as well as Peter Stewart, negotiated with EGE the terms of a "forward sale of shares" agreement for shares in SVL.  On or about August 28, 2002, a forward sale of shares agreement was executed - - by Hoo and Levy, and Peter Stewart, each individually, and by Hoo and Peter Stewart, on behalf of SVL, with all of the foregoing signatures being witnessed by Graham, all of whom were Directors of SVL - - which required that each of the Founding Shareholders of SVL, namely Hoo and Levy, as well as Peter Stewart, and, thus, Defendant Stewart, provide and immediately sell to EGE the required 17% of the shares of SVL.  To accomplish this sale, the forward sale of shares agreement further provided that SVL was to issue and deliver upon execution of the forward sale of shares agreement a total of 204,820 new additional shares, as follows, to the Founding Shareholders:

| | |
|---|---|
| Hoo | 84,320 |
| Peter Stewart | 84,329 |
| Levy | 36,141 |

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

who, in turn, were each sold all of the above-described shares to EGE.  The forward sale of shares agreement also provided that the 204,820 newly issued shares would rank *in pari passu* with the previously issued shares held by the Founding Shareholders.

385.   The final acts required to complete the sale of the 204,820 newly issued shares of SVL's stock were performed and/or occurred at a business office of EGE, then-located in Boca Raton.  Following the closing, EGE **owned the 204,820 newly issued shares of SVL's stock.**

386.   Prior to the execution of the above-indicated forward sale of shares agreement, on July 14, 2002, the Directors of SVL, namely, Hoo, Levy, as well as Peter Stewart, and Mouttet, among other Directors, passed a corporate resolution authorizing the issuance of the 204,820 shares of SVL to each of the Founding Shareholders.  Such corporate resolution was presented by Graham to the Jamaican Registrar of Companies.

387.   Pursuant to the foregoing forward sale of shares agreement, each of the Founding Shareholders executed undated instruments of transfer for the newly issued shares, which all indicated that EGE had paid each of them for their shares.  These instruments of transfer and the newly issued stock certificates were then furnished to EGE at a business office, then-located in Boca Raton.

388.   In addition, pursuant to the foregoing agreement, each of the three (3) Founding Shareholders were to pay $1 JMD par value for each of their shares at least seven (7) days prior to August 28, 2002.  On or about August 26, 2002, each of the three (3) Founding Shareholders executed a letter addressed to SVL, to request the total aggregate of 204,820 shares be issued by SVL, and represented that they were

146

paying SVL $1 JMD for each newly issued share.  Copies of the three (3) letters were delivered to EGE at its business office, then-located in Boca Raton.

389.   As a result of its recent investigation, **EGE discovered, on September 2, 2010**, during the sworn testimony of Hoo in another proceeding, involving claims other than alleged herein in this Complaint, that the Founding Shareholders had never paid the required $204,820 JMD (let alone in August, 2002), as they had agreed in writing and previously represented in letters, they each signed and delivered to EGE at a business office, then-located in Boca Raton.

390.   In furtherance of the "forward sale of shares" agreement, Graham, as a Director of, and as legal counsel for SVL, along with Hoo, as a Director and Secretary of SVL, each executed a statutory certificate to the Jamaican Registrar of Companies, stating that the authorized shares of Defendant SVL had increased by 204,820 shares at $1 JMD par value, and that the new shares would rank in *pari passu* with the already outstanding shares.  **Unbeknownst to EGE** at the time, this statutory certificate was false, in that none of the Founding Shareholders had paid SVL any monies for the newly issued shares.  This fact became evident to **EGE when it first learned, on or about September 2, 2010,** that none of the Founding Shareholders had paid for the newly issued shares, contrary to their written obligations and promises to do so.

391.   In addition, Graham issued a legal opinion to EGE, sent to a business office of EGE, then-located in Boca Raton, which represented that "all acts, conditions and things required by the laws of Jamaica to be carried out, fulfilled and performed" had occurred, so as to ensure that the obligations of SVL are "valid, legal and enforceable."  That legal opinion was false, because (as a Director of, and legal counsel

147

for SVL and the three Founding Shareholder), Graham knew that SVL, at minimum, among other things, had **not** received payment from the Founding Shareholders of the required capital to acquire the 204,820 newly issued shares.  As alleged in the preceding paragraph of this Complaint, those facts were **not known to EGE until on or about September 2, 2010**.

392.  The 2002 "forward sale of shares" agreement for the SVL shares contained certain provisions, which unilaterally permitted EGE to immediately date the undated instruments of transfer, and demand that SVL immediately register the shares in the name of EGE, in the books and records of Defendant SVL.  Those provisions included the maturity of the $30 million in loans to SVL and Atlantic; a change in control of SVL; an IPO of SVL or its affiliates; or the completion of any sale of any previously issued and outstanding ordinary shares held by any of the Founding Shareholders, any of which would entitle EGE to effectuate the registration of the shares in the name of EGE in the books and records of SVL.

393.  As more fully alleged below, and in accordance with the written agreements with SVL, Hoo, Levy, and Stewart (as the surviving spouse of Peter Stewart), as amended, on or about October 27, 2008, EGE offered to pay the corresponding amount of the $204,820 JMD to each of the Founding Shareholders. Notwithstanding that offer, each of these Defendants refused to accept said payment, and blocked EGE's efforts from registering its ownership of the SVL shares in EGE's name in SVL's books and records.  In addition, as more fully alleged below, after EGE provided SVL's transfer agent with the executed instruments of transfer, the Founding

148

Shareholders, Graham, and George, among others, blocked the transfer agent from registering in EGE's name the SVL shares owned by EGE.

**(b)**    **EGE's Additional Stock Acquisition and Inducements in 2004**

394.    On or about February 27, 2004, ***SVL further represented to EGE,*** in a writing signed by Hoo and Mouttet, on SVL's behalf, that the Founding Shareholders of SVL owned only 83% of the capital stock of SVL, an acknowledgement that the beneficial interest in the remaining 17% of SVL's capital stock had properly vested and belonged to EGE.

395.    On or about February 27, 2004, EGE increased its equity participation and stock ownership in SVL by another 1.2874%, or another 15,510 shares of SVL, which shares were sold by Hoo from his existing shareholder's position in another "forward sale" transaction.  This second "forward sale of shares" agreement was executed by Mouttet and Hoo, as Directors of SVL, and by Hoo, individually, as the selling shareholder of 15,510 shares in SVL.   Under the second forward sale of shares agreement, Hoo delivered to EGE the requisite stock certificate(s), evidencing the sold shares, as well as undated instruments of transfer and an irrevocable power of attorney to vote the 15,510 shares.

396.    The undated instrument(s) of transfer for the 15,510 additional shares of SVL's stock, as well as the irrevocable Power of Attorney to allow EGE to vote said shares were each executed, on or about March 1, 2004, by Hoo, and copies of the executed documents were all sent, on or about March 1, 2004, by facsimile transmission to EGE by Hoo.  On or about June 29, 2004, the executed instruments

149

were also delivered by Pinnacle to EGE.  Each such transmission/delivery to EGE was to the Florida fax machine of the Decision Maker for EGE.

397.  The final acts required to complete the sale of the 15,510 additional shares of Defendant SVL's stock were performed and/or occurred at a business office of EGE, then-located in Boca Raton.   Following this closing, ***EGE owned the additional 15,510 shares of SVL's stock.***

398.  Similar to the first such agreement in 2002, EGE's right to present the additional 15,510 shares*,* for registration of ownership, in the books and records of SVL, occurred only after certain events took place.  The same four (4) events that were recited in the 2002 agreement were included in the 2004 agreement, and a fifth provision was added, that being, in the event SVL increased the authorized number of its shares or any allotment of additional shares by SVL.  Once any one of these events occurred, EGE could demand registration of ownership, in the books and records of SVL, of each of the 15,510 shares.

399.  Levy and Stewart each executed separate letters addressed to SVL, and provided to EGE - - by facsimile transmission(s) to a business office, then-located in Boca Raton - - that they were each aware of, and did not object to Hoo's sale of 15,510 shares of SVL stock to EGE, and that they each expressly waived their respective pre-emptive rights to said 15,510 shares.

400.  On or about October 27, 2008, EGE offered to pay the $15,510 JMD to Hoo, but he refused to accept said payment.

401.  In accordance with both the 2002 and 2004 "forward sale of shares" agreements, even prior to the registration of ownership of the shares in SVL in the

150

books and records of SVL, **EGE was entitled in the interim to all dividends and distributions** in respect of the forwardly sold shares and the transfer of the shares, including all of the rights thereto being transferred to EGE.  Notwithstanding those facts, Mouttet, Hoo, Levy, Stewart, SVL, George, and Graham, among others, have illegally withheld payment of all such dividends and distributions to EGE, and otherwise hidden the true facts respecting same.

402.   While refusing to pay dividends to EGE, and **unbeknownst to EGE until October 5, 2011**, SVL, Mouttet, George, Hoo, Levy, Stewart, and Graham fraudulently paid "disguised dividends" and made other distributions to themselves, through Atlantic Consultants, in the form of consultancy, management, and/or marketing fees, namely, Service Fees, of some $300,000 per month, commencing in November, 2004.

403.   SVL also paid "disguised dividends" to Mouttet, members of his family, and the Founding Shareholders, through Atlantic and Peninsula, as well as AmeriServices, through alleged Service Fees.

404.   As more fully alleged, below, despite EGE's delivery of duly executed instruments of transfer and powers of attorney, and notwithstanding the occurrence of events provided for in the 2002 and 2004 "forward sale of shares" agreements, and EGE's demands for registration of ownership in the books and records of SVL, of the shares of SVL stock said Plaintiff owned, SVL, Mouttet, Hoo, Levy, Stewart, and Graham, among others, have instructed SVL's Company Secretary, Winsome Minott, **not** to register the shares owned by EGE in SVL's shareholder registry.

151

(c)      **The June 28, 2005 Supplemental Agreement, the 2005 Private Placement and the 2006 IPO**

405.    By a resolution passed at an extraordinary General Meeting of SVL's shareholders, held on May 30, 2005, SVL's *authorized* capital was increased from 2 million ordinary shares (no par value) to 3 billion ordinary shares (no par value) by the creation of 2,998,000,000 ordinary shares, with such new shares to rank *in pari passu* in all respects with the existing ordinary shares of SVL.

406.    By a resolution passed at an extraordinary General Meeting of SVL's shareholders, held on May 31, 2005, the then-*issued* capital of SVL of 97,581,918 ordinary shares was sub-divided and split into 2,136,539,521 ordinary shares, no par value.

407.    Prior to the passage of the foregoing two corporate resolutions, the issued shares of the capital stock of SVL were evidenced by physical certificated shares.  After the passage of the resolutions, all prior issued stock certificates were cancelled by the registrar (transfer agent) of SVL, and all ownership of the post-split shares of SVL's capital stock was evidenced only by "book entries" maintained by the registrar of SVL. No new physical stock certificates for the newly split shares were issued.  While the three (3) Founding Shareholders and SVL knew that EGE was sold the previously 204,820 and 15,510 shares, after the stock splits, Hoo, Levy, Stewart, Mouttet, George, and Graham all did not cause the registrar of SVL to reflect, and, in fact, hid from the registrar of SVL that EGE owned the corresponding split shares evidenced by the original 204,820 and 15,510 certificated shares previously sold to, and in the possession of EGE.  EGE **did not learn** these facts until on or **after March 10, 2011**,

152

when Stewart filed a Witness Statement from the Executor of her late husband's estate in the Jamaican action, involving claims other those alleged in this Complaint.

408.   Thus, when SVL approved the referenced stock splits, the shares owned by EGE were also split, but the book entries for the ownership of the post-split shares did **not** reflect EGE as the owner; rather, those shares were reflected as owned by Hoo, Levy and Stewart, **without the encumbrances and prior ownership rights** from the previous 2002 and 2004 agreements, **which had vested ownership** of the additional shares to EGE.

409.   Hoo, Levy and Stewart kept all of those additional, stolen shares, even though they were not legally entitled to any of them, and even though the ownership of those additional shares belonged to, was vested in, and was passed to EGE by virtue of the 2002 and 2004 "forward sale of shares" agreements.

410.   On or about June 28, 2005, SVL, its Founding Shareholders, Hoo, Levy, and Stewart, and EGE, among others, including George, entered into a Supplemental Agreement to amend the prior 2002 "forward sale of shares" agreement.  The signing of the June 28, 2005 Supplement Agreement occurred in Jamaica.  The Supplemental Agreement resulted from broader discussions with Mouttet, the Founding Shareholders of SVL, Hoo, Levy, and Stewart, and SVL, which led to the execution of the St. Georges Option Agreement, alleged in detail, below.

411.   Pursuant to the terms of the June 28, 2005 Supplemental Agreement, EGE was persuaded to agree, did agree, and otherwise consented to the increase of the number of authorized shares of SVL from 2 million to 3 billion, as part of SVL's "going public" activities, including the contemplated private placement and eventual IPO

153

of SVL's shares, which would make it fully capitalized to become one of the primary lottery operations in the Caribbean, Central America, and elsewhere.

412.    Pursuant to the June 28, 2005 Supplemental Agreement, EGE was also persuaded to agree, did agree, and otherwise consented to the issuance and transfer of 96,377,098 newly issued shares of SVL stock to Hoo, Levy, and Stewart, as Founding Shareholders, to retire various Directors' loans in a total dollar amount of $96,377,097.70 JMD.    In return, the Founding Shareholders each agreed and acknowledged, in the June 28, 2005 Supplemental Agreement, that they were paid by EGE a collective sum of $16,384,155.00 JMD, which sum is equal to 17% of the amount of the Directors' loans being retired, as evidence that EGE had paid for, and, thus owned 17% of the additional shares of SVL stock being issued to the Founding Shareholders. *In this manner, EGE maintained its 17% equity ownership in SVL in pari passu with the Founding Shareholders.*

413.    However, thereafter, SVL, Hoo, Levy, Stewart, Mouttet, George, and Graham, among others, all failed to reflect that EGE owned the required 17% of these 96 million plus shares to EGE, notwithstanding their continuing promises and the subsequent events they employed to lull, delay, and frustrate EGE's ownership rights in these SVL shares, which they stole for themselves.

414.    Pursuant to the June 28, 2005 Supplemental Agreement, EGE was persuaded to agree, did agree, and otherwise consented to the prior issuance to George of over 21,000,000 shares of SVL.    After learning of the other thefts in 2010, and 2011, it now appears that this Supplemental Agreement was yet another overt act and step in the Florida Law Defendants' RICO conspiracy, to lull and otherwise prevent

154

EGE from asserting its legal rights under the 2002 and 2004 "forward sale of shares" agreements and related documents, as evidenced, again, by all of the actions taken by these Defendants after September 30, 2008 to prevent EGE's registration of ownership of the SVL shares EGE properly owned, in the books and records of SVL, and the failure to pay over the dividends previously paid and received on those shares, despite demand therefor.

415.   Finally, pursuant to the June 28, 2005 Supplemental Agreement, SVL, Hoo, Levy, and Stewart all acknowledged and agreed that once EGE paid the required $204,820 JMD to the Founding Shareholders, it would be entitled to register EGE's ownership, in the books and records of SVL, of the original 204,820 shares, and those additional shares acquired by EGE as a result of SVL's subsequent stock split, which EGE calculates to be a total of 391,584,242 shares of SVL's stock (after the subsequent acquisition of Hoo's additional 15,510 shares, and the corresponding stock split are taken into account and calculated).   As previously alleged in paragraphs __ and __, above, however, when EGE offered to pay the $204,820 JMD and the $15,510 JMD to the Founding Shareholders, and Hoo, on or about October 27, 2008, respectively, they each refused to accept said payment(s).

416.   In a sworn affidavit filed, on or about October 5, 2011, in the prior lawsuit before the District Court against Mouttet to enforce his Atlantic Guarantee and SGCW Guarantee, George, testifying as the CEO of SVL (and thus, on behalf of its Directors, namely, Hoo, Levy, Stewart, Graham, and previously Mouttet as well) not only admitted the existence and authenticity of the June 28, 2005 Supplemental Agreement, but also

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

attempted to use that agreement "as a sword" to attempt to support Mouttet's asserted defenses before the District Court.

417.   **Yet, previously during the Jamaican lawsuit,** which was instituted by EGE on December 15, 2008 (alleging different claims from those alleged by EGE herein in this Complaint), the June 28, 2005 Supplemental Agreement was <u>not</u> produced by SVL, George, Hoo, Levy, or Stewart, and under the orchestration of Graham, and all of them challenged the authenticity and admissibility of the June 28, 2005 Supplemental Agreement, in order to prevent its introduction into evidence, and thereby obstruct justice, and mislead the Jamaican trier of fact to render a decision contrary to the true facts.   In particular, under the orchestration of Graham, Hoo, Levy, Stewart, George, Graham, and SVL all took the position, which was later adopted by the Jamaican court in its opinion, that a "trigger date" requiring EGE to demand registration of its ownership of SVL shares had occurred before the date of the June 28, 2005 Supplemental Agreement; that "time was of the essence," thus requiring EGE to immediately demand that registration after the occurrence of a "trigger date;" and that, as a consequence, EGE's rights to and ownership of the SVL shares were purportedly lost, when it did not make that demand immediately.   That argument, and the Jamaican court's adoption of it in its opinion, would not have been possible if the June 28, 2005 Supplemental Agreement had been produced, and if George had testified at the Jamaican trial as he did in his October 4, 2011 Affidavit filed by Mouttet with the District Court.

418.   In particular, at least three (3) provisions of the June 28, 2005 Supplemental Agreement prove that the "time of the essence" theory is false, namely:

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

(a)   Paragraph 3 refers to EGE's right to participate in SVL's future IPO "in the same proportion of the shares in the Company [SVL] that [it] holds in the Company;"

(b)   Paragraph 6 specifically refers to the "shares which are being held by the Founding Shareholders [Hoo, Levy, and Stewart] for sale to the Investor [EGE] under the Principal Agreement [the 2002 "forward sale of shares" agreement]. . .," and payments received by EGE regarding them; and

(c)   Paragraph 10 provides that, with the exception of certain amendments, the 2002 "forward sale of shares" agreement remains "in full force and effect."

419.   ***As a result of the June 28, 2005 Supplemental Agreement, and the 2004 agreement, directly with Hoo, EGE owns 391,584,242 shares in SVL,*** which were stolen and taken by the Founding Shareholders, Hoo, Levy, and Stewart, with the active assistance of Mouttet, and Graham, among others.

420.   On or about January 4, 2012, Mouttet also admitted, under penalty of perjury, in other litigation previously pending before the District Court, the existence, genuineness, and authenticity of the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement.  Since Mouttet was a Director of SVL at the time this Supplemental Agreement was agreed to, Mouttet's admission is evidence that the Supplemental Agreement exists, and was genuine and binding, despite the prior, false denials of SVL, Hoo, Levy, Stewart, George, and Graham in the previous Jamaican litigation on claims ***other than*** those brought by EGE in this Complaint.  Such admission by Mouttet, as well as the Affidavit of George, is each also evidence that (a)

157

SVL, Hoo, Levy, Stewart, George, and Graham, and maybe others, all *intentionally withheld from production* during pre-trial discovery and disclosures in the Jamaican action, and *withheld as evidence at trial* of the Jamaican action, the June 28, 2005 Supplemental Agreement they previously executed, agreed, and consented to; (b) with knowledge thereof, they each and collectively pursued a course of conduct that caused injuries and damage to EGE; and/or (c) the foregoing Defendants were either in possession of said Supplemental Agreement, or had knowledge of the same, at the time of the trial in Jamaica, but intentionally *withheld* the Supplemental Agreement from the trier of fact in Jamaica, with the express intent and purpose to *commit perjury*, and to unlawfully persuade the trier of fact to render a decision contrary to the true facts.  Such unlawful acts and conduct by the foregoing Defendants were part of their illegal conspiracy and association-in-fact, designed for the purpose of intentionally defrauding the Jamaican court, by intentional acts of obstruction of justice, to thereby defraud and steal from EGE in violation of Florida law.

421.   In its "Statement in Lieu of Prospectus," SVL, Hoo, Levy, Mouttet, Graham, Stewart, and George all acknowledged that the three Founding Shareholders - - Hoo, Levy, and Stewart - - had previously sold 204,820 shares (pre-stock split) of SVL stock to EGE.  This document was executed by Hoo, Levy, Stewart, Mouttet, Graham, and George.  EGE first saw this document in 2010, during the trial in Jamaica, involving claims other than those alleged in this Complaint.

**(d)     The July 7, 2005 St. Georges Option Agreement**

422.   As part of the financing strategy in going public, and to otherwise persuade EGE not to request recordation of the SVL shares, because re-payment - -

158

from the private placement, IPO, and traditional bank loan - - of the outstanding loans was allegedly "just around the corner," Mouttet sought an option, at a pre-set price, pursuant to which all the SVL shares owned by EGE would be acquired by Mouttet.  In exchange, EGE was persuaded to agree, did agree, and otherwise consented that it would not exercise its rights at that time to record the registration of the shares in the name of EGE, in the books and records of SVL (due to the sales under the 2002 and 2004 agreements) until the expiration of the option agreement, which by amendments was extended to at least March 31, 2008.

423.   However, by the terms of the June 28, 2005 Supplemental Agreement, even if the option granted to Mouttet expired on March 31, 2008, **EGE still had the right to demand registration of its ownership of the SVL shares,** and was not obligated to do so, until after September 30, 2008, when the $30 million loan to Atlantic matured, since that was the sole "trigger date" that remained after the June 28, 2005 Supplemental Agreement was executed.

424.   Since gaining knowledge in 2010 and 2011 of the Defendants' thefts, frauds, and conspiracy, it is now apparent that this option arrangement was another step in the schemes perpetrated by Mouttet, as well as SVL, Hoo, Levy, Stewart, Graham, and George - - as more fully alleged, below - - to intentionally and deceptively delay, and otherwise avoid EGE's requests or demands for the immediate registration of the sale of the SVL shares to EGE, in the books and records of SVL.

425.   To implement his plan, and to provide Mouttet and/or other members of the SVL Florida Enterprise and/or The Mouttet Family Florida Criminal Enterprise with the means to acquire the SVL shares owned by EGE, Mouttet used another St. Lucia

159

entity, St. Georges, which was owned by Mouttet and his family members, and which was controlled by Mouttet and/or other members of The Mouttet Family <u>Florida</u> Criminal Enterprise.  ***Unbeknownst to EGE at the time***, Mouttet ultimately used St. Georges, and the option he received, as tools to intentionally and deceptively delay, and otherwise attempt to avoid EGE's requests or demands for the immediate registration of the sale of the SVL shares to EGE, in the books and records of SVL, and to otherwise attempt to gain more time to delay and avoid payment of the loans previously granted to Atlantic and SGCW by the Lender.

426.   By agreement dated "as of" July 7, 2005, EGE agreed to provide Mouttet, through his alter ego, St. Georges, with an option - - through an assignment and vesting of rights - - ***to purchase the SVL shares which EGE owned*** pursuant to the 2002 and 2004 "forward sale of shares" agreements.

427.   The final acts required to complete the transaction evidenced by the Option Agreement were performed and/or occurred at a business office of EGE, then-located in Boca Raton.

428.   The Option Agreement expressly provided that the option could be exercised by St. Georges ***only upon <u>full</u> repayment of the loans due to the Lender*** from SVL and Atlantic, as well as AmeriServices.

429.   To ensure that SVL was well aware of this Option Agreement, and its impact on the 2002 and 2004 "forward sale of shares" agreements, and to acknowledge that the forwardly sold shares under the 2002 and 2004 agreements were, in fact, owned by EGE (despite the occurrence of any previous event that might be argued to require EGE to request the registration, in the books and records of SVL, of EGE's

160

ownership of the shares under those agreements), the Option Agreement explicitly stated that **SVL was a "party to this [Option] Agreement for the purposes of acknowledging the grant of this option and for purposes of agreeing that it will comply with the terms and conditions of this Agreement insofar as they relate to [SVL]."**  (Emphasis added)  The Option Agreement was executed not only by Mouttet, on behalf of St. Georges (and who was also still a Director of SVL at that time), but also by both George, as CEO, and Hoo, under the "common seal," and both on behalf of SVL.  A schedule of shares previously held and owned by the Founding Shareholders of SVL that were sold to EGE in 2002 and 2004 was also attached to the Option Agreement.  Hoo and George each have admitted to both the existence and validity of the Option Agreement in sworn statements filed in other litigation.  Thus, SVL, itself, also agreed to the terms of the Option Agreement dated "as of" July 7, 2005.

430.    In addition, on September 2, 2010, Hoo also admitted, in sworn testimony in another proceeding, that Levy and Stewart were each aware of the Option Agreement.  Thus, each of the Founding Shareholders, namely, Hoo, Levy, and Stewart, were each aware of, and approved the Option Agreement.  In fact, Hoo admitted in his sworn testimony that, if St. Georges had exercised the option and acquired the SVL shares previously sold to EGE in 2002 and 2004, SVL would have honored and acknowledged St. Georges and Mouttet's ownership of those SVL shares.

431.    The option purchase price was initially $20.6 million, provided that Mouttet exercised the option by September 30, 2005.  Thereafter, it increased by $1 million each month thereafter through November, 2005, and then further increased by an additional $2 million (to a total of $24.6 million) if not exercised until December 5, 2005.

161

432.    The initial expiration date of the option was December 6, 2005.  By two (2) separate amendments, each executed by Mouttet (while he still was also a Director of SVL), on behalf of St. Georges, the expiration date for the exercise of the option was extended first to January 31, 2008, and then ultimately to March 31, 2008.  Despite their prior denials of the existence of the two amendments to the Option Agreement, due to Mouttet's control of SVL and his status as a Director of SVL, the other Directors of SVL, namely, Hoo, Levy, Stewart, Graham, and George, all knew that the expiration of the Option Agreement was extended to March 31, 2008.

433.    In a meeting in Los Angeles, in or about February or March, 2007, attended by Mouttet, as a Director of SVL, and as a representative of SVL's Board of Directors; and Mr. Emami as representative of EGE (the "Representation of EGE"), among others, *EGE was introduced to the representative(s) of UBS as a "major shareholder of SVL."*

434.    In addition, at a meeting held, sometime in 2007, in Pinnacle's offices, in Miami, in this District, attended by Mouttet, as a Director of SVL, and a representative of SVL's Board of Directors; the Representative of EGE; and a representative of UBS from either New York or Los Angeles, a proposal to sell SVL was discussed, *and it was stated that EGE would receive approximately 13.5% of the net sales proceeds* due to its ownership interest in SVL.  Further, immediately after that meeting was concluded, Mouttet and the Representative of EGE called Hoo in Jamaica from Pinnacle's office, to report to Hoo the results of the meeting just concluded, and to request that SVL assemble the information and documents that UBS needed to complete the required offering memorandum for the proposed sale of SVL.  *At no time during this meeting*

162

**or telephone conference call did Mouttet or Hoo ever dispute that EGE owned at least 13.5% of the outstanding shares of the capital stock of SVL.**

435.   In or about 2008, and prior to the expiration of the St. Georges option, and continuing for at least several months thereafter, and prior to the maturity date of the outstanding $29.5 million loan to Atlantic, since Mouttet had not exercised the option, the Representative of EGE contacted Mouttet several times - - by calling his Florida cellular phone number - - to discuss whether Mouttet and St. Georges would exercise the option, and to discuss the registration of ownership, in the books and records of SVL, of the SVL shares owned by EGE pursuant to the 2002 and 2004 "forward sale of shares" agreements.  During these conversations, Mouttet initially delayed a response, and ultimately made various excuses, including an asserted "blackout period for stock trades," "regulatory scrutiny" into trading in SVL stock, and the need for updated financial statements for SVL, as to why the option could not yet be exercised and/or why registration of EGE's ownership was delayed.   Through such statements and representations, EGE was falsely and fraudulently lulled into believing that Mouttet would either purchase the SVL shares owned by EGE, or cause EGE's SVL shares to be duly registered.  At no time did Mouttet, or any of the Founding Shareholders - - whose actions were controlled by Mouttet and/or other members of his family, including his father P. G. Mouttet - - ever indicate that EGE was not entitled to register the ownership in the name of EGE, in the books and records of SVL, of the SVL shares, or to receive dividends on said stock.

436.   In or about August, 2008, again, prior to the maturity date of the $29.5 million loan to Atlantic, the Representative of EGE spoke to Hoo by telephone, and

163

discussed, again, the recordation/registration of ownership, in the books and records of SVL, of the SVL stock owned by EGE. **_Hoo, however, directed EGE back to Mouttet, as "the person from whom Hoo took his instructions."_**  At no time did Hoo ever indicate that EGE was not entitled to register its ownership of the SVL shares EGE owned in the books and records of SVL, or to receive dividends on said stock.

437.   Hoo, Levy, Stewart, SVL, George, Graham, and Mouttet, among others, individually, and collectively as an association-in-fact, and in furtherance of their illegal conspiracy, never intended to comply with the Option Agreement, but merely intended that agreement, and the other asserted problems/excuses, to serve as an ongoing ruse, to delay as long as possible a demand by EGE for the recordation of the SVL shares in its name, thereby falsely and fraudulently strengthening their planned argument, that EGE's right to do so was waived because "time was of the essence."

438.   Neither Mouttet, nor anyone else acting on behalf of St. Georges, ever exercised the Option Agreement.  Instead, as learned by EGE for the first time during the Summer of 2011, **_Mouttet either double-pledged_** (as collateral for the other $16.5 million loan owed by Supreme Holdings-Delaware and Supreme Gaming-Florida to Petters, previously alleged above) **_the SVL shares which EGE owned,_** and/or **_he sold them to a third party(ies)_** (such as Relief Defendant Intralot, as alleged, below). Accordingly, Mouttet, with Hoo's, Stewart's, Levy's, Graham's, George's, and SVL's knowledge and assistance, among others, defrauded EGE, and they stole its SVL stock and other valuable rights.

164

**(e)**      **Other Lulling Activities of the Florida Law Defendants**

439.   As more fully alleged above, after having been informed by Mouttet, by telephone calls on his Florida cell phone with the Representative of EGE, that EGE would receive a dividend payment from Hoo, Levy, and Stewart, on its SVL stock, but that such payment was delayed due to the "blackout period for stock trades," "regulatory scrutiny" into trading in SVL stock, and the need for updated financial statements for SVL, and that EGE should be patient to allow the dividends to first be paid to the Founding Shareholders, who would then pay EGE its percentage of the dividends, ***Mouttet, instead, paid the dividends to "settle debts of Mouttet," himself.*** EGE ***first learned*** of the diversion of the dividend payment rightfully belonging to EGE, during the meeting held, ***in or about late September, 2008*** at the Miami Airport, in the District, with Mouttet, and other members of his family.  As previously alleged above, ***EGE later learned during 2011*** that the dividends had been diverted to one of Petters' companies, from whom Mouttet had also borrowed money, ***unbeknownst to EGE***.

440.   Despite EGE's demands for the registration of its SVL stock (made in or the first half of 2008) as alleged above, including its delivery (in or about October, 2008) of duly executed instruments of transfer and powers of attorney for the SVL stock, and notwithstanding the maturity of the outstanding Atlantic loan on September 30, 2008, entitling EGE to demand registration of ownership, in the books and records of SVL, of all of the shares EGE owned, SVL, Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, have falsely, fraudulently, and unlawfully refused to allow EGE to register its ownership of the SVL shares it owns.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

**(f)**    **The Florida Law Defendants Commit Perjury and Intentionally Withhold Documents and Information to Further Their Unlawful Conspiracy to Steal from and Defraud EGE**

441.    To further their unlawful conspiracy and illicit scheme to steal from and otherwise defraud EGE, Graham, while officially acting only as counsel for Hoo (while at the same time serving as a Director of SVL, and its primary attorney) orchestrated a fraudulent defense to illegally obstruct justice in the Jamaican lawsuit on behalf of all of the defendants therein - - SVL, Hoo, Levy, and Stewart - - which included the intentional withholding from production of documents and perjury.

442.    In particular, Hoo, Levy and Stewart, SVL, and George unlawfully withheld documents showing that:

(a)    Mouttet and/or his family owned a controlling interest in Falcon and Senoda, and, therefore, controlled SVL (which would have proved false Hoo's testimony that Mouttet never directly or indirectly owned shares of SVL), and would have drastically affected the admissibility of excluded oral statements made by Mouttet, documents authored by him, and of particular significance, two extensions of the St. Georges Option Agreement;

(b)    the June 28, 2005, Supplemental Agreement, which proved flatly false *their main contention*, namely, that EGE's right to, and ownership of the SVL shares *expired before the date of that agreement*; and

(c)    Hoo, Levy, and Stewart were direct and/or indirect shareholders of Haven, and as a consequence of Atlantic (which would have proved false Hoo's

166

denial that he shared in the proceeds of the $29.5 million loan to Atlantic), and would have contradicted Stewart's claimed lack of knowledge[16]

443.   Graham presented the testimony of Hoo (by affidavit and at the 2010 trial) that he knew to be false.   In particular, Hoo falsely testified under oath, among other matters, as follows:

a.   That Mouttet had no interest in the shares of SVL capital stock that Hoo and his wife held in Senoda (when, in fact, Hoo transferred shares of SVL capital stock to Senoda for the express purpose of holding those shares in trust for Mouttet and other members of The Mouttet Family Florida Criminal Enterprise);

b.   That Mouttet never owned any shares of SVL (when, in fact, at least Hoo and Stewart transferred substantial shares of SVL stock to Mouttet and other members of The Mouttet Family Florida Criminal Enterprise sometime after SVL obtained its lottery and gaming license); and

c.   That he had no interest in shares of Atlantic (when, in fact, his mother was a shareholder of Haven, which owned 83% of the outstanding shares of Atlantic).

Hoo falsely testified for the express purpose of preventing the disclosure Mouttet's substantial ownership interest in SVL, and to otherwise thereby allow the exclusion of

---

[16]   Such intentional withholding of documents and information also included the **secret** marketing services agreement with Atlantic Consulting, which would have showed that Hoo, Levy, Stewart, and George falsely represented, previously, to the Lender that the marketing services agreement with Atlantic needed to be terminated in order for SVL's future planned private placement and IPO to succeed.

167

any oral statements previously by Mouttet that might support EGE's contract claims being tried in Jamaica.

444.   Furthermore, Hoo admitted during his September 1, 2010 trial testimony that **he had never paid** the required $1 JMD per share for the issuance of the new shares of SVL capital stock that were previously sold to EGE, **and, therefore admitted** that his prior written representations to EGE, and those of Graham, each given to EGE in or about late August, 2002, were, indeed, false.

**(g)**   **Allegations Concerning Relief Defendant Intralot**

445.   In or about October, 2008, Relief Defendant Intralot (through Relief Defendant Intralot St. Lucia, S.A.) acquired approximately 105,490,000 shares of SVL stock from Hoo.   In or about January, 2009, Relief Defendant Intralot (through Relief Defendant Intralot St. Lucia, S.A.) acquired another 80,000,000 shares of SVL stock from either or both of Hoo and Levy.   Sometime thereafter, Relief Defendant Intralot (through Relief Defendant Intralot St. Lucia, S.A.) planned to acquire additional shares of SVL stock from Stewart.

446.   On or about January 11, 2010, Relief Defendant Intralot (through Relief Defendant Intralot Caribbean Ventures Limited) acquired over 1,300,000,00 (1.3 billion) shares of SVL stock.

447.   As previously alleged above, Relief Defendant Intralot acquired the foregoing shares of SVL, by purchasing said shares from the Founding Shareholders, Hoo, Levy, and Stewart, as well as from Mouttet, and other members of his family, through entities they controlled and owned, namely, Falcon and Senoda.   Prior to these transactions, Falcon and Senoda were the two largest shareholders of SVL.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

448.   Upon information and belief, Relief Defendant Intralot's foregoing acquisitions of shares of SVL were made to hinder, delay, and/or defraud the rights to collateral security for the indebtedness owed to the Lender, and, thus, Talisman, as well as the registration of EGE's ownership of its shares of SVL stock in the books and records of SVL, and the payment of the dividends due EGE on the shares of SVL this Plaintiff owns, and to otherwise defraud each of the Plaintiffs, and to steal valuable property and rights from each of the Plaintiffs.

**(h)   EGE's Formal Demand Letters**

**(i)   Demands for Registration of Ownership in the Books and Records of SVL of the SVL Shares Owned by EGE**

449.   By letter dated October 17, 2008, upon reading a press release that SVL planned to issue shares to Relief Defendant Intralot, EGE notified SVL that EGE had a right of first refusal on a pro rata basis to any proposed issuance of SVL shares to Relief Defendant Intralot.  That letter was ignored.

450.   By mid-October, 2008, realizing that Mouttet, P. G. Mouttet, C. Mouttet, Hoo, Levy, Stewart, George, Graham, SVL, and Atlantic all never intended repayment of the outstanding loan balances, and otherwise planned to continue in their excuses and delaying tactics, in furtherance of their unlawful conspiracy and association-in-fact, EGE again made formal demand for the registration of its ownership in the books and records of SVL of the SVL shares which EGE already owned.  By letter dated October 17, 2008, EGE made demand of SVL, and delivered duly executed instruments of transfer for the 391,584,242 SVL shares, previously sold to EGE, for registration and recording of EGE's ownership in the shareholder registry of SVL.  These Defendants falsely, fraudulently, and illegally refused to allow EGE to register its SVL shares, by

169

instructing SVL's Company Secretary not to register EGE's ownership in the shareholder registry.

451.   By letters dated October 27, 2008, EGE again reminded SVL, Hoo, and Levy of the "forward sale" of 220,330 SVL shares by the Founding Shareholders (Hoo, Levy and Stewart), which, after various stock splits, equaled 391,584,242 shares, and notified those Defendants of EGE's intent to effect the registration of ownership in the books and records of SVL of the shares EGE owned in the name of EGE, and enclosed duly executed instruments of transfer, and demanded that new stock certificates, reflecting the split shares, be delivered to counsel for EGE. These Defendants falsely, fraudulently, and illegally refused.

452.   By letter dated October 27, 2008, EGE also notified Stewart of the "forward sale" by her late husband, Peter Stewart, of 84,329 ordinary SVL shares, which after subsequent stock splits equaled at least 152,821,778 SVL shares.  That letter informed Stewart that, in essence, no steps had been taken by her to permit the registration of ownership of those shares, in the books and records of SVL, in the name of EGE as required by the agreements previously executed by her late husband; attached the instrument of transfer previously duly executed by her late husband; attached another instrument of transfer to be executed by her to effectuate the transfer of the registration of the post-split SVL shares into the name of EGE in the books and records of SVL; and informed her that the consideration for all of those shares was being held in an escrow account.  The letter also requested the transfer of the post-split SVL shares to EGE, and the delivery of the stock certificates to counsel for EGE. Stewart has falsely, fraudulently, and illegally refused to do so.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

453.    In furtherance of their illegal conspiracy and association-in-fact, SVL, Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, each and all participated in the false, fraudulent, and unlawful refusal to approve the registration of ownership, in the books and records of SVL, of the SVL shares owned by EGE.

454.    By letter dated October 30, 2008, EGE notified SVL and its Company Secretary (Ms. Winsome Minott) of the prior letters dated October 17 and 27, 2008.  By email dated October 30, 2008, Ms. Winsome Minott acknowledged receipt of the October 30, 2008 letter.

455.    By letter dated November 3, 2008, counsel for EGE again notified SVL and its Company Secretary (Ms. Winsome Minott) that the appropriate stamp duty fee had been submitted, based on an independent assessment by the Office of the Stamp Commissioner, and that pursuant to the 2002 and 2004 "forward sale of shares" agreements, Hoo, Levy, and Stewart were each responsible for payment of transfer taxes and stamp duties owed on the SVL shares, and gave them 72 hours to do so.

456.    By letter dated November 4, 2008, counsel for EGE notified Stewart of her failure to act on the prior letters, dated October 17 and 27, 2008, and her failure to effectuate registration of ownership in the name of EGE in the books and records of SVL, and gave her a final 72 hours to do so.  Stewart refused to act.

457.    Despite all of the written requests and demands by EGE, SVL, Hoo, Levy, Stewart, George, and Graham, and Mouttet and members of the SVL Florida Enterprise and/or The Mouttet Family Florida Criminal Enterprise among others, have all continued to refuse to honor the agreements, or to register ownership in the books and records of

171

SVL of the SVL shares EGE already owns, in furtherance of their illegal conspiracy and association-in-fact.

**(ii)** **Demands for Dividends**

458.   EGE also made similar, final, written demand for payment of past dividends.  By separate letters, each dated October 17, 2008, EGE notified Hoo, Levy, and Stewart of their respective breaches and failures to pay and/or otherwise transfer the dividend payments, taken by each of them, on the SVL shares previously sold to and owned by EGE, and provided wire transfer instructions for payment over to EGE of the dividends the Defendants previously wrongfully received and retained.   None of them did do.

459.   By separate letters, each dated November 3, 2008, EGE, again, notified each of the Hoo, Levy, and Stewart of their respective breach of their failures to pay and/or otherwise transfer the dividend payments, taken by them, to EGE, and EGE gave the Defendants 72 hours to do so.  None of them did so.

460.   On or about December 4, 2008, Mouttet directed and caused a term sheet to EGE, as well as the Lender, to be sent via facsimile transmission directly to the Decision Maker for EGE, on his own behalf, as well as on behalf of Atlantic, SGCW, and AmeriServices.  ***This term sheet proposed the re-structuring of the outstanding debts owed by Atlantic and SGCW by means of a transfer of a portion of the SVL shares (which EGE already owned), and by means of dividend payments (which EGE was already entitled to receive).***  This proposed term sheet is further evidence of, and another indication that Mouttet (on behalf of not only himself, but, as previously alleged above, also SVL, and its Board members, including, without limitation, Hoo,

Levy, Stewart, George, and Graham) all recognized EGE's ownership of "forwardly sold" shares of SVL, as well as the obligation for payment to EGE of any outstanding dividends paid or to be paid on said shares by SVL.

461.   In addition, the term sheet that Mouttet directed and caused to be faxed *admits that SVL had previously paid cash dividends to its shareholders,* but which dividends - - amounting to at least US $690,000 - - *had not been paid to EGE,* as the owner of, now, approximately 13.5% of the outstanding shares of SVL.

462.   The term sheet sent that Mouttet directed and caused to be faxed also *admitted that Atlantic and/or SGCW owned 45% of Relief Defendant SGLBVI.* Based on this term sheet, it is the information and belief of EGE, as well as Talisman, that *Mouttet transferred assets* from some of the Florida Law RICO Defendants (such as, without limitation, Mouttet, other members of his family, including, but not limited to, P. G. Mouttet, C. Mouttet, and N. Mouttet, as well as Atlantic, Haven, Peninsula, SVL, AmeriServices, Hoo, Levy, Stewart, SGCW, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Flying Fish) *to Relief Defendant SGLBVI,* to hinder, delay, and otherwise frustrate the rights of the EGE, as well as, first, the Lender, and, then, Talisman, and to otherwise defraud each of them, and to steal valuable property and rights from each of the Plaintiffs.

463.   Finally, the term sheet that Mouttet directed and caused to be faxed also sought the release of Hoo, Levy, and Stewart from their respective obligations under the 2002 and 2004 "forward sale of shares" agreements, as amended.   This request is *additional evidence and an admission by Mouttet, individually, and as the authorized agent of the Founding Shareholders, and SVL's Board of Directors*,

173

that, as of December 4, 2008, **EGE had the right to demand registration of ownership,** in the books and records of SVL, of the shares of SVL EGE owned, in addition to other rights under the 2002 and 2004 agreements.

464.    On or about December 8, 2008, EGE and the Lender submitted a counter-proposal, in which they identified and listed many of the major provisions and conditions that Mouttet, SVL, Atlantic, Hoo, Levy, and Stewart, as well as the other SVL Board members, such as George, and Graham (as well as AmeriServices), among others, had failed to carry out under the terms of prior agreements, including the failure to record the ownership, in the books and records of SVL, of the 391,584,242 shares of SVL that EGE owned, and the failure to pay to EGE the outstanding dividends on those shares.

465.    It is the information and belief of EGE, as well as Talisman, that Mouttet **transferred assets** from some of the other Florida Law RICO Defendants (such as, without limitation, Mouttet, other members of his family, including, but not limited to, P. G. Mouttet, C. Mouttet, and N. Mouttet, as well as Atlantic, Haven, Peninsula, SVL, Hoo, Levy, Stewart, SGCW, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Flying Fish) **to Relief Defendant VLT(BVI),** to hinder, delay, and otherwise frustrate the rights of the Plaintiffs, and to otherwise defraud each of them, and to steal valuable property and rights from each of the Plaintiffs.

466.    EGE has subsequently learned, during its ongoing investigation, that **SVL has paid dividends totaling at least $0.79 JMD per share, during the years 2008 through June 22, 2012**, collectively, to each of its shareholders, including Hoo, Levy, and Stewart, as well as Mouttet, his family members, and to entities the Mouttet family controlled and/or owned.  **No such dividends were paid to EGE.**

174

467.   *In or about the summer of 2011, EGE learned for the first time* that, in order to settle his affairs with the Receiver in the <u>Petters</u> matter, Mouttet paid at least a portion of the dividend income he had received from SVL to the Receiver.  *Those SVL dividends belonged to EGE, pursuant to the 2002 and 2004 "forward sale of shares" agreements, as amended.  Mouttet, the SVL <u>Florida</u> Enterprise, and The Mouttet Family <u>Florida</u> Criminal Enterprise simply stole them.*

468.   Based upon documents recently produced by Mouttet, in or about mid-July, 2012, to the Bankruptcy Trustee, it is now apparent that Falcon and Senoda actually pledged the SVL shares that served as collateral for the $16.5 million loan from Petters to Supreme Holdings-Delaware and Supreme Gaming-Florida; and that Mouttet has re-acquired the shares of SVL previously pledged to Petters, but has hidden them from EGE, the rightful owner of the SVL shares to begin with, and the Bankruptcy Trustee or he has sold them and secreted the proceeds.

469.   Based upon information first learned during Mouttet's examination under oath only just taken on July 27, 2012, pursuant to Bankruptcy Rule 2004, it now also appears that some of the SVL shares previously sold to EGE were sold, liquidated, and/or transferred to either repay a portion of the $16.5 million loan from Petters; and to provide funds for Mouttet, other members of his family, and/or The Mouttet Family <u>Florida</u> Criminal Enterprise to personally use; and/or to attempt to hide and/or place the shares out of the reach of EGE, and in derogation of EGE's legal rights.  *Mouttet, and the Mouttet Family <u>Florida</u> Criminal Enterprise, among others, simply stole the SVL shares and/or the proceeds derived therefrom.*  EGE reserves the right to

175

amend this Complaint once additional facts, documents, and/or information is obtained.[17/]

470.   All conditions precedent to the institution of each of the causes of action alleged by EGE in this Complaint have occurred, have been waived, and/or have been excused.

471.   EGE has retained the services of its undersigned counsel, and has agreed to pay said counsel a reasonable fee for its services, and to reimburse said counsel for all expenses incurred to bring the claims alleged herein. EGE has also retained the services of other Experts to assist in the investigation and assembly of the facts on which this case is based.

### COUNT III
### FLORIDA RICO CLAIMS ASSERTED
### BY PLAINTIFF TALISMAN
### Fla. Stat. §§772.103(3) and 895.03(3)

472.   By Count III of this Complaint, Talisman seeks relief against those Florida Law Defendants referenced, below, in this Count III, for violation of Fla. Stat. §§772.103(3) and 895.03(3).

**A.     The Enterprise(s)**

473.   Talisman re-alleges paragraphs 171 through 173, above, regarding the illegal enterprise(s) and incorporates each of said paragraphs by reference as if fully set forth herein.  At all times relevant to this Complaint, all of these Florida Law Defendants, and numerous unknown persons, including Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25 (collectively, the "Florida Law RICO Defendants"), were an

---

[17/]     In this regard, EGE will seek an extension of time until at least October 9, 2012, to assert potential claims against Mouttet pursuant to Section 727 of the Bankruptcy Code.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

association-in-fact enterprise(s) as defined by Fla. Stat. §§772.104(3) and 895.02(3) (the "SVL <u>Florida</u> RICO Enterprise," and/or "The Mouttet Family <u>Florida</u> Criminal Enterprise"), engaged in, whose activities affected, interstate and foreign commerce, and caused damage to persons then-located within the State of Florida, namely, Talisman's assignors, the Lender.

**B.      The Role of Each Florida Law RICO Defendant in the Illegal SVL Florida Enterprise and The Mouttet Family Florida Criminal Enterprise**

474.   Talisman re-alleges paragraphs 174 through 204, above, regarding the illegal role of each of the Florida Law RICO Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, in the ***unlawful SVL Florida Enterprise, and/or The Mouttet Family <u>Florida</u> Criminal Enterprise***, and incorporates each of said paragraphs by reference as if fully set forth herein.

475.   In addition to all of the foregoing, Mouttet, Haven, Hoo, Levy, Stewart, and Atlantic, among others, have engaged in multiple acts of fraud and deceit regarding, and theft and misappropriation of, at least a portion of the collateral that secures the $29.5 million loan to Atlantic, namely, the pledge, or "charge over," of the 83% of the shares of Atlantic owned by Haven, and beneficially owned by Mouttet and other members of his family, as well as Hoo, Levy, and Stewart and/or other members of their respective families.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

476.   In addition to all of the foregoing, Mouttet, Haven, Hoo, Levy, Stewart, Peninsula, and Atlantic, among others, have engaged in multiple acts of fraud and deceit regarding, and theft and misappropriation of, a portion of the collateral that secures the $29.5 million loan to Atlantic, namely, the pledge, or "charge over," of the 83% of the shares of Peninsula owned by Haven, and beneficially owned by Mouttet and other members of his family, as well as Hoo, Levy, and Stewart and/or other members of their respective families.

477.   In addition, Mouttet, SVL, Atlantic, Hoo, Levy, Stewart, George, and Graham, among others, have engaged in multiple acts of fraud and deceit regarding, and theft and misappropriation of, a portion of the collateral that secures the $29.5 million loan to Atlantic, namely, the pledge, assignment, and "charge over" shares, and other instruments entered into by the Founding Shareholders of SVL, regarding 1,389,173,513 ordinary shares of SVL.

478.   In addition, Mouttet, SVL, Atlantic, Hoo, Levy, Stewart, George, and Graham, among others, have engaged in multiple acts of fraud and deceit regarding, and theft and misappropriation of, a portion of the collateral that secures the $29.5 million loan to Atlantic, namely, the pledge, assignment, and "charge over" shares, and other arrangements made by Hoo regarding his 235,173,649 ordinary shares of SVL.

479.   In addition, Mouttet, SVL, Atlantic, SGCW, Hoo, Levy, Stewart, George, and Graham, among others, have engaged in multiple acts of fraud and deceit regarding, and theft and misappropriation of, a portion of the collateral that secures the $29.5 million loan to Atlantic, namely, the later pledge and assignment of 15% of SVL's

178

outstanding capital shares, which were some of the SVL shares held and owned by Mouttet.

## C. The Predicate Acts of Criminal Activity

480.    Talisman re-alleges paragraph 205, above, regarding the illegal predicate acts of each of the Florida Law RICO Defendants, named in this Count III, in the unlawful SVL Florida Enterprise and/or The Mouttet Family Florida Criminal Enterprise.

### (1) The Wire Fraud:  The $29.5 Million Loan to Atlantic

481.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 206 through 218, above, regarding the illegal predicate acts of each of the Florida Law RICO Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, *in the unlawful SVL Florida Enterprise and/or The Mouttet Family Florida Criminal Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

### (2) The Wire Fraud:  Florida RICO Defendants' Efforts to Obtain Lottery and Gaming Licenses and Expand into Central America

482.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 220 through 222, above, regarding the illegal predicate acts of each of the Florida Law RICO Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL,

179

Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, *in the unlawful SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

**(3)    The Wire Fraud:  The SGCW Loan in 2007**

483.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 224 through 242, above, regarding the illegal predicate acts of each of the Florida Law RICO Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, *in the unlawful SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

**(4)    The Wire Fraud:  Lulling**

484.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 244 through 247, above, regarding the illegal predicate acts of each of the Florida Law RICO Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La

180

Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25,

*in the unlawful SVL Florida Enterprise and/or The Mouttet Family Florida Criminal*

*Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth

herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

**(5)**    **The Mail Fraud**

485.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 249

through 255, above, regarding the illegal predicate acts of each of the Florida Law RICO

Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family

members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants,

AmeriServices,  Haven,  Peninsula,  Pinnacle,  Supreme  Holdings-Delaware,  SGL,

Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La

Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25,

*in the unlawful SVL Florida Enterprise and/or The Mouttet Family Florida Criminal*

*Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth

herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

**(6)**    **The Money Laundering**

486.    Pursuant to Fla. Stat. §895.02(1)(B), Talisman re-alleges paragraphs 257

through 259, above, regarding the illegal predicate acts of each of the Florida Law RICO

Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family

members), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants,

AmeriServices,  Haven,  Peninsula,  Pinnacle,  Supreme  Holdings-Delaware,  SGL,

Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Sevilla, Montesano, and De La

Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25,

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

*in the unlawful SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise*, and incorporates each of said paragraphs by reference as if fully set forth herein.  These predicate acts violated Chapters 812, 817, and/or 896, Florida Statutes.

**(7)     <u>The Making of False Statements to Obtain Credit</u>**

487.   In addition to all of the foregoing, the Florida Law RICO Defendants named in this Count III acted together, aided each other, conspired, agreed, and acted collusively, in an ongoing and systematic course of conduct to defraud, first, the Lender, and, then, Talisman.

488.   These Florida Law RICO Defendants acted with intent to defraud, first, the Lender, and, then, Talisman, and with the intent to steal and otherwise deprive, first, the Lender, and, then, Talisman of (a) tens of millions of dollars of cash and other valuable collateral that could have, and should been used to repay the balance of the indebtedness owed by Atlantic, and (b) to steal the $13.6 million in loan proceeds provided to SGCW, the interest payments due thereon, and the collateral to secure said loan, as detailed hereinabove.

489.   The Lender, and, thus, Talisman, reasonably relied on each of the statements, promises, representations, and covenants in the loan documents, regarding the assets and liabilities of the various entities that served as borrowers, as well as those entities that were to provide collateral to secure the outstanding loans, including the willful misrepresentations of future acts by the Florida Law RICO Defendants, in governing its actions to extend tens of millions of dollars of loans, in extending the maturity dates of the $29.5 million loan to Atlantic, and the failure to act in pursuing other courses of action.  In addition, the Florida Law RICO Defendants failed to provide

182

to the Lender, and, thus, Talisman, with the true facts regarding their assets and liabilities, and their hidden, secret dealings in that, among other things, the Florida Law RICO Defendants failed to disclose the existence of the millions dollars of the undisclosed loan made by Petters, as well as the collateral pledged for that loan, and the fact that certain of the collateral was already pledged, or to be pledged to the Lender, was already pledged to Petters. Thus, these Florida Law RICO Defendants were engaged in "loan kiting" and the double-pledge of assets as collateral.

490.    These false statements, omissions of fact, and overt acts included, without limitation:

(a)    The failure to disclose the $16.5 million loan obtained, by Supreme Holdings-Delaware and Supreme Gaming-Florida, from Petters to finance the operations in at least Central America;

(b)    The double-pledge of the Lender's collateral to also, purportedly secure the loan *secretly* obtained from Petters;

(c)    The diversion of monies by Mouttet from Supreme Gaming-Florida, as well as from Supreme Holdings-Delaware, to *secretly* repay a portion of the loan *secretly* received from Petters; and

(d)    The use of the proceeds of the collateral that secured the outstanding loan owed to the Lender, and, thus, Talisman, to repay at least a portion of the loan *secretly* extended by Petters.

These acts amounted to "loan kiting," "the attempted fraudulent conveyance of collateral," and "money laundering."

183

491.    These Florida Law RICO Defendants' false statements, and their omissions of material fact, to obtain credit from the Lender, and, thus, Talisman, were the direct and proximate cause of, first, the Lender's, and, thus, Talisman's injuries and damages.

492.    The corporate form of each of the foregoing corporate Florida Law RICO Defendants need not be honored, because all of the Defendants' domestic Florida companies, off-shore SPVs, and other entities were all related and affiliated, and were *de facto* instrumentalities and alter egos, through which the individual Florida Law RICO Defendants engaged in the fraudulent acts and practices alleged in this Complaint, which acts and practices have injured and damaged, first, the Lender, and, thus Talisman.  The corporate form of the Florida companies and the off-shore entities was a mere sham, to clothe and disguise the true nature of the fraudulent activities in which all of the Florida Law RICO Defendants were engaged.   On information and belief, the corporate entities Atlantic, Atlantic Consultants, AmeriServices, Haven, Pinnacle, Peninsula, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Flying Fish, among other entities, each did not hold prescribed meetings; did not maintain accurate corporate books; and did not pay annual registration and franchise fees.

493.    In addition, on or about September 2 and 3, 2010, Hoo and Levy, each respectively, also admitted in their sworn testimony in another proceeding that SVL did not hold regular board meetings until SVL "went public."

494.    When it served the needs of Mouttet, and/or The Mouttet Family <u>Florida</u> Criminal Enterprise, they caused, directed, and/or permitted the registrations of Haven, Atlantic, and Pinnacle, all to lapse *(and/or allowed each to be voluntarily liquidated)*.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

When either the Lender and/or Talisman then-tried to reactivate Haven, to regain its share position over Atlantic, and to exercise its rights in the collateral pledged in the loan documents, Mouttet objected and reinstalled himself as majority shareholder, chairman of the board, and the person with admitted *de facto* control over the affairs of those companies. In addition, C. Mouttet has now instituted actions to attempt to voluntarily liquidate Atlantic.

495.   Therefore, all of the aforementioned Florida Law RICO Defendants have violated Fla. Stat. §§817.03 and 772.103(3).

**(8)    The Florida Communications Fraud**

496.   In addition to the foregoing false statements, to unlawfully obtain credit, the Florida Law Defendants also violated the Florida Communications Fraud Act, Fla. Stat. §817.034, and, therefore, Fla. Stat. §772.103(3).

497.   Further, as alleged above, during the period from at least early, 2008, through September, 2008, Mouttet used the telephones to delay, otherwise frustrate, the repayment of the outstanding loan, and to cover-up the "loan kiting" and "double-pledge" of the Lender's collateral.

**(9)    The Theft**

498.   Talisman re-alleges paragraphs 59 through 76, and 98 through 157, as well as all the other allegations common to Talisman's Florida State law claims, above, regarding the thefts of (a) tens of millions of dollars of cash and other valuable collateral that could have, and should been used to repay the balance of the indebtedness owed by Atlantic, and (b) the $13.6 million in loan proceeds provided to SGCW, the interest

payments due thereon, and the collateral to secure said loans, as set forth in great detail hereinabove.

499.   Accordingly, the Florida Law RICO Defendants have violated the provisions of Fla. Stat. §812.014, and, therefore, Fla. Stat. §772.103(3).

**D.**   **The Pattern of Unlawful Criminal and Racketeering Activity**

500.   Talisman re-alleges paragraphs 261 through 272, above, regarding the illegal predicate and overt acts of each of the Florida Law RICO Defendants (Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members and members of The Mouttet Family Florida Criminal Enterprise and/or the SVL Florida Enterprise), Hoo, Levy, Stewart, SVL, Graham, George, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, SGCW, Flying Fish, Vazquez, Montesano, Sevilla, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25), to establish the pattern of unlawful criminal and racketeering conduct pursued by each of the foregoing Florida Law RICO Defendants, and incorporates each of said paragraphs by reference as if fully set forth herein.

501.   The foregoing Florida Law RICO Defendants have engaged in multiple incidents of criminality, in connection with their dealings with the Lender, including organized fraud, communications fraud (i.e., wire fraud and mail fraud), money laundering, and theft.

502.   The Florida Law RICO Defendants agreed to, did conduct, and did participate in the conduct of the SVL Florida Enterprise's and/or The Mouttet Family Florida Criminal Enterprise's affairs, through a pattern of more than two (2) incidents of

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

racketeering activity, and for the unlawful purpose of intentionally stealing, diverting, embezzling, and/or otherwise misappropriating millions of dollars of funds loaned to the SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise by Talisman's assignors, the Lender, and otherwise stealing, diverting, embezzling, laundering or otherwise misappropriating other valuable property owned by Talisman, as more fully alleged above.

503.    The acts set forth above constitute a pattern of racketeering activity, pursuant to Fla. Stat. §§772.102(1) and (4), and 895.02 (1) and (4), in that such acts violated Chapters 812, 817, and/or 896, Florida Statutes.

504.    The Florida Law RICO Defendants have directly and indirectly conducted and participated in the conduct of the SVL <u>Florida</u> Enterprise's and/or The Mouttet Family <u>Florida</u> Criminal Enterprise's affairs, through the pattern of racketeering and activity described above, in violation of Fla. Stat. §§772.103(3), 772.102(1) and (4), 895.03(3), and 895.02 (1) and (4).

505.    As a direct and proximate result of the Florida Law RICO Defendants' racketeering activities, and the violations of Fla. Stat. §§772.103(3) and 895.03(3), Talisman has been injured in its business and property.  Specifically, after securing tens of millions of dollars of legitimate loans through the SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise, the Florida Law RICO Defendants' post-loan racketeering acts included, first, the ***misappropriation of cash and other valuable collateral*** that could have, and should have been paid to the Lender, and, then, ***the outright theft of $13.6 million*** in additional loan proceeds, and the collateral security therefor, all while the Lender was then-located in Florida (and/or the Decision Maker for

187

the Lender was then-based in Florida) and operating a business within the State of Florida, and, **otherwise prevented the Lender,** and, thus, Talisman, from **knowing about, learning about, or being in a position to halt** the diversion of funds and other valuable property, and/or they caused, first, the Lender, and, then, subsequently, Talisman, to forego the opportunity to recover its funds and other valuable property, by calling the loans and agreements executed in association therewith.

506.   The Lender, and, thus, Talisman, reasonably relied, when entering into each of the loan transactions alleged in this Complaint, on the Florida Law RICO Defendants' unlawful conduct alleged in this Complaint, and in otherwise governing its/their behavior.

507.   Had the Lender been provided the truth, it would not have extended the maturity date of the $29.5 million loan to Atlantic, nor relinquished any of its rights to the cash and other valuable collateral security therefor, and would not have granted the $13.6 million loan to SGCW.

**E.     Allegations to Support Request(s) for Injunctive and Other Equitable Relief**

508.   **Talisman will likely succeed on the merits of its Florida RICO claim(s)**, Fed.R.Civ.P. 65.   Based upon the foregoing allegations, Talisman has established *prima facie* violations by the Florida Law RICO Defendants of the provisions of Sections 772.103(3) and 895.03(3), Florida Statutes.

509.   **Talisman will suffer irreparable injury unless an injunction issues or other equitable relief is awarded**, Fed.R.Civ.P. 65.   The entry of an injunction and other equitable relief is needed to stop the Florida Law RICO Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

Talisman.  Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of Talisman's property, namely, the loan proceeds, the collateral security for the loans, and the proceeds of that collateral.  To do so, Talisman seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of Talisman's property stolen by the Florida Law RICO Defendants, and to prevent the further dissipation and theft of Talisman's property.

510.  **The threatened injury to Talisman outweighs whatever damage the proposed injunction or other equitable relief may cause the Florida Law RICO Defendants**, Fed.R.Civ.P. 65.  The Florida Law RICO Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to perpetrate their illicit RICO schemes and conspiracy, which has resulted in Talisman being deprived of its property and the agreed-upon collateral to repay the outstanding loans.  The equities weigh far more heavily in favor of Talisman, than in favor the Florida Law RICO Defendants.  In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by Talisman exceeds $200 million, and, thus, the injury to Talisman far outweighs any perceived injury to the Florida Law RICO Defendants, which may result from the injunctive and other equitable relief awarded to Talisman.

511.  **The requested injunction and other equitable relief will not be adverse to the public interest**, Fed.R.Civ.P. 65.  In fact, the public interest is served by carrying out the Florida Legislature's mandate for the courts to issue the injunctive

189

and other equitable relief specifically requested by Talisman, and specifically authorized pursuant to Sections 895.05(1)(a), (b), (c), and (e), Florida Statutes.

**COUNT IV**
**FLORIDA RICO CONSPIRACY CLAIM**
**ASSERTED BY PLAINTIFF TALISMAN**
**Fla. Stat. §§772.103(4) and 895.03(4)**

512.    By Count IV of this Complaint, Talisman seeks relief against all of the Florida Law Defendants, and Jane and Does Nos. 1-25 and Moe and Joe Entities Nos. 1-25, among others (collectively, the "Count IV Florida Law RICO Defendants") named in this Count IV for violations of Fla. Stat. §§ 772.103(4) and 895.03(4).

513.    Talisman re-alleges paragraphs 472 through 507 from Count III, above, regarding the Count IV Florida Law RICO Defendants' illegal racketeering activities in violation of Florida law, and incorporates each of said paragraphs by reference as if fully set forth herein.

514.    The Count IV Florida Law RICO Defendants agreed, acted, and conspired to violate Fla. Stat. §§772.103(4) and 895.03(4).  Specifically, the Count IV Florida Law RICO Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise through two (2) or more incidents of a pattern of racketeering activity, described above, in violation of Fla. Stat. §§772.103(3) and (4), 772.102(1) and (4), 895.03(3) and (4), and 895.02 (1) and (4).

515.    It was a purpose of the conspiracy for the Count IV Florida Law RICO Defendants and their co-conspirators to defraud and deceive the Lender into relinquishing its rights to cash and other valuable collateral securing the $29.5 million loan to Defendant, and, thereafter, steal and otherwise illegally diverted said monies to

190

their own individual collective personal use, and, thereafter, solicit and obtain tens of millions of additional dollars from the Lender through false pretenses, representations, and promises, all in order to obtain substantial economic benefits for themselves and others, through the $13.6 million in a new loan made to them, and through the unauthorized diversion, theft, misuse, laundering and misappropriation of those loan proceeds, the outstanding interest payments due the Lender, and the thefts of collateral, including Service Fees, lottery and gaming revenues, and stock pledges, that secured the loans to Atlantic and SGCW, which they stole for their own use and purposes.

516.    To accomplish these purposes, as alleged above, in great detail, each of the individual and corporate Count IV Florida Law RICO Defendants either carried out two or more of the predicate acts, or agreed to the conduct of the SVL Florida Enterprise's and/or The Mouttet Family Florida Criminal Enterprise's affairs and overall objectives of the conspiracy, which conduct constituted, and continues to constitute a conspiracy to violate Fla. Stat. §§ 772.103(4) and 895.03(4).

517.    The Count IV Florida Law RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the scheme described above.  That conduct constitutes a conspiracy to violate Fla. Stat. §§772.109(3) and 895.03(3), in violation of Fla. Stat. §§772.103(4) and 895.03 (4).

518.    As a direct and proximate cause of the Count IV Florida Law RICO Defendants' conspiracy, the overt acts they took in the furtherance of that conspiracy, and the violations of Fla. Stat. §§772.103(4) and 895.03(4), first, Talisman's assignors, then-located in Florida (and/or the Decision Maker of the Lender was then-based in

Florida) and doing business within the State of Florida, and, then, Talisman, have been injured in its/their business and property.

### Allegations to Support Request(s) for Injunctive and Other Equitable Relief

519.  **Talisman will likely succeed on the merits of its Florida RICO claim(s)**, Fed.R.Civ.P. 65.  Based upon the foregoing allegations, Talisman has established *prima facie* violations by the Count IV Florida Law RICO Defendants of the provisions of Sections 772.103(4) and 895.03(4), Florida Statutes.

520.  **Talisman will suffer irreparable injury unless an injunction issues or other equitable relief is awarded**, Fed.R.Civ.P. 65.  The entry of an injunction and other equitable relief is needed to stop the Count IV Florida Law RICO Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of Talisman.  Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of Talisman's property, namely, the loan proceeds, the collateral security for the loans, and the proceeds of that collateral.  To do so, Talisman seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of Talisman's property stolen by the Count IV Florida Law RICO Defendants, and to prevent the further dissipation and theft of Talisman's property.

521.  **The threatened injury to Talisman outweighs whatever damage the proposed injunction or other equitable relief may cause the Florida Law Defendants**, Fed.R.Civ.P. 65.  The Count IV Florida Law RICO Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

perpetrate their illicit RICO schemes and conspiracy, which has resulted in Talisman being deprived of its property and the agreed-upon collateral to repay the outstanding loans.  The equities weigh far more heavily in favor of Talisman, than in favor the Count IV Florida Law RICO Defendants.  In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by Talisman exceeds $200 million, and, thus, the injury to Talisman far outweighs any perceived injury to the Count IV Florida Law RICO Defendants, which may result from the injunctive and other equitable relief awarded to Talisman.

522.  **The requested injunction and other equitable relief will not be adverse to the public interest**, Fed.R.Civ.P. 65.  In fact, the public interest is served by carrying out the Florida Legislature's mandate for the courts to issue the injunctive and other equitable relief specifically requested by Talisman, and specifically authorized pursuant to Sections 895.05(1)(a), (b), (c), and (e), Florida Statutes.

**COUNT V**
**FLORIDA RICO CLAIMS ASSERTED**
**BY PLAINTIFF EGE**
**Fla. Stat. §§772.103(3) and 895.03(3)**

523.  By Count V of this Complaint, EGE seeks relief against all of the Florida Law Defendants referenced in this Count V, below, for violation of Fla. Stat. §§772.103(3) and 895.03(3).

**A.**      **The Enterprise(s)**

524.  At all times relevant to this Complaint, all of the Florida Law Defendants named in this Count V, and numerous unknown persons, were an association-in-fact enterprise, as defined by Fla. Stat. §§772.104(3) and 895.02(3) (the "SVL <u>Florida</u> Enterprise" and/or "The Mouttet Family <u>Florida</u> Criminal Enterprise"), who/which was

193

engaged in, and its activities affected, interstate and foreign commerce, and caused damage to persons then-located within the State of Florida, namely, EGE.

525.  Through this unlawful association-in-fact of several individuals and business entities (almost all of whom/which are related or affiliated companies of SVL, as well as Mouttet, and almost all of whom/which are the alter ego of Mouttet), the Florida Law Defendants (Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet, SVL, Hoo, Levy, Stewart, Graham, George, St. Georges, Haven, Atlantic, Supreme Holdings-Delaware, Supreme Gaming-Florida, Pinnacle, and Peninsula, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25), have engaged in multiple acts of fraud and criminality in connection with their dealings with EGE.  Such acts of criminality include multiple acts of communications fraud (wire fraud and mail fraud), money laundering, obtaining property by false statements, and theft.

526.  From 2002, and continuously to the present, Mouttet, Hoo, Levy, and Stewart used several companies, which they owned or, in the case of Mouttet, also owned and controlled (e.g., among others, SVL, Atlantic, Haven, Peninsula, Supreme Holdings-Delaware, Supreme Gaming-Florida, and St. Georges), and in which each of the Florida Law Defendants received a direct or indirect benefit, to give the false appearance of arm's length transactions.  However, as alleged, below, the Florida Law Defendants participated in various acts of deception, to steal, misappropriate, unlawfully retain, and otherwise divert shares of SVL, the dividends declared thereon, and other valuable property rights - - including a 17% equity participation in both Atlantic and Peninsula - - for their own individual and collective personal benefit, ***when all of the foregoing had been sold and owned solely by EGE.***

**B.**    **The Role of Each Florida Law Defendant in the Unlawful SVL Florida Enterprise and The Mouttet Family Florida Criminal Enterprise**

527.    As previously alleged above, **Mouttet, Hoo, Levy, and Stewart** orchestrated and masterminded the thefts and misappropriations of hundreds of millions of shares of SVL's stock, millions of dollars of dividends declared thereon, and other valuable property rights sold to and owned by EGE.  They each participated, as well, in the fraudulent acts, practices, and diversionary tactics set forth in great detail hereinabove.  They negotiated the agreements pertaining to the stock and the rights sold to, and owned by, EGE.  Mouttet, together with his father, **P. G. Mouttet**, with the active assistance and participation of the Founding Shareholders, Hoo, Levy, and Stewart, formed and used an association-in-fact of a group of companies and individuals, all of which were affiliated with Mouttet, or otherwise were subject to his direct or indirect control, or over which he exercised influence, to make them all an integral part of his fraudulent scheme.  Mouttet directed, fronted-for, and/or caused this group of companies and individuals to act, in concert, for the purpose of obtaining lottery licenses and contracts, and for the purpose of selling EGE an equity participation in SVL, Atlantic, and Peninsula.  They all shared, and committed overt acts for their collective, nefarious purposes.  After the Jamaican gaming and lottery license was obtained by SVL in 2001, Mouttet was the common thread, through which all entities and individuals named or referenced in this Count V acted, and carried out his wishes. Thus, Mouttet controlled the financial affairs of the companies, and he took and misused the assets, and exerted his influence for his own personal gain, as well as the individual and collective personal gain of his co-Florida Law Defendants, and others.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

528.   Mouttet negotiated the sales of SVL stock, as well as the sales of the 17% equity participations in each of Atlantic and Peninsula sold to EGE, as well as the provisions which would entitle EGE to demand registration of ownership, in the books and records of SVL, of the SVL shares EGE owned.  Mouttet also negotiated the terms of various escrow agreements related to the sales and acquisition by EGE of shares of SVL's stock.

529.   Mouttet personally participated and benefited from the thefts of the SVL shares, as well as the equity participations in Atlantic and Peninsula, sold to, and owned by EGE, as well as the dividends declared and paid thereon, and other associated valuable property rights sold to and owned by EGE.

530.   Mouttet sat on the Board of Directors of SVL, and served as its Treasurer.

531.   Mouttet, individually, and through **St. Georges**, also participated in acts of lulling, and misrepresentations, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

532.   As previously alleged above, P. G. Mouttet helped to form an association-in-fact of various individuals, and obtained the active assistance and participation of the Founding Shareholders of SVL (Hoo, Levy, and Stewart) to acquire a lottery license, without revealing to the Jamaican authorities that he and his son, Mouttet, were the real proponents of this business venture, and that they were not citizens/residents of Jamaica.  P. G. Mouttet personally participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

196

533.  **C. Mouttet** also met with EGE in 2008, in an attempt to frustrate, delay, and otherwise lull EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

534.  **N. Mouttet** also met with EGE in 2008, in an attempt to frustrate, delay, and otherwise lull EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

535.  As previously alleged above, **Hoo** has, among other things, served as a "front man" and alter ego for Mouttet and his father P. G. Mouttet, in seeking to obtain the lottery license in Jamaica in the name of SVL, which then served as the basis to defraud and otherwise steal from EGE.

536.  Hoo agreed to, and then reneged on, his written agreements to sell and deliver both his portion (84,320 shares) of the 204,820 newly issued shares of SVL's stock, as well as his own additional 15,510 shares of SVL stock, pursuant to the 2002 and 2004 "forward sale of shares" agreements, respectively.  Hoo personally participated in, and benefited from the thefts of the SVL shares sold to, and owned by EGE, as well as the dividends declared and paid thereon, and other associated valuable property rights sold to and owned by EGE.

537.  Hoo sits on the Board of Directors of SVL, and serves as its Chairman.

538.  Hoo also participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

539.  Hoo also failed to produce, during the proceedings in Jamaica, the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement, and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

otherwise **withheld evidence and offered perjured testimony,** with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts, all of which amounted to a fraud perpetrated on the Jamaican court, as well as on EGE, and was an illegal obstruction of justice.

540.   As previously alleged above, **Levy** has, among other things, served as a "front man" and alter ego for Mouttet, and his father P. G. Mouttet, in seeking to obtain the lottery license in Jamaica in the name of SVL, which then served as the basis to defraud and otherwise steal from EGE.

541.   Levy agreed to, and then reneged on his written agreement to sell and deliver his portion (36,141 shares) of the 204,820 newly issued shares of SVL's stock, pursuant to the 2002 "forward sale of shares" agreement.  Levy personally participated in, and benefited from the thefts of the SVL shares sold to, and owned by EGE, as well as the dividends declared and paid thereon, and other associated valuable property rights sold to and owned by EGE.

542.   Levy sits on the Board of Directors of SVL, and serves as its Deputy Chairman.

543.   Levy also participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

544.   Levy also failed to produce, during the proceedings in Jamaica, the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement, and otherwise **withheld** evidence, with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts, all of which

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

amounted to a fraud perpetrated on the Jamaican court, as well as on EGE, and amounted to an illegal obstruction of justice.

545.   As previously alleged above, **Janette Stewart** is the widow of Peter Stewart, who, among other things, served as a "front man" and alter ego for Mouttet, and his father P. G. Mouttet, in seeking to obtain the lottery license in Jamaica in the name of SVL, which then served as the basis to defraud and otherwise steal from EGE.

546.   Peter Stewart agreed to, and then reneged, and his wife Janette also reneged, on the written agreement to sell Stewart's portion (84,329 shares) of the 204,820 newly issued shares of SVL's stock, pursuant to the 2002 "forward sale of shares" agreement.  Stewart personally participated in, and benefited from the thefts of the SVL shares sold to, and owned by EGE, as well as the dividends declared and paid thereon, and other associated valuable property rights sold to and owned by EGE.

547.   Stewart sat on the Board of Directors of SVL.

548.   Stewart also participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.

549.   Stewart also failed to produce, during the proceedings in Jamaica, the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement, and otherwise *withheld* evidence, with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts, all of which amounted to a fraud perpetrated on the Jamaican court, as well as on EGE, and amounted to an illegal obstruction of justice.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

550.   **SVL** was the corporate mechanism by which Mouttet and P. G. Mouttet, and the three Founding Shareholders, applied for, and obtained the Jamaican lottery license.  It was the stock of SVL that they sold to EGE.  SVL also participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements and related documents.  SVL also failed to produce, during the proceedings in Jamaica, the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement, and otherwise **withheld** evidence, with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts, all of which amounted to a fraud perpetrated on the Jamaican court, as well as on EGE, and amounted to an illegal obstruction of justice.

551.   As alleged above, **Graham** served as the Secretary, a Director, and a lawyer, advising, representing, and assisting the Founding Shareholders and SVL, among others, in their fraudulent dealings with EGE, and other overt illegal acts in which they engaged, to steal EGE's stock and other rights, and otherwise assisted The Mouttet Family Florida Criminal Enterprise and the SVL Florida Enterprise.

552.   Graham issued a legal opinion dated August 28, 2002 in which he **falsely opined** to EGE that "all acts, conditions and things required by the laws of Jamaica" had been carried out, fulfilled and performed in "strict compliance with the laws of Jamaica," when he knew, among other things, that none of the Founding Shareholders had paid their collective $204,820 JMD as paid-in capital, prior to August 28, 2002, as required under the 2002 "forward sale of shares" agreement, and that each of the Founding Shareholders had falsely represented in separate writings, signed by each of

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

the Founding Shareholders, sent to a business office of EGE then-located in Boca Raton.

553.   Graham also failed to produce, during the proceedings in Jamaica, the June 28, 2005 Supplemental Agreement to the 2002 "forward sale of shares" agreement, and otherwise **withheld evidence and suborned perjured testimony** by at least Hoo, with the express intent and purpose to unlawfully persuade that trier of fact to render a decision contrary to the true facts, all of which amounted to a fraud perpetrated on the Jamaican court, as well as on EGE, and amounted to an illegal obstruction of justice.

554.   For his efforts and participation, Graham has received substantial sums for legal fees and other benefits from the Mouttet Family <u>Florida</u> Criminal Enterprise, from the SVL <u>Florida</u> Enterprise, from SVL, and from the other Florida Law Defendants.

555.   As alleged above, **<u>George</u>** has served as the President and CEO of SVL since 2003.  Despite the contentions of SVL, Hoo, Levy, Stewart, George, and Graham to the contrary, and their collective failure to produce a copy during the proceedings in Jamaica, in an Affidavit filed, on or about October 5, 2011, in another proceeding previously pending before the District Court, George has admitted, on behalf of himself, and as the CEO of SVL, and for the benefit of Mouttet, the existence and authenticity of the June 28, 2005 amendment to the 2002 "forward sale of shares" agreement.  George also signed, on behalf of SVL, the St. Georges Option Agreement.  For his efforts and participation, the other Florida Law Defendants assisted George in his acquisition of tens of millions of shares of SVL, at the direct expense of EGE and the future public shareholders of SVL.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

556.  **St. Georges** entered into the Option Agreement with EGE, as part of the Florida Law Defendants' fraudulent scheme to steal EGE's SVL shares, and to attempt to cut off the registration rights of EGE for the SVL shares it owns. St. Georges also participated in acts of lulling, and misrepresentation, to persuade EGE into delaying the exercise of its legal rights under the various sale agreements, the Option Agreement, and related documents.

557.  **Haven** was the sole owner of both Atlantic and Peninsula, when EGE acquired a 17% equity participation in both Atlantic and Peninsula.  Hoo, Levy, and Stewart, either individually or through other family members, owned shareholder interests in Haven.

558.  **Atlantic** sold EGE a 17% equity participant in the company, and agreed to issue, and did issue, 1,700 new shares owned by EGE.

559.  **Peninsula** sold EGE a 17% equity participant in the company, and agreed to issue, and did issue, 1,700 new shares to be owned by EGE.  **Pinnacle** is the Manager of Peninsula.

560.  **Supreme Holdings-Delaware** and **Supreme Gaming-Florida** *together secretly obtained a $16.5 million loan* from Petters by pledging the very shares of SVL stock that had been previously sold to EGE.

561.  Based upon documents produced by Mouttet in or about mid-July, 2012, to the Bankruptcy Trustee, it now appears that Falcon and Senoda actually pledged the SVL shares that served as collateral for the $16.5 million loan from Petters to Supreme Holdings-Delaware and Supreme Gaming-Florida; and that Mouttet has re-acquired the

shares of SVL previously pledged to Petters, but he has hidden them from EGE, and the Bankruptcy Trustee, or sold some or all of them and secreted the proceeds.

562.    EGE anticipates naming **Jane and John Does No. 1-25**, and **Moe and Joe Entities Nos. 1-25**, as discovery proceeds, as additional individuals and entity defendants that participated in the Florida Law Defendants' theft and misappropriation of the SVL stock, the equity participations in Atlantic and Peninsula, the theft and misappropriations of the dividends either declared and paid, that should have been declared and paid on the SVL shares and equity participations in Atlantic and Peninsula owned by EGE, and the theft and misappropriations of other valuable property rights owned by EGE, and the illegal wire fraud, mail fraud, and money laundering activities.

563.    Based upon EGE's investigation, following the testimony of certain of the Founding Shareholders and other officers/representatives of SVL during the prior trial in Jamaica, in 2010, and as a result thereof, EGE *first learned* that SVL, through its Directors, officers, and representatives, principally George, Graham, Hoo, Mouttet, Levy, and Stewart, among others, had *withheld* documents and evidence they either *secretly* executed, consented to, and/or with knowledge thereof pursued a course of conduct to defraud and otherwise steal from EGE, as well as to suborn and/or commit perjury, resulting in injuries and damage to said Plaintiff.

564.    The corporations and other entities which are named as Florida Law Defendants in this Count V are each liable for the illegal acts, conduct, practices, and course of business of their respective officers, Directors, agents and representatives, named as individual Florida Law Defendants in this Count V, who each acted within the scope of their apparent authority.  Further, said corporations and other entities were the

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

alter egos of the Florida Law Defendants, to be used to perpetrate the Florida RICO violations and overt acts. The knowledge of each individual and/or entity is the knowledge of, and is legally imputed to the other.

## C.    The Predicate Acts of Criminal Activity

565.    Each of the predicate acts alleged, below, related to the purposes of the unlawful SVL Florida Enterprise and The Mouttet Family Florida Criminal Enterprise the Florida Law Defendants formed, because they were designed and intended for the same or similar purposes and results, to-wit:  (a) to negotiate and enter into various agreements with the *secret* purpose of stealing EGE's shares of SVL, Atlantic, and Peninsula stock, the dividends declared and paid thereon, and the other valuable property rights, purchased by, and owned by EGE, and thereafter (b) to participate in acts of lulling, and misrepresentation, to persuade EGE into delaying its exercise of its legal rights under the sale agreements and related documents.  Thus, the Florida Law Defendants embarked upon a scheme or artifice to defraud, to illegally obtain hundreds of millions of shares of SVL's stock, millions of dollars of dividends declared and paid thereon, as well as the equity participations in Atlantic and Peninsula, and then attempt to unlawfully retain that stock and money, by means of knowingly false or fraudulent pretenses, representations, or promises, as set forth below, by use of the mails and wires, all in violation of Fla. Stat. §§817.03, 817.034, 812.014, and 772.103(3), among other Florida laws.

## (1)    The Obtaining of EGE's Property by False Statements

566.    The Florida Law Defendants named in this Count V made various false statements of fact, and/or otherwise omitted to state the true facts regarding their assets

204

and/or liabilities - - namely, the **secret** pledge(s) of SVL shares for an **undisclosed** loan from Petters, and the **secret** payment of dividends on SVL stock to Petters, as payments toward the monies owed on that **secret** loan - - in order to deny EGE's ownership rights in the SVL shares of, and its equity participation in SVL, and to otherwise steal the stock EGE owned, the dividends declared and paid on those shares, and other valuable property rights acquired by EGE.

567.   These false statements of fact and/or omissions of fact include, without limitation, the following:

(a)   **Secretly** obtaining a $16.5 million loan from Petters, and **secretly pledging,** as collateral for those loans, **the very same shares in SVL that were sold to and owned by EGE;**

(b)   Using at least a portion of the dividends declared and paid on the shares of SVL stock, sold to and owned by EGE, to **secretly** repay at least a portion of the loan **secretly** extended by Petters;

(c)   **Falsely representing to EGE** that it would be permitted to register its ownership of the shares of SVL stock it owned, in SVL's books and records, pursuant to the provisions of the various sale agreements, and related documents;

(d)   **Falsely representing to EGE,** in or about August, 2002, that each of the Founding Shareholders had collectively paid $204,820 JMD for their newly issues of SVL stock, when, in fact, none of them had ever done so; and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

(e)    ***Falsely representing to EGE,*** in or about August, 2002 that SVL had received the collective sum of $204,820 JMD from the Founding Shareholders when, in fact, no such monies were ever paid.

568.    The Florida Law Defendants named in this Count V acted together, aided each other, conspired, agreed, and acted collusively in an ongoing and systematic course of conduct ***to defraud EGE,*** and to otherwise attempt to deprive it of its valuable property and rights, and ***to steal EGE's ownership*** in SVL, Atlantic, and Peninsula that it had bargained for, paid for, and acquired.

569.    These Florida Law Defendants acted ***with intent to defraud EGE,*** and ***with the intent to deprive it*** of its valuable property and rights, and ***to otherwise steal*** from EGE the hundreds of millions of shares of SVL stock, millions of dollars of dividends declared and paid on those shares, its equity participations in Atlantic and Peninsula, and other valuable ***property rights owned by EGE.***

570.    ***EGE reasonably relied*** on each of the statements, promises, representations, and covenants in the sales documents, the St. Georges Option Agreement, and related documents, regarding the assets and liabilities of the various entities that were the sellers of the stock, including the willful misrepresentations - - namely, the failures to disclose the ***secret*** loan from Petters, the ***secret*** pledging of the SVL shares owned by EGE as collateral for the ***secret*** loan, and the ***secret*** payments of dividends owed to EGE to repay at least a portion of the ***secret*** loan owed to Petters - - and fraudulent acts by the Florida Law Defendants, in governing its actions, and the failure to act in pursuing other courses of action.

206

571.   Had EGE been provided the truth, it would have acted immediately to demand recordation of its ownership of the SVL shares it purchased.

572.   These Florida Law Defendants' false statements, and omissions of material fact, employed to obtain property owned by EGE, were the direct and proximate cause of EGE's injuries and damages.

573.   Therefore, all of the aforementioned Florida Law Defendants have violated Fla. Stat. §§817.03 and 772.103(3).

**(2)   The Florida Communications Fraud**

574.   On or about August 28, 2002, the 2002 "forward sale of shares" agreement was sent, or caused to be sent, by Mouttet, Hoo, Levy, SVL, and/or Graham, as well as Peter Stewart, by private or commercial interstate or international carrier to a business office of EGE, then-located in Boca Raton.

575.   On or about August 28, 2002, each of Hoo and Levy, and Peter Stewart, sent original executed undated instruments of transfer for the 204,820 shares of newly issued SVL stock, by private or commercial interstate or international carrier, to a business office of  EGE, then-located in Boca Raton.

576.   On or about August 28, 2002, Graham mailed his legal opinion to a business office of EGE, then-located in Boca Raton.

577.   On or about August 28, 2002, the agreement whereby EGE was sold a 17% equity participation in Atlantic was sent, or caused to be sent, by Mouttet, Atlantic, and/or Haven, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

578.   On or about August 28, 2002, the agreement whereby EGE was sold a 17% equity participation in Peninsula was sent, or caused to be sent, by Mouttet, Peninsula, and/or Haven, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.

579.   On or about February 27, 2004, the 2004 "forward sale of shares" agreement was sent, or caused to be sent, by Mouttet, Hoo, SVL, and/or Graham, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.

580.   On or about February 27, 2004, Hoo sent original, executed, undated instruments of transfer for the 15,510 additional shares of SVL stock, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.

581.   On or about June 28, 2005, the Supplement Agreement to the 2002 "forward sale of shares" agreement was sent, or caused to be sent, by Mouttet, Hoo, Levy, Stewart, SVL, George, and/or Graham, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.

582.   On or about July 7, 2005, the St. Georges Option Agreement was sent, or caused to be sent, by Mouttet, Hoo, SVL, George, Graham, and/or St. Georges, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton.  ***The intent and misrepresentations of all of the Florida Law Defendants were to lull EGE,*** so that it would not exercise its rights, or otherwise demand registration of the SVL shares it owned.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

583.   On or about December 5, 2005, the agreement to amend the St. Georges Option Agreement was sent, or caused to be sent, by Mouttet, and/or St. Georges, by private or commercial interstate or international carrier, to a business office of EGE, then-located in Boca Raton. *The intent and misrepresentations of all of the Florida Law Defendants were to lull EGE,* so that it would not exercise its rights, or otherwise demand registration of the SVL shares it owned.

584.   On or about January 4, 2007, the second agreement to amend the St. Georges Option Agreement was sent by Mouttet's attorneys in Miami by facsimile transmission to EGE, which amendment was then delivered to the Decision Maker for EGE. *The intent and misrepresentations of all of the Florida Law Defendants were to lull EGE,* so that it would not exercise its rights, or otherwise demand registration of the SVL shares it owned.

585.   *In about sometime in 2007,* from Pinnacle's offices in Miami, Mouttet and the Representative of EGE called Hoo in Jamaica to discuss the UBS draft memorandum for the proposed sale of SVL. At no time during this telephone call did Mouttet or Hoo, each then Directors of SVL, and representatives of SVL's Board of Directors, ever deny that SVL was a substantial shareholder of SVL.

586.   As alleged above, *beginning sometime in 2008,* and continuing to in or about late March and early April 2008, since Mouttet did not exercise the St. Georges option, the Representative of EGE contacted Mouttet by calling his Florida cell phone about the immediate need for the registration of the SVL shares EGE owned and recordation of the SVL shares EGE owned on the transfer agent's and registrar's books. In response, during these telephone calls, Mouttet delayed and made various excuses,

209

including an alleged/asserted "blackout period" for stock trades, "regulatory scrutiny into trading in SVL stock," and the "need for updated financial statements."  At this time, neither Mouttet, nor any of the Founding Shareholders, ever indicate that EGE was not entitled to register title to the SVL shares it owned, or to receive dividends on said stock.

587.  ***In or about August, 2008,*** again, prior to the maturity date of the $29.5 million loan to Atlantic, the Representative of EGE spoke by telephone to Hoo, and discussed, again, the recordation/registration of the SVL stock owned by EGE.  Hoo, however, directed EGE back to Mouttet as the person from whom Hoo took his instructions.  At no time did Hoo ever indicate that EGE was not entitled to register title to the SVL shares it owned, or to receive dividends on said stock.

588.  ***On or about December 4, 2008, Mouttet directed and caused a term sheet to be sent to EGE, by facsimile transmission, directly to the Decision Maker for EGE, asking for a release of each of the Founding Shareholders' liability under the 2002 and 2004 "forward sale of shares" agreements;*** when, in fact, the Florida Law Defendants had ***secretly*** conspired for years to deny EGE's ownership rights, and its rights to demand registration of the shares of SVL stock it was sold by the Florida Law Defendants, and which it owned, and to otherwise lull EGE in believing it still owned, and could exercise its ownership rights in, and registration rights for, the shares of SVL stock.

589.  Therefore, all of the aforementioned Florida Law Defendants have violated Fla. Stat. §§817.03 and 772.103(3).

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

**(3)**     **The Theft**

590.   EGE re-alleges paragraphs 524 through 573, as well as all of the other allegations common to EGE's Florida State law claims, above, regarding the theft of the hundreds of millions of shares of SVL stock, the millions of dollars of dividends declared and paid on those shares of SVL stock, its equity participations in both Atlantic and Peninsula, and the other valuable property rights sold to, and owned by, EGE.

591.   Hoo, Levy, and Stewart, among others, also stole the $16,384,155.00 JMD paid by EGE, collectively, to each of them, in or about June, 2005, in exchange for 17% of the 96,377,098 newly issued shares of SVL stock, when, in fact, the 17% of the shares of SVL's stock was never delivered to EGE.   ***This additional theft was not discovered by EGE until in and after October, 2008, when SVL, George, Mouttet, Hoo, Levy, Stewart, and Graham all denied SVL's registration of its substantial stock ownership in SVL.***

592.   Accordingly, the Florida Law Defendants have violated the provisions of Fla. Stat. §812.014, and, therefore, Fla. Stat. §772.103(3).

**D.**     **The Pattern of Unlawful Criminal and Racketeering Activity**

593.   These Florida Law Defendants agreed to, did commit, and did participate in the conduct of the SVL <u>Florida</u> Enterprise's affairs, and The Mouttet Family <u>Florida</u> Criminal Enterprise's activities through a pattern of more than two (2) incidents of racketeering activity, and ***for the unlawful purpose of intentionally stealing, diverting, embezzling, and/or otherwise misappropriating hundreds of millions (after the "stock split") of shares of SVL's stock sold to, and owned by EGE; the millions of cash dividends declared on those shares; and a 17% equity***

211

**participation in both Atlantic and Peninsula, all owned by EGE**, as more fully alleged above.

594.   The acts set forth above constitute a pattern of racketeering activity, pursuant to Fla. Stat. §§772.102(1) and (4), and 895.02 (1) and (4), in that such acts violated Chapters 812, 817, and/or 896, Florida Statutes.

595.   The Florida Law Defendants have directly and indirectly conducted and participated in the conduct of the SVL <u>Florida</u> Enterprise's affairs, and The Mouttet Family <u>Florida</u> Criminal Enterprise's activities, through the pattern of racketeering and activity described above, in violation of Fla. Stat. §§772.103(3), 772.102(1) and (4), 895.03(3), and 895.02 (1) and (4).

596.   As a direct and proximate result of the Florida Law Defendants' racketeering activities and violations of Fla. Stat. §§772.103(3) and 895.03(3), EGE has been injured in its business and property.  Specifically, after EGE made its investments in SVL, Atlantic, and Peninsula, the Florida Law Defendants stole those equity participations, and the dividends declared and paid on those equity participations, which are all owned by EGE.  Further, the Florida Law Defendants have all prevented EGE from halting these thefts, and caused EGE to forebear, forego, and/or otherwise delay the exercise of its rights to its property, and the registration of its SVL shares.

597.   **EGE reasonably relied** on the Florida Law Defendants' unlawful conduct alleged in this Complaint, and in otherwise governing its behavior, when entering into each of the sales and related transactions, including the St. Georges Option Agreement, and thereafter.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

**E.**     <u>Allegations to Support Request(s) for Injunctive and Other Equitable Relief</u>

598.   **EGE will likely succeed on the merits of its Florida RICO claim(s)**, Fed.R.Civ.P. 65.   Based upon the foregoing allegations, EGE has established *prima facie* violations by the Florida Law Defendants of the provisions of Sections 772.103(3) and 895.03(3), Florida Statutes.

599.   **EGE will suffer irreparable injury unless an injunction issues or other equitable relief is awarded**, Fed.R.Civ.P. 65.   The entry of an injunction and other equitable relief is needed to stop the Florida Law Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of EGE.   Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of EGE's property, namely, over 391,500,000 shares of SVL stock, and the dividends paid thereon.   To do so, EGE seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of EGE's property stolen by the Florida Law Defendants, and to prevent the further dissipation and theft of EGE's property.

600.   **The threatened injury to EGE outweighs whatever damage the proposed injunction or other equitable relief may cause the Florida Law Defendants**, Fed.R.Civ.P. 65.   The Florida Law Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to perpetrate their illicit RICO schemes and conspiracy, which has resulted in EGE being deprived of its property, namely, the over 391,500,000 shares of SVL stock, and the dividends paid thereon.   The equities weigh far more heavily in favor of EGE, than in favor the Florida

213

Law Defendants.   In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by EGE exceeds $200 million, and, thus, the injury to EGE far outweighs any perceived injury to the Florida Law Defendants, which may result from the injunctive and other equitable relief awarded to EGE.

601.   **The requested injunction and other equitable relief will not be adverse to the public interest**, Fed.R.Civ.P. 65.   In fact, the public interest is served by carrying out the Florida Legislature's mandate for the courts to issue the injunctive and other equitable relief specifically requested by EGE, and specifically authorized pursuant to Sections 895.05(1)(a), (b), (c), and (e), Florida Statutes.

## COUNT VI
## FLORIDA RICO CONSPIRACY CLAIM
## ASSERTED BY PLAINTIFF EGE
## Fla. Stat. §§772.103(4) and 895.03(4)

602.   Count VI of this Complaint seeks relief against all of the Florida Law Defendants and Jane and Does Nos. 1-25 and Moe and Joe Entities Nos. 1-25, among others (collectively, the "Count VI Florida Law RICO Defendants") referenced in this Count VI for violations of Fla. Stat. §§772.103(4) and 895.03(4).

603.   EGE re-alleges paragraphs 524 through 592 from Count V, above, regarding the Count VI Florida Law RICO Defendants' illegal racketeering activities in violation of Florida law, and incorporates each of said paragraphs by reference as if fully set forth herein.

604.   The Count VI Florida Law RICO Defendants agreed and conspired to violate Fla. Stat. §§772.103(4) and 895.03(4).   Specifically, the Count VI Florida Law RICO Defendants have intentionally conspired and agreed to directly and indirectly

214

commit, conduct, and participate in the conduct of the affairs of the SVL <u>Florida</u> Enterprise and/or The Mouttet Family <u>Florida</u> Criminal Enterprise through two (2) or more incidents of a pattern of racketeering activity described above, in violation of Fla. Stat. §§772.103(3) and (4), 772.102(1) and (4), 895.03(3) and (4), and 895.02(1) and (4).

605. ***It was the purpose of this illegal conspiracy to steal EGE's stock*** ownership in SVL, Atlantic, and Peninsula, ***and the dividends declared and paid*** on that stock ownership, sold to and owned by EGE.

606. To accomplish these purposes, as alleged above, each of the individual and corporate Count VI Florida Law RICO Defendants either carried out two or more of the predicate acts, or agreed to the conduct of the SVL <u>Florida</u> Enterprise's affairs, as well as The Mouttet Family <u>Florida</u> Criminal Enterprise's affairs, and the overall objectives of the conspiracy, which conduct constitutes a conspiracy to violate Fla. Stat. §§772.103(4) and 895.03(4).

607. The Count VI Florida Law RICO Defendants knew that their two (2) or more predicate acts, as specifically alleged above, were part of a pattern of racketeering activity, and they agreed to the commission of those acts to further the scheme described above. That conduct constitutes a conspiracy to violate Fla. Stat. §§772.103(4) and 895.03(4).

608. ***As a direct and proximate cause*** of the Count VI Florida Law RICO Defendants' conspiracy, the overt acts taken in the furtherance of that conspiracy, and violations of Fla. Stat. §§772.103(4) and 895.03(4), ***EGE has been injured*** in its business and property.

215

609.   Accordingly, the Count VI Florida Law RICO Defendants have violated the provisions of Fla. Stat. §§772.103(4) and 895.03(4).

**Allegations to Support Request(s) for Injunctive and Other Equitable Relief**

610.   **EGE will likely succeed on the merits of its Florida RICO claim(s)**, Fed.R.Civ.P. 65.   Based upon the foregoing allegations, EGE has established *prima facie* violations by the Count VI Florida Law RICO Defendants of the provisions of Sections 772.103(4) and 895.03(4), Florida Statutes.

611.   **EGE will suffer irreparable injury unless an injunction issues or other equitable relief is awarded**, Fed.R.Civ.P. 65.   The entry of an injunction and other equitable relief is needed to stop the Count VI Florida Law RICO Defendants from continuing their on-going fraudulent conduct, to avoid any further harm and damage of EGE.   Further, this equitable relief is necessary to obtain control of the fruits of this massive fraud, and the thefts of EGE's property, namely, over 391,500,000 shares of SVL stock, and the dividends paid thereon.   To do so, EGE seeks the entry of appropriate injunctive relief, the imposition of necessary constructive trusts, and the resulting institution of appropriate freeze orders, to have this Bankruptcy Court and/or the District Court take control of all of EGE's property stolen by the Count VI Florida Law RICO Defendants, and to prevent the further dissipation and theft of EGE's property.

612.   **The threatened injury to EGE outweighs whatever damage the proposed injunction or other equitable relief may cause the Count VI Florida Law RICO Defendants**, Fed.R.Civ.P. 65.   The Count VI Florida Law RICO Defendants have entered into a massive conspiracy, and joined together in illegal enterprise(s), to

216

perpetrate their illicit RICO schemes and conspiracy, which has resulted in EGE being deprived of its property, namely, the over 391,500,000 shares of SVL stock, and the dividends paid thereon.  The equities weigh far more heavily in favor of EGE, than in favor the Count VI Florida Law RICO Defendants.  In addition, the amount of compensatory, treble, and punitive damages, plus attorneys' fees and costs, sought by EGE exceeds $200 million, and, thus, the injury to EGE far outweighs any perceived injury to the Count VI Florida Law RICO Defendants, which may result from the injunctive and other equitable relief awarded to EGE.

613.    **The requested injunction and other equitable relief will not be adverse to the public interest**, Fed.R.Civ.P. 65.  In fact, the public interest is served by carrying out the Florida Legislature's mandate for the courts to issue the injunctive and other equitable relief specifically requested by EGE, and specifically authorized pursuant to Sections 895.05(1)(a), (b), (c), and (e), Florida Statutes.

**COUNT VII**
**CONVERSION CLAIM ASSERTED**
**BY PLAINTIFF TALISMAN**
**Fla. Stat. §812.014(1)**

614.    Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, C. Mouttet, P. G. Mouttet, N. Mouttet (among other members of the Mouttet family and The Mouttet Family Florida Criminal Enterprise and/or the SVL Florida Enterprise), George, Graham, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, Flying Fish, SGCW, Vazquez, Sevilla, Montesano, and De La Cruz, and Relief Defendants Intralot, SGLBVI, and VLT(BVI), as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, either individually, or collectively, have all illegally obtained monies

217

and other valuable personal property of the Lender, and, thus, Talisman, as more fully alleged above, by (a) *unlawfully taking, and/or illegally exercising control over, individually and/or collectively for themselves,* of (i) *more than $13.6 million* of new loan funds made to SGCW, (ii) *the collateral for the loan,* (iii) as well as certain of the *cash and other valuable collateral* that could have, and should have been paid to the Lender on the $29.5 million Atlantic loan, and, thus, Talisman, *secretly, and surreptiously*, since at least November 1, 2004, and (iv) *other personal property* belonging solely to the Lender, and, thus, Talisman, and thereafter, making an unauthorized transfer(s) of said cash, collateral, and/or personal property to themselves, and (b) they so-obtained said cash proceeds, collateral, and other personal property by the fraud, willful misrepresentations of a future fact, and/or false promises, as more fully alleged above.  By doing so, *the Florida Law Defendants have illegally converted* the cash proceeds, the collateral, and the other valuable personal property of, first, the Lender, while it was operating a business office (and/or the Decision Maker for the Lender was then-based in Florida) within the State of Florida, and, thus, Talisman, in violation of Fla. Stat. §812.014(1).

615.    In addition, by *unlawfully stealing and/or misappropriating the collateral* for the loans extended to Atlantic and SGCW, *the Florida Law Defendants have deprived,* first, the Lender, and, thus, Talisman, of the rights to, and the benefits of the collateral, in violation of Fla. Stat. §812.014(1).

616.    As a direct and proximate result of the Defendants' theft and conversion, and violations of Fla. Stat. §812.014(1), first, the Lender, while it was operating a business office (and/or the Decision Maker for the Lender was then-based in Florida)

218

within the State of Florida, and, thus, Talisman, has been injured in their/its business and property in Florida.

617.    The actions and conduct of the Florida Law Defendants have been willful, wanton, and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[18/]

618.    The Florida Law Defendants' wrongful conduct was motivated solely by greed, and the desire for unreasonable financial gain, by whatever illegal means necessary.    There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

619.    Each of **the Florida Law Defendants had a specific intent to harm,** first, the Lender, and, thus, Talisman, and the conduct of each of the Defendants did in fact harm, first, the Lender, and, then, therefore, Talisman.

620.    As a result of the Florida Law Defendants' unlawful conduct, **Talisman is entitled to the damages proximately caused** by said illegal conduct.

### COUNT VIII
### FLORIDA CIVIL THEFT CLAIM
### ASSERTED BY PLAINTIFF TALISMAN
### Fla. Stat. §772.11

621.    Talisman re-alleges and incorporates all of the allegations contained in paragraphs 613 through 620 of this Complaint, above, as if fully stated herein.

622.    ***Pursuant to a demand letter dated August 10, 2012, Talisman has made a formal written demand*** upon the Florida Law Defendants referenced in said demand letter, pursuant to Fla. Stat. §772.11(1), for the return of Talisman's cash,

---

[18/]    Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

and/or collateral and other valuable personal property that said Florida Law Defendants have stolen and/or otherwise illegally converted to their own individual and/or collective personal uses.

623.    A true and correct copy of the August 10, 2012 demand letter is attached hereto as Exhibit "A," and the contents are specifically incorporated herein by specific reference.  The August 10, 2012 demand letter will be served upon each of the Florida Law Defendants with the initial process in this action.

624.    If any or all of the Florida Law Defendants fail to respond and/or otherwise comply with the demands recited in the August 10, 2012 demand letter within thirty (30) days after receipt of the demand letter, **Talisman will be entitled to recover threefold** the actual damages it has sustained, due to said Defendants' unlawful conversion and/or theft, in violation of Fla. Stat. §812.014(1), as well as Talisman's reasonable attorneys' fees and court costs, all pursuant to Fla. Stat. §772.11(1).

625.    None of the Florida Law Defendants named in the August 10, 2012 demand letter will be required to respond to this Count VIII until the thirtieth (30th) day after their respective receipt of this letter with initial process in this action.

**COUNT IX**
**CONVERSION CLAIM**
**ASSERTED BY PLAINTIFF EGE**
**Florida Stat. §812.014(1)**

626.    Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members and other members of The Mouttet Family Florida Criminal Enterprise and/or the SVL Florida Enterprise), Atlantic, Haven, Peninsula, Pinnacle, Atlantic Consultants, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, Graham, and George, as well as Jane and

220

John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, **have all illegally stolen, misappropriated, and/or illegally obtained stock, equity participations, dividends, stock splits, and other valuable property rights of EGE,** as more fully alleged above.

627.    The Florida Law Defendants, either individually, or collectively, unlawfully **took, and/or illegally exercised control over,** individually and/or collectively for themselves, **over 391,500,000 shares of SVL stock, 17% equity participations in both Atlantic and Peninsula, dividends declared and paid on the foregoing stock and equity participations, and millions of dollars siphoned off from SVL, Atlantic, and Peninsula to prevent the declaration and payment of dividends to EGE, belonging solely to EGE.**

628.    The Florida Law Defendants so-obtained said stock, equity participations, dividends, cash proceeds, and other valuable property rights by the fraud, willful misrepresentations of a future fact, and/or false promises as more fully alleged above. By doing so, said Florida Law Defendants have illegally converted the stock, equity participations, dividends, cash proceeds, and other valuable property rights of EGE, in violation of Fla. Stat. §812.014(1).

629.    In addition, **by unlawfully stealing and/or misappropriating the cash proceeds of SVL, Atlantic, and Peninsula,** the Florida Law Defendants have deprived EGE, of its rights to, and the benefits of, its ownership of shares of SVL, and 17% equity participations in both Atlantic and Peninsula, in violation of Fla. Stat. §812.014(1).

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

630.   **As a direct and proximate result** of the Defendants' theft(s) and conversion(s), and violations of Fla. Stat. §812.014(1), **EGE has been injured** in its business and property.

631.   The actions and conduct of the Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[19/]

632.   The Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.   There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

633.   Each of the Florida Law Defendants had a **specific intent to harm EGE,** and the conduct of each of the Defendants did in fact harm EGE.

634.   As a result of the Florida Law Defendants' unlawful conduct, **EGE is entitled to the damages proximately caused** by said illegal conduct.

### COUNT X
### FLORIDA CIVIL THEFT CLAIM
### ASSERTED BY PLAINTIFF EGE
### Fla. Stat. §772.11

635.   EGE re-alleges and incorporates all of the allegations contained in paragraphs 626 through 634 of this Complaint, above, as if fully stated herein.

636.   **Pursuant to a demand letter dated August 10, 2012, EGE has made a formal written demand upon the Florida Law Defendants** referenced in said demand letter, pursuant to Fla. Stat. §772.11(1), for the return and delivery of EGE's shares,

---

[19/]   EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

equity participations, dividends, and other valuable property rights that the Florida Law Defendants have stolen and/or otherwise illegally converted to their own individual and/or collective personal uses.

637.    A true and correct copy of the August 10, 2012 demand letter is attached hereto as Exhibit "B," and the contents are specifically incorporated herein by specific reference.  The August 10, 2012 demand letter will be served upon each of the Florida Law Defendants with the initial process in this action.

638.    *If any or all of the Florida Law Defendants fail to respond and/or otherwise comply with the demands recited in the August 10, 2012 demand letter within thirty (30) days after receipt of the demand letter, EGE will be entitled to recover threefold the actual damages it has sustained,* due to said Defendants' unlawful conversion and/or theft, in violation of Fla. Stat. §812.014(1), as well as EGE's reasonable attorneys' fees and court costs, all pursuant to Fla. Stat. §772.11(1).

639.    None of the Florida Law Defendants named in the August 10, 2012 demand letter will be required to respond to this Count X until the thirtieth (30th) day after their respective receipt of this letter with initial process in this action.

**COUNT XI**
**COMMON LAW FRAUD CLAIM**
**ASSERTED BY PLAINTIFF TALISMAN**

640.    As alleged hereinabove, the Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, C. Mouttet, P. G. Mouttet, N. Mouttet (among other Mouttet family members and members of the Mouttet Family Florida Criminal Enterprise and/or the SVL Florida Enterprise), George, Graham, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-

223

Florida, Flying Fish, SGCW, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, **made numerous misrepresentations and omissions of fact and promised future conduct, all of which were material** to the transactions described in this Complaint, and on which they intended the Lender to rely.  These representations were critical to the granting of the loans, the extension of the credit facilities that the Lender granted over time, and the amendments to grant additional time for repayment.

641.   Each and every one of the representations, promises, and statements made and provided by the Florida Law Defendants in the above-described transactions **were intended to induce** the Lender to act on the basis of those statements, misrepresentations or omissions.

642.   **The Lender reasonably relied** on the representations, promises, and statements made and provided by the Florida Law Defendants.

643.   As alleged hereinabove, each of the Florida Law Defendants acted with **intent to defraud the Lender, or with reckless disregard and indifference** to their obligations to the Lender under the various loan documents.

644.   The Florida Law Defendants each knew of the falsity and/or fraudulent character of the representations, promises, and statements made.

645.   As alleged above, the Florida Law Defendants' acts of fraud and misrepresentation were **the proximate cause of,** first, the Lender, and, thus, Talisman's **injury**.

646.   **Talisman has been injured** by the Florida Law Defendants' fraudulent acts and practices, misrepresentations and omissions.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

647. The actions and conduct of the foregoing Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[20]

648. The Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary. There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

649. **Each of the Florida Law Defendants had a specific intent to harm,** first, the Lender, and, thus, Talisman, and the conduct of each of the Defendants did in fact harm, first, the Lender, and, then, therefore, Talisman.

650. As a result of the Florida Law Defendants' unlawful conduct, **Talisman is entitled to the damages proximately caused** by said illegal conduct.

## COUNT XII
## COMMON LAW FRAUD CLAIM
## ASSERTED BY PLAINTIFF EGE

651. As alleged hereinabove, the Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members and members of the Mouttet Family <u>Florida</u> Criminal Enterprise and/or the SVL <u>Florida</u> Enterprise), Atlantic, Haven, Peninsula, Pinnacle, Atlantic Consultants, Graham, George, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and St. Georges, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, **made numerous misrepresentations and omissions of fact and promised future conduct,** all of which were material to the transactions described in

---

[20] Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

225

this Complaint, and on which **they intended EGE to rely.**  These representations were critical to the negotiations and execution of the 2002 and 2004 "forward sale of shares" agreements, and the Option Agreement with St. Georges; the extensions of time granted by EGE in the amendments to the various sales agreements, the Option Agreement, and related documents; and the forbearance of EGE's rights to demand registration of the shares it owned.

652.   Each and every one of the representations, promises, and statements made and provided by the Florida Law Defendants in the above-described transactions **were intended to induce** EGE to act on the basis of those statements, misrepresentations or omissions.

653.   **EGE reasonably relied** on the representations, promises, and statements made and provided by the Florida Law Defendants.

654.   As alleged hereinabove, each of the Florida Law Defendants acted with **intent to defraud EGE, or with reckless disregard and indifference to their obligations** to EGE under the various sales and options documents.

655.   The Florida Law Defendants each knew of the falsity and/or fraudulent character of the representations, promises, and statements made.

656.   As alleged above, the Florida Law Defendants' acts of fraud and misrepresentation were **the proximate cause of EGE's injury.**

657.   **EGE has been injured** by the Florida Law Defendants' fraudulent acts and practices, misrepresentations and omissions.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

658.    The actions and conduct of the Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[21/]

659.    The Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.   There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

660.    Each of the Florida Law Defendants had **a specific intent to harm EGE,** and the conduct of each of the Defendants did in fact harm EGE.

661.    As a result of the Florida Law Defendants' unlawful conduct, **EGE is entitled to the damages proximately caused** by said illegal conduct.

## COUNT XIII
## CONSPIRACY UNDER FLORIDA COMMON LAW
## ASSERTED BY PLAINTIFF TALISMAN

662.    Florida Law Defendants Mouttet, Hoo, Levy, Stewart, George, and Graham **unlawfully agreed to defraud and otherwise deceive the Lender** into relinquishing the cash and other valuable collateral that could have, and should have been used to repay, in full, the $29.5 million loan to Atlantic; **consented** to Mouttet's and C. Mouttet's illegal personal use of the of the $13.6 million loan to SGCW; **agreed to** siphon off cash proceeds and Service Fees from SVL and SGCW in derogation of the rights of the Lender, and, thus, Talisman; and **consented to** the double-pledge of collateral, and the payment of the cash proceeds to other third parties from the collateral

---

[21/]    EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

227

that was pledged to secured the outstanding loans made by the Lender to Atlantic and SGCW, *among other overt illegal acts.*

663.   As heretofore alleged in this Complaint, Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, C. Mouttet, P. G. Mouttet, N. Mouttet (among other Mouttet family members and members of the Mouttet Family Florida Criminal Enterprise and/or the SVL Florida Enterprise), George, Graham, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, SGL, Supreme Gaming-Florida, Flying Fish, SGCW, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25 and Moe and Joe Entities Nos. 1-25, among others (collectively, the "Count XIII Florida Law Defendants"), directly or indirectly, through their officers, directors, employees, or agents, have all participated in the overt acts in furtherance of this unlawful conspiracy.

664.   The objective of this unlawful conspiracy was to engage in the various illegal overt acts, or to engage in those lawful acts by illegal means, including the acts, schemes, conduct, and business practices described above and alleged in this Complaint, including theft, wire fraud, mail fraud, money laundering, as well as loan kiting and double-pledging of collateral.

665.   As a result of the Count XIII Florida Law Defendants' conspiracy, the Lender was, first, and, thus, Talisman has been injured by the loss of monies loaned plus interest, by the loss of collateral, by the loss of the cash proceeds of the collateral, and by the loss of the cash proceeds of the Service Fees which had all been duly assigned to the Lender, and, thus, Talisman, to which Talisman is entitled.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

666.    The actions and conduct of the Count XIII Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[22/]

667.    The Count XIII Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.  There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Count XIII Florida Law Defendants.

668.    Each of the Count XIII Florida Law Defendants **had a specific intent to harm,** first, the Lender, and, thus, Talisman, and the conduct of each of the Count XIII Florida Law Defendants **did in fact harm,** first, the Lender, and, then, therefore, Talisman.

669.    As a result of the Count XIII Florida Law Defendants' unlawful conspiracy, **Talisman is entitled to the damages proximately caused** by said illegal conspiracy.

## COUNT XIV
## CONSPIRACY UNDER FLORIDA COMMON LAW
## ASSERTED BY PLAINTIFF EGE

670.    As previously alleged in this Complaint, Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members and other members of The Mouttet Family <u>Florida</u> Criminal Enterprise and/or the SVL <u>Florida</u> Enterprise), Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, Atlantic, Haven, Peninsula, Pinnacle, Atlantic Consultants, Graham, George, and St. Georges, as well as Jane and John Does Nos. 1-25 and Moe and Joe

---

[22/]    Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

Entities Nos. 1-25, among others (collectively, the "Count XIV Florida Law Defendants"), all unlawfully agreed to prevent, and/or acted in unlawful concert to prevent EGE from *registering its ownership in SVL's shares,* to prevent EGE from *receiving its 17% equity participations* in both Atlantic and Peninsula, to prevent dividends from being paid to EGE, to *pledge the shares* of stock and equity participations owned by EGE *to other third parties,* to *pay the dividends* due EGE *to other third parties,* and to prevent EGE from *receiving its other valuable property rights,* among other overt illegal acts.

671.   As heretofore alleged in this Complaint, the Count XIV Florida Law Defendants, among others, directly or indirectly, through their officers, directors, employees, or agents, have all *participated in the overt acts in furtherance of this unlawful conspiracy.*

672.   The objective of this unlawful conspiracy was to engage in the various illegal overt acts, or to engage in those lawful acts by illegal means, including the acts, schemes, conduct, and business practices described above and alleged in this Complaint, including theft, wire fraud, mail fraud, obstruction of justice, and money laundering as well as loan kiting and the double-pledging of collateral.

673.   As a result of the Count XIV Florida Law Defendants' conspiracy, EGE has been injured by the loss of shares of SVL's stock it owns, the loss of 17% equity participations in Atlantic and Peninsula, and the loss of dividends due and owing to EGE, and to which EGE is entitled.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

674.   The actions and conduct of the Count XIV Florida Law Defendants has been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. § 768.73.[23]

675.   The Count XIV Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.  There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Count XIV Florida Law Defendants.

*676*.   Each of the Count XIV Florida Law Defendants **had a specific intent** to harm EGE, and the conduct of each of the Count XIV Florida Law Defendants **did in fact harm EGE.**

677.   As a result of the Count XIV Florida Law Defendants' unlawful conspiracy, **EGE is entitled to the damages proximately caused** by said illegal conspiracy.

**COUNT XV**
**FRAUD IN THE INDUCEMENT CLAIM**
**ASSERTED BY PLAINTIFF TALISMAN**

678.   As alleged above, the Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, C. Mouttet, P. G. Mouttet, N. Mouttet (among other Mouttet family members and other members of The Mouttet Family <u>Florida</u> Criminal Enterprise and/or the SVL <u>Florida</u> Enterprise), George, Graham, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, SGL, Supreme Gaming-Florida, Flying Fish, SGCW, Vazquez, Sevilla, Montesano, and De La Cruz, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, **made numerous**

---

[23]/   EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

*misrepresentations and omissions of fact* and the promise of future action, all of which were material to the transactions described in this Complaint. These misrepresentations were critical to the Lender's willingness and decision to grant several amendments, providing additional time for repayment of the $29.5 million loan to Atlantic; relinquishing specified cash and other collateral that could have, and should have been used to repay said loan; and making the $13.6 million in new loan financing.

679.    The *Lender reasonably relied* on the representations, promises and statements made and provided by the Florida Law Defendants.

680.    As alleged above, each of the Florida Law Defendants *acted with intent to defraud the Lender* to, among other things, induce the Lender to agree to relinquish specified cash and other valuable collateral that could have, and should have been used to repay the loans; to enter into new loan transactions; to accept the additional collateral for the outstanding loans; to extend the maturity date(s) of the outstanding loans; to agree to amend the loan documents for the outstanding loans; and to otherwise forbear from exercising its rights as lender under the various loan documents.

681.    The Florida Law Defendants *each knew of the falsity* of the representations, promises, and statements made.

682.    But for the numerous misrepresentations and omissions of the Florida Law Defendants, the Lender would not have agreed to relinquish the specified cash and other valuable collateral, to have agreed to extend the maturity date for the $29.5 million loan to Atlantic, and would not have entered into the new loan transaction with SGCW, as alleged hereinabove in this Complaint.

232

683.   As alleged above, the Florida Law Defendants' **acts of fraud and misrepresentation were the proximate cause of injury to,** first, the Lender, and, thus, to Talisman.

684.   Talisman has been injured by the Florida Law Defendants' fraudulent acts and practices, misrepresentations and omissions.

685.   The foregoing actions and conduct of the Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[24/]

686.   The Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.   There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

687.   Each of the Florida Law Defendants had a specific intent to harm, first, the Lender, and, thus, Talisman, and the conduct of each of the Defendants did in fact harm, first, the Lender, and, then, therefore, Talisman.

688.   As a result of the Florida Law Defendants' unlawful conduct, **Talisman is entitled to the damages proximately caused** by said illegal conduct.

### COUNT XVI
### FRAUD IN THE INDUCEMENT CLAIM
### ASSERTED BY PLAINTIFF EGE

689.   As alleged above, the Florida Law Defendants SVL, Hoo, Levy, Stewart, Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet (among other Mouttet family members and other members of The Mouttet Family Florida Criminal Enterprise and/or the SVL

---

[24/]   Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

233

Florida Enterprise), Atlantic, Haven, Peninsula, Pinnacle, Atlantic Consultants, Graham, George, and St. Georges, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, **made numerous misrepresentations and omissions of fact** and the promise of future action, all of which were material to the transactions described in this Complaint.  These misrepresentations were critical to the Florida Law Defendants' attempts to prevent EGE from registering its stock ownership in SVL's shares, to prevent EGE from receiving its 17% equity participations in both Atlantic and Peninsula, to prevent dividends from being paid to EGE, to double-pledge the shares and equity participations owned by EGE to other third parties, and to pay the dividends due EGE to other third parties, as well as to induce EGE to enter into the 2002 and 2004 "forward sale of shares" agreements, the St. Georges Option Agreement, to periodically amend the 2002 and 2004 "forward sale of shares" agreements, to periodically amend the St. Georges Option Agreement, and to otherwise forbear from exercising its rights as owner of shares of SVL, Atlantic, and Peninsula, among other matters.

690.   **EGE reasonably relied** on the representations, promises and statements made and provided by the Florida Law Defendants, as intended by the Florida Law Defendants.

691.   As alleged above, each of the Florida Law Defendants **acted with intent to defraud EGE** to induce it to enter into the aforesaid stock transactions, and the amendments and the other transactions related thereto.

692.   The Florida Law Defendants **each knew of the falsity** of the representations, promises, and statements made.

234

693.   But for the numerous misrepresentations and omissions of the Florida Law Defendants, EGE would not have entered into the "forward sale of shares" transactions, equity participation acquisitions, the St. Georges Option Agreement, and/or any of the amendments thereto, as alleged hereinabove in this Complaint.

694.   As alleged above, the Florida Law Defendants' acts of fraud and misrepresentation *were the proximate cause of EGE's injury.*

695.   *EGE has been injured* by the Florida Law Defendants' fraudulent acts and practices, misrepresentations, and omissions.

696.   The actions and conduct of the Florida Law Defendants have been willful, wanton and malicious, justifying the imposition and award of punitive damages, pursuant to Fla. Stat. §768.73.[25/]

697.   The Florida Law Defendants' wrongful conduct was motivated solely by greed and the desire for unreasonable financial gain, by whatever illegal means necessary.   There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by each of the Florida Law Defendants.

698.   Each of the Florida Law Defendants had a specific intent to harm EGE, and the conduct of each of the Defendants did in fact harm EGE.

699.   As a result of the Florida Law Defendants' unlawful conduct, *EGE is entitled to the damages proximately caused* by said illegal conduct.

---

[25/]    EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

**COUNT XVII**
**CLAIM FOR CONSTRUCTIVE TRUST**
**ASSERTED BY PLAINTIFF TALISMAN**

700.    The Lender made tens of millions of dollars of loans, which have benefited corporate Defendants SVL, Haven, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Pinnacle, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, SGCW, and Flying Fish, as well as the individual Defendants Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet, Hoo, Levy, Stewart, George, and Graham, among others, including Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25.

701.    As parties, participants and/or signatories to the various loan transactions alleged in this Complaint, the Florida Law Defendants have knowledge of the benefits conferred.

702.    The Florida Law Defendants accepted and retained the benefits of the loan proceeds.

703.    In would be unfair and inequitable for the Defendants to continue to retain those benefits, without having paid for them.

704.    Accordingly, the Florida Law Defendants held, and/or continue to hold the outstanding loan proceeds, as well as the collateral for the outstanding loans, in constructive trust for the benefit of the Lender, and, thus, Talisman.

705.    The Florida Law Defendants are obligated to account to Talisman for the benefits conferred upon them by the loans previously made by the Lender, which benefits are required to be held in a constructive trust for the benefit of the Lender, and, thus, Talisman.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

## COUNT XVIII
## CLAIM FOR CONSTRUCTIVE TRUST
## ASSERTED BY PLAINTIFF EGE

706.   *EGE purchased and owns hundreds of millions of shares of SVL's stock, as well as a 17% equity participation in both Atlantic and Peninsula.*   In addition, *EGE is entitled to the dividends* that were declared and paid on those equity interests, as well as the dividends that were wrongfully not declared and paid.

707.   As parties, participants and/or signatories to the various transactions alleged in this Complaint, the Florida Law Defendants, as well as Jane and John Does Nos. 1-25, and Moe and Joe Entities Nos. 1-25, among others, *have knowledge of* the benefits, rights, and property ownership conferred upon EGE.

708.   The Florida Law Defendants *wrongfully stole, misappropriated, and/or retained* the benefits, rights, and property ownership sold to EGE.

709.   Accordingly, the Florida Law Defendants held, and/or continue to hold the benefits, rights, and property ownership sold to EGE, namely, the over *391,500,00 million shares of SVL's stock,* the *17% equity participation in both Atlantic and Peninsula,* and *the dividends* that should have been paid to EGE, in constructive trust for the benefit of EGE.

710.   The Florida Law Defendants are obligated to account to EGE for the benefits, rights, and property ownership sold to EGE, namely, the over 391,500,000 million shares of SVL's stock, the 17% equity participation in both Atlantic and Peninsula, and the dividends that should have paid to EGE, which benefits, rights, and property ownership are all required to be held in a constructive trust for the benefit of EGE.

237

**ALLEGATIONS COMMON TO ALL OF THE**
**SECTION 523(a) CLAIMS OF NON-DISCHARGEABILTY**
**AGAINST DEFENDANT MOUTTET, ONLY**

**A.**    **Introduction to the Section 523 Non-Dischargeability Claims**

711.   Plaintiffs Talisman and EGE each separately bring the following challenges/objections to the dischargeability of the debts Mouttet separately owes to each of the Plaintiffs, seeking relief pursuant to Sections 523(a)(2), (a)(4), and (a)(6) of the Bankruptcy Code, 11 U.S.C. §§523(a)(2), (a)(4), and (a)(6).

**B.**    **The Parties to the Section 523 Non-Dischargeability Claims**

712.   As to Plaintiffs Talisman and EGE, each of said Plaintiffs re-allege paragraphs 26, and 321 through 322, above, and incorporate the allegations in each of said paragraphs by specific reference as if fully set forth herein.

713.   In addition, as a proper assignee of the rights of the Lender, Talisman is entitled to, and has the requisite standing to assert the various Section 523 claims/challenges/objections, alleged below, to the non-dischargeability of the debts Mouttet owes to Talisman, itself, and/or on behalf of the Lender in whose shoes Talisman stands.

714.   As to Defendant Mouttet, Talisman and EGE re-allege paragraph 27, above, and incorporate the allegations in said paragraph by specific reference as if fully set forth herein.

715.   On or about February 24, 2012, Mouttet filed a voluntary petition, pursuant to Chapter 7 of the Bankruptcy Code, with the U.S. Bankruptcy Court for the South District of Florida, under Case No. 12-14490-LMI.

238

**C.    Jurisdiction and Venue for the Section 523 Non-Dischargeability Claims**

716.    Jurisdiction for the challenges/objections to the dischargeability of the debts Mouttet separately owes to each of Talisman and EGE is proper in this Bankruptcy Court, pursuant to 28 U.S.C. §§157(a), (b)(1), and (c)(1).  In addition, if the reference for this action is withdrawn by the District Court and/or if this action is transferred and/or otherwise referred back to the District Court, jurisdiction of the claims asserted by Talisman and EGE, pursuant to Section 523 of the Bankruptcy Code, is proper in said District Court, pursuant to 28 U.S.C. §§157(a), (b)(1), (c)(1), and (d), and 1334(a) and (b).

717.    Venue for the challenges/objections to dischargeability is proper in this District, pursuant to 28 U.S.C. §1409(a).

718.    Pursuant to Fed. R. Bankr. P. 7008(a), the third part of this Complaint is a core proceeding, pursuant to 28 U.S.C. §157(b)(2)(I).

**D.    Factual Background of the Sections 523(a) Non-Dischargeability Claims**

719.    For the factual basis of their individual challenges/objections to the dischargeability of the debts Mouttet separately **owes to each of Talisman and EGE, under Federal law (as to Talisman, only),** and separately to **each of Talisman and EGE, pursuant to Florida state law,** Talisman and EGE re-allege paragraphs 1 through 298, and 300 through 380, above, and incorporate all of the allegations in each of said paragraphs by specific reference as if fully set forth herein.

**(1)    Additional Factual Allegations to Support Talisman's Section 523(a) Claims**

720.    As part of **an illicit plan to defraud the Lender,** and, thus, Talisman, at a yet undetermined date, but now believed to have begun by no later than sometime in or

239

before June, 2005, SVL and Atlantic, with the express knowledge and complicity of Mouttet, *secretly* agreed to, and did, in fact, terminate the then-existing marketing services agreement between these two entities, effective June 30, 2005, and, replaced that agreement with a new, *secret* marketing services agreement between SVL and Atlantic Consultants - - an entity to be created and controlled by Mouttet, which Mouttet now admits is the same entity as Atlantic - - effective November 1, 2004.  In order to terminate the then-existing marketing services agreement between SVL and Atlantic, Mouttet needed the acquiescence and consent of the Lender, since the Service Fees to be generated pursuant to that agreement were all pledged and required to be paid to the Lender to service the $40 million in indebtedness then-due the Lender.

721.   In order to deceive, defraud, and induce the Lender to provide its consent and acquiescence, Mouttet informed the Lender, through oral statements he made, in or about late June/early July, 2005, to the Representative of the Lender, that:

a.   SVL was generating insufficient cash flows, due, in part, to increased taxes levied by Jamaica on lottery games, and, accordingly, was paying substantially reduced Service Fees, to be used to amortize the outstanding loans;

b.   The Jamaican regulatory authorities were then requiring that SVL maintain certain liquidity levels and ratios in order to retain its lottery and gaming license.  Accordingly, SVL needed to pay less Services Fees;

c.   Without disclosing his true intentions, Mouttet requested the Lender to explore alternative strategies for repayment of the outstanding loans;

240

d.      That in or about late 2004, SVL - - for which Mouttet then-served as a Director - - decided that the best means for achieving liquidity for SVL, as well as providing a means to make substantial partial payments of both principal and interest on the outstanding loans to SVL-related companies, would be for SVL to "go public," through a two-step process, the first step of which was a private placement of its shares to private investors, and the second step of which would be an IPO of its shares, to be sold to the public;

e.      Under this financing plan, SVL would first raise funds through a private placement to raise $30 million (US) of new equity capital, and would use a portion of those gross proceeds to make at least substantial partial payments to the Lender of principal and interest against the outstanding loans;

f.      However, in order to be able to implement these plans to generate substantial sums of cash, the Lender was falsely told by Mouttet that the financial advisors for SVL had advised SVL that the marketing services agreement with Atlantic needed to be terminated, because new investors in the private placement and/or any future IPO would be unwilling to invest "new money" in SVL, when a substantial percentage of gross revenues were paid to another entity, especially when that entity might eventually be perceived as having no real future value to SVL (but nevertheless be necessary to repay the $29.5 million loan owed to the Lender); and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

g.     Finally, in order to induce the Lender to agree and otherwise consent to terminate the right to *future* Service Fees to be paid to Atlantic, Mouttet represented to the Lender not only that (i) the Lender would receive the lion's share of the private placement, and/or future IPO proceeds, which would both be used to pay off at least a substantial portion of the outstanding loans, and that, also, (ii) the Founding Shareholders of SVL, to-wit:  Hoo, Levy and Stewart, would obtain a more traditional bank loan, with their respective shares in SVL pledged as collateral, to repay the Lender.

722.   As part of his concerted plan to defraud the Lender, and otherwise deceive it into providing the required consent and acquiescence to allow for the termination of the specific marketing services agreement between SVL and Atlantic, **Mouttet,** individually, and as a Director and/or authorized representative of each of Atlantic, and its then-majority, 83% shareholder, Haven, and while serving as a Director and/or authorized representative of SVL, ***intentionally did not disclose to the Lender:***

a.     That SVL had already terminated the marketing services agreement with Atlantic;

b.     That, before tricking the Lender into consenting to the cancellation of the marketing services agreement, SVL had already **secretly replaced that agreement** with a new marketing services agreement with Atlantic Consultants, effective on or about November 1, 2004, months earlier. This new, ***secret agreement was executed by Mouttet*** (when he was also a Director of SVL) for Atlantic Consultants;

242

c.     That pursuant to the new, *secret* agreement with Atlantic Consultants, SVL had agreed to pay, and *was paying Atlantic Consultants (in essence, Mouttet) $300,000 each month,* effective November 1, 2004, instead of paying Atlantic the Service Fees that went directly to the Lender to be applied to the indebtedness owed to the Lender;

d.     That the foregoing events were implemented to ensure that *Mouttet,* who, along with other members of his family, controlled the affairs of SVL, would be guaranteed a substantial monthly income stream - - to the detriment of, first, the Lender, and, then, Talisman - - if he was later removed or resigned, for any reason, from being a Director of SVL, as a result of the planned private placement and/or IPO of additional capital stock of SVL;

e.     Further, by terminating the previous marketing services agreement between SVL and Atlantic, it was not, now, necessary to disclose the existence of that agreement and the relationship between Atlantic, SVL, Mouttet - - then a SVL Director - - and the Mouttet family; thus, neither the controlling interest of the Mouttet family in SVL nor the substantial payments from SVL to, in essence, Mouttet and his family were publicly disclosed to the investing public;

f.     That, because *SVL was able to secretly pay $300,000 each month* to Atlantic Consultants, *SVL had the ability to pay those monies to the Lender.* Without the Lender's consent to terminate the marketing services agreement with Atlantic, both SVL and Atlantic would have continued to

243

be obligated to pay Service Fees indefinitely to the Lender, for many more years, until the full indebtedness was repaid; and

g.     The termination of the revenue stream from SVL in the form of Service Fees paid to the Lender enabled monies to be made available, indefinitely, in the future to be paid to Mouttet, including Mouttet family members, in the form of dividends on their shareholder holdings in SVL, to the detriment of, first, the Lender, and, then, Talisman.

*All of these facts were intentionally withheld and keep secret from the Lender* by Mouttet.  *The Lender, and, thus, Talisman*, *did not learn of any of these facts until on or about <u>October 5, 2011</u>* when Mouttet filed his own Affidavit, and another Affidavit of George, the CEO of SVL, in another civil action previously pending before the District Court, and attached a copy of the heretofore *secret* agreement between SVL and Atlantic Consultants.

723.  In addition, on <u>July 27, 2012</u>, *Mouttet admitted* under oath in his Bankruptcy Rule 2004 examination *that Atlantic and Atlantic Consultants were the same entity.*

724.  *Without knowledge of the existence of, and reasons for the new, secret* agreement between SVL and Atlantic Consultants, on or about July 7, 2005, the Lender was fraudulently persuaded, otherwise deceived, and fraudulently induced to agree, did agree, and consent to the termination of the original marketing services agreement between Atlantic and SVL (and <u>only</u> thereby agreed to forego payment of any *<u>future</u>* Service Fees due to Atlantic from SVL, in exchange for other payment

244

arrangements established by SVL and Atlantic).  Mouttet negotiated and executed this amendment to the $29.5 million loan agreement on behalf of Atlantic and SVL.

725.  As part of July 7, 2005 amendment, and based on the foregoing representations actually made to the Lender, the Lender was also persuaded, by fraud, to agree, did agree, and otherwise consented to the extension of the maturity date, on the initial $29.5 million loan to Atlantic, to December 5, 2005.

726.  In order to induce the Lender, by fraud, to agree and otherwise consent, again, to the extension of the maturity date, on the initial $29.5 million loan to Atlantic, to January 31, 2006, on or about October 13 and 14, 2005, Mouttet (while he was a Director of SVL) had two telephone conversations with a representative of the Lender, located at the Lender's business office then-located in Boca Raton, and, thereafter sent, on or about January 5, 2006, a follow-up email to the Lender's business office, then-located in Boca Raton, during which Mouttet represented to the Lender that Hoo was arranging a $40 million bank loan from NCB, the proceeds of which would be used to repay the outstanding loan owed by Atlantic to the Lender.  Thereafter, ***Mouttet did not disclose the true reasons why the traditional bank loan had not been obtained, namely, with the active assistance of Hoo and Stewart, Mouttet had secretly obtained a $16.5 million loan from Petters to Supreme Holdings-Delaware and Supreme Gaming-Florida, by secretly pledging the same shares of SVL stock they each nominally held for Mouttet and/or other members of his family.***  As previously alleged above, the Lender, and Talisman, first learned of the $16.5 million ***secret*** loan, and the pledge of the SVL shares, in the ***<u>Summer of 2011</u>***, and ***<u>mid-September, 2011</u>***, respectively.

245

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

727.   On or about January 4, 2007, Mouttet executed another, further extension of the maturity date of the $29.5 million loan previously made by the Lender to Atlantic to March 31, 2008.  In order to induce the Lender to do so, **Mouttet,** individually, and as a Director and/or authorized representative of each of Atlantic, and its then-majority, 83% shareholder, Haven, and while serving as a Director and/or authorized representative of SVL, **misrepresented to the Representative of the Lender,** the following material facts, among others:

a.   **That the remaining monies owed to the Lender by Atlantic would be repaid** from revenues to be generated from the use of other lottery licenses Mouttet had obtained, either on his own or on behalf of entities he controlled, in Central America, when, in fact, and **unbeknownst to the Lender at the time, and, thus, unknown to Talisman, until in or about the <u>Summer of 2011,</u>** Mouttet had already obtained various investments and loans of at least $16.5 million (made during the period commencing from in or about July, 2006, through in or about April, 2007, to finance this expansion into Central America) from Petters, to Supreme Holdings-Delaware and Supreme Gaming-Florida - - two entities either 100% owned by, and/or controlled by Mouttet; and

b.   **That Mouttet would personally guarantee the repayment of the remaining** indebtedness owed by Atlantic to the Lender, when, in fact, Mouttet had absolutely no intention of honoring his Atlantic Guarantee that he simultaneously and then-contemporaneously executed and delivered to the Lender, and only executed the Atlantic Guarantee to lull the Lender

246

into believing that re-payment of the remainder of the $29.5 million loan was assured.

728.   In or about January, 2007 **Mouttet executed the MOU,** and in or about March, 2007, Mouttet executed the various loan documents, for the additional $13.6 million loan to SGCW.  In order to induce the Lender to do so, Mouttet, individually, and as a Director and/or authorized representative of each of SGCW, and its then-majority, 66 2/3% shareholder, Flying Fish, and while serving as a Director and/or authorized representative of SVL, **misrepresented to the Lender the following material facts,** among others:

a.   That the monies to be lent, and then-owed back to the Lender by SGCW **would be repaid from revenues to be generated from the use of other lottery licenses Mouttet had obtained,** either on his own or on behalf of entities he controlled, in Central America, when, in fact, and **unbeknownst to the Lender at the time, and, thus, unknown to Talisman, until in or about the <u>Summer of 2011</u>,** Mouttet had already obtained various investments and loans in the amount of $16.5 million (made during the period commencing from in or about July, 2006, through in or about April, 2007, to finance this expansion into Central America) from Petters to Supreme Holdings-Delaware and Supreme Gaming-Florida;

b.   **Mouttet expressly agreed that neither he nor his brother, C. Mouttet, would have any outside gaming interests, except through SGL. Unbeknownst to the Lender**, and, thus, Talisman, at the time, **and not**

247

discovered until the <u>Summer of 2011</u>, (when the Reports of the Petters

Receiver were first uncovered), Mouttet (and his brother, C. Mouttet) was

in violation of this provision of the MOU due to their previous loan

transactions with Petters, as more fully alleged hereinabove, and lacked

any remaining semblance and charade of "good faith dealings;"

c.    In or about April, 2010, Mouttet admitted in a sworn affidavit, filed in

another court proceeding, that it was "agreed between [the parties to the

loan] that all the profits from our gaming business would go to repay the

interest and then the principal on the loan."    This representation,

previously made to the Lender, prior to the making of the $13.6 million

loan to SGCW, was false, and the falsity of the same was *unbeknownst

to the Lender*, and, thus, Talisman, at the time, *and not discovered until

the <u>Summer of 2011</u>* (when the Reports of the Petters Receiver were first

uncovered), indicating Mouttet's previous loan transactions with Petters,

as more fully alleged above; and

d.    In order to induce the Lender to make the $13.6 million loan, *Mouttet

expressly agreed in writing he would personally guarantee the

repayment of the indebtedness owed to the Lender*, when, in fact,

Mouttet had absolutely no intention of honoring his SGCW Guarantee that

he executed and delivered to the Lender, and only executed the SGCW

Guarantee to lull the Lender into believing that re-payment of the $13.6

million loan was assured.

248

729.   In addition, *in order to induce the Lender to make the additional $13.6 million loan to SGCW, Mouttet*, individually, and as a Director and/or authorized representative of each of SGCW, and its then-majority, 66 2/3% shareholder, Flying Fish, and while serving as a Director and/or authorized representative of SVL, *failed to disclose to the Lender the following material facts,* among others:

a.   The prior and outstanding *$16.5 million loan* to Supreme Holdings-Delaware and Supreme Gaming-Florida (two entities either 100% owned and/or controlled by Mouttet) from Petters to finance the operations in at least Central America;

b.   *The double-pledge of collateral* to also secure the loan *secretly* obtained from Petters;

c.   The *diversion of monies* by Mouttet from Supreme Gaming-Florida and/or Supreme Holdings-Delaware, to *secretly* repay a portion of the loan *secretly* received from Petters; and

d.   *The use of the proceeds of the collateral* that secured the outstanding loans owed to the Lender, and, thus, Talisman, to repay at least a portion of the loan *secretly* extended by Petters.

730.   The rights of the Lender, pursuant to the $29.5 million loan previously made to Atlantic, were *duly assigned and transferred to Talisman* on or about December 29, 2008 and March 17, 2009, *prior to the Lender's knowledge of any of the fraudulent acts perpetrated by Mouttet*, as alleged, above.  Discovery of all of said fraudulent acts by Mouttet all occurred *after* the entirety of the $29.5 million in loan proceeds had been funded by the Lender to Atlantic.

249

731.    Similarly, the rights of the Lender, pursuant to the $13.6 million loan to SGCW *were duly assigned and transferred to Talisman* on or about March 6, 2009, *prior to the Lender's knowledge of any of the fraudulent acts perpetrated by Mouttet*, as alleged, above.   Discovery of all of said fraudulent acts by Mouttet in connection with said loan all occurred *after* the entirety of the $13.6 million in loan proceeds had been funded by the Lender to SGCW.

732.    Finally, as previously alleged above, *Mouttet caused at least a portion of the collateral, and loan proceeds belonging to the Lender,* and, thus, Talisman *to be transferred to Relief Defendants Intralot, SGLBVI, and/or VLT(BVI),* to hinder, delay, and frustrate the property rights of, first, the Lender, and, thus, Talisman, and to otherwise defraud, first, the Lender, and, thus, Talisman, and *to steal valuable property and rights* from, first, the Lender, and, thus, Talisman.

733.    *Mouttet committed actual fraud* in obtaining the extensions of the foregoing maturity dates for the $29.5 million loan to Atlantic, as well as in obtaining the original $13.6 million in financing for SGCW.

734.    When *Mouttet made* each of the foregoing representations to the Lender (and otherwise failed to apprise the Lender of certain other material facts) Mouttet knew each and every one of them to be false, and Mouttet made each and every one of said representations, and omitted to state other material facts, *with the intent to deceive and defraud the Lender,* and *to induce the Lender* to act in reliance on each of those representations and omissions of material facts in the manner alleged above, and/or with the expectation that the Lender would so act, with the intent that the foregoing

250

loans would be extended and/or renewed for Mouttet's own purposes, rather than for the stated and intended purposes under the various loan documents.

735. **The Lender,** at the time of each of the representations was made by Mouttet (or when Mouttet otherwise failed to state material facts) and at the time each of the foregoing loans were either made or had its maturity date extended, **was unaware of the falsity of Mouttet's representations** (and was unaware of his omissions of material fact) and believed that his representations were true. **In reliance upon the representations**, the Lender extended the maturity date of the $29.5 million loan previously made to Atlantic, and made the $13.6 million loan to SGCW, and agreed to accept Mouttet's personal guarantees of repayment of both loans. **Had the Lender known the true and actual facts,** the Lender would not have agreed to the termination of the management services agreement between SVL and Atlantic, would not have agreed to extend the maturity date of the $29.5 million loan, and would not have agreed to make the $13.6 million loan. The Lender's reliance on each and every one of the foregoing representations of Mouttet was justified and reasonable, as it had no reason not to rely upon each and every one of the foregoing representations of Mouttet.

736. **As a proximate result and cause** of Mouttet's fraudulent misrepresentations and omissions of material facts, the Lender was induced to renew, and otherwise extend the maturity date of the $29.5 million loan several times, and was otherwise induced to make the $13.6 million loan, and as a result of Mouttet's fraudulent actions, his willful and malicious actions, and his conversion, the Lender, and, thus Talisman, has been damaged. Mouttet has previously agreed and stipulated in the District Court that Talisman's compensatory contract damages are at least $70,073,454.

251

737.   ***Mouttet's conduct rises to the level of intentional misrepresentation, deceit, and concealment of material facts*** each known to Mouttet, with the intention by Mouttet of depriving first, the Lender, and, then, Talisman, as assignee, of property or legal rights or otherwise causing injury, so as to justify an award of exemplary and punitive damages, pursuant to Fla. Stat. §768.73.[26/]

738.   Mouttet's wrongful conduct was motivated solely by greed, and the desire for unreasonable financial gain, by whatever illegal means necessary.  There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by Mouttet.

**(2)**   **Additional Factual Allegations to Support EGE's Section 523(a) Claims**

739.   As previously alleged above, as part of ***an illicit plan to defraud and steal from EGE***, Mouttet masterminded, and/or acted as front man for a scheme to prevent EGE from registering its ownership in over 391,500,000 shares of SVL stock, and from receiving dividend payments on said stock, ***while at the same time, first, pledging the very shares previously sold to EGE, to secretly obtain the $16.5 million loan from Petters;*** second, retaining those loan proceeds from Petters for his own personal use and benefit; and third, ***to sell and otherwise transfer the very shares of SVL stock owned by EGE*** to purported third parties, such as Relief Defendants Intralot, SGLBVI, and/or VLT(BVI) - - each entity either controlled or substantially influenced by Mouttet and/or members of his family - - and ***used the proceeds to buy-back the SVL shares from Petters*** and otherwise for Mouttet's personal benefit, all to the detriment, loss, and damage of EGE.

---

[26/]   Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

740.   As alleged above, in order to accomplish the **theft of the over 391,500,000 shares of SVL stock sold to, and owned by EGE,** and the **resulting dividends paid** thereon, Mouttet fraudulently induced EGE to execute, first, the June 28, 2005 Supplemental Agreement and the July 7, 2005 St. Georges Option Agreement, and, then, the two amendments to said Option Agreement, to lull and otherwise prevent EGE from immediately exercising its rights to demand registration of the over 391,500,000 shares of SVL stock sold to, and owned by EGE, to allow Mouttet to **secretly** pledge the very shares owned by EGE to obtain the $16.5 million loan from Petters.  As part of this illicit plan, Mouttet, when he was a Director of SVL, caused SVL to execute both the June 28, 2005 Supplemental Agreement and the July 7, 2005 Option Agreement.  Unbeknownst to EGE at the time, Mouttet had no intention to honor, or to have SVL, Hoo, Levy, and Stewart honor, any of their agreements recited in those documents.

741.   To cover up and to continue to hide from EGE the **secret** loan from Petters, Mouttet orchestrated the failure of Hoo, Levy, Stewart, George, Graham, and SVL to produce in their pre-trial disclosure, and the failure to acknowledge at the trial in Jamaica, the June 28, 2005 Supplemental Agreement, and to otherwise deny knowledge of any amendments to the St. Georges Option Agreement.  This allowed Mouttet to convert the SVL shares EGE owned to Mouttet's own use and benefit to, first, obtain, and thereafter maintain, and eventually pay off, the loan from Petters, and then to sell and otherwise transfer to Relief Defendants Intralot, SGLBVI, and VLT(BVI), among others.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

742.    Also, as alleged above, Mouttet also misappropriated and stole the dividends that should have been paid to EGE on the SVL shares it owned, to make payments on the indebtedness Mouttet owed (through Supreme Holdings-Delaware and Supreme Gaming-Florida) to Petters.

743.    Later, when it suited Mouttet's own personal and selfish reasons, Mouttet caused George to later admit (in litigation previously pending before the District Court, and over a year after the trial in Jamaica on claims other than those asserted by EGE in this Complaint) the existence, genuineness, and authenticity of the very June 28, 2005 Supplemental Agreement that he previously requested George - - as well as Hoo, Levy, Stewart, and Graham - - to deny that it existed.

744.    Mouttet also solicited and encouraged Hoo, Levy, Stewart, Graham, and George, among others, to have the registrar of SVL register ownership of the newly split shares of SVL stock in the individual names of Hoo, Levy, and Stewart, and/or in entities such as Falcon and Senoda, which nominally held the shares in trust for Mouttet and other members of family, despite EGE's ownership of over 391,500,000 shares of their total, collective shareholder ownership.

745.    As alleged above, ***Mouttet also made representations to UBS at least twice in 2006/2007 that EGE was a substantial shareholder in SVL*** to induce and otherwise lull EGE into a decision to defer the immediate rights to register its ownership of the 391,500,000 shares in SVL's books and records.

*746*. As previously alleged above, Mouttet provided EGE with various reasons/excuses why the St. Georges option could not be exercised, why EGE could not register ownership of its over 391,500,000 shares of SVL, and why EGE could not

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

receive the proceeds of dividends paid by SVL on said shares, including, without limitation, an asserted "blackout period for stock trades," "regulatory scrutiny" into trading in SVL stock, and the need for updated financial statements for SVL, before disclosing, for the first time in late <u>September, 2008</u>, **that Mouttet had used said dividend payments to "settle debts of Mouttet" himself.**

747.    As previously alleged above, **EGE did not learn of Mouttet's prior fraud upon EGE,** and **his prior theft and misappropriation of EGE's over 391,500,000 plus shares, and dividend payments thereon**, <u>until the Summer of 2011</u>, and <u>mid-September, 2011</u>**, respectively.**

748.    Mouttet encouraged, condoned and suborned Hoo (a) to lie, on or about September 2, 2010, on the witness stand in Jamaica, to falsely deny that Mouttet owned any shareholder interest in SVL, when Mouttet had previously told EGE that Hoo and Stewart held substantial shares of SVL stock (some 43.3% of the outstanding shares) in nominee name in Falcon and Senoda for the Mouttets, and (b) to deny under oath any shareholder interest in Atlantic and Haven, when Hoo, Levy, and Stewart each owned individually, or through other family members, an interest in Haven (the 83% majority owner of Atlantic), as evidenced by the documents Mouttet first produced to EGE, on or about July 2, 2012.

749.    Finally, as previously alleged above, **Mouttet caused** at least a portion of the SVL stock that had been sold to, and which was owned by EGE, to be **transferred to Relief Defendants Intralot, SGLBVI and/or VLT(BVI)**, to hinder, delay, and frustrate the property rights of EGE, and to otherwise defraud EGE, and to steal valuable property and rights from EGE.

255

750.   Mouttet committed actual fraud in obtaining EGE's consent to the June 28, 2005 Supplemental Agreement, the July 7, 2005 St. Georges Option Agreement, and the extensions of that option, thereafter.

751.   When Mouttet made each of the foregoing representations to the EGE (and otherwise failed to apprise EGE of certain material facts),  Mouttet knew each and every one of them to be false, and Mouttet made each and every one of said representations, and omitted to state other material facts, **with the intent to deceive and defraud EGE**, and **to induce EGE to act** in reliance on each of the representations and omissions of material facts in the manner alleged above, or with the expectation that EGE would so act, with the intent that EGE would delay and/or otherwise the exercise of its rights to demand registration of its ownership in the books and records of SVL of the over 391,500,000 shares of SVL stock, all for Mouttet's own nefarious and illegal purposes.

752.   **EGE,** at the time of each of the representations was made by Mouttet (or when Mouttet otherwise failed to state material facts), and at the time each of the foregoing documents were executed, **was unaware of the falsity** of Mouttet's representations (and was unaware of his omissions of material fact) and believed that his representations were true.  In **reliance upon these representations**, EGE agreed to forego its demand to register its ownership of the SVL stock it owned in SVL's books and records.  Had EGE known the actual facts, the Lender would not have so agreed, and would have demanded said registration of its ownership.  EGE's reliance on each and every one of the foregoing representations of Mouttet was justified and reasonable,

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

as it had no reason not to rely upon each and every one of the foregoing representations of Mouttet.

753. ***As a proximate result and cause of Mouttet's fraudulent misrepresentations and omissions of material facts, EGE was fraudulently induced*** to provide its consent as alleged above, and agreed to otherwise forego the registration of its over 391,500,000 shares of SVL stock in SVL's books and records, and was otherwise induced to do so, and as a result of Mouttet's fraudulent actions, his willful and malicious actions, and his conversion, EGE has been damaged.

754. Mouttet's conduct rises to the level of intentional misrepresentation, deceit, and concealment of material facts each known to Mouttet, with the intention by Mouttet of depriving EGE of property or legal rights or otherwise causing injury, so as to justify an award of exemplary and punitive damages, pursuant to Fla. Stat. §768.73.[27/]

755. Mouttet's wrongful conduct was motivated solely by greed, and the desire for unreasonable financial gain, by whatever illegal means necessary.  There was a very high likelihood of serious injury resulting from said conduct, and such was actually known by Mouttet.

**COUNT XIX**
**CLAIM FOR NON-DISCHARGEABILTY**
**PURSUANT TO SECTION 523(a)(2)**
**BY PLAINTIFF TALISMAN**

756. Mouttet intentionally misrepresented the material facts to the Lender, and otherwise intentionally concealed other material facts, all as previously alleged in paragraphs 719 through 738, above.

---

[27/]    EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

757.    Mouttet made each of the misrepresentations and otherwise concealed the true facts, knowing each was false.  Mouttet made each of the misrepresentations and otherwise concealed the true facts with the **intent to deceive and defraud** the Lender.  **The Lender reasonably and justifiably relied** upon each of the representations, and as a result, Talisman is entitled to and does stand in the shoes of the Lender, as assignor(s).

758.    As a result of the intentionally false and fraudulent misrepresentations, and concealments, first, the Lender, and, then, **Talisman has been damaged in the sum of at least $70,073,454, as expressly agreed and stipulated to by Mouttet in the District Court** in addition to other damages sustained by Talisman, as the assignee of the Lender, alleged above in this Complaint.

759.    **Section 523(a)(2) provides that money, property, or services obtained by fraud or false pretenses is not dischargeable.**  Mouttet obtained money and property of first, the Lender, and, thus, Talisman, through fraud and false pretenses.

760.    Based upon the above, the debt owed to Talisman by Mouttet should not be discharged.

**COUNT XX**
**CLAIM FOR NON-DISCHARGEABILTY**
**PURSUANT TO SECTION 523(a)(4)**
**BY PLAINTIFF TALISMAN**

761.    Talisman re-alleges paragraphs 756 through 760, above, and incorporates all of the allegations in each of said paragraphs by specific reference as if fully set forth herein.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

762.    Pursuant to Section 523(a)(4) of the Bankruptcy Code, the Bankruptcy Court, as well as the District Court, shall not discharge a debt "for embezzlement or larceny."

763.    Based upon the foregoing allegations, Mouttet illegally, **secretly, and/or surreptiously** obtained monies and other valuable personal property of the Lender, and, thus, Talisman, as more fully alleged heretofore, above, by (a) unlawfully taking, and/or illegally exercising control over (i) $13.6 million of loan proceeds provided to SGCW, (ii) the collateral for the loan, (iii) as well as certain of the cash and other valuable collateral that could have, and should have been paid to the Lender, and, thus, Talisman, **secretly, and surreptiously**, since at least November 1, 2004, and (iv) other personal property belonging solely to the Lender, and, thus, Talisman, and thereafter, making an unauthorized transfer(s) of said cash, collateral, and/or personal property to himself; and (b) so-obtained said cash proceeds, collateral, and other personal property by the fraud, willful misrepresentations of a future fact, and/or false promises, as more fully alleged above.  By doing so, Mouttet has illegally converted the cash proceeds, the collateral, and the other valuable personal property of, first, the Lender, and, thus, Talisman.

764.    In addition, by unlawfully stealing and/or misappropriating the collateral for the loans extended to Atlantic and SGCW, **Mouttet has deprived,** first, the Lender, and, thus, Talisman, of the rights to, and the benefits of the collateral.

765.    **As a direct and proximate result of Mouttet's theft and conversion**, first, the Lender, and, thus, **Talisman, has been injured in their respective business and property.**

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

766.    Mouttet had a **specific intent to harm,** first, the Lender, and, thus, Talisman, and the conduct of Mouttet did in fact harm, first, the Lender, and, then, therefore, Talisman.

767.    Based upon the above, the debt owed to Talisman by Mouttet should not be discharged.

## COUNT XXI
## CLAIM FOR NON-DISCHARGEABILTY
## PURSUANT TO SECTION 523(a)(6)
## BY PLAINTIFF TALISMAN

768.    Talisman re-alleges paragraphs 761 through 767, above, and incorporates all of the allegations in each of said paragraphs by specific reference as if fully set forth herein.

769.    Pursuant to Section 523(a)(6) of the Bankruptcy Code, the Bankruptcy Court, as well as the District Court, shall not discharge as a debt any "willful and malicious injury by the debtor to another entity, or to the property of another entity."

770.    Based upon the actions of Mouttet as set forth above, Mouttet committed willful and malicious injury to the Lender, and the property of the Lender, and, thus, Talisman.

771.    Mouttet acted with malice and oppression against the Lender, and, thus, Talisman, in committing the acts set forth above; and stealing the $13.6 million in loan proceeds from the Lender, and, thus, Talisman, the collateral security therefor, and the Service Fees that could have, and should have been paid to the Lender, and, thus, Talisman, since November 1, 2004, in violation of the representations and covenants Mouttet made to the Lender.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

772.    Mouttet intended to commit those acts, and intended to willfully and maliciously harm, first, the Lender, and, thus, Talisman, with his multiple, intentional misrepresentations.

773.    Mouttet in fact did willfully and maliciously harm and injure the Lender, and, thus, Talisman.  Based upon the above, the debt owed to Talisman by Mouttet should not be discharged.

**COUNT XXII**
**CLAIM FOR NON-DISCHARGEABILTY**
**PURSUANT TO SECTION 523(a)(2)**
**BY PLAINTIFF EGE**

774.    Mouttet intentionally misrepresented the material facts to EGE, and otherwise intentionally concealed other material facts, all as previously alleged in paragraphs 299, and 381 through 471, above.

775.    ***Mouttet made each of the misrepresentations and otherwise concealed the true facts knowing each was false.***  Mouttet made each of the misrepresentations and otherwise concealed the true facts ***with the intent to deceive and defraud EGE.***    EGE reasonably and justifiably relied upon each of the representations.

776.    ***As a result*** of the intentionally false and fraudulent misrepresentations, and concealments, ***EGE has been damaged.***

777.    Section 523(a)(2) provides that money, property, or services obtained by fraud or false pretenses is not dischargeable.  Mouttet obtained money and property of EGE, through fraud and false pretenses.

778.    Based upon the above, the debt owed to EGE by Mouttet should not be discharged.

261

**COUNT XXIII**
**CLAIM FOR NON-DISCHARGEABILTY**
**PURSUANT TO SECTION 523(a)(4)**
**BY PLAINTIFF EGE**

779.    EGE re-alleges paragraphs 774 through 778, above, and incorporate all of the allegations in each of said paragraphs by specific reference as if fully set forth herein.

780.    Pursuant to Section 523(a)(4) of the Bankruptcy Code, the Bankruptcy Court, as well as the District Court, shall not discharge a debt "for embezzlement or larceny."

781.    Based upon the foregoing allegations, *Mouttet illegally obtained monies and other valuable personal property of EGE,* as more fully alleged above, *by unlawfully taking,* and/or *illegally exercising control over of the over 391,500,000 shares of SVL stock purchased and owned by EGE,* as well as t*he dividends paid by SVL* on those shares, as more fully alleged above.   By doing so, Mouttet has *illegally converted the stock, cash proceeds of the dividends,* and *other valuable personal property of EGE.*

782.    As a direct and proximate result of Mouttet's theft and conversion, EGE has been injured in its business and property.

783.    Mouttet had a specific intent to harm EGE, and the conduct of Mouttet did in fact harm EGE.

784.    Based upon the above, the debt owed to EGE by Mouttet should not be discharged.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

**COUNT XXIV**
**CLAIM FOR NON-DISCHARGEABILTY**
**PURSUANT TO SECTION 523(a)(6)**
**BY PLAINTIFF EGE**

785.    EGE re-alleges paragraphs 779 through 784, above, and incorporate all of the allegations in each of said paragraphs by specific reference as if fully set forth herein.

786.    Pursuant to Section 523(a)(6) of the Bankruptcy Code, the Bankruptcy Court, as well as the District Court, shall not discharge as a debt any "willful and malicious injury by the debtor to another entity, or to the property of another entity."

787.    Based upon the actions of Mouttet as set forth above, Mouttet committed willful and malicious injury to EGE.

788.    Mouttet acted with malice and oppression against EGE, in committing the acts set forth above, in stealing the over 391,500,000 shares of SVL stock and the dividends paid by SVL thereon, that are all owned by EGE.

789.    Mouttet intended to commit those acts, and intended to willfully and maliciously harm EGE, with his multiple, intentional misrepresentations.

790.    Mouttet in fact did willfully and maliciously harm and injure EGE.  Based upon the above, the debt owed to EGE by Mouttet should not be discharged.

**RELIEF REQUESTED BY PLAINTIFFS TALISMAN AND EGE**

A.    **Plaintiff Talisman**

791.    As to ***Counts I and II, Talisman, and it alone, seeks*** the following relief from the Federal RICO Defendants, jointly and severally:

(a)    Treble damages (approximately $65.1 million, as of April 30, 2012) for the fraudulent conspiracy perpetrated upon Talisman's assignors, and, thus

263

Talisman, which resulted in an illegal scheme to avoid the repayment of the loan remaining principal balance due on the $29.5 million loan (of which $21,722,811 in principal remains unpaid) made to Atlantic;

(b)     Treble damages (approximately $80.1 million, as of April 30, 2012) for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $26,718,044, as of April 30, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 21%);

(c)     Treble damages (approximately $41 million, as of March 27, 2012) for the theft of loan proceeds totaling $13.6 million provided to SGCW;

(d)     Treble damages (approximately $25,670,001, as of March 27, 2012) for the theft of the gaming and lottery revenues, which Mouttet has admitted were supposed to have been used to repay the $13.6 million loan made to SGCW, as well as other collateral that were to secure said loan, which theft(s) resulted in unpaid interest accruing and being owed on this loan in the amount of $8,556,667, as of March 27, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 15%);

(e)     Divestiture to Talisman by Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet and/or any other members of the Mouttet Family Criminal Enterprise of their equity interests and/or beneficial interests in SVL, Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Flying Fish, Supreme

264

Holdings-Delaware, Supreme Gaming-Florida, SGL, and SGCW, and Relief Defendants SGLBVI and VLT(BVI);

(f) An injunction imposing reasonable restrictions on the Federal RICO Defendants' future activities, including, without limitation, prohibiting them from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged above;

(g) Ordering the dissolution of Pinnacle and Supreme Gaming-Florida, each an entity organized and existing under the laws of the State of Florida, and the divestiture of the assets of each entity to Talisman;

(h) Prejudgment and post judgment interest;

(i) Reasonable attorneys' fees;

(j) Costs of this action; and

(k) Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

792.   As to **Counts III and IV**, pursuant to Fla. Stat. §§772.104, 772.18, 772.185, and 895.05, **Talisman seeks the following relief** from the Florida Law RICO Defendants, jointly and severally:

(a) Treble damages (approximately $65.1 million, as of April 30, 2012) for the fraudulent conspiracy perpetrated upon Talisman's assignors, and, thus, Talisman, which resulted in an illegal scheme to avoid the repayment of the remaining principal balance due on the $29.5 million loan (of which $21,722,811 in principal remains unpaid) made to Atlantic;

265

(b)      <u>Treble damages (approximately $80.1 million, as of April 30, 2012)</u> for the

theft of some of the collateral for the $29.5 million loan made to Atlantic,

which theft resulted in unpaid interest accruing and being owed on this

loan in the amount of $26,718,044, as of April 30, 2012 (with interest

continuing to accrue and being owed after that date at the annual rate of

21%);

(c)      <u>Treble damages (approximately $41 million, as of March 27, 2012)</u> for the

theft of the $13.6 million in loan proceeds for the loan made to SGCW;

(d)      <u>Treble damages (approximately $25,670,001, as of March 27, 2012)</u> for

the theft of gaming and lottery revenues, which Mouttet has admitted were

supposed to have been used to repay the $13.6 million loan made to

SGCW, as well as other collateral that were to secure said loan, which

thefts resulted in unpaid interest accruing and being owed on this loan in

the amount of $8,556,667, as of March 27, 2012 (with interest continuing

to accrue and being owed after that date at the annual rate of 15%);

(e)      <u>Divestiture to Talisman</u> by Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet

and/or any other members of the Mouttet Family <u>Florida</u> Criminal

Enterprise of their equity interests and/or beneficial interests in SVL,

Atlantic, Atlantic Consultants, AmeriServices, Haven, Peninsula, Flying

Fish, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and

SGCW, and Relief Defendants Intralot, SGLBVI, and VLT(BVI);

(f)      <u>An injunction imposing reasonable restrictions</u> on the Florida Law

Defendants' future activities, including, without limitation, prohibiting them

266

from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged above;

(g)    Ordering the dissolution of Pinnacle, and Supreme Gaming-Florida, each an entity organized and existing under the laws of the State of Florida, and the divestiture of the assets of each entity to Talisman;

(h)    An accounting of the unlawfully retained benefits conferred upon each of the Florida Law Defendants;

(i)    The imposition of a constructive trust over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate Talisman for the loss of the principal, interest thereon, and collateral that secured the outstanding loans made to Atlantic and SGCW;

(j)    Prejudgment and post judgment interest;

(k)    Reasonable attorneys' fees;

(l)    Costs of this action; and

(m)    Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

793.    As to **Counts VII, XI, XIII, and XV, Talisman seeks the following relief** from the Florida Law Defendants, jointly and severally:

(a)    Compensatory damages in such amounts to be proven at trial for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which thefts have resulted in more than $48 million in unpaid principal and accrued interest being wrongfully not paid to Talisman;

267

(b)     <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of the proceeds of the $13.6 million loan made to SGCW;

(c)     <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of the collateral for the $13.6 million loan made to SGCW;

(d)     <u>Prejudgment and post judgment interest</u>;

(e)     <u>Punitive damages pursuant to Fla. Stat. § 768.73</u>;[28/]

(f)     <u>Costs of this action</u>;

(g)     <u>The imposition of a constructive trust</u> over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate Talisman for the loss of the principal, interest thereon, and collateral that secured the outstanding loans made to Atlantic and SGCW; and

(h)     <u>Such other relief</u> as this Bankruptcy Court, as well as the District Court, each deems just and proper.

794.    As to **Count VIII**, if any or all of the Florida Law Defendants fail to respond and/or otherwise comply with the demands recited in the August 10, 2012 demand letter (attached to this Complaint as Exhibit "A") within thirty (30) days after receipt of the demand letter, **Talisman will seek the following relief** against all of said Defendants, jointly and severally:

(a)     <u>Treble damages (approximately $65.1 million, as of April 30, 2012)</u> in such amounts to be proven at trial for the theft of some of the collateral for the

---

[28/]     Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

$29.5 million loan made to Atlantic, which theft resulted in the unpaid principal amount of $21,722,811 on this loans, as of April 30, 2012;

(b)  <u>Treble damages (approximately $80.1 million, as of April 30, 2012)</u> in such amounts to be proven at trial for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $26,718,044, as of April 30, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 21%);

(c)  <u>Treble damages (approximately $41 million, as March 27, 2012)</u> in such amounts to be proven at trial for the theft of the proceeds of the $13.6 million loan made to SGCW;

(d)  <u>Treble damages (approximately $25,670,001, as of March 27, 2012)</u> in such amounts to be proven at trial for the theft of the collateral for the $13.6 million loan made to SGCW, which theft resulted in unpaid interest accruing and being owed on this loan in the amount of $8,556,667, as of March 27, 2012 (with interest continuing to accrue and being owed after that date at the annual rate of 15%);

(e)  <u>Prejudgment and post judgment interest</u>;

(f)  <u>Reasonable attorneys' fees</u>;

(g)  <u>Costs of this action</u>;

(h)  <u>The imposition of a constructive trust</u> over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate Talisman for the loss of the principal, interest thereon, and

269

collateral that secured the outstanding loans made to Atlantic and SGCW; and

(i)    <u>Such other relief</u> as this Bankruptcy Court, as well as the District Court, each deems just and proper.

795.    As to **Count XVII, Talisman seeks the following relief** from the Florida Law Defendants, jointly and severally:

(a)    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of some of the collateral for the $29.5 million loan made to Atlantic, which thefts have resulted in more than $48 million in unpaid principal and accrued interest being wrongfully not paid to Talisman;

(b)    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of the proceeds of the $13.6 million loan made to SGCW;

(c)    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of the collateral for the $13.6 million loan made to SGCW;

(d)    <u>An accounting</u> of the monies and damages due and owing to Talisman;

(e)    <u>Prejudgment and post judgment interest</u>;

(f)    <u>The imposition of a constructive trust</u> over the assets of Atlantic, Atlantic Consultants, AmeriServices, Peninsula, Haven, SGCW, and Flying Fish, and Relief Defendants Intralot, SGLBVI, and VLT(BVI);

(g)    <u>Costs of this action</u>; and

(h)    <u>Such other relief</u> as this Bankruptcy Court, as well as the District Court, each deems just and proper.

270

796.   As to **Counts XIX, XX, and XXI, Talisman seeks the following relief** against Mouttet:

a.   To determine and otherwise liquidate the claims of Talisman and the debts owed by Mouttet to Talisman;

b.   That the $70,073,454 debt and final judgment owed by Mouttet to Talisman should not be discharged in bankruptcy, pursuant to Sections 523(a)(2), 523(a)(4), and/or 523(a)(6);

c.   An award in favor of Talisman of any other additional damages sustained by Talisman, which additional award of damages should not be discharged in bankruptcy, pursuant to Sections 523(a)(2), 523(a)(4), and/or 523(a)(6);

d.   Prejudgment and post judgment interest;

e.   Talisman's attorneys' fees;

f.   Talisman's costs of this action;

g.   Punitive damages pursuant to Section 768.73, Florida Statutes,[29] which additional award of damages should not be discharged in bankruptcy, pursuant to Sections 523(a)(2), 523(a)(4), and/or 523(a)(6); and

h.   Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

---

[29]   Talisman is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

**B.    Plaintiff EGE**

797.    As to **Counts V and VI**, pursuant to Fla. Stat. §§772.104, 772.18, 772.185, and 895.05, **EGE seeks the following relief** from the Florida Law RICO Defendants, jointly and severally:

(a)    The return, delivery, and/or proper registration, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE of all of the 391,584,242 shares of SVL stock, and treble damages of either 1,174,752,726 shares of SVL or the dollar value of said shares for the theft, of the over 391.5 million shares of stock it owns in SVL;

(b)    Treble damages for the theft of its 17% equity participation in Atlantic;

(c)    Treble damages for the theft of its 17% equity participation in Peninsula;

(d)    Treble damages for the theft of all of the dividends declared and paid on the shares of stock it owns in SVL;

(e)    Treble damages for the theft of all of the dividends declared and paid on its 17% equity participation in Atlantic;

(f)    Treble damages for the theft of all of the dividends declared and paid on its 17% equity participation in Peninsula;

(g)    Treble damages for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants;

(h)    Divestiture to EGE by Mouttet, P. G. Mouttet, C. Mouttet, N. Mouttet and/or any other members of the Mouttet Family Florida Criminal Enterprise of their equity interests and/or beneficial interests in SVL,

272

Atlantic, Atlantic Consultants, Haven, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Peninsula and Relief Defendants Intralot, SGLBVI, and VLT(BVI);

(i)     <u>Divestiture to EGE</u> by Hoo, Levy, and Stewart of their equity interests and/or beneficial interests in SVL, Supreme Holdings-Delaware, Supreme Gaming-Florida, SGL, and Relief Defendants Intralot, SGLBVI and VLT(BVI);

(j)     <u>An injunction imposing reasonable restrictions</u> on the Florida Law Defendants' future activities, including, without limitation, prohibiting them from engaging in the same type of endeavor as the criminal enterprise(s) (the unlawful association(s)-in-fact) engaged in, as more fully alleged hereinabove;

(k)     <u>An accounting</u> of the unlawfully retained benefits conferred upon each of the Florida Law Defendants;

(l)     <u>The imposition of a constructive trust</u> over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate EGE for the theft of the stock in SVL it owned, and the dividends that should have been paid to EGE on those shares;

(m)     <u>Prejudgment and post judgment interest</u>;

(n)     <u>Reasonable attorneys' fees</u>;

(o)     <u>Costs of this action</u>; and

(p)     <u>Such other relief</u> as this Bankruptcy Court, as well as the District Court, each deems just and proper.

273

798.    As to **Counts IX, XII, XIV, and XVI, EGE seeks the following relief** from the Florida Law Defendants, jointly and severally:

(a)    The return, delivery, and/or proper registration, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE of all of the 391,584,242 shares of SVL stock, and/or compensatory damages in such amounts to be proven at trial for the theft of the over 391.5 million shares of stock it owns in SVL;

(b)    Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Atlantic;

(c)    Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Peninsula;

(d)    Compensatory damages in such amounts to be proven at trial for the theft of all of the dividends declared and paid on the shares of stock it owns in SVL;

(e)    Compensatory damages in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Atlantic;

(f)    Compensatory damages in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Peninsula;

(g)    Compensatory damages in such amounts to be proven at trial for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in

274

derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants

(h)   Prejudgment and post judgment interest;

(i)   Punitive damages pursuant to Fla. Stat. § 768.73;[30/]

(j)   Costs of this action;

(k)   The imposition of a constructive trust over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate EGE for the theft of the stock in SVL it owned, and the dividends that should have been paid to EGE on those shares; and

(l)   Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

799.   As to **Count X**, if any or all of the Florida Law Defendants fail to respond and/or otherwise comply with the demands recited in the August 10, 2012 demand letter (attached to this Complaint as Exhibit "B") within thirty (30) days after receipt of the demand letter, **EGE will seek the following relief** against all of said Defendants, jointly and severally:

(a)   The return, delivery, and/or proper registration, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE of all of the 391,584,242 shares of SVL stock, and treble damages of either 1,174,752,726 shares of SVL or the dollar value of said shares for the theft, of the over 391.5 million shares of stock it owns in SVL;

---

[30/]   EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

275

(b)    <u>Treble damages</u> in such amounts to be proven at trial for the theft of its 17% equity participation in Atlantic;

(c)    <u>Treble damages</u> in such amounts to be proven at trial for the theft of its 17% equity participation in Peninsula;

(d)    <u>Treble damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on the shares it owns in SVL;

(e)    <u>Treble damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Atlantic;

(f)    <u>Treble damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Peninsula;

(g)    <u>Treble damages</u> in such amounts to be proven at trial for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants;

(h)    <u>Prejudgment and post judgment interest</u>;

(i)    <u>Reasonable attorneys' fees</u>;

(j)    <u>Costs of this action</u>;

(k)    <u>The imposition of a constructive trust</u> over the assets of the Florida Law Defendants and Relief Defendants Intralot, SGLBVI, and VLT(BVI), to compensate EGE for the theft of the stock in SVL it owned, and the dividends that should have been paid to EGE on those shares; and

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797

(l)     Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

800.    As to **Count XVIII, EGE seeks the following relief** from the Florida Law Defendants, jointly and severally:

(a)     The return, delivery, and/or proper registration, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE of all of the 391,584,242 shares of SVL stock, and/or compensatory damages in such amounts to be proven at trial for the theft of the over 391.5 million shares of stock it owns in SVL;

(b)     Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Atlantic;

(c)     Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Peninsula;

(d)     Compensatory damages in such amounts to be proven at trial for the theft of the dividends declared and paid on the shares it owns in SVL;

(e)     Compensatory damages in such amounts to be proven at trial for the theft of the dividends declared and paid on its 17% equity participation in Atlantic;

(f)     Compensatory damages in such amounts to be proven at trial for the theft of the dividends declared and paid on its 17% equity participation in Peninsula;

(g)     Compensatory damages in such amounts to be proven at trial for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in

277

derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants;

(h)    An accounting of the monies and damages due and owing to EGE;

(i)    Prejudgment and post judgment interest;

(j)    The imposition of a constructive trust over the assets of SVL, Atlantic, Haven, Atlantic Consultants, and Peninsula, and Relief Defendants Intralot, SGL(BVI), and VLT(BVI);

(k)    Costs of this action; and

(l)    Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

801.    As to **Counts XXII, XXIII, and XXIV, EGE seeks the following relief** against Mouttet:

a.    To determine and otherwise liquidate the claims of EGE and the debts owed by Mouttet to EGE;

b.    The return, delivery, and/or proper registration, in the books and records of SVL and/or its registrar or transfer agent, in the name of EGE of all of the 391,584,242 shares of SVL stock, and/or compensatory damages in such amounts to be proven at trial for the theft of the over 391.5 million shares of stock it owns in SVL;

c.    Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Atlantic;

d.    Compensatory damages in such amounts to be proven at trial for the theft of its 17% equity participation in Peninsula;

278

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL  33131 · (305) 371-8797

e.    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on the shares it owns in SVL;

f.    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Atlantic;

g.    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Peninsula;

h.    <u>Compensatory damages</u> in such amounts to be proven at trial for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants;

i.    <u>Treble damages</u> in such amounts to be proven at trial for the theft of, now, over 391.5 million shares it owns in SVL;

j.    <u>Treble damages</u> in such amounts to be proven at trial for the theft of its 17% equity participation in Atlantic;

k.    <u>Treble damages</u> in such amounts to be proven at trial for the theft of its 17% equity participation in Peninsula;

l.    <u>Treble damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on the shares it owns in SVL;

m.    <u>Treble damages</u> in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Atlantic;

279

n.      Treble damages in such amounts to be proven at trial for the theft of all of the dividends declared and paid on its 17% equity participation in Peninsula;

o.      Treble damages in such amounts to be proven at trial for the theft and siphoning off of cash from SVL, Atlantic and/or Peninsula, in derogation of the property rights and ownership of the shares and/or equity participations by EGE in each of said Defendants

p.      That the debts Mouttet owes to EGE should not be discharged in bankruptcy, pursuant to Sections 523(a)(2), 523(a)(4), and/or 523(a)(6);

q.      Prejudgment and post judgment interest;

r.      EGE's attorneys' fees;

s.      EGE's costs of this action;

t.      Punitive damages pursuant to Section 768.73, Florida Statutes,[31] which additional award of damages should not be discharged in bankruptcy, pursuant to Sections 523(a)(2), 523(a)(4), and/or 523(a)(6); and

u.      Such other relief as this Bankruptcy Court, as well as the District Court, each deems just and proper.

---

[31]    EGE is mindful of the need to comply with the requirements of Section 768.73, and will do so at the appropriate time later in this litigation.

280

I HEREBY CERTIFY that I am admitted to the Bar for the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Bankruptcy Court set forth in Local Rule 2090-1(A).

Dated: August 10, 2012

Respectfully submitted,

**SACHER, ZELMAN, HARTMAN,**
**PAUL, BEILEY & SACHER, P.A.**
Counsel for Plaintiffs Talisman Capital
    Alternative   Investments Fund, Ltd. <u>and</u>
    EGE Ltd.
1401 Brickell Avenue
Suite 700
Miami, Florida 33131
Telephone:   (305) 371-8797
Facsimile:    (305) 374-2605
E-mail:   rhartman@sacherzelman.com

By: _/s/ Roy M. Hartman, Esq._____
    **ROY M. HARTMAN, ESQ.**
    Florida Bar. No. 0319902

SACHER, ZELMAN, HARTMAN, PAUL, BEILEY & SACHER, P.A., ATTORNEYS, 1401 BRICKELL AVE., STE 700, MIAMI, FL 33131 · (305) 371-8797